IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

XUEDAN WANG, on behalf of herself and all
others similarly situated,

                                          Plaintiff,

v.

THE HEARST CORPORATION,

                                     Defendant.

**ECF**

12-cv-00793 (HB)(AJP)

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
## TO STRIKE THE CLASS AND COLLECTIVE ACTION ALLEGATIONS

**HEARST CORPORATION**

Office of General Counsel
Eve B. Burton
Jonathan R. Donnellan
Kristina E. Findikyan
Shari M. Goldsmith
Courtenay B. O'Connor
300 W. 57th Street, 40th Floor
New York, New York 10019
Tel: (212) 841-7000
Fax: (212) 554-7000

*Attorneys for Defendant Hearst Corporation*

Of Counsel:

Proskauer Rose LLP
Mark W. Batten
One International Place
Boston, MA  02110-2600
Tel: (617) 526-9850
Fax: (617) 526-9899

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................. 3

    The Facts About Hearst's Magazine Internships .......................................... 3

    The Facts About Plaintiff Wang ................................................................... 8

ARGUMENT ...................................................................................................... 9

  I.    PLAINTIFF CANNOT SATISFY THE REQUIREMENTS FOR
       CERTIFICATION OF HER FLSA CLAIM ......................................... 10

      A.    Conditional Certification Should Be Denied Because The
            Legality Of An Unpaid Internship Necessarily Turns On
            Individualized Facts ........................................................................ 10

      B.    Even If The Court Were To Certify The Class Conditionally,
            It Would Be Futile, As Plaintiff Would Be Unable To Sustain
            Certification After Discovery ......................................................... 16

  II.   PLAINTIFF'S PROPOSED STATE LAW CLASS CANNOT
       BE CERTIFIED ...................................................................................... 19

      A.    Hearst's Relationships With Its Interns Are Far Too Individualized
            To Be Decided On An Aggregate Basis .......................................... 20

          1.    Plaintiff Cannot Satisfy The Commonality Requirement ....... 20

          2.    Plaintiff Cannot Prove Predominance .................................... 21

      B.    Wang Cannot Represent The Proposed Class ................................. 23

  III.  THE "DEDUCTIONS" CLASS IS INCAPABLE OF CERTIFICATION FOR
       OTHER REASONS AS WELL ................................................................ 24

  IV.  THE COURT SHOULD RESOLVE THE VIABILITY OF THE CLASS
       NOW ........................................................................................................ 25

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES:**                                                         **Page**

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) ..................................................................................................22

*Archie v. Grand Cent. P'ship, Inc.,*
997 F. Supp. 504 (S.D.N.Y. 1998) ...........................................................................14

*Blank v. Jacobs,*
No. 03-CV-2111, 2009 WL 3233037 (E.D.N.Y. Sept. 30, 2009) ...........................23

*Christensen v. Harris Cnty,*
529 U.S. 576 (2000) ...............................................................................................14n

*Colozzi v. St. Joseph's Hosp. Health Ctr.,*
595 F. Supp. 2d 200 (N.D.N.Y. 2009) ......................................................................11

*Cordes & Co. Financial Services v. AG Edwards & Sons,*
502 F.3d 91 (2d Cir. 2007) ........................................................................................22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
903 F.2d 176 (2d Cir. 1990) ......................................................................................23

*General Tel. Co. v. Falcon,*
457 U.S. 147 (1982) ...................................................................................................19

*Hudacs v. Frito-Lay, Inc.,*
90 N.Y.2d 342 (1997) ................................................................................................24

*Marisol A. By Forbes v. Guiliani,*
126 F.3d 372 (2d Cir. 1997) ......................................................................................23

*McLaughlin v. Ensley,*
877 F.2d 1207 (4th Cir. 1989) ...................................................................................16

*Mike v. Safeco Ins. Co.,*
274 F. Supp. 2d 216 (D. Conn. 2003) ........................................................................11

*Miles v. Merrill Lynch & Co.,*
471 F.3d 24 (2d Cir. 2006) .........................................................................................19

*Myers v. Hertz Corp.,*
624 F.3d 537 (2d Cir. 2010), *cert. denied,* 132 S. Ct. 181 (2011) ...........10, 11, 19

*Myers v. Hertz Corp.*,
    No. 02CIV4325, 2007 WL 2126264 (E.D.N.Y. July 24, 2007), *aff'd*,
    624 F.3d 537 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 181 (2011) ......................................21

*Reich v. Parker Fire Protection Dist.*,
    992 F.2d 1023 (10th Cir. 1993) ...................................................................... 15-16

*Savino v. Computer Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998) ......................................................................................23

*Solis v. Laurelbrook Sanitarium & Sch.*,
    642 F.3d 518 (6th Cir. 2011) ...................................................................................15

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)......................................................................................19

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985).............................................................................................14n

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)................................................................................19, 20, 25

*Walling v. Portland Terminal Co.*,
    330 U.S. 148 (1947)......................................................................................12, 14, 18

*Williams v. Strickland*,
    87 F.3d 1064 (9th Cir. 1996) ....................................................................................16

*Zivali v. AT&T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011)................................................................ 10, 16-19

**STATUTES:**

29 U.S.C. § 216(b) ...................................................................................................10

Fed. R. Civ. P. 23 ...............................................................................................19, 20

Fed. R. Civ. P. 23(a)(2) ...........................................................................................20

Fed. R. Civ. P. 23(a)(3) ...........................................................................................23

Fed. R. Civ. P. 23(a)(4) ...........................................................................................23

Fed. R. Civ. P. 23(b)(3)......................................................................................20, 21

New York Labor Law § 193 ............................................................................ 24

**OTHER AUTHORITIES:**

New York State Department of Labor Fact Sheet P725 (April 2011)
    (available at http://www.labor.ny.gov/formsdocs/wp/P725.pdf)................................20n, 22

U.S. Dep't of Labor, Wage and Hour Div. Fact Sheet #71, *Internship Programs*
    *Under the Fair Labor Standards Acts* (April 2010)
    (available at http://www.dol.gov/whd/regs/compliance/whdfs71.htm)................................12

WHD Field Operations Handbook § 10b11 (October 20, 1993)
    (available at http://www.dol.gov/whd/FOH/FOH_ch10.pdf) ............................................12

WHD Opinion FLSA (Mar. 13, 1995), 1995 WL 1032473........................................................13

WHD Opinion FLSA (July 11, 1995), 1995 WL 1032496........................................................13

WHD Opinion FLSA (May 8, 1996), 1996 WL 1031777..........................................................13

WHD Opinion FLSA2006-12 (Apr. 6, 2006), 2006 WL 1094598................................................13

## INTRODUCTION

The Hearst Corporation owns nineteen different magazines, ranging in subject matter from the fashion of Harper's Bazaar to the do-it-yourself projects of Popular Mechanics. All of these magazines run its own intern programs, free of centralized control or supervision, which each individually designs based on its own history, culture, and editorial focus. Over the six years purported to be included in this case, more than three thousand students have studied in these programs, learning about varied aspects of the magazine industry. The educational value of their experiences has been recognized by the more than 100 colleges and graduate schools that have provided school credit for the internships. Hearst's magazine internships provide extraordinary opportunities to young people interested in learning about publishing, art, photography, fashion, advertising, marketing, and numerous related disciplines in a real-world environment. As plaintiff Xuedan Wang herself concluded, her internship was "the most unique and valuable professional experience [she] could have asked for" and it "provided [her with] unrivaled skills for working in fashion."

For a few months in 2011, plaintiff Wang held a unique position as a "head intern" – which no other Hearst magazine has – at Harper's Bazaar, a position that she gained by lying about her entitlement to academic credit. Now she hopes to represent not merely herself but thousands of students, regardless of which magazine hosted them, regardless of the activities they engaged in, regardless of the benefits they did or did not receive from their participation, in claiming that all nineteen magazines' intern programs are uniformly unlawful.

Courts consistently hold that the legality of an intern program turns on whether the individual student or the supposed employer gained more from the experience – including not just tangible benefits but also such intangibles as lessons about responsibility, the importance of

working hard and seeing a task through to completion, leadership, sensitivity and respect. Wang's class complaint thus necessarily rests on the fanciful notion that this Court could determine, in a single aggregate trial, how educational and helpful the intern experience was for each of those thousands of students hosted at diverse magazines, and in each case whether the experience yielded more for the student or for the respective magazine.

The Court should strike the class allegations now, before the parties expend substantial resources litigating an unwieldy case that can never be fairly or properly tried on a class basis. The lack of cohesion permitting class treatment is partly a function of the multi-factor test itself; assessing the relative benefit of a particular internship to a particular intern necessarily is an individualized inquiry. That is especially true here, because the plaintiff hopes to stretch this lawsuit to cover dozens of different intern programs at nineteen magazines, which vary not only in the experiences of each intern but in the culture and mission of each magazine, and the many categories of interns who explore different areas of the publishing industry within each of those magazines. The proposed class members share nothing more than the fact that (other than Wang herself) they received academic credit, but no wages, for their internships.[1]  Whether that feature of the internship was lawful is not susceptible of a common answer, and the class cannot be certified under either the Fair Labor Standards Act or New York law. There has never before been a collective challenge to an unpaid intern program, much less one that earns academic credit. This should not be the first. There is no possibility of a class here, and the Court should strike the class allegations.

---

[1] The Amended Complaint asserts claims on behalf of "unpaid and underpaid" interns.  There are no "underpaid" interns at Hearst's magazines.  The few interns who are paid receive wages in accordance with at least the minimum required by law.

## STATEMENT OF FACTS

**The Facts About Hearst's Magazine Internships**.  The Complaint falsely alleges

without supporting facts that each of Hearst's twenty magazines has the same "hiring criteria" or

policies, practices and procedures with respect to interns.[2]  (Am. Cmplt ¶ 15)  In fact, each of

Hearst's magazines has its own highly differentiated intern programs, which operate

autonomously.  *See* Findikyan Decl., Exs. 1-36 (all references to Exhibits hereafter are those

attached to the Findikyan Decl.).  The programs range from Popular Mechanics' very small

program, which has no more than one or two interns at a time and no formal training program, to

more than 20 interns in the highly organized summer programs at Cosmopolitan.  *See* Ex. 24

(Cain) ¶ 4; Ex. 2 (Greene) ¶¶ 8-10; Ex. 3 (Schmidt) ¶¶ 7-8.  No two Hearst magazines are alike.

Each has its own distinct history, culture and editorial focus.

The magazines' internships reflect these differences.  Independent of central corporate

control, each magazine determines the categories of internships it will offer (*e.g.*, editorial, art,

photo, fashion, accessories, sales, marketing, etc.) and the duties and responsibilities of students

within each category.  Most magazines have several categories of interns, which vary depending

on the content of the publication.  At Harper's Bazaar, for example, where plaintiff Wang

interned, there are nine categories of editorial internships (Accessories, Art/Design, Beauty,

Editor-in-Chief, Fashion/Market, Fashion Features, Features, Management and Photo &

Bookings) and two for the publishing (Advertising and Marketing) side of the business, for a

total of eleven internship categories altogether.  *See* Ex. 14 (Rosengarten) ¶ 5; Ex. 16 (Officer) ¶

4.  Elle similarly separates its sales and marketing interns into two groups, while  Marie Claire

---

[2] The Amended Complaint alleges that Hearst has twenty magazines.  While this is correct, only nineteen magazines
are addressed herein because Car and Driver magazine does not have interns. *See* Declaration of Kristina Findikyan,
dated April 4, 2012 (hereinafter, "Findikyan Decl."), Ex. 1 (Alterman) at ¶ 4.

treats its business-side interns as a single category. *See* Ex. 6 (Healy) ¶ 4; Ex. 21 (Riess) ¶ 7.
The categories can be deceptive, however, because there are unusual experiences. Beauty interns
generally do not write copy, but some at Redbook were permitted to do so. *See* Ex. 26 (Cheney)
¶ 13. Marie Claire's editorial interns are permitted to pitch story ideas, and, on the business side,
to assist with organizing events. *See* Ex. 20 (Smith) ¶ 9; Ex. 21 (Riess) ¶ 12. Cosmopolitan
interns sometimes have to spend time with more mundane tasks, such as answering phones or
opening mail, while other magazines never have interns engage in such activities. *See* Ex. 2
(Greene) ¶ 11; Ex. 4 (Carbone) ¶ 12. Cosmopolitan also, unlike any other magazine, has interns
in Los Angeles, whose research involves upcoming Hollywood movies and attending celebrity
cover shoots. *See* Ex. 2 (Greene) ¶ 17.

At most of the magazines, interns set their own schedules, visiting the magazine when
they choose. There are examples, however, where interns' schedules are more rigid, such as
Marie Claire, where some interns train at the magazine full-time as part of a co-op program. *See*
Ex. 20 (Smith) ¶ 8.

Each magazine also chooses its own interns and administers its programs as it sees fit;
most magazines delegate the selection process to individual departments, so that, for example,
the Fashion department chooses the fashion interns according to its own preferences and needs,
and the Photo department conducts its own process. At the magazine level, there is also
variation; some magazines actively recruit interns on websites and through college career
departments, while others, such as Popular Mechanics, do not recruit at all and rely instead on
unsolicited inquiries from interested students. *See* Ex. 24 (Cain) ¶ 8. Plaintiff Wang's own
admitted lack of contact with Hearst Magazines HR before and during her internship confirms
the lack of central corporate control or direction over the magazines' various internships. *See*

Ex. 35 (Helmus) Ex. A (Wang's post-internship email to Helmus stating: "I would like to introduce myself, as the only interaction I have had with the Human Resources at Hearst has been brief and involved obtaining ID cards for Accessories interns at Bazaar this past fall."). Hearst Magazines HR's role is limited to assisting the magazines in posting internship openings at various colleges and universities and receiving the letters from the magazines stating that selected students will receive academic credit for their internships. *See id.* ¶¶ 3, 5.

The intern programs also vary enormously in the type and degree of formal training they provide. Town & Country pays for each of its interns to attend Magazine University, a program presented by the Magazine Publishers of America. *See* Ex. 32 (Cazzola) ¶ 8; *see also* Ex. 27 (Rubin) ¶ 11; Ex. 30 (Greenblatt) ¶ 10. Harper's Bazaar features "Bazaar Backstage," a series of how-to lessons for interns. *See* Ex. 16 (Officer) ¶ 9. Cosmopolitan offers an in-house program called "Cosmo U.," but it varies even within the magazine: sales and marketing interns get to attend the program only if they intern in the summer, and then attend about two hours per week; other Cosmopolitan interns attend Cosmo U. in four individual sessions throughout the semester. *See* Ex. 2 (Greene) ¶ 10; Ex. 3 (Schmidt) ¶ 7. HGTV offers a resume and cover letter workshop, which no other magazine does. *See* Ex. 17 (Mariola) ¶ 13. Seventeen holds regular lunches with speakers. *See* Ex. 29 (Abbey) ¶ 14. At the other end of the spectrum, Good Housekeeping and Popular Mechanics have no formal training programs. *See* Ex. 12 (Scrymser) ¶ 9 ("there are no activities in which all of the interns participate"); Ex. 24 (Cain) ¶ 4.

Relatedly, the magazines vary in their approach to individualized training. Marie Claire has interns complete an individualized semester-end project; Esquire's business-side interns also do an individual project, but across the entire semester; and Elle's interns (other than those in sales and marketing) get individual 20-30 minute interviews with the managing editor at the start

of the internship so that the managing editor can craft an internship experience consistent with the intern's interests. *See* Ex. 21 (Riess) ¶ 15; Ex. 9 (Perri) ¶ 8; Ex. 5 (Baughman) ¶ 7.

Day-to-day experiences also vary from magazine to magazine and from intern to intern. For instance, for those like plaintiff Wang, who intern in the "fashion closet" at Harper's Bazaar – where designer clothing and accessories are kept on loan from designers to be used (if selected by editors) in the magazine's influential fashion photography – the internship provides a rare opportunity to have immediate access to the expensive designs studied at top fashion schools. *See* Ex. 14 (Rosengarten) ¶¶ 6-7.  Harper's Bazaar's fashion closet interns are also provided the opportunity to visit exclusive designers' studios and interact with their staffs when picking up or dropping off clothes and accessories, opportunities not available at many other magazines (including Hearst titles such as O, The Oprah Magazine) where editors opt instead to have designers drop off and pick up their fashions in order for them to be considered for inclusion in the magazine. *Compare* Ex. 15 (Broekema) ¶ 9 *with* Ex. 22 (Bell) ¶ 10.

Even those interns who work in the various magazine fashion departments have distinct experiences.  Different magazine missions, content, target audiences and staffing all contribute to varying internships even within the same subject matter.  For example, Town & Country's fashion interns learn about security measures for jewelry at photo shoots that are not necessarily part of Cosmopolitan photo shoots.  Similarly, Town & Country does not provide as much beauty coverage as Marie Claire, and therefore the focus is different, impacting beauty interns' experiences at the two magazines.  *See* Ex. 31 (Grippo) ¶ 12; *see also* Ex. 29 (Abbey) ¶ 21 (contrasting editorial intern experiences at Seventeen and O).

The students' opportunities to gain experience and assume responsibility vary not just from magazine to magazine, and category to category, they also necessarily vary from one

internship to another, depending on the focus of a given month's publication, whether it is Fashion Week in New York, the Good Housekeeping anniversary issue, redesign of Harper's Bazaar, and the like.  *See* Ex. 5 (Baughman) ¶ 11; Ex. 12 (Scrymser) ¶ 10; Ex. 14 (Rosengarten) ¶ 14.  Interns pick up a lot about magazine publishing and the fashion industry simply by being present and observing staff members do their jobs.  Many interns love to hang out and would like to spend more hours in the office than necessary or required.  *See* Ex. 5 (Baughman) ¶ 4.

There are few elements common to each of Hearst's magazine intern programs.  All require that the students receive academic credit for their unpaid internship from an accredited college or graduate school.[3]  *See* Ex. 35 (Helmus) ¶ 3.  Prospective interns must submit a letter or other proof from the school that credit will be awarded.  *Id.*  Over 100 different colleges and universities have awarded credit to unpaid interns at Hearst's magazines, providing objective evidence that all of the internships provide a bona fide educational experience, contrary to the allegations in the Complaint.  *Compare id.* ¶ 4 *with* Am. Cmplt ¶ 59; *see also* Ex. 37 (Decl. of Melanie Rush, Fashion Institute of Technology) ¶¶ 4-9.

There are three other common aspects to Hearst's unpaid internship programs.  First, the students generally visit during one academic semester (spring, summer, fall, and at some magazines during the winter holiday break as well), with a fixed start date and end date.  Second, the magazines expressly communicate in advance that the internship will be unpaid.  Third, the magazine makes clear to the student that there will be no job offer at the end of the internship.

Two Hearst magazines also have paid internship programs, hiring a few paid interns each year.  Esquire hires a few interns, typically college graduates, to work in the Editorial department to conduct research and draft articles for a period of a few months.  Because they are graduates,

---

[3] All of Hearst's magazines require unpaid interns to receive academic credit.  This common requirement developed over time.  *See* Ex. 36 (Roberts) ¶ 3.

they do not receive college credit.  They are paid minimum wage by Esquire.  *See* Ex. 8

(Rubinstein) ¶ 13.  The O magazine also has some paid interns.  They too are largely college

graduates who do not receive academic credit and are paid minimum wage by O.  *See* Ex. 22

(Bell) ¶ 11.  In addition, Hearst Magazines has a diversity program whereby it recruits five to six

minority interns each summer and places them at different magazines.  They are paid wages in

excess of the minimum set by law.  *See* Ex. 35 (Helmus) ¶ 6.  Finally, Hearst magazines

occasionally participate in an intern program sponsored by the American Society of Magazine

Editors ("ASME"), selecting an intern from the ASME pool and paying the intern in accordance

with ASME guidelines.  *See id.*  Over the past six years, a number of corporate departments at

Hearst Magazines each have had various interns as well.[4]  *See* Ex. 36 (Roberts) ¶ 5.  Those

interns' experiences reflect the focuses of the different departments.  *See id.*

       **The Facts About Plaintiff Wang**.  The Amended Complaint alleges that plaintiff Wang

was the "Head Accessories Intern" at Harper's Bazaar from August 2011 until December 2011,

five days a week, between 40 and 55 hours a week.  (Am. Cmplt ¶¶ 4, 68-70, 72, 74-76).  If

Wang did indeed spend that much time at the magazine, her experience was different than that of

many of the students she hopes to represent, who were not present nearly as many hours as she

claims to have been.  Wang's title and position were also unusual, as there are no "head" interns

supervising other interns at other Hearst magazines.  Wang's opportunity to supervise others led

to unusual individual coaching and counseling by her direct supervisor, Sr. Accessories Editor

Sam Broekema.  *See* Ex. 15 (Broekema) ¶ 8.  Broekema repeatedly observed Wang give unclear

and inaccurate instructions to the interns she supervised, leading Broekema to take her aside and

counsel her on appropriate behavior and professional skills in the workplace.  *See id.* ¶¶ 12-14.

---

[4] These include: Human Resources, Brand Development, Integrated Media, Digital Media, Digital Studio, Direct Response, Controller's Office and Consumer Marketing.  *See* Ex. 36 (Roberts) ¶ 5.

For at least a few weeks after the internship ended, Wang apparently believed it had been extraordinarily beneficial to her.  On January 5, 2012, Wang wrote an email to Amy Helmus of Hearst Magazines HR stating that her internship "provided [her] unrivaled skills for working in fashion."  Ex. 35 (Helmus), Ex. A.  Wang's email also said that it "was the most valuable work experience [she] has had to date."  *Id.*  In another email that Wang sent to Bazaar fashion editor Ana Maria Pimental (Broekema's direct supervisor) the day before, Wang wrote that her internship "was the most unique and valuable professional experience I could have asked for."  Ex. 36 (Roberts), Ex. A.  In her January 5, 2012 email, Wang also asked Helmus if Hearst had any job openings.  *See* Ex. 35 (Helmus), Ex. A.  On January 20, she wrote to Pimentel again, asking her to provide a reference for a position elsewhere.  *See* Ex. 36 (Roberts), Ex. B.  On February 1, 2012, Wang filed this lawsuit.

Wang had provided Hearst with the required university letter representing that she would be receiving academic credit for the period of her internship with Harper's Bazaar.  *See* Ex. 35 (Helmus), Ex. B.  In February 2012, a Hearst Magazines Human Resources representative spoke to the signatory of that letter from Ohio State University, and learned that Wang had asked Ohio State for information about its graduate program at the School of Communication, requested the letter stating that she would get credit for her internship, but then never enrolled in the program and thus never received any academic credit from Ohio State for her Harper's Bazaar internship.  *Id.* at ¶ 9; *see also* Ex. 39 (Letter from Ohio State Registrar).

## ARGUMENT

The Amended Complaint identifies two proposed classes: (1) an Intern Class comprised of paid and underpaid interns (¶¶ 28-38), and (2) a Deductions Class, made up of those interns who received college credit for their internship, on the theory that students' payments to their

colleges for that credit amounted to an unlawful deduction from their wages (¶¶ 39-49).

Argument Points I, II, and IV below apply equally to all these putative class members, as it

would be impossible to determine on a class-wide basis whether any of them were "employees"

under the Fair Labor Standards Act or New York Labor Law.  Point III spells out additional

reasons why the deductions class allegations should be stricken.

# I.    PLAINTIFF CANNOT SATISFY THE REQUIREMENTS FOR CERTIFICATION OF HER FLSA CLAIM

The FLSA provides that "[a]n action . . . may be maintained against any employer . . . by

any one or more employees for and in behalf of himself or themselves and other employees

similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his

consent in writing to become such a party and such consent is filed in the court in which such

action is brought."  29 U.S.C. § 216(b).  Courts commonly use a two-stage analysis to determine

whether to proceed collectively under Section 216(b).  *See, e.g., Myers v. Hertz Corp.*, 624 F.3d

537, 554-55 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 181 (2011).  In the first stage, often referred

to as the conditional certification stage, the court must make an initial determination as to

whether the named plaintiffs are "similarly situated" to the putative class members.  *See id.*  The

second stage involves a more searching determination as to whether the plaintiffs are similarly

situated.  *See, e.g., Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).

## A.  Conditional Certification Should Be Denied Because The Legality Of An Unpaid Internship Necessarily Turns On Individualized Facts

At the conditional certification stage of the FLSA inquiry, the named plaintiff must make

a modest factual showing that she and potential opt-in plaintiffs are similarly situated, which

means that they together were victims of a common policy or plan that violated the law.  If such

a showing is made, the court has discretionary power to facilitate the sending of notice to

potential class members.  *See, e.g., Myers*, 624 F.3d at 555.  However, a court must "take a measured approach when addressing a request for collective action certification, mindful of the potential burden associated with defending against an FLSA claim involving a broadly defined collective group of plaintiffs." *Colozzi v. St. Joseph's Hosp.*, 595 F. Supp. 2d 200, 207 (N.D.N.Y. 2009).

Plaintiff's collective action should not be conditionally certified in the first instance because this case lacks a common policy or plan that violated the law.  To show that she is "similarly situated" to the thousands of other current and former interns at all of Hearst's magazines, plaintiff must demonstrate that the facts determining the legality of the internships do not differ materially as between the thousands of students who make up the proposed collective. Plaintiff cannot establish these requirements.  "In other words, [conditional certification should be denied because] there is [no] basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case." *Mike v. Safeco Ins. Co.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (denying conditional certification because a final determination of the merits of the case would involve examining the individual facts and circumstances of each plaintiff's position, and the court would have to undergo an individual inquiry for each proposed plaintiff to determine whether he/she was similarly situated to the named plaintiff); *see also, e.g., Colozzi*, 595 F. Supp. 2d at 207 ("For the proposed class members to be deemed similarly situated, there must be demonstrable similarity among the individual situations, some identifiable factual nexus which binds the named plaintiffs and potential class members together as victims of a particular [violation of law].") (internal citations and quotation marks omitted).

The U.S. Department of Labor has set forth – albeit not in formal regulations but merely

in an advisory "fact sheet" – a list of six factors to consider in determining whether an intern is an "employee."  Because no court has ever directly addressed the question as to interns, and there is no legislation on the issue, the DOL analysis is based on a 1947 Supreme Court case involving trainees, where the Court concluded that unpaid railroad trainees performing work during training were not "employees" for FLSA purposes.  *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) (An individual who, "without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure or profit," is outside the sweep of the Act.).  "[O]bviously," the Court held, the FLSA's definition of "employ" was "not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another."  *Id.*  *Walling* thus held that courts must examine the motivation of each individual in order to determine the legal status of their training or internship.

DOL's six factor analysis similarly reflects that employee status is a fact-intensive question unique to each intern.  The DOL's six factors are: (1) The internship, even though it includes actual operation of the facilities of the employer, is similar to the training that would be given in an educational environment; (2) the internship experience is for the benefit of the intern; (3) the interns do not displace regular employees, but work under close supervision; (4) the employer that provides the training derives no "immediate advantage" from the activities of the intern, and on occasion its operations may actually be impeded; (5) the intern is not necessarily entitled to a job at the conclusion of the internship; (6) the employer and the intern understand that the intern is not entitled to wages for the time spent in the internship. *See* Exs. 40, 41 (US Dep't of Labor, Wage and Hour Div. ("WHD") Fact Sheet #71; WHD Field Operations Handbook § 10b11).

Several principles emerge from DOL's application of these factors to unpaid internships in a series of opinion letters. First, DOL has opined that intern programs for academic credit are presumptively lawful: "[i]n situations where students receive college credits applicable toward graduation when they volunteer to perform internships under a college program, and the program involves the students in real life situations and provides the students with educational experiences unobtainable in a classroom setting, [DOL] do[es] not believe that an employment relationship exists between the students and the facility providing the instruction." Exs. 42, 43 (May 8, 1996 WHD opinion letter; July 11, 1995 WHD opinion letter). WHD has long considered the provision of academic credit for an unpaid internship to be a key factor weighing against a finding of employment. Ex. 38 (Slate) ¶ 3. Second, even where students did not receive college credits for their internship, and they "perform small office tasks or assist with a project," an internship program still may not constitute employment, because "[i]n the typical externship or internship program, where the work activities are simply an extension of the student's academic program, [the six DOL] factors often are met and an employer-employee relationship does not exist." Ex. 44 (Apr. 6, 2006 WHD Opinion letter). Third, "[w]hether trainees or students are employees . . . under the FLSA will depend upon all the circumstances surrounding their activities." Exs. 42, 45 (May 8, 1996 WHD opinion letter; March 13, 1995 WHD opinion letter). DOL itself recognizes the fact-specific nature of this inquiry, concluding in several instances that it could not say definitively whether an employment relationship existed even though it had detailed facts about the internship program. Exs. 43, 45 (July 11, 1995 WHD opinion letter; March 13, 1995 WHD opinion letter). Finally, DOL has stated that internships are not employment relationships where they are "predominantly for the benefit of the college students." Ex. 45 (March 13, 1995 WHD opinion letter). In sum, internships for college credit

are presumptively lawful; a definitive determination of legality cannot be made without a detailed review of the totality of the circumstances in each case; and those internships found predominantly to benefit the interns are lawful.

The DOL's framework is not binding,[5] and courts generally have not applied it rigidly in evaluating unpaid training programs. Instead, courts have acknowledged DOL's factors as part of the totality of the circumstances to be considered in determining who receives the "primary benefit" in a particular case. For example, *Archie v. Grand Central Partnership, Inc.*, 997 F. Supp. 504 (S.D.N.Y. 1998), a case involving unpaid trainees – the only such case we are aware of in the Second Circuit – cited several of the DOL factors in considering the totality of the circumstances. The court observed that the DOL factors "are not exhaustive and are intended to be consistent with" the *Walling* case, noting that both eschew reliance on any single factor and instead require "consideration of all the circumstances." *Archie*, 997 F. Supp. at 532. The court reviewed five of the six DOL factors (concluding that four were not satisfied) as well as the "economic reality" of the situation (where plaintiffs clearly expected compensation and thought the program was a job),[6] and concluded that unpaid homeless workers were "employees" on the facts presented. *Id*. at 532-33.

The courts of appeal that have applied *Walling* and the DOL factors in unpaid trainee cases have similarly used the DOL factors as guidelines rather than a rigid checklist. The dispositive question is whether the trainee or the putative employer was the primary beneficiary of the relationship. This approach requires a balancing not only of the tangible benefits derived

---

[5] The DOL guidelines are not law and no judicial deference is required under established Supreme Court precedent. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

[6] In *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985), the Supreme Court stated that "[t]he test of employment under the [FLSA] is one of 'economic reality.'" The principal focus of the test is whether the worker is economically dependent on the alleged employer and expects compensation for his services. *Id.* at 301-02.

by the trainee and the company, but also the intangible benefits that inure to each individual. The most recent such case, *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518 (6th Cir. 2011), exemplifies the approach and collects the considerable body of case law it reflects. The *Solis* court held "that the proper approach for determining whether an employment relationship exists in the context of a training or learning situation is to ascertain which party derives the primary benefit from the relationship." *Id.* at 529. It applied this analysis to affirm a ruling that students who worked caring for patients at a sanitarium in accordance with religious instruction provided by a Seventh Day Adventist school were not employees for purposes of FLSA's prohibition on child labor, even though they engaged in "practical" work including kitchen duty, housekeeping, and work that generated revenue for the sanitarium. *Id.* at 520-21, 531-32.

The *Solis* court gave considerable weight to the "intangible benefits" students received through their work, including: lessons about responsibility, the dignity of manual labor, the importance of working hard and seeing a task through to completion, leadership, sensitivity and respect. *Id.* at 531. The court relied on testimony from parents that the students had become more responsible and taken on leadership roles; from former students who testified about the leadership skills and work ethic they developed; and from employers who testified about graduates' work ethic, leadership skills and other practical skills. *Id.* The court found that the intangible benefits received were significant and cited other cases in which such amorphous benefits had "tip[ped] the scale" of primary benefit against "employment" even where schools received tangible benefits from the students' activities. *Id.* at 531-32 (citing cases).

*Solis* cites numerous courts that have expressly followed this "primary benefit" approach. *Id.* at 528. *Solis* also cites the many other courts that implicitly apply a primary benefit test. *Id.* at 528-29. The Tenth Circuit's decision in *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023,

1027-28 (10th Cir. 1993), follows this approach as well. There the court concluded that all six DOL factors need not be met, but rather should be used to assess the totality of the circumstances. It ultimately concluded that fire department trainees were not employees even though there was an expectation of permanent employment at the end of their training period. Likewise, in *McLaughlin v. Ensley*, 877 F.2d 1207, 1210 (4th Cir. 1989), the Fourth Circuit applied various factors, such as the nature of the instruction involved, to determine the "relative degrees of benefit" at issue in the case, which it used as the ultimate criterion to determine employment status. In *Williams v. Strickland*, 87 F.3d 1064, 1066-67 (9th Cir. 1996), the Ninth Circuit, like the court in *Archie*, *supra*, conducted an analysis which blended the *Walling* and "economic realities" approaches, holding that participants in a six-month Salvation Army work therapy program were not employees under the FLSA because there was no agreement for compensation and participants received benefits such as self-worth, accomplishment, and reentry to the workplace.

Regardless of what legal standard is applied to determine whether plaintiff and other interns are "employees" under the FLSA, each necessarily requires an individualized inquiry as to each intern and internship. Not surprisingly, no class of "interns" has ever been certified under the FLSA. There is no basis in law for certification here.

### B. Even If The Court Were To Certify The Class Conditionally, It Would Be Futile, As Plaintiff Would Be Unable To Sustain Certification After Discovery

Conditional certification would be futile in any case, as plaintiff could never meet her burden to sustain second-step FLSA certification. The second step of the "similarly situated" analysis involves a "more stringent standard of proof." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). To satisfy this standard, courts examine the proposed class under the following three factors: (1) disparate factual and employment settings of the individual

plaintiffs; (2) defenses available which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.  The burden is on the named plaintiff to prove that she is similarly situated to the opt-in plaintiffs.  *Id.*

With respect to the first factor, when a defendant's formal policies are legal, a plaintiff cannot support certification based solely on those policies.  *Id.* at 461-63.  Rather, plaintiff must demonstrate that the practices and culture of which she complains are "sufficiently uniform and pervasive to warrant class treatment."  *Id.* at 463.  Here, Wang would have to show not merely that all of the internships were unpaid (or "underpaid"), but that in every case, the student's tangible and intangible benefits were less significant than the benefits that the particular magazine received from the intern's "work."  That evaluation cannot possibly be made on a class basis.  As the *Zivali* court held, where there is a wide range of company practices in the context of varied factual and employment settings, plaintiffs are not similarly situated with respect to the first factor.  *Id.* at 463-67.  Wang's class approach would require the Court to evaluate the benefits she personally obtained from, for example, the Bazaar Backstage program, and then simply to assume that the same result would apply to thousands of other interns who attended Cosmo U., or Magazine University, and also to those who interned at Good Housekeeping or Popular Mechanics, where there is no formal training beyond that received through observation, instruction and feedback during the internship.

Moreover, when the potential defenses will be highly fact specific, as they are here, the second factor of the similarly situated analysis "weighs heavily against" certifying a collective action.  *Id.* at 467-68.  Hearst is entitled to show, on a student-by-student basis, that the practical training and intangible benefits received by each student were significant and outweighed any benefit that the magazine in question received from that particular intern.  A balancing of

- 17 -

benefits would need to be conducted as to each intern based on what she did and what she got out of the experience.  This would necessarily entail testimony and other evidence from each student, her supervisors and mentors, parents, friends, academic advisors, and past and future employers to ascertain the student's motivation for taking the internship (made relevant by *Walling*), what each intern actually did while at the magazine, and the benefits he or she received.  Did a Marie Claire intern's semester-end project give her unique insight into some aspect of magazine publishing?  Did the Town & Country intern who worked with the Editor-In-Chief get something of value from that experience?  What was the quality of the speakers at Seventeen's intern lunches?  Did internships at Good Housekeeping suffer from the lack of a formal training program, or was the experience nevertheless useful?  Some interns undoubtedly had extraordinarily useful experiences while the magazine received no benefit at all; other interns might testify that the internship was less helpful, or be able to show that the magazine received more substantially useful work product than is usually the case.  Whatever the facts might eventually show, it is simply unavoidable that those facts will differ from intern to intern and must be examined individually.

The final factor – fairness and procedural considerations – weighs against certification as well, because mere extrapolation from the unique experience of the plaintiff, or from some sample of the class, would deny Hearst the opportunity to present its individual defenses on the particular facts of each class member's experience, which even the DOL acknowledges to be the touchstone of liability.  As the *Zivali* court concluded:

> Resolution of the many fact-specific issues in this case would essentially require
> . . . mini-trials in which each individual plaintiff could present evidence that [his
> or her internship experience in fact ran afoul of the FLSA] – evidence that would
> then be subject to cross-examination and similar challenge by the defendant.
> Such a result is the antithesis of collective action treatment and would overwhelm

the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." 784 F. Supp. 2d at 469.

For all of these reasons, the FLSA class allegations should be stricken.

## II.   PLAINTIFF'S PROPOSED STATE LAW CLASS CANNOT BE CERTIFIED

The inherent individuality of the "primary benefit" test, and the substantial differences among the numerous intern programs that plaintiff hopes to sweep into this case, are even more pronounced in evaluating plaintiff's New York Labor Law class allegations, because they are governed by Fed. R. Civ. P. 23, which poses further obstacles to certification.  Rule 23 "does not set forth a mere pleading standard;" rather, a plaintiff seeking class certification must "affirmatively demonstrate" that in fact each and every Rule 23 element has been established. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).  Plaintiff cannot meet that burden here, and the class allegations as to the state law claim should also be stricken.

The Court cannot certify a class unless it is satisfied, after a "rigorous analysis," that the Rule's requirements have been met.  *Dukes*, 131 S. Ct. at 2551 (*quoting General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  And those requirements must be met as to "all factual or legal issues"; "it does not matter" if one of those issues is an affirmative defense asserted by the defendant.  *Myers v. Hertz Corp.*, 624 F.3d 537, 550-51 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368 (2011).  Should the Court have any doubts on the subject, it must deny certification, which is improper unless and until the Court is convinced that every Rule 23 element has been met.  *Miles v. Merrill Lynch & Co.*, 471 F.3d 24, 41 (2d Cir. 2006).

### A. Hearst's Relationships With Its Interns Are Far Too Individualized To Be Decided On An Aggregate Basis

The legal standard governing plaintiff's state law claims largely mirrors the FLSA, but is even more fact-intensive. New York uses an eleven-factor analysis, adding five more individualized inquiries to the DOL's list.[7] The Court should strike the Complaint's Rule 23 class allegations because plaintiff cannot possibly satisfy the commonality element of Rule 23(a)(2) nor the predominance or superiority elements of Rule 23(b)(3).

### 1.   Plaintiff Cannot Satisfy The Commonality Requirement

As to commonality, Rule 23 does not merely require plaintiffs to show that their claims assert the same violations or share common questions; the key to certification is proof that a class-wide trial will "generate common answers" – that the "determination of [the common claim's] truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*." *Dukes*, 131 S. Ct. at 2551 (emphasis added). The common question plaintiff poses here – whether interns were unlawfully denied wages and overtime – has no common answer. The legality of internships at Hearst's magazines will turn on an analysis of whether each intern was the primary beneficiary of his or her internship at his or her magazine, an analysis that depends entirely on individualized testimony and other particular evidence concerning each student's motivation for pursuing the internship, his or her experience, and the education, training and intangible benefits he or she received.

---

[7] The additional five factors (which follow the DOL's six factors) are as follows: (7) Any clinical training is performed under the supervision and direction of people who are knowledgeable and experienced in the activity; (8) the trainees or students do not receive employee benefits; (9) the training is general, and qualifies trainees or students to work in any similar business – it is not designed specifically for a job with the employer that offers the program; (10) the screening process for the internship is not the same as for employment, and does not appear to be for that purpose – the screening only uses criteria relevant for admission to an independent educational program; (11) advertisements, postings, or solicitations for the program clearly discuss education or training, rather than employment, although employers may indicate that qualified graduates may be considered for employment. Ex. 46 (NYS DOL Fact Sheet P725).

More specifically, formal training varies from none to extensive, regular courses. Some magazines feature lunch discussions on such topics as how to edit and how to break into the media business, or, at HGTV, how to write a resume. Still others provide on-the-job-training only. Supervision differs as well, depending on the staff members' seniority, availability, and management style, as well as the area of internship, and the interns' need and desire for supervision. Mentoring also differs from magazine to magazine, with some magazines having formal mentor programs, others informal, and some no structured program at all. Some interns come to the magazine very few days per week, on a schedule that they set for themselves; others follow a more regular, and in some cases rigorous, schedule.

On these facts, the only common elements of Hearst's intern programs (student credit, no expectation of job or compensation) all weigh against liability. As for the other factors, which inform the primary beneficiary analysis (or NYSDOL test), there can be no assurance that resolution of those factors as to one student will say anything at all about how the balance should be resolved for another. The analysis is simply too fact-dependent for class treatment.

### 2.    Plaintiff Cannot Prove Predominance

The lack of a common question that can be answered for all of the thousands of students with common evidence, as discussed above, necessarily prevents Wang from demonstrating that such common issues will "predominate," as Rule 23(b)(3) requires. *Myers v. Hertz Corp.*, No. 02 civ. 4325, 2007 WL 2126264, at *6 (E.D.N.Y. July 24, 2007), *aff'd*, 624 F.3d 537 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368 (2011). More demanding than the commonality requirement, Rule 23(b)(3) requires Wang to show not merely that there are common questions that could be answered once, on common evidence, for the entire class, but rather that such common issues so dominate any individual questions that a class trial would "achieve economies of time, effort,

and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

Here, the only truly common elements of the magazines' intern programs, and of the students' experiences (apart from the lack of wages), are factors that weigh against liability: academic credit; a clear understanding in advance that the internships are unpaid and that no job offer awaits at the end; and, typically, part time hours.  Wang accordingly must look elsewhere for predominant common issues that might support her claim; but as soon as the inquiry strays from these elements, the analysis is lost in a morass of variations between magazines, programs, internship categories, and the student-by-student "primary benefit" analysis.

Beyond the six factors that the FLSA and state law claims share, New York then adds five more factors, *see* n.7 above, that multiply exponentially the individual issues.  Whether a student was supervised and directed by "people who are knowledgeable and experienced in the activity," for example, will vary not only from magazine to magazine but from category to category, since the sales and marketing interns will not have been supervised by the same individuals who oversaw the fashion students.  Whether the training those students receive "qualifies trainees or students to work in any similar business," or instead is magazine-specific, also will vary. Ex. 45 (NYS DOL Fact Sheet P725, factors 7, 9).

There will be no common evidence on most of the issues that determine liability in this case, and individual issues overwhelm whatever few might be said to be susceptible of common resolution.  The class will not be certifiable, and the Court should strike the class allegations.

### B. Wang Cannot Represent The Proposed Class

Even leaving aside the overwhelming individuality of the issues, it is already clear that the proposed state-law class fails the requirements of Rule 23(a)(3) and 23(a)(4), which require that the class be represented by an individual whose claims are "typical" and who will be an "adequate" class representative. Some courts hold that these requirements tend to merge, ensuring that the named class representative will adequately protect the interests of absent class members and that a trial focusing on the representative will be fair. *See, e.g., Blank v. Jacobs*, No. 03-civ-2111, 2009 WL 3233037, at *4 (E.D.N.Y. Sept. 30, 2009) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). The facts before the Court concerning Wang conclusively demonstrate that she cannot serve in this role.

At the outset, here there is no "typical" case; the detailed circumstances of each internship are critically material to the claims presented because the Court must determine the primary beneficiary of each internship. The prerequisite established by Rule 23(a)(3) is not met. It further follows in this case that the named plaintiff is not an adequate representative under Rule 23(a)(4) for absent class members who have different kinds of claims or different prospects of success on whatever claims they have.

Proposed class representatives also fail the adequacy and typicality tests where the defendant has fact-specific defenses that challenge the representative's credibility or otherwise threaten her individual claim. *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (class certification denied because proposed plaintiff not credible).

The facts of Wang's internship demonstrate the individualized nature of her experience and therefore her claim, as well as the unique defenses Hearst has to her claim that make her a

- 23 -

poor choice to stand for the proposed class.  For example: Wang lied to Hearst that she would receive academic credit for her internship, Ex. 35 (Helmus) ¶ 9 and Ex. B; Ex. 39 (Ohio State Letter); Wang was a full-time intern, while the vast majority of interns are part time; Wang had a title of "head intern" and supervised other interns, an unusual if not unique opportunity, Ex. 15 (Broekema) ¶¶ 8-11; Wang received lengthy individual counseling because of her inappropriate and unprofessional communications and behavior, *Id.* ¶¶ 12-13; and, by her own admission, Wang acquired "unrivaled skills" through her internship and was the primary beneficiary, Ex. 35 (Helmus), Ex. A.

Wang's claims are not typical of the class, as evidence relevant to her claim will have no bearing on Hearst's liability to any other putative class member.  Nor is she an adequate representative of other interns, particularly in light of the unique defenses Hearst has to her claims, which presumably are not shared by most of the class she hopes to represent.  The class allegations should be stricken.

## III.    THE "DEDUCTIONS" CLASS IS INCAPABLE OF CERTIFICATION FOR OTHER REASONS AS WELL

The proposed "deductions" class cannot be certified for the same reasons stated above. But those class allegations should be stricken because they fail as a matter of law.  As the New York Court of Appeals has held, New York Labor Law Section 193 (which restricts deductions from employee wages, and is the only law presented by plaintiff in support of the deductions claim) prohibits deductions that benefit the employer as opposed to the employee.  *Hudacs v. Frito-Lay, Inc.*, 90 N.Y.2d 342, 346-47 (N.Y. 1997).  Here, however, Hearst took nothing from the students and received no benefit from their payment of tuition to their colleges, while the students received the credits for which they paid.  In sum, plaintiff's creative deductions theory provides no basis to conclude that any Hearst magazine intern was "underpaid."  Nor does it

provide the foundation for a separate Deductions class.  Finally, plaintiff Wang is incapable of representing this proposed class, as she did not pay for college credits.  The allegations relating to these classes should be stricken on these additional grounds as well.  This proposed class accordingly cannot be certified.

## IV.   THE COURT SHOULD RESOLVE THE VIABILITY OF THE CLASS NOW

There is no reason to delay resolution of the class certification question in this case, because the facts and law that cripple the class claims cannot be affected by discovery. Whatever documents are produced, whatever depositions plaintiff takes, the legal standards governing the magazines' intern programs will still require more than three thousand inquiries into the relative benefits realized – or not – by each class member.  Nor can discovery make Wang a more typical or adequate class representative.

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Dukes*, 131 S. Ct. at 2550 (quotation marks and citation omitted).  There is no justification for such an exception here.

## CONCLUSION

Hearst's motion should be granted; the class and collective action allegations should be stricken; and this case should proceed, if at all, as an individual action only.

Respectfully submitted,

Dated: April 4, 2012

**HEARST CORPORATION**

Eve B. Burton
Jonathan R. Donnellan
Kristina E. Findikyan
Shari M. Goldsmith
Courtenay B. O'Connor

Of Counsel:
Proskauer Rose LLP
Mark W. Batten

*Attorneys for Defendant Hearst Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing to be served on all counsel of record, this 4th day of April, 2012, by operation of the Court's CM/ECF electronic filing system.

Jonathan R. Donnellan