**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Elizabeth H. Wagoner
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  212-245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| XUEDAN WANG, on behalf of herself and all others similarly situated, | |
| Plaintiff, | **12 Civ. 0793 (HB)** |
| v. | |
| THE HEARST CORPORATION, | |
| Defendant. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE CLASS AND COLLECTIVE ACTION ALLEGATIONS AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE PURSUANT TO SECTION 216(b)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND..................................................................................2

    I.    Hearst Centrally Controls and Supervises Intern Recruitment and Enforcement of its Intern Policies ..................................................................................2

    II.    Hearst Uniformly Fails to Pay Interns Minimum Wages and Overtime for All Hours Worked ..................................................................................4

    III.    Unpaid Interns at Hearst Perform Work That Benefits Hearst ...........................5

    IV.    Hearst Uniformly Fails to Ensure That Its Unpaid Internships Comply With The Law ..................................................................................8

    V.    Hearst Underfunds Its Internship Programs .........................................................9

PROCEDURAL HISTORY..................................................................................9

ARGUMENT ..................................................................................11

    I.    Hearst Misconstrues The Standards That Apply to Unpaid Internships ...............11

    II.    Plaintiff's Cross-Motion For Conditional Certification Should Be Granted ........14

        A.    Plaintiff Exceeds Her Low Burden For Conditional Certification ............15

        B.    The "Distinctions" In Intern Tasks That Hearst Cites Are Not Relevant And Do Not Defeat Collective Certification ...............................................16

        C.    Hearst Is Misleading When It Claims That No Court Has Certified A Class Of Interns ..................................................................................17

        D.    Second-Stage Decertification Is Inappropriate Because Notice Has Not Yet Issued And The Record Is Not Complete ...........................................18

    III.    The Court Should Deny Hearst's Motion To Strike The Class And Collective Allegations Because It Is Premature And Lacks Merit.........................................19

        A.    There Is No Basis In Law For Hearst's Motion to Strike The Collective Allegations ..................................................................................19

        B.    Hearst's Motion To Strike The Class Allegations Is Procedurally Premature ..................................................................................19

C.      Even After Very Limited Discovery, It Is Clear That Plaintiff Will Be
        Able to Certify The Class ........................................................................21

D.      Plaintiff Satisfies Rule 23's Typicality And Adequacy Requirements......24

IV.   Hearst's Motion To Dismiss The Unlawful Deduction Claim Should Be
      Denied ...........................................................................................................25

CONCLUSION................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Archie v. Grand Central Partnership, Inc.*,
  997 F. Supp. 504 (S.D.N.Y. 1998)…………..................................................... passim

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................19, 21

*Austin v. Amazon.Com, Inc.*,
  No. 09 Civ. 1679, 2010 WL 1875811 (W.D. Wash. May 10, 2010).....................19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................19

*Chen-Oster v. Goldman, Sachs & Co.*,
  No. 10 Civ. 6950, 2012 WL 205875 (S.D.N.Y. Jan. 19, 2012)........................20, 21

*Chenensky v. N.Y. Life Ins. Co.*,
  No. 07 Civ. 11504, 2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011)...................19, 20

*Cruz v. Hook-Superx, LLC*,
  No. 09 Civ. 7717, 2010 WL 3069558 (S.D.N.Y. Aug. 5, 2010) ...........................20

*Cunningham v. Elec. Data Sys. Corp.*,
  754 F. Supp. 2d 638 (S.D.N.Y. Dec. 13, 2010) ..............................................18, 19

*Damassia v. Duane Reade, Inc.*,
  250 F.R.D. 152 (S.D.N.Y. 2008) ..........................................................................24

*Donovan v. New Floridian Hotel, Inc.*,
  676 F.2d 468 (11th Cir. 1982) .........................................................................12, 22

*Dziennik v. Sealift, Inc.*,
  No. 05 Civ. 4639, 2007 WL 1580080 (E.D.N.Y. May 29, 2007)..........................24

*Gerlach v. Wells Fargo & Co.*,
  No. 05 Civ. 585, 2006 WL 824652 (N.D. Cal. Mar. 28, 2006).............................18

*Gortat v. Capala Bros., Inc.*,
  No. 07 Civ. 3629, 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010).............................18

*Hernandez v. Merrill Lynch & Co., Inc.*,
  No. 11 Civ. 8472, 2012 WL 1193836 (S.D.N.Y. Apr. 6, 2012).............................17

*Labriola v. Bank of Am., Nat. Ass'n,*
  No. 12 Civ. 79, 2012 WL 1657191 (N.D. Cal. May 10, 2012) ..............................21

*Lewis v. Alert Ambulette Serv. Corp.,*
  No. 11 Civ. 442, 2012 WL 170049 (E.D.N.Y. Jan. 19, 2012)................................21

*Myers v. Hertz Corp.,*
  624 F.3d 537 (2d Cir. 2010)..............................................................14, 15, 18

*Pabst v. Oklahoma Gas & Elec. Co.,*
  228 F.3d 1128 (10th Cir. 2000) ........................................................................11

*Parker v. Time Warner Entm't Co.,*
  331 F.3d 13 (2d Cir. 2003).................................................................................20

*Pippins v. KPMG LLP,*
  No. 11 Civ. 377, 2012 WL 19379 (S.D.N.Y. Jan. 3, 2012)...................................17

*Rahman v. Smith & Wollensky Rest. Grp., Inc.,*
  No. 06 Civ. 6198, 2008 WL 161230 (S.D.N.Y. Jan. 16, 2008)............................20

*Rogers v. Capital One Servs., LLC,*
  No. 10 Civ. 398, 2011 WL 873312 (D. Conn. Feb. 19, 2011) .............................20

*Salomon v. Adderley Indus.,*
  No. 11 Civ. 6043, 2012 WL 716197 (S.D.N.Y. Mar. 6, 2012) .............................15

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.,*
  659 F.3d 234 (2d Cir. 2011)...............................................................................24

*Shajan v. Barolo, Ltd.,*
  No. 10 Civ. 1385, 2010 WL 2218095 (S.D.N.Y. June 2, 2010)......................14, 15

*Singh v. City of New York,*
  524 F.3d 361 (2d Cir. 2008)...............................................................................11

*Solis v. Laurelbrook Sanitarium & Sch., Inc.,*
  642 F.3d 518 (6th Cir. 2011) ........................................................................12, 13

*Summa v. Hofstra Univ.,*
  715 F. Supp. 2d 378, 386-89 (E.D.N.Y. 2010) ......................................... passim

*Walling v. Portland Terminal Co.,*
  330 U.S. 148 (1947)............................................................................... passim

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011)...............................................................................21, 23

*Wirtz v. Wardlaw,*
    339 F.2d 785 (4th Cir. 1964) ........................................................................................12, 22

**STATUTES**

29 U.S.C. § 203(g) ........................................................................................................11, 12

## PRELIMINARY STATEMENT

In *Walling v. Portland Terminal Co.*, the U.S. Supreme Court defined a narrow exception to the broad sweep of the Fair Labor Standard Act's ("FLSA's") coverage for "trainees" participating in a brief vocational training program offered by their prospective employer. 330 U.S. 148 (1947). Key to the Court's decision, the trainees worked "solely for [their] personal purpose or pleasure" and their prospective employer received "no immediate advantage from any [of their] work." *Id.* at 150-53. Under these narrow circumstances, the Court held that the trainees were not employees covered by the FLSA.

This case is not *Walling*. For years, The Hearst Corporation ("Hearst") has capitalized on the glamour and prestige of its publications, such as Harper's Bazaar and Cosmopolitan, to induce aspiring young people to work for them—answering its phones, making its deliveries, keeping its clothing and accessories closets organized, and doing other tasks that are unglamorous but necessary to Hearst's operations—without paying them anything at all. Hearst even employs interns to perform administrative work in its Human Resources department. Hearst's "interns" are no different than entry-level workers whom FLSA-compliant companies regularly employ and pay, except that Hearst "has evasively accepted the services of [these] beginners at pay less than the legal minimum." *Walling*, 330 U.S. at 153.

With no real defense to the merits, Hearst has moved to strike Plaintiff's class and collective allegations in a premature motion that takes the extreme position that a case brought by interns cannot be certified. To the contrary, the issues that this case presents could not be better suited for class and collective treatment. Although there has been little discovery to date, Hearst's own declarations leave no doubt that, throughout the organization, Hearst used interns to perform productive work that benefitted its day-to-day operations. If interns did not do the

work for free, the work, by its very nature, would have required Hearst to pay regular employees to do it.

Even at this early stage, Plaintiff more than adequately meets her low burden to show that she and other Hearst interns are similarly situated. Hearst uniformly classified its interns as non-employees, failed to pay them minimum wages and overtime, assigned them productive work that benefited its operations, and provided them with minimal formal training and supervision. After notice issues and Plaintiff has had a full opportunity to conduct discovery related to her class and collective allegations, Hearst may oppose class certification and seek to decertify the collective with the arguments it makes now. At this early stage, Hearst's motion is premature and should be denied.

## FACTUAL BACKGROUND

### I. Hearst Centrally Controls and Supervises Intern Recruitment and Enforcement of its Intern Policies.

For the last six years, Hearst has employed over 3,000 interns. Def.'s Br. 1. Hearst has employed interns at twenty-one magazines, Ex. 35[1] (Helmus Decl.) ¶¶ 3, 7, and in many "shared services" departments within its Magazines division, such as Human Resources, Public Relations, Corporate Communications, Special Events, Digital Media, The Hearst App Lab, and Studio D (Hearst's in-house photo studio); Ex. A[2] (Human Resources Postings); Ex. B (Studio D Posting); Ex. C (Helmus Dep.) 99:11-14.

---

[1]     Unless otherwise indicated, all numbered exhibits are attached to the Declaration of Kristina E. Findikyan in Support of Defendant's Motion to Strike the Class and Collective Action Allegations, ECF No. 11.

[2]     Unless otherwise indicated, all lettered exhibits are attached to the Declaration of Rachel Bien in Opposition to Defendant's Motion to Strike the Class and Collective Action Allegations and in Support of Plaintiff's Cross-Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b).

Hearst made a determination at the corporate level that interns are not "employees" subject to the overtime and minimum wage requirements of the law.  Ex. C (Helmus Dep.) 59:22-24, 63:7-12; Ex. D (Roberts Dep.) 14:3-24, 50:24-51:5, 52:15-53:3.  With Hearst's Legal department, Hearst's Human Resources department sets and enforces Hearst's policies governing interns.  For example, Human Resources enforces Hearst's policy that interns must show that they are eligible to receive school credit by submitting a letter from their school.  Ex. C (Helmus Dep.) 78:15-81:24; Ex. E (Hiring Criteria Email).  Human Resources has also instructed intern applicants to purchase school credit from another college when their own college refuses to award them credit for an unpaid internship.  Ex. C (Helmus Dep.) 86:15-88:15; Ex. F (Yale Email).  Human Resources maintains a list of "approved interns" who have provided credit letters and a list of interns who have not.  Ex. C (Helmus Dep.) 22:8-15, 92:13-15, 154:3-17; Ex. G (Intern List); Ex. H (Winter-Spring 2012 Email); Ex. I (Intern List Email).  Human Resources will not provide interns with a building ID if they have not submitted a credit letter.  Ex. C (Helmus Dep.) 80:5-81:15; Ex. E (Hiring Criteria Email); Ex. I (Intern List Email); Ex. J (ID Policy Email).

Human Resources is also involved in intern recruitment.  They maintain templates for intern job postings in a central "Internship" folder, which Human Resources uses to create job descriptions and advertise open internship positions.  Ex. C (Helmus Dep.) 91:10-92:10, Ex. K (Job Description Email).  They also field requests for interns from magazine and department staff, post internship openings on Hearst's website and at schools, and actively recruit interns for magazines and departments.  Ex. C (Helmus Dep.) 104:20-105:20; Ex. L (Bazaar Email), Ex. M (WomansDay.com Email), Ex. N (Columbia Email), Ex. O (Cosmo Publisher Email).  Human Resources frequently fields questions from magazine staff regarding Hearst's internship policies,

seeks advice from Hearst's Legal department regarding interpretations of these policies, and relays Legal's responses to magazine personnel.  Ex. C (Helmus Dep.) 68:17-22; Ex. D (Roberts Dep.) 21:1-22:24; Ex. E (Hiring Criteria Email); Ex. P (Rutgers Intern Email); Ex. Q (Princeton Email).

Human Resources enforces Hearst's policy that "[i]nterns must be able to provide documentation that they are legally able to work in the U.S."  Ex. D (Roberts Dep.) 82:4-21; Ex. E (Hiring Criteria Email).  Hearst "will not consider J-1 [visa] holders" for intern positions.  Ex. C (Helmus Dep.) 127:15-128:2; Ex. R (Qatar Email); Ex. S (J-1 Email).  Hearst must pay outside counsel to review the immigration papers and has determined that it does not want to bear that expense.  Ex. C (Helmus Dep.) 127:15-128:2; Ex. R (Qatar Email); Ex. S (J-1 Email).

## II.   Hearst Uniformly Fails to Pay Interns Minimum Wages and Overtime for All Hours Worked.

With limited exceptions, Hearst follows a uniform practice of not paying any wages, stipends, or compensation of any kind to its unpaid interns—a policy that Hearst refers to as the "no pay" rule.  Ex. E (Hiring Criteria Email); Ex. T (December 2005 Memo) ("Interns can *only* be brought on who can receive college (or possibly high school) credit; we will not pay any interns either a weekly salary or stipend of any kind.").  Instead of paying them, Hearst requires them to show that they are eligible to receive academic credit, which Hearst erroneously believes gives interns "something of monetary value" that makes not paying them legal.  Ex. E (Hiring Criteria Email).

There are only three exceptions to Hearst's "no pay" rule.  Esquire and O Magazine have a handful of paid interns.  Ex. 8 (Rubinstein) ¶ 13 (Esquire typically has three to four paid Editorial interns); Ex. 22 (Bell) ¶ 11 (O Magazine typically has four paid interns).  Hearst also runs a Diversity Internship Program, through which it selects five or six interns each summer

who are paid.  Ex. C (Helmus Dep.) 107:20-109:1; Ex. D (Roberts Dep.) 44:14-53:13.  Hearst's

corporate policy is that these paid interns are also not "employees" of Hearst.  Ex. D (Roberts

Dep.) 47:9-11, 52:15-53:3.  Hearst therefore keeps them off its payroll by paying them through a

third-party vendor.  Ex. C (Helmus Dep.) 111:9-17; Ex. D (Roberts Dep.) 50:9-51:1.

## III.    Unpaid Interns At Hearst Perform Work That Benefits Hearst.

The discovery to date and Hearst's admissions establish that all interns perform entry-

level work that benefits Hearst, regardless of the magazine or magazine department for which

they work.  Unpaid interns conduct research,[3] write content and internal memos,[4] help plan and

staff events,[5] maintain inventory,[6] maintain archives,[7] work on design projects,[8] maintain

---

[3]        Ex. 2 (Greene) ¶¶ 12-13, 15, 17-18 (Cosmopolitan); Ex. 3 (Schmidt) ¶ 8 (Cosmopolitan);
Ex. 4 (Carbone) ¶¶ 9-11 (Country Living); Ex. 5 (Baughman) ¶¶ 9, 12-13 (ELLE); Ex. 8
(Rubinstein) ¶¶ 11-12 (Esquire); Ex. 9 (Perri) ¶ 11  (Esquire); Ex. 10 (Baugh) ¶¶ 9, 11 (Food
Network); Ex. 12 (Scrymser) ¶¶ 10-11 (Good Housekeeping); Ex. 13 (Rockefeller) ¶ 14 (Good
Housekeeping); Ex. 14 (Rosengarten) ¶¶ 6, 9-11 (Harper's Bazaar); Ex. 15 (Broekema) ¶ 16
(Harper's Bazaar); Ex. 16 (Officer) ¶ 7 (Harper's Bazaar); Ex. 17 (Mariola) ¶¶ 8-10  (HGTV);
Ex. 18 (Bauman) ¶¶ 9-10 (House Beautiful); Ex. 19 (Sullivan) ¶ 10 (House Beautiful); Ex. 20
(Smith) ¶¶ 9-11 (Marie Claire); Ex. 22 (Bell) ¶¶ 6, 9 (O Magazine); Ex. 23 (Denholtz) ¶ 7 (O
Magazine); Ex. 24 (Cain) ¶ 12 (Popular Mechanics); Ex. 26 (Cheney) ¶ 15 (Redbook); Ex. 30
(Greenblatt) ¶ 7 (Seventeen); Ex. 31 (Grippo) ¶ 11 (Town & Country); Ex. 32 (Cazzola) ¶ 10
(Town & Country); Ex. 34 (Kakstys) ¶ 9, 11 (Woman's Day); Ex. U (Nagi Decl.) ¶ 8
(Cosmopolitan).
[4]         Ex. 2 (Greene) ¶¶ 13, 17 (Cosmopolitan); Ex. 4 (Carbone) ¶ 10 (Country Living); Ex. 5
(Baughman) ¶ 8 (ELLE); Ex. 14 (Rosengarten) ¶ 10-11 (Harper's Bazaar); Ex. 17 (Mariola) ¶ 8
(HGTV); Ex. 20 (Smith) ¶ 9 (Marie Claire); Ex. 24 (Cain) ¶ 12 (Popular Mechanics); Ex. 26
(Cheney) ¶¶ 13, 15 (Redbook); Ex. 30 (Greenblatt) ¶ 6 (Seventeen); Ex. 34 (Kakstys) ¶ 9
(Woman's Day); Ex. U (Nagi Decl.) ¶ 8 (Cosmopolitan); Ex. V (Skorka Decl.) ¶ 7 (Redbook &
O Magazine).
[5]        Ex. 6 (Healy) ¶ 14 (ELLE); Ex. 12 (Scrymser) ¶ 11 (Good Housekeeping); Ex. 16
(Officer) ¶ 7 (Harper's Bazaar); Ex. 19 (Sullivan) ¶ 10 (House Beautiful); Ex. 21 (Riess Decl.) ¶
12 (Marie Claire); Ex. V (Skorka Decl.) ¶ 7 (Redbook & O Magazine).
[6]        Ex. 2 (Greene) ¶ 14 (Cosmopolitan); Ex. 4 (Carbone) ¶ 11 (Country Living); Ex. 5
(Baughman) ¶ 11 (ELLE); Ex. 8 (Rubinstein) ¶ 9 (Esquire); Ex. 12 (Scrymser) ¶¶ 9-10 (Good
Housekeeping); Ex. 14 (Rosengarten) ¶¶ 6, 15 (Harper's Bazaar); Ex. 18 (Bauman) ¶ 9 (House
Beautiful); Ex. 20 (Smith) ¶¶ 7-8, 11 (Marie Claire); Ex. 22 (Bell) ¶ 10 (O Magazine); Ex. 26
(Cheney) ¶¶ 13-14 (Redbook); Ex. 29 (Abbey) ¶ 16-17 (Seventeen); Ex. 31 (Grippo) ¶ 11
(Town & Country); Ex. 33 (Truelove) ¶ 8 (Veranda); Ex. W (Wang Decl.) ¶¶ 11-12 (Harper's

websites,[9] prepare and assemble documents and materials,[10] "liaise" and communicate with

public relations firms and vendors,[11] conduct polls and interviews,[12] and transcribe interviews.[13]

Interns also perform physical, administrative, and menial tasks, such as making shopping trips

and running personal errands,[14] making pick-ups and deliveries,[15] making copies,[16] opening

---

Bazaar); Ex. X (Stoller Decl.) ¶ 7 (Harper's Bazaar); Ex. Y (Behnen Decl.) ¶ 9 (Harper's Bazaar).

[7]      Ex. 4 (Carbone) ¶ 9 (Country Living); Ex. 29 (Abbey) ¶ 18 (Seventeen); Ex. 30 (Greenblatt) Decl. ¶ 9 (Seventeen).

[8]      Ex. 2 (Greene) ¶ 16 (Cosmopolitan); Ex. 3 (Schmidt) ¶ 8 (Cosmopolitan); Ex. 9 (Perri) ¶ 11 (Esquire); Ex. 10 (Baugh) ¶ 10 (Food Network); Ex. 14 (Rosengarten) ¶ 13 (Harper's Bazaar); Ex. 16 (Officer) ¶ 7 (Harper's Bazaar); Ex. 19 (Sullivan) ¶ 12 (House Beautiful); Ex. 20 (Smith) ¶ 8 (Marie Claire); Ex. 23 (Denholtz) ¶ 7 (O Magazine); Ex. 26 (Cheney) ¶ 16 (Redbook); Ex. 32 (Cazzola) ¶ 11 (Town & Country); Ex. 34 (Kakstys) ¶ 11 (Woman's Day).

[9]      Ex. 5 (Baughman) ¶ 8 (ELLE); Ex. 12 (Scrymser) ¶ 11 (Good Housekeeping); Ex. U (Nagi Decl.) ¶ 8 (Cosmopolitan).

[10]     Ex. 2 (Greene) ¶ 16 (Cosmopolitan); Ex. 3 (Schmidt) ¶ 8 (Cosmopolitan); Ex. 5 (Baughman) ¶ 12 (ELLE); Ex. 6 (Healy) ¶¶ 13-14 (ELLE); Ex. 9 (Perri) ¶ 11 (Esquire); Ex. 10 (Baugh) ¶ 10 (Food Network); Ex. 12 (Scrymser) ¶ 11 (Good Housekeeping); Ex. 13 (Rockefeller) ¶ 13 (Good Housekeeping); Ex. 14 (Rosengarten) ¶¶ 9-10, 14 (Harper's Bazaar); Ex. 15 (Broekema) ¶¶ 8, 17 (Harper's Bazaar); Ex. 16 (Officer) ¶ 7 (Harper's Bazaar); Ex. 19 (Sullivan) ¶¶ 10-11 (House Beautiful); Ex. 20 (Smith) ¶ 7 (Marie Claire); Ex. 21 (Riess) ¶¶ 11-12 (Marie Claire); Ex. 22 (Bell) ¶ 9 (O Magazine); Ex. 24 (Cain) ¶ 12 (Popular Mechanics); Ex. 30 (Greenblatt) ¶ 7 (Seventeen); Ex. 31 (Grippo) ¶ 11 (Town & Country); Ex. 32 (Cazzola) ¶ 10 (Town & Country).

[11]     Ex. 5 (Baughman) ¶ 9 (ELLE); Ex. 12 (Scrymser) ¶ 10 (Good Housekeeping); Ex. 14 (Rosengarten) ¶ 15 (Harper's Bazaar); Ex. 23 (Denholtz) ¶ 7 (O Magazine); Ex. 33 (Truelove) ¶ 8 (Veranda); Ex. V (Skorka Decl.) ¶ 7 (Redbook & O Magazine).

[12]     Ex. 2 (Greene) ¶ 13 (Cosmopolitan); Ex. 22 (Bell) ¶ 14 (O Magazine); Ex. 24 (Cain) ¶ 12 (Popular Mechanics); Ex. 29 (Abbey) ¶ 21 (Seventeen).

[13]     Ex. 4 (Carbone) ¶ 10 (Country Living); Ex. 5 (Baughman) ¶ 9 (ELLE); Ex. 12 (Scrymser) ¶ 9 (Good Housekeeping); Ex. 14 (Rosengarten) ¶ 10 (Harper's Bazaar); Ex. 17 (Mariola) ¶ 8 (HGTV); Ex. 20 (Smith) ¶¶ 9, 11 (Marie Claire); Ex. 22 (Bell) ¶ 6 (O Magazine); Ex. 34 (Kakstys) ¶ 9 (Woman's Day).

[14]     Ex. 17 (Mariola) ¶ 9 (HGTV); Ex. X (Stoller Decl.) ¶ 7 (Harper's Bazaar); Ex. Y (Behnen Decl.) ¶ 10 (Harper's Bazaar).

[15]     Ex. 2 (Greene) ¶ 14 (Cosmopolitan); Ex. 14 (Rosengarten) ¶ 6 (Harper's Bazaar); Ex. 15 (Broekema) ¶ 9 (Harper's Bazaar); Ex. 16 (Officer) ¶ 7 (Harper's Bazaar); Ex. 20 (Smith) ¶¶ 7, 10 (Marie Claire); Ex. W (Wang Decl.) ¶ 11 (Harper's Bazaar); Ex. X (Stoller Decl.) ¶ 7 (Harper's Bazaar); Ex. Y (Behnen Decl.) ¶ 8 (Harper's Bazaar).

mail,[17] answering phones,[18] acting as "assistants" on location,[19] and maintaining Hearst's

fashion, accessory, beauty, and product closets.[20]

Hearst's internship job postings consistently describe the productive work that interns

will perform.  *See* Ex. Z (Hearst Internship Postings).  For example, Graphic design interns at

Seventeen are responsible for "scanning," "light retouching," "archiving and resizing."  *Id.*

(Graphic Design Intern, Seventeen).  Photo interns at Studio D, who work for several Hearst

publications, are responsible for "set building and shoot production," "assisting photographers

with lighting and equipment set up and break down," "picking up and delivering products on

urgent shoots," and "maintaining the studio and equipment in a clean, tidy, and organized

manner."  *Id.* (Hearst Magazines Photo Studio Summer Internship).  ELLE features interns must

"organize CDs and books; research and pitch story ideas; brainstorm events for the Elle

Calendar; transcribe celebrity interviews; [and] assist in other office tasks."  *Id.* (Spring 2012

ELLE Features Internship).

Some of the job postings explicitly state that interns will perform the same job duties as

regular employees.  *See, e.g.*, *id.* (Internships at Good Housekeeping, Art ("The right candidate

---

[16]     Ex. 2 (Greene) ¶ 11 (Cosmopolitan); Ex. W (Wang Decl.) ¶ 13 (Harper's Bazaar); Ex. X
(Stoller Decl.) ¶ 7 (Harper's Bazaar); Ex. Y (Behnen Decl.) ¶ 10 (Harper's Bazaar); Ex. C
(Helmus Tr.) 99:4-19.
[17]     Ex. 2 (Greene) ¶ 11 (Cosmopolitan); Ex. 26 (Cheney) ¶ 15 (Redbook).
[18]     Ex. 2 (Greene) ¶ 11; (Cosmopolitan); Ex. X (Stoller Decl.) ¶ 7 (Harper's Bazaar); Ex. Y
(Behnen Decl.) ¶ 10 (Harper's Bazaar).
[19]     Ex. 4 (Carbone) ¶ 11 (Country Living); Ex. 10 (Baugh) ¶ 11 (Food Network); Ex. 14
(Rosengarten) ¶¶ 6, 9 (Harper's Bazaar); Ex. 15 (Broekema) ¶ 15 (Harper's Bazaar); Ex. 18
(Bauman) ¶ 8 (House Beautiful); Ex. 20 (Smith) ¶¶ 7-8 (Marie Claire); Ex. 33 (Truelove) ¶ 8
(Veranda); Ex. 34 (Kakstys) ¶ 10 (Woman's Day); Ex. W (Wang Decl.) ¶ 13 (Harper's Bazaar);
Ex. X (Stoller Decl.) ¶ 7 (Harper's Bazaar); Ex. Y (Behnen Decl.) ¶ 10 (Harper's Bazaar).
[20]     Ex. 5 (Baughman) ¶ 11 (ELLE); Ex. 12 (Scrymser) ¶ 9 (Good Housekeeping); Ex. 14
(Rosengarten) ¶ 15 (Harper's Bazaar); Ex. 20 (Smith) ¶¶ 7-8 (Marie Claire); Ex. 22 (Bell) ¶ 10
(O Magazine); Ex. 26 (Cheney) ¶¶ 13-14 (Redbook); Ex. 29 (Abbey) ¶ 16 (Seventeen); Ex. V
(Skorka Decl.) ¶ 7 (O Magazine and Redbook); Ex. W (Wang Decl.) ¶¶ 11-12 (Harper's Bazaar);
Ex. X (Stoller Decl.) ¶¶ 7-8 (Harper's Bazaar); Ex. Y (Behnen Decl.) ¶¶ 8-9 (Harper's Bazaar).

will hold many of the same responsibilities as a full-time staff member."); O Magazine Editorial

Internship ("O magazine interns are treated as part of the team, so while there may be some

administrative tasks, there is also a real opportunity to contribute . . . .").  According to Hearst,

interns perform many of the same duties performed by regular employees.  Ex. C (Helmus Dep.)

34:11-17, 37:18-38:2, 104:3-11; Ex. D (Roberts Dep.) 151:2-22.

Interns at Hearst do not need retraining to move from magazine to magazine.  Interns

sometimes move from one magazine to another during the course of their internships and do not

need to reapply because the internships are "all with the same company . . . Hearst Magazines."

Ex. AA (LIM Email); Ex. BB (Marketing Email).

**IV.    Hearst Uniformly Fails To Ensure That Its Unpaid Internships Comply With The
        Law.**

Hearst has taken no steps to ensure that its unpaid internships comply with the law.   For

example, Hearst does nothing to ensure that interns benefit from their internships, that their work

does not directly or immediately benefit Hearst, that interns do not displace regular employees,

or that interns receive training or supervision.  Ex. C (Helmus Dep.) 89:25-90:10; Ex. D (Roberts

Dep.) 71:6-73:13.

Across all of Hearst's magazines and departments, no internship offers formal training

for the majority of the intern's workday or even as a substantial component of the intern's time

spent working.  In fact, as Hearst's own declarations admit, the magazines and internal

departments provided little or no training at all.  The formal training that is offered is short and

infrequent—such as brief gatherings once every week or two or brown bag lunches once a

month.  *See, e.g.*, Ex. 32 (Cazzola) ¶ 8 (five classes over the course of one summer); Ex. 16

(Officer) ¶ 9 & Ex. A ("how-to" lessons once per week); Ex. 2 (Greene) ¶ 10 (four sessions

during entire internship); Ex. 3 (Schmidt) ¶ 7 (one session of two hours per week); Ex. 17

(Mariola) ¶ 13 (one workshop at the end of each semester); Ex. 29 (Abbey) ¶ 14 (lunch sessions once a month).

## V.    Hearst Underfunds Its Internship Programs.

Hearst does not provide its magazines with resources to pay interns.  Ex. D (Roberts Dep.) 68:2-19.  The magazines have not set aside money in their own budgets to pay interns.  Ex. CC (Budget Email) ("[N]one [of the magazines] have any money in their budgets [for paid internships], so [interns] must receive school credit."); Ex. DD (Resume Email) ("[W]e do rely on interns . . . .  We are unable to pay our interns . . . .").  Hearst relies on unpaid interns, instead of paying for the work, to save money.  For example, one Hearst magazine recommended using interns to make deliveries instead of using messengers to cut down on costs.  Ex. EE (Cost Savings Email) ("There needs to be a 20% reduction in the use of messengers . . . . In the event this is not possible . . . , please use your interns to do Manhattan runs (using the subway).  If you don't have an intern please check with Lisa who will look into finding you one for this purpose.").

### PROCEDURAL HISTORY

On February 1, 2012, Plaintiff Xuedan Wang filed a class and collective action complaint alleging that Hearst unlawfully failed to pay minimum wages and overtime to her and other unpaid and underpaid interns for the work that they performed during their internships.  ECF No. 1.  On March 23, 2012, Plaintiff filed an amended class action complaint that additionally alleged that Hearst's policy of requiring interns to pay for college credit in order to be employed constituted an "unlawful deduction" under New York Labor Law Section 193.  ECF No. 7.  Three individuals who worked as unpaid interns at Marie Claire, Esquire, and Redbook have joined the case as opt-in plaintiffs pursuant to Section 216(b) of the FLSA.  ECF Nos. 3, 17.

On April 4, 2012, after negotiating a discovery plan with Plaintiff that called for six months of discovery, Hearst filed a Motion to Strike the Class and Collective Action Allegations ("Motion to Strike"), asking the Court to deny class and collective certification before discovery had even commenced.  ECF No. 9.  In support of its Motion to Strike, Hearst included declarations from 34 magazine editors and two Human Resources employees.  *Id*.  In order to respond to Hearst's Motion to Strike, Plaintiff sought document discovery, depositions of Hearst's 36 declarants, and contact information for Hearst interns and their supervisors.  Bien Decl. ¶ 4.  On April 12, 2012, the Court ordered Hearst to produce its two Human Resources declarants for depositions and documents regarding the terms and conditions of its internship programs.  ECF No. 15.

On May 8, 2012, Plaintiff raised with the Court two discovery disputes regarding Hearst's refusal to provide a search term "hit list" to facilitate Plaintiff's request for responsive emails and to provide Plaintiff with a limited sampling of emails between Hearst's Human Resources personnel and interns.  Bien Decl. ¶ 5.  On May 17, 2012, Plaintiff raised an additional dispute regarding Hearst's redaction of class members' and witnesses' names in its document production.  *Id*.  On May 24, 2012, Magistrate Judge Peck, to whom the Court referred the disputes, ordered Hearst to conduct email searches for a limited set of search terms and to produce emails between Human Resources and Human Resources interns.  Judge Peck denied Plaintiffs' requests for a hit list and for unredacted versions of documents containing the names of Hearst interns.  ECF No. 19.  Judge Peck set June 7, 2012 as the revised deadline for Plaintiff's opposition brief.  *Id*.

10

**ARGUMENT**

## I.   Hearst Misconstrues The Standards That Apply to Unpaid Internships.

Hearst misconstrues the standards that the Court will ultimately apply to determine whether its intern policies are lawful in several ways.

First, the test that the U.S. Supreme Court articulated in *Walling v. Portland Terminal Co.*, that was followed by a court in this District in *Archie v. Grand Central Partnership, Inc.*, and that underlies the U.S. Department of Labor's six-factor test ("DOL Test")[21] looks at whether the work that the alleged "non-employee" performs directly or immediately benefits the "employer."  *Walling*, 330 U.S. at 153 (the employer did not receive any "immediate advantage" from the work performed by the trainees); *Archie*, 997 F. Supp. 504, 531-32 (S.D.N.Y. 1998) ("If a defendant gains an immediate advantage from a plaintiff's labor, courts have held that the plaintiff is an employer for purposes of the FLSA."); Ex. FF (Fact Sheet #71) ("The employer . . . derives no immediate advantage from the activities of the intern . . . .").  The test derives from the definition of "employ" under the FLSA, which means "to suffer or permit" work.  29 U.S.C. § 203(g).  When an employer "suffer[s] or permit[s]" work, it obtains a direct or immediate benefit from the work and must compensate the worker for it.[22]  *See Walling*, 330 U.S. at 152.  In *Walling*, the Supreme Court held that railroad trainees were not employees because there was

---

[21]     The New York State Department of Labor has an eleven-factor test ("NYSDOL Test") that includes the same six DOL Test factors and five additional factors of its own.  Ex. GG (NYS Fact Sheet).  Like the DOL Test, the NYSDOL Test specifies that "[a]n employment relationship does not exist only if the situation meets ALL of [the eleven] criteria."  *Id.*  For practical purposes, then, cases interpreting *Walling* and the DOL Test are equally applicable to the question of whether Plaintiff and other Hearst interns are employees under the New York Labor Law ("NYLL").

[22]     In fact, an employer can "suffer" work even where the employee does not affirmatively perform any tasks, such as when an employer requires an employee to be "on call" in case the need for work arises.  *Singh v. City of New York*, 524 F.3d 361, 368 (2d Cir. 2008); *Pabst v. Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1134-35 (10th Cir. 2000).

undisputed evidence that "the railroads receive[d] *no* 'immediate advantage' from any work done by the trainees," that the trainees worked "*solely* for [their own] personal purposes or pleasure," and that their "work serve[d] *only* [their] own interest."  *Id.* at 152-53 (emphasis added).

      *Walling* strongly suggests that the outcome would have been different if the railroad had obtained an immediate advantage from the trainees and cautioned future courts to be wary of circumstances where an employer "has evasively accepted the services of . . . beginners at pay less than the legal minimum."  *Walling*, 330 U.S. at 153.  Courts have refused to extend *Walling* beyond its narrow circumstances where there is evidence that the alleged employer benefitted from the "non-employee's" work.  *See Archie*, 997 F. Supp. at 535 (concluding that the plaintiffs were employees because they "performed productive work for the defendants," despite that they "received certain advantages as well—such as basic job skills and the ability to create an employment history"); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 (11th Cir. 1982) (mental patients who "did work which was of economic benefit" were employees); *Wirtz v. Wardlaw*, 339 F.2d 785, 787 (4th Cir. 1964) (high school students who performed office tasks were employees despite defendant's claim that "he was endeavoring to teach [them] enough to enable them to determine whether they would be interested in preparing for careers in the insurance business after completion of their high school courses").

      Hearst urges the Court to apply a "primary beneficiary" or "primary benefit" balancing test, which is contrary to the test used by courts in this Circuit and the DOL Test.  The test weighs the benefits to the employer against the benefits to the employee to determine the primary beneficiary of the arrangement.  *See, e.g.*, *Solis v. Laurelbrook Sanitarium & Sch., Inc.*,

642 F.3d 518, 529 (6th Cir. 2011).[23]  The test contradicts *Walling* and *Archie*, a Southern District

case, which held that homeless volunteers were employees because they "performed productive

work," *despite that* they "received certain advantages as well—such as basic job skills and the

ability to create an employment history."  *Archie*, 997 F. Supp. at 535.  Moreover, the balancing

approach could lead to a perverse outcome that would undermine the purposes of the FLSA—

authorizing employers to deny entry-level or beginner workers pay if they derive a substantial

benefit from their work.  This is not what the U.S. Supreme Court had in mind when it permitted

a narrow exception for trainees during their training course.  *See Walling*, 330 U.S. at 153.

Second, Hearst is wrong that the Court will be required to "examine the motivation of

each individual in order to determine the legal status of their training or internship."  Def.'s Br.

12.[24]  The test—whichever applies—is an objective one.  The DOL Test[25] makes this clear.  It

enumerates the objective factors that courts should evaluate in determining whether an intern is

an employee, including the nature of the internship and its similarity to a educational program,

the extent of the training provided, the nature of the work performed and whether it overlaps

with the work of paid employees, among others.  Ex. FF (Fact Sheet #71).

---

[23]    The educational program in *Solis* is not analogous to Hearst's internships because, in *Solis*, the defendant's entire Sanitarium program existed for the sole purpose of "serv[ing] as a training vehicle for students."  642 F.3d at 520.  Here, Hearst clearly does not operate its magazines for the sole purpose of training interns—it operates magazines to make profits.  Moreover, *Solis* is not persuasive to the extent that it advocates for a balancing test under which an unpaid internship that resulted in an immediate benefit to the defendant would nonetheless be lawful simply because the intern arguably derived greater benefit from the experience.
[24]    Hearst says that *Walling* suggests an examination of each individual's motivations, but then cites nothing in *Walling* that actually supports this.  *See* Def. Br. 12.
[25]    Hearst cherry picks the factors that it believes benefit it, while ignoring those that do not. Hearst also chooses to ignore that, according to the U.S. Department of Labor, all of the factors are mandatory and must be established by the employer in order for the employer to classify an intern as a non-employee.  Ex. FF (Fact Sheet #71) ("If *all* of the factors . . . are met, an employment relationship does not exist under the FLSA, and the Act's minimum wage and overtime provisions do not apply to the intern.") (emphasis added).

Third, Hearst's claim that internships are "presumptively lawful" where the interns receive college credit is pulled of thin air.  *See* Def.'s Br. 13.  The July 11, 1995 and May 8, 1996 opinion letters on which Hearst relies say that "*all* of the [six DOL] criteria" must be met. Ex. 43 (WHD Opinion Ltr. – July 11, 1995); Ex. 42 (WHD Opinion Ltr. – May 8, 1996).  The letters merely observe that many internship and volunteer programs that offer college credit are lawful because those programs *comply with all six criteria*.[26]  *Id*.  In any case, even if college credit is relevant, whether it renders the internship lawful under the FLSA and NYLL is a common issue for all Hearst interns.

## II.    Plaintiff's Cross-Motion For Conditional Certification Should Be Granted.

Plaintiff respectfully requests that the Court authorize notice to the following Collective:

All persons who have worked as unpaid or underpaid interns at Hearst Magazines between February 1, 2009 and the date of final judgment in this matter.

Courts in the Second Circuit employ a two-step approach when faced with a motion for conditional certification.  *Myers v. Hertz Corp.,* 624 F.3d 537, 554-55 (2d Cir. 2010).  At the initial notice stage, a plaintiff must establish that other employees "may be similarly situated" to her.  *Id*. at 555 (internal quotation marks omitted).  "Nothing more is needed at this stage of the litigation."  *Shajan v. Barolo, Ltd.,* No. 10 Civ. 1385, 2010 WL 2218095, at *1 (S.D.N.Y. June 2, 2010).

---

[26]     The other opinion letters that Hearst cites likewise do not support their arguments.  The April 6, 2006 opinion letter addresses an externship program that is nearly the polar opposite of Hearst's internships because students spent only one week "shadowing" a particular employee and "[did] not generally perform work for the employers[.]"  The Administrator noted "the virtual absence of actual work" and "that the only benefit to the sponsor, aside from satisfaction in assisting students' career development, is the potential opportunity to screen future interns or employees."  Ex. 44 (WHD Opinion Ltr. – Apr. 6, 2006).  The March 13, 1995 opinion letter does not even provide an opinion, but only recites the six-factor test and, like the July 11, 1995 and May 8, 1996 letters, makes clear that "all of the [six] criteria" must be met.  Ex. 45 (WHD Opinion Ltr. – Mar. 13, 1995).

At this initial stage, Plaintiff's burden is "minimal" and she need only make a "modest factual showing" that she and others are similarly situated. *Salomon v. Adderley Indus.*, No. 11 Civ. 6043, 2012 WL 716197, at *1 (S.D.N.Y. Mar. 6, 2012) (quoting *Myers*, 624 F.3d at 555). This is because "the purpose of the first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Myers*, 624 F.3d at 555 (emphasis in original). Accordingly, at this stage, "[w]eighing of the merits is absolutely inappropriate." *Shajan*, 2010 WL 2218095, at *1. Courts "regularly rely on plaintiffs' affidavits and hearsay statements in determining the propriety of sending [collective certification] notice." *Salomon*, 2012 WL 716197, at *1. At the second stage, based upon a fuller record, the Court may determine that the plaintiffs who opted in are in fact not similarly situated and can de-certify the collective. *Myers*, 624 F.3d at 555.

### A.      Plaintiff Exceeds Her Low Burden For Conditional Certification.

Plaintiff supports her motion with ample evidence that she and other unpaid Hearst interns are similarly situated with respect to Hearst's common policy or plan to deny interns compensation for the hours they work. *See Summa v. Hofstra Univ.*, 715 F. Supp. 2d 378, 386-89 (E.D.N.Y. 2010) (affirming certification of a collective of student workers who "were together the victims of a single decision, policy or plan" of classifying students as workers who are excluded from the FLSA). First, Hearst admits that it made the determination that interns are not employees entitled to minimum wages and overtime at the corporate level and applied this policy to all interns, regardless of the magazine or department in which they worked. Ex. C (Helmus Dep.) 59:22-24, 63:7-12; Ex. D (Roberts Dep.) 14:3-24, 50:24-51:5, 52:15-53:3. Second, Hearst enforces this decision at the corporate level—Hearst does not budget for intern pay, use its payroll vendor for interns, or apply its employee policies to interns, including its worker's compensation policy. Ex. C (Helmus Dep.) 94:24-95:23; Ex. D (Roberts Dep.) 68:2-

15

19; Ex. HH (Intern Incident Email).  Hearst also enforces the same corporate policy that requires

all interns to submit college credit letters.  Ex. C (Helmus Dep.) 78:15-81:24; Ex. E (Hiring

Criteria Email).  Third, declarations from five former interns who worked at four different

magazines, Hearst's declarations, and documents produced by Hearst, including job descriptions,

show that Plaintiff and other interns all performed entry-level work that benefitted Hearst

regardless of the magazine or Hearst department in which they work.  *See* Factual Background,

Part III *supra*.  This evidence is more than sufficient to meet Plaintiff's low burden.  *See Summa*,

715 F. Supp. 2d at 386-87 (granting conditional certification based on statements contained in

the plaintiffs' declarations that they and others were covered by the same compensation policy).

### B.     The "Distinctions" In Intern Tasks That Hearst Cites Are Not Relevant And Do Not Defeat Collective Certification.

The "distinctions" that Hearst attempts to draw among interns do not defeat conditional

certification because, as discussed above, the evidence shows that, *across magazines*, interns

performed many of the same tasks.  *See* Factual Background, Part III *supra*.  Moreover, even if

some interns answered phones, while others did research, these "differences" do not make them

differently situated because Hearst uniformly treated them as non-employees regardless of their

duties.  *See Summa*, 715 F. Supp. 2d at 390.

The court rejected an argument very similar to Hearst's argument in *Summa v. Hofstra*

*University*.  In that case, Hofstra students worked in a variety of on-campus positions and were

not paid for all of the hours they worked.  715 F. Supp. 2d at 380.  Like Hearst, Hofstra argued

that a class of students could not be certified because determining whether they were employees

would require "an individualized inquiry into each putative class member" because each had

different duties.  *Id.* at 389-91.  The court rejected Hofstra's argument, reasoning that "under

section 216(b) parties may be similarly situated, despite not occupying the same positions or

performing the same job functions and in the same locations, provided that they are subject to a common unlawful policy or practice." *Id.* at 390 (internal quotation marks omitted).  The court further found that variations in positions and job functions did not defeat the plaintiffs' showing that they were victims of a common unlawful policy—Hofstra's classification of them as non-employees and failure to pay them.  *Id.* at 390-91 (citing *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 368 (S.D.N.Y. 2007)).

Here, the evidence demonstrates that Hearst determined at the corporate level that Plaintiff and other Hearst interns were not employees entitled to be paid and that this determination did not vary depending on the specific tasks they were assigned.  Ex. C (Helmus Dep.) 59:22-24, 63:7-12; Ex. D (Roberts Dep.) 14:3-24, 50:24-51:5, 52:15-53:3.  This evidence, together with Plaintiffs' declarations and Hearst's admissions, is sufficient to meet Plaintiffs' low burden at this early stage.  *See Summa*, 715 F. Supp. 2d at 390.

### C.    Hearst Is Misleading When It Claims That No Court Has Certified A Class Of Interns.

Hearst's claim that "no class of 'interns' has . . . been certified under the FLSA" is misleading because it suggests that interns have sought conditional certification and that courts have denied it.  However, Plaintiff is not aware of any case in which a court has denied certification of an intern collective and Hearst does not cite any.  In fact, there is no reason to believe that collective actions brought by misclassified interns are different than collective actions brought by other misclassified workers, which courts routinely certify.  *See, e.g., Hernandez v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 8472, 2012 WL 1193836, at *4-5 (S.D.N.Y. Apr. 6, 2012); *Pippins v. KPMG LLP*, No. 11 Civ. 377, 2012 WL 19379, at *8 (S.D.N.Y. Jan. 3, 2012); *Summa*, 715 F. Supp. 2d at 386-390.  Moreover, as discussed above, at least one court in this Circuit has granted conditional certification in a case brought by students classified as non-

employees that involved the same legal standards that the Court will apply in this case.  *See Summa*, 715 F. Supp. 2d at 390; *see also Archie*, 997 F. Supp. at 531-32 (applying *Walling* to a group of forty plaintiffs in an FLSA collective action and concluding that they were misclassified as trainees who were not covered by the FLSA).

> **D.      Second-Stage Decertification Is Inappropriate Because Notice Has Not Yet Issued And The Record Is Not Complete.**

Likely recognizing that Plaintiff will meet the "low standard" required to show that she and other interns are similarly situated at this early stage, *see Myers*, 624 F.3d at 555, Hearst argues that conditional certification should not be granted because the collective will ultimately be decertified.  Def.'s Br. 16-19.  This argument is procedurally improper and meritless.

Determining whether the collective should be decertified now is inappropriate because the Court does not yet know who will join the case.  *See Myers*, 624 F.3d at 555 (only after notice issues can a district court determine whether the plaintiffs who have opted in are in fact "similarly situated" to the named plaintiffs); *Gortat v. Capala Bros., Inc.*, No. 07 Civ 3629, 2010 WL 1423018, at *10 (E.D.N.Y. Apr. 9, 2010) (emphasis in original).

Moreover, courts have consistently disapproved of attempts to prematurely apply the higher, "second stage" decertification standard where, as here, discovery is still in its early stages.  *See, e.g.*, *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 645 (S.D.N.Y. Dec. 13, 2010) (applying second stage standard "conflict[ed] with the general practice of courts in [the Second] Circuit" under which courts apply lenient first-stage standard when discovery is not far advanced) (listing cases).  Even where there has been extensive discovery, courts reject attempts to apply the second-stage standard before the record is complete as contrary to the broad remedial purposes of the FLSA.  *See Gerlach v. Wells Fargo & Co.*, No. 05 Civ. 585, 2006 WL 824652, at *3 (N.D. Cal. Mar. 28, 2006).

Here, where it is not yet known who will join the collective and there has been approximately one month of discovery, involving limited document production and just two depositions of Human Resources personnel, it would be inappropriate to apply the second stage standard to preemptively decertify the collective.  *See Cunningham*, 754 F. Supp. 2d at 645.

## III.   The Court Should Deny Hearst's Motion To Strike The Class And Collective Allegations Because It Is Premature And Lacks Merit.

### A.   There Is No Basis In Law For Hearst's Motion To Strike The Collective Allegations.

There is no procedural device under which Hearst may strike Plaintiff's collective allegations.  Even assuming it is moving under Rule 12(b)(6), the allegations in the complaint alone—even apart from the evidence Plaintiff submits to support notice—easily meet the plausibility standard under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  *See Austin v. Amazon.Com, Inc.*, No. 09 Civ. 1679, 2010 WL 1875811, at *3 (W.D. Wash. May 10, 2010) (denying motion to strike where evidence in support of collective allegations met plausibility standard under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Iqbal*).

### B.   Hearst's Motion To Strike The Class Allegations Is Procedurally Premature.

In this Circuit, "[m]otions to strike are generally looked upon with disfavor [and] a motion to strike class allegations . . . is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation . . . before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."[27]  *Chenensky*, 2011 WL 1795305, at *1 (citing cases); *see also*

---

[27]     In a similar case involving unpaid interns who worked for Fox Searchlight Pictures, *Glatt v. Fox Searchlight Pictures, Inc.*, No. 11 Civ. 6784 (S.D.N.Y. filed Sept. 28, 2011), the defendant withdrew its request to file a similar motion to strike the class and collective allegations after Judge Pauley signaled that such a motion would essentially be futile, citing

*Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 21-22 (2d Cir. 2003) (reversing premature denial of class certification); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2012 WL 205875, at *4 (S.D.N.Y. Jan. 19, 2012) (denying defendants' motion to strike class allegations as procedurally premature where all of defendants' arguments were indistinguishable from issues that would be decided on motion for class certification); *Rogers v. Capital One Servs., LLC*, No. 10 Civ. 398, 2011 WL 873312, at *7-9 (D. Conn. Feb. 19, 2011) (holding that portions of a class complaint should only be struck where "the basis for the motion to strike is distinct from the issues that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b) . . . and it is clear that plaintiffs cannot possibly prove the deleted portions of those claims") (internal citations omitted)); *Cruz v. Hook-Superx, LLC*, No. 09 Civ. 7717, 2010 WL 3069558, at *4 (S.D.N.Y. Aug. 5, 2010) ("At this early stage of the proceedings, before any discovery has been taken and prior to Plaintiffs' making a Rule 23 motion, the Court finds that there is no basis for granting Defendants' motion to deny class certification . . . .").

Striking Plaintiff's class allegations at this preliminary stage would be inappropriate. Hearst produced a narrow set of documents, refused to produce emails from anyone other than two Human Resources employees, and produced only these two employees for depositions.  Bien Decl. ¶ 6.  Hearst also refused to produce contact information for putative class members or their supervisors to enable Plaintiffs to gather evidence in support of their class allegations.  *Id.*

Moreover, a motion to strike should be denied where, as here, it raises essentially the same arguments that would be considered on a motion for class certification.  *Chen-Oster*, 2012 WL 205875, at *4; *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06 Civ. 6198, 2008 WL

---

*Chenensky v. N.Y. Life Ins. Co.*, No. 07 Civ. 11504, 2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011).  Bien Decl. ¶ 6 & Ex. II (Fox Searchlight Tr.) 3:4-9, 7:11-21.

161230, at *3 (S.D.N.Y. Jan. 16, 2008).  Hearst's arguments regarding the "individualized"

nature of its internships are the same arguments that it would make to oppose a motion for class

certification.  Plaintiff should be afforded the same opportunities to prove her case that the

Federal Rules provide to all other plaintiffs in civil litigation.  *See Chen-Oster*, 2012 WL

205875, at *4 (denying defendants' motion to strike where plaintiffs had not yet completed the

discovery needed to obtain class certification).  Further, Plaintiff has submitted sufficient

evidence to render her class action allegations plausible.  *See Iqbal*, 556 U.S. at 678.

### C.     Even After Very Limited Discovery, It Is Clear That Plaintiff Will Be Able To Certify The Class.

Hearst fails to show that Plaintiff will not ultimately be able to satisfy Rule 23 because

the limited discovery to date points to common questions that "will generate common answers

apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

2551 (2011) (internal quotation marks omitted).  The existence of just one common question that

predominates is sufficient to satisfy Rule 23.  *See Labriola v. Bank of Am., Nat. Ass'n*, No. 12

Civ. 79, 2012 WL 1657191, at *9 (N.D. Cal. May 10, 2012) (denying motion to strike class

allegations where plaintiff identified at least one common question that potentially

predominated); *Lewis v. Alert Ambulette Serv. Corp.*, No. 11 Civ. 442, 2012 WL 170049, at *9

(E.D.N.Y. Jan. 19, 2012).  Here, there are several.

One important common question is whether Hearst derived an immediate advantage from

the work that Plaintiff and other interns performed.  *See Archie*, 997 F. Supp. at 531-32 ("If a

defendant gains an immediate advantage from a plaintiff's labor, courts have held that the

plaintiff is an employe[e] for purposes of the FLSA."); Ex. FF (Fact Sheet #71).  This question

looks to the nature of the work that interns performed.  *Archie*, 997 F. Supp. at 535 (concluding

that the plaintiffs were employees because they "performed productive work for the

defendants"); *Donovan*, 676 F.2d at 471 (mental patients who "did work which was of economic benefit" to defendant were employees); *Wirtz*, 339 F.2d at 786-88 (high school students who helped to perform office tasks were employees).  The common proof that will answer this question includes, but is not limited to: (1) Hearst's internship postings, which uniformly describe productive work; (2) consistent testimony from Hearst employees familiar with interns' work, including many of Heart's own declarants, who describe interns' entry-level productive work; and (3) the testimony of the interns themselves, some of whom submitted declarations in support of Plaintiff's Cross-Motion, who discuss the productive work they performed.  *See* Factual Background, Part III *supra*.

Another common question is whether Plaintiff and other interns displaced regularly employees by performing work that paid employees typically perform.  Ex. FF (Fact Sheet #71). Much of the proof discussed above can also be used to generate common answers to this question.  For example, Hearst's own declarations, its own corporate representatives, and its internship job postings concede that interns perform the same work as paid employees.

A third common question is whether Plaintiff and other interns are subject to the same policy under which they are classified as non-employees and not paid for all (or any) of the hours they work.  The evidence to date shows that Hearst made a decision at the corporate level that interns are not employees who are required to be paid and that this decision did not take into account the specific tasks that they would perform during their internships.  *See* Factual Background, Part I *supra*.

A fourth common question is whether Hearst's requirement that interns obtain school credit to be hired constitutes an unlawful deduction under NYLL § 193.  The answer to this question will not vary from intern to intern.

A fifth common question is whether Hearst's policy that interns obtain school credit to be hired excuses it from paying interns in accordance with the FLSA and NYLL.

A sixth common question is whether Hearst's violations of the law were willful.  The evidence used to answer this question will not vary from intern to intern and will involve whether Hearst took steps to ensure that its intern policies were compliant.  Hearst's Human Resources witnesses testified that Hearst took no such steps, except requiring that interns produce college credit letters, which Hearst believes make the internships lawful.  *See* Factual Background, Part IV *supra.*

Moreover, Plaintiff will be able to show that these common questions predominate over any individualized issues.  *See Wal-Mart*, 131 S. Ct. at 2551.  As discussed above, the individualized issues that Hearst claims exist—that interns performed different tasks and that the extent of their (minimal) training and supervision differed—will not defeat predominance because they are less substantial than the many issues that unite the class, including that interns performed productive work, similar to what entry-level paid employees performed, that produced an immediate benefit to Hearst.  *See Archie*, 997 F. Supp. at 535 (plaintiffs were employees because they "performed productive work" that benefitted the defendants, even though the plaintiffs also "received . . . basic job skills and the ability to create an employment history"); Ex. FF (Fact Sheet #71) (requiring that all six factors must be met in order for unpaid interns to be exempt).  Moreover, Hearst does not—and cannot—contend that individual issues will predominate over the third, fourth, fifth, and sixth issues discussed above because they do not bear in any way on the tasks that interns performed or the extent of their supervision or training.

**D.      Plaintiff Satisfies Rule 23's Typicality And Adequacy Requirements.**

The Court should reject Hearst's half-baked arguments that Plaintiff is not a typical or adequate class representative.  Plaintiff is typical of the class because she was an intern, was classified as a non-employee under Hearst's uniform intern classification policy, and was not paid for her work.  Ex. W (Wang Decl.) ¶¶ 1-2; First Am. Compl. ¶¶ 9, 52, 56, 60.  *See Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) (typicality met where "all class members' claims, including those of named plaintiffs, are based on the same course of events and legal theory, namely that [defendant]'s decision to classify [them] as 'exempt' is inconsistent with the requirements of the NYLL").  As to adequacy, Hearst does not (and cannot) claim that "a conflict that goes to the very subject matter of the litigation" exists between Plaintiff and the class that would defeat her representative status.  *See Dziennik v. Sealift, Inc.*, No. 05 Civ. 4639, 2007 WL 1580080, at *6 (E.D.N.Y. May 29, 2007) (internal quotation marks omitted); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 253 (2d Cir. 2011) (adequacy met where the "class representative[] [is] prepared to prosecute fully the action and ha[s] no known conflicts with any class member").

Nothing that Hearst cites renders Plaintiff an atypical or inadequate class representative.  There is no evidence that Plaintiff "lied" to Hearst.[28]  Moreover, Hearst cannot dispute that she worked as an intern, was not paid, and was classified as a non-employee.  There are also no "unique defenses" available to Hearst based on the "facts" that its cites—that Plaintiff worked full-time, that she was a "head intern," or that she received "lengthy individual counseling"— because none of this matters to whether she is owed wages.  Plaintiff's "admission" that she

---

[28]      Plaintiff submitted a letter from Ohio State University confirming that she had enrolled in a Continuing Education program, which she had done.  Ex. W (Wang Decl.) ¶ 6.  This was sufficient to meet Hearst's requirement.  Hearst does not track whether the schools from which interns submit college credit letters actually award the credits.  Ex. C (Helmus Dep.) 85:23-86:3.

acquired "unrivaled skills" through her internship does not impact whether she was an employee —most paid, entry-level employees likely feel the same way about their first jobs.

**IV.     Hearst's Motion To Dismiss The Unlawful Deduction Claim Should Be Denied.**

Whether Hearst benefited from its credit letter policy—by relying on the college credits to (erroneously) justify classifying interns as non-employees—is a factual question that is not appropriate on a motion to dismiss.  Although Plaintiff did not pay for credits, many Hearst interns did, including opt in Stephanie Skorka who is prepared to serve as an additional class representative.  With the Court's permission, Plaintiff will seek leave to amend the proposed Second Amended Complaint to add Ms. Skorka as a named Plaintiff.  Bien Decl. ¶ 7 & Ex. JJ (Proposed SAC).

CONCLUSION

For the foregoing reasons, the Court should: (1) deny Hearst's Motion to Strike in its entirety; (2) grant Plaintiff's Cross-Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b); and (3) order the parties to meet and confer on the form of a proposed Court-Authorized notice.

Dated: New York, New York
       June 7, 2012

                              Respectfully submitted,


                    By:    */s/ Rachel Bien*
                           Rachel Bien

                           **OUTTEN & GOLDEN LLP**
                           Adam T. Klein
                           Rachel Bien
                           Elizabeth H. Wagoner
                           3 Park Avenue, 29th Floor
                           New York, New York 10016
                           Telephone:  (212) 245-1000

                           **Attorneys for Plaintiff and the Putative Class**