```
C6rdwanm
```
                              MOTION

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   XUEDAN WANG, on behalf of
     herself and all others
 4   similarly situated,

 5              Plaintiffs,              New York, N.Y.

 6         v.                           12 Civ. 0793 (HB)

 7   THE HEARST CORPORATION,

 8              Defendant.

 9   ------------------------------x

10                                      June 27, 2012
                                        12:03 p.m.
11
     Before:
12
                     HON. HAROLD BAER, JR.,
13
                                        District Judge
14
                           APPEARANCES
15
     OUTTEN & GOLDEN, LLP (NYC)
16        Attorneys for Plaintiffs
     BY:  RACHEL MEGAN BIEN
17        ADAM T. KLEIN

18   HEARST CORPORATION
     Office of General Counsel
19        Attorneys for Defendant
     BY:  JONATHAN R. DONNELLAN
20        COURTENAY O'CONNOR
          KRISTINA E. FINDIKYAN
21

22

23

24

25

C6rdwanm
                                    MOTION

1          (Case called)

2          THE COURT:  Good morning, or good afternoon.

3          Anyway, this is a Hearst motion.  Why don't I hear

4    from you first.

5          MR. DONNELLAN:  Thank you, your Honor.

6          We're here on our motion to strike the class

7    allegations under both the FLSA and Rule 23 as well as

8    plaintiffs' cross motion to conditionally certify the FLSA.  I

9    am going to address the FLSA and Rule 23 aspects of our motion

10   separately.

11         With respect to the FLSA, the question is whether or

12   not all interns at Hearst's 19 magazines and dozens of

13   internship programs are similarly situated for purposes of

14   first-stage conditional certification under the FLSA.  The

15   answer to that is no.  And we know that because discovery has

16   now confirmed the facts that were set forth in Hearst's motion,

17   which show that the interns are not similarly situated on the

18   question of whether or not they are employees, as that term is

19   used in the FLSA.

20         Discovery has shown that there is no single Hearst

21   magazine internship program; there are dozens of programs,

22   there are 19 magazines and several different corporate

23   departments, each of which is different.

24         THE COURT:  Aren't the plaintiffs going to say or

25   actually do say that all she needs to show for this conditional

C6rdwanm
                                MOTION

 1   certification is the potential opt-in plaintiffs were victims

 2   of a common policy?  I think that's a lower hurdle than you

 3   seem to posit.

 4           MR. DONNELLAN:  Well, your Honor, the

 5   similarly-situated analysis focuses on necessarily whether or

 6   not a fair determination can be made based on representative

 7   evidence.  The cases that they have cited and the cases that

 8   are discussed in the briefs dealing with conditional

 9   certification are in the misclassification category.

10           And in the misclassification cases, the

11   similarly-situated analysis is tied into whether or not you can

12   show on a class-wide basis whether or not all of the members of

13   the class are exempt or not.  Here you also have to be able to

14   show that they are similarly situated with respect to the legal

15   standard.  The similarly-situated analysis is tied necessarily

16   directly to the legal standard at issue.  So what they need to

17   be able to show, based on representative evidence, at this

18   stage, at least, is that you can answer that question as to all

19   based on one.

20           Now, here, because the interns differ so significantly

21   in terms of the internship programs, in terms of what they do,

22   in terms of the sorts of benefits that they got, that's not

23   possible to do here.  It's far different from the

24   misclassification cases where you have a category of

25   employee -- the ones where conditional certification is granted

C6rdwanm
                                MOTION

1    all deal with facts where you have, say, an assistant manager

2    of a store.  Their job duties are defined.  All of their

3    responsibilities are defined.  Those are the situations where

4    conditional certification is granted.

5              On the other hand --

6              THE COURT:  So, I mean, you say that.  But the problem

7    I have -- again, relying on the sort of low hurdle -- is that I

8    gather, at least in <u>Walling</u>, the definition of the narrow

9    exception to the broad sweep was the intent of the FLSA when it

10   was passed, it really makes it reasonable to assume that even

11   if they were all trainees participating, as the Court said, in

12   a brief vocational training program, which is all true,

13   allegedly, as you allege, that's offered by their employer,

14   that that was enough.  Isn't that what's happening here?

15             MR. DONNELLAN:  Well, your Honor, it's not enough in

16   this particular case because, as you see, the courts that have

17   applied that <u>Walling</u> standard subsequently have all come around

18   to say that you have to engage in an analysis of who is the

19   primary beneficiary of the relationship.  There is not a single

20   court which has adopted the test that is proposed by plaintiffs

21   here which say that it is simply enough to show that the

22   interns, the trainees and so on engaged in productive work.

23             THE COURT:  You wouldn't argue that what Hearst does,

24   as the plaintiffs point out, is to capitalize on the alleged

25   glamor that being an intern at Cosmopolitan brings and that's

C6rdwanm
MOTION

1   pretty much universal in terms of all of the interns, right?

2   So that at the very least -- and I suggest that, as I'm sure

3   you suggest, that that's not very much in terms of commonality.

4        There is some of that.  That's why they're there.  And

5   then you can go on to discuss, as you are biting your lip to

6   get a chance to do, to say that in fact it really is a value

7   only to the employee and that there is no value to the

8   employer.  But I think that's a hard jump to take.

9        I'm glad to listen to how you bridge the gap.

10       MR. DONNELLAN:  Well, your Honor, that goes to the

11  merits ultimately, right?  When you go into a balancing of the

12  benefits to the employer, the host company, and the balance of

13  the benefits to the intern, which the case law, we have six

14  circuit courts which have accepted that as the appropriate

15  inquiry in terms of determining whether one is an employee.

16       Our point at this stage is that if that is the

17  standard, that that standard cannot be employed on a class-wide

18  basis, because the balance is going to be different with

19  respect to different interns.  They do different things.  They

20  are necessarily potentially going to provide different benefits

21  to the company and potentially going to receive different

22  benefits from the company under these different standards.

23  It's not the sort of analysis that can be conducted on a

24  representative basis.

25       THE COURT:  Isn't that a problem for tomorrow, for

C6rdwanm
MOTION

1    certification purposes?

2          MR. DONNELLAN:  No, your Honor.  I think it is a

3    problem for today in terms of conditional certification,

4    because in the conditional certification cases, even under the

5    misclassification cases, where you are just trying to take a

6    group that has the same title and trying to determine if they

7    do all the same things so you can determine if they can all be

8    classified as exempt or not, conditional certification is only

9    granted in those cases where there is a sufficient showing of

10   uniformity across the board about what everybody does.

11         THE COURT:  That doesn't sound to me like <u>Walling</u>.  I

12   mean, <u>Walling</u> -- and I quote just a snippet and I don't suggest

13   that this is the whole meaning, but it does talk at one point

14   about how if a defendant gains an immediate advantage from a

15   plaintiff's waiver, courts have found that the plaintiff is an

16   employer for purposes of the FLSA, unquote.

17         It's hard for me to see how you can argue with that no

18   matter how few clothes they picked up, whatever else they did.

19         MR. DONNELLAN:  Well, in this particular case, it is

20   far different from <u>Walling</u> because you had a group of interns

21   who one thing that we can say is common about them and is true

22   across the board is that they are all receiving academic credit

23   from accredited academic institutions which dub this worthy in

24   some ways.  It is for a fixed duration, and they knew they were

25   not getting paid.

C6rdwanm
MOTION

1        THE COURT:  I read all of that.  I'm still not sure I

2   understand what that does for either of you.

3        MR. DONNELLAN:  Well, that goes to show that the

4   commonalities in this case, your Honor, or the ways in which

5   the interns are similarly situated do not advance plaintiffs'

6   case at all in terms of proving liability.

7        In terms of proving liability, under Walling and under

8   all of the circuit courts that have employed Walling and under

9   the Archie case in this district, which is the only district

10   court decision in the Second Circuit that we're aware of which

11   has employed the analysis, it sets --

12        THE COURT:  The only one in this century from what I

13   can see.  There may be some others.

14        MR. DONNELLAN:  The benefit -- the balance of the

15   benefit that one --

16        THE COURT:  Actually, Archie is a '98 case.  It is not

17   even in this century.  But that's OK.

18        MR. DONNELLAN:  Well, the one that is in this century,

19   your Honor, which we would point to which is the most factually

20   analogous is the Solis case.  The Solis case is very similar in

21   that it deals with students who are in an educational setting.

22   They are doing tasks at a sanitarium which is connected with a

23   school, and the claim was made there by the Department of Labor

24   that they should be deemed employees.  And what the Court

25   determined in that case was that there was indeed an advantage,

C6rdwanm
MOTION

1    an economic benefit that was going to the school through the

2    students' work, but on the other hand there was also

3    significant benefits that were going to the students both

4    tangible and intangible.  And the Court engaged in a balancing

5    of those benefits, and determined that the balance was in favor

6    of the students.

7            And it looked in that case not just to the tangible

8    benefits but also to intangible benefits such as work ethic,

9    responsibility, and the like, finding that that was favorable

10   and weighed against employee analysis.

11           Now, that case also collects a number of other cases

12   from other circuits which have employed the same sort of

13   balancing analysis -- the McLaughlin case in the Fourth

14   Circuit, the Blair case from the Eighth Circuit.  We also cite

15   in our brief the Reich case from the Tenth Circuit, and the

16   Strickland case from the Ninth Circuit.

17           THE COURT:  Did you ever peek at the New Floridian --

18   the Donovan case in the Eleventh Circuit because that case

19   doesn't seem to subscribe to your view?  I mean, it really

20   talks about how -- or concludes that the plaintiffs were

21   employees because they performed productive work for the

22   defendants despite what you are talking about, that they

23   received certain advantages as well as what you laid out --

24   precisely what you laid out, actually -- job skills and the

25   ability to create employment history.

C6rdwanm
                              MOTION

 1           MR. DONNELLAN:  Well, the New Floridian case --

 2           THE COURT:  Not the same.

 3           MR. DONNELLAN:  Well, I'll tell you why it is not the

 4      same, your Honor.  It is not the same because they conduct an

 5      economic benefits -- an economic realities analysis in that

 6      particular case.  And in that case the workers of the New

 7      Floridian were adults, they weren't students.  They were

 8      actually living there.  And it was a long-term assignment.  It

 9      was, in effect, a job where those workers, who were former

10      patients in the mental institution, most of them, were

11      economically dependent on New Floridian.

12           That is consistent with the Alamo case out of the

13      Supreme Court, your Honor, and also with then Judge Sotomayor's

14      decision in the Archie case.  In all of those cases the court

15      looked also to the economic realities of the situation to see

16      whether or not the trainees in those cases, as they were

17      dubbed, were actually economically dependent, whether or not

18      they depended on them either for a paycheck, an extended pay,

19      or for room and board, essentially.

20           THE COURT:  You wouldn't say you have to earn money in

21      order to qualify for your class, for FLSA treatment, would you?

22           MR. DONNELLAN:  The Alamo case actually suggests that

23      you do, your Honor.  It says that you need to receive

24      compensation.  In that case it says --

25           THE COURT:  You're saying they all got credit.  That

C6rdwanm
MOTION

1   is like money, right?

2          MR. DONNELLAN:  They received credit from their

3   academic institutions, which they paid for.  Hearst provides

4   the training; the academic institutions provides the credit.

5          THE COURT:  So they have that money, whether it be

6   credit or whether it be in your pocket.  So that sort of, it

7   seems to me, brings your argument to a draw.  But --

8          MR. DONNELLAN:  Well, potentially on the merits, your

9   Honor, we have been focused so far mostly on whether or not at

10  the end of the day Hearst will be able to establish whether or

11  not these interns are employees or not.  And the point that

12  we're trying to make on this motion is, you know, this Court

13  has a decision to make about what the governing standard is.

14  And that standard, which we say is a balance-of-the-benefits

15  test, which involves a look at who is the primary beneficiary

16  and what the economic realities are, is different from the sort

17  of test that has been proposed by plaintiffs here, which is

18  simply if you can say that interns did productive work, that's

19  enough, that's a liability and that is enough to show that they

20  are similarly situated.

21          That very approach has been rejected by two courts.

22  It has been rejected by the Tenth Circuit in the Reich case,

23  where the court said that Walling was not an all-or-nothing

24  approach and that productive work was not dispositive.

25          It was the same by the Fifth Circuit in Donovan v.

C6rdwanm
MOTION

1    American Airlines, which said that Walling didn't rest on

2    whether the work that was provided was economically beneficial

3    to the company.

4            So that in and of itself can't be enough in order to

5    establish liability or to establish that they are similarly

6    situated.

7            What the Court needs to look at here, we suggest, is

8    whether or not they are going to be able to -- and whether or

9    not they have shown, even on a minimal basis at this point --

10   that this case will be able to be tried on a collective basis.

11   And the cases where the courts have granted conditional

12   certification, it usually involves uniform job descriptions at

13   the outset.  That's the way in which courts can say, sure, we

14   can look at assistant managers at Duane Reade and we can say

15   that they are all similarly situated because they get exactly

16   the same training, have exactly the same responsibilities and

17   exactly the same duties across the board; they are defined

18   specifically.

19           The cases where conditional certification is not

20   granted, such as the Myers case, is when the same sort of

21   employees are not subject to the same sort of uniform

22   definitions of what they do and what their responsibilities are

23   in the outset.

24           THE COURT:  But in large measure interns are pretty

25   much doing uniform work even under your analysis.  I mean, if

C6rdwanm
MOTION

1  the magazine talks about airplanes, they obviously aren't going

2  to be doing a lot of fashion design.  But in terms -- unless

3  you're saying that that does it, there is no longer a

4  possibility of coming out the way the plaintiffs come out.  If

5  you are not saying at that, and let's for the sake of argument

6  say you are not saying that, then it seems to me we don't

7  really have any problem here.  I mean, these people all worked

8  for magazines, or whatever that uniform concept denotes, and

9  they all did the kind of work that every intern does depending

10  on what the rationale and what the goal was for these

11  magazines.  And if they were a fashion magazine, they did

12  fashion work.  And if they were Popular Mechanics, they did

13  mechanical work.

14       I'm not sure -- I would just be interested in if you

15  believe what I just said is wrong, that you couldn't have a

16  class with that sort of spread, you ought to tell me.

17       MR. DONNELLAN:  Your Honor, I don't think that you can

18  have a class, because at the end of the day if you're going to

19  have to balance the benefits, you are going to need to know

20  much more about what they do.  And the reason why we supported

21  our motion with so many declarations was to give, at even just

22  a top-down level look, the differences among them.  These

23  interns are not only just in different magazines with different

24  focuses, but also the intern programs within each magazine, you

25  have art, you have photography, you have editorial, you have

C6rdwanm
MOTION

1     sales and marketing, which is a completely different side of

2     the business, you have the fashion closets and the beauty

3     closets, and all of these are different duties, different

4     experiences for these interns.  They are also subject to

5     different supervisors and to different sorts of training --

6            THE COURT:  My interns really work with clerks.  In

7     the last analysis, they get to see what they do.  But you

8     wouldn't say, if they all worked on habeas petitions and then

9     in some case maybe what we needed was somebody to work on class

10    actions, that wouldn't be a problem for you, right?  They would

11    still all be interns?  Which is the point I'm trying to make,

12    apparently not very well.

13           MR. DONNELLAN:  There is a certain level of generality

14    that's accepted, obviously, in the certification decisions.

15    And if you were going just to job duties, that would be one

16    thing.

17           I still think here that the differences are

18    significant enough, as in the Myers case and the Mike case and

19    the Diaz case that we cited where class certification was

20    denied.

21           THE COURT:  I'll like at Mike again.

22           MR. DONNELLAN:  In those particular -- and then, also,

23    I would also say to your Honor take a look back at the Zivali

24    case, where Judge Rakoff decertified a class.  In that case you

25    were dealing with assistant store managers which at first

C6rdwanm
MOTION

1    blush, because they were all the same across the board, were

2    certified.  And then when it was actually looked at what the

3    facts were and the differences among what they did, he

4    decertified the class.

5            THE COURT:  Yes.  But isn't that the next step?

6            MR. DONNELLAN:  It would be the next step, your Honor,

7    if at this stage you had some sort of a policy -- which is what

8    we conducted discovery to see if it exists, and it doesn't --

9    which said you are a Hearst intern, you show up on day one,

10   this is what you are going to do.  It is defined.  These are

11   all of your duties.  These are all of your tasks.  This is your

12   training, and this is you're going to be supervised.  That

13   would perhaps get you -- because you would have a uniform

14   approach to the internship program, which they have

15   challenged -- that might get you past the first step.

16           But there's another level of analysis that's required

17   here because the test, or the legal standard for determining

18   employee status is different from a misclassification case.

19   You have to look at the benefit on the other side, and look at

20   the differences there as well.  It's not just what they did and

21   what benefit they may have provided to the company, which in

22   and of itself is insufficient to support any finding of

23   liability, you also have to look at what sort of benefit was

24   provided to them.  And there each of their experiences are

25   going to be different based on the kinds of work they did, the

C6rdwanm
MOTION

1   amount of training they received, the amount of supervision.

2   You could see it reflected even in the declarations that the

3   plaintiff puts forward, the differences there, as well as the

4   declarations that obviously that we put in, as well.

5         THE COURT:  No doubt that there are certainly

6   different types of benefits according, as I suggested earlier,

7   according to the kind of work they are doing.  I mean, it is a

8   given.

9         MR. DONNELLAN:  So if you do have to balance those in

10  the end to determine whether or not they are an employee, you

11  can't take one plaintiff, based on that plaintiffs'

12  experience -- in this case, Wang, she was a full-time person,

13  50 hours a week, in a fashion closet, in a fashion magazine --

14  what her experience was in terms of what benefit she believes

15  that she received and in terms of what contribution she made,

16  that balance is going to be different from somebody who is

17  writing stories, perhaps, and posting them online for Car &

18  Driver or for another intern who works at The Food Network

19  Magazine and was engaged in helping to make sales or learning

20  how to do sales pitches on the business side of the magazine.

21        Each one of these experiences is very different, and

22  it is going to result in a different balance.  And because of

23  that reason you are not going to be able to take this kind of a

24  case and say give me the plaintiff, I'm going to look and see

25  what she did, I'm going to make a determination about the level

C6rdwanm
                              MOTION

1    of benefit that she received and that she provided, and then

2    based on that determine if she is an employee and that can be

3    applied equally across the board to all interns.

4           THE COURT:  You said -- I don't want to put you on the

5    spot, so you may know the answer, but would you say that if you

6    were trying a case and you had as a class both waiters and

7    headwaiters and busboys, that that would be a sufficient

8    distinction so as to have to dismiss on a conditional -- right

9    at this juncture in your case?

10          MR. DONNELLAN:  I know, your Honor, that there is a

11   case that's been cited in our papers which deals with wait

12   staff in a restaurant, and I believe that was --

13          (Pause)

14          THE COURT:  It is OK.  I know the case.

15          MR. DONNELLAN:  OK.  The Shajan case, and I know that

16   the Court said in that case that you don't have to live under a

17   toad stool in order to know what people do in a restaurant and

18   that this is pretty generic work.  I think that you could say

19   the same thing about the Hart v Rick's Cabaret case about the

20   strippers.  You know, there is --

21          THE COURT:  More interesting.

22          MR. DONNELLAN:  You don't have to live under a toad

23   stool to know what they do for a living when they show up for

24   work, too.

25          But the interns, they are covering every aspect of the

C6rdwanm
MOTION

1    magazine business.  These are each complex businesses, which

2    somebody who is involved in the area of art and graphic design

3    is going to be doing something completely different from

4    somebody who is in the area of photography and learning about

5    photography.  And these interns are reflected even in the

6    schools that they come from.  There are more than 100 colleges

7    that participate in the intern programs, some coming from very

8    specific disciplines, such as the fashion Institute of

9    Technology, others coming from photography and graphics arts

10   programs, such as Parsons, and some come from business programs

11   to learn about the sales and marketing aspects of the business.

12        THE COURT:  I have people -- let's continue with the

13   analogy in the restaurant.  I have people in a program I run

14   who have as their background essentially prison, and their

15   ability to wash dishes is not enhanced or inhibited by the fact

16   that their background was serving time.  So why don't we add to

17   the Shajan concept, although it may be added, sous chefs and

18   dishwashers?  Do you think that would make a difference in the

19   analogy?

20        MR. DONNELLAN:  I'm not sure that it would.

21        But, your Honor, we are not talking here just about

22   the interns in a Good Housekeeping kitchen, which there is one,

23   because what they do is entirely different from somebody who

24   works in a fashion closet or, again, who writes for the

25   magazine or who is doing photography for the magazine or

C6rdwanm
MOTION

1   research.  These are all wildly different tasks, and the level

2   of benefit, again, that they are going to receive is going to

3   be inherently different.

4           In the _Solis_ case, it's interesting, they had a much

5   smaller variety of different types of work that were being done

6   by the students there, including working in the kitchen,

7   including janitorial work, work which at a level you could say

8   superficially this is all manual labor.  So maybe you can deal

9   with this altogether.  But at the end of the day it was the

10   balance in that case which came out against them being held

11   employees was that they learned the dignity of manual labor.

12   They learned responsibility.  They learned a work ethic.  So

13   you can still balance all of these things and you need to

14   balance all of these things.

15           And these sorts of benefits to the interns are going

16   to be different based on what they are doing.

17           THE COURT:  Does it make any difference that in the

18   collective action lawsuit it is an opt-in operation so

19   everybody that wants to play a role has to actually say so?

20           MR. DONNELLAN:  Well, your Honor, under the

21   conditional certification cases, there is still a hurdle that

22   needs to be overcome here, otherwise there wouldn't any sort of

23   first-stage analysis.

24           THE COURT:  Well, does it make it a little lower

25   hurdle?

C6rdwanm
MOTION

1          MR. DONNELLAN:  It is certainly a lower hurdle, but

2     the lower hurdle is -- in the cases where it has been granted

3     has been where you are able to tell on a corporate policy or

4     practice basis that everyone is uniform with respect to the

5     legal standard determining liability, because that ultimately

6     goes to assist the court in trying this case on a

7     representative basis and into the question of whether or not

8     you can determine liability on representative evidence in a way

9     that's just and fair and complies with -- comports with due

10     process.  And where you will have a balance-of-the-benefit

11     standard, which needs to be applied, and the balance is going

12     to be different because there is no uniformity here, then this

13     sort of case can't get past the first step.  It is not like the

14     other cases where conditional certification have been granted.

15          THE COURT:  Isn't the uniformity -- the real

16     uniformity here that I suppose they can utilize, it is sort of

17     averse to my way of thinking, but isn't the real common policy

18     that indeed interns are denied any compensation?

19          MR. DONNELLAN:  Yes, your Honor.  That's one of the

20     parts, which is that they are subject to the same pay

21     provisions or to the same sort of treatment with respect to

22     pay.

23          But as the District Court said in <u>Myers</u> -- this is

24     Judge Cogan's July 24, '07 opinion.  He was dealing with a Rule

25     23 class issue there, but he also referred back to the

C6rdwanm
MOTION

1   conditional certification under the FLSA, which was denied.  He

2   said that, basing an argument just on that, the fact that you

3   have somebody with the same title subject to the same pay

4   provision, that that's superficial reasoning, which is not

5   sufficient for certification purposes.  You have to go beyond

6   that, because here we need to know whether or not these class

7   members, or putative class members, are similarly situated

8   because they are subject to an unlawful policy.

9          Now, the policy that Hearst has of not paying interns

10  and requiring that they are able to get school credit for their

11  internship is not facially unlawful.  What's needed to show

12  that it is unlawful is to show that they are actually employees

13  under the FLSA.  And what's needed to show that they are

14  actually employees under the FLSA is a balance of the benefits.

15         So to simply point to that policy about requiring

16  credit for unpaid internships doesn't advance the ball at all

17  in terms of telling you can you decide this case on a

18  representative basis -- can you take one intern, take a look at

19  the benefits they provided, the benefits they received, and

20  determine for the entire class whether or not liability exists.

21  It can't be done in this case.

22         (Pause)

23         Your Honor, the balance that needs to be conducted

24  here is necessarily going to depend on what program the interns

25  were in.  There are different programs at different magazines

C6rdwanm
                              MOTION

1    at different times subject to different management, different

2    supervisors, and the interns were doing different things based

3    on what category of internship they were in.  They received, as

4    is demonstrated through our submissions, different training

5    from different people, both on a program-wide level and also on

6    an individual level.  They had different supervisors.  And they

7    certainly derived different benefits.

8         THE COURT:  Well, I certainly hear you.  It is just

9    hard for me to picture how -- I mean, I hate to keep talking

10   about these analogies, most of which are probably not very good

11   anyway.

12        I mean, if you ran a hunting school and you were

13   hunting for six or eight different animals so that you would

14   use different instruments, like different guns or arrows or

15   whatever, and you had to, just to make it more humorous, I

16   guess you had a group of interns who were helping you with your

17   bullets or your arrows or your bows, the fact that they had all

18   kinds of different instruments and they did all kinds of

19   different things -- I mean, they ran after the rabbits but not

20   after the deer -- they would still be interns

21        MR. DONNELLAN:  You got me there, your Honor.  Maybe

22   the interns with the crossbows, if they only learned about the

23   crossbow, would be treated differently from the ones with the

24   shotguns based on the amount of danger they exposed them to, I

25   don't know.

C6rdwanm
                              MOTION

1         But here what you're dealing with is a different kind

2    of program where you're not mixing together a bunch of interns

3    who are learning all of these disciplines together.  They are

4    segregated, and they are --

5         THE COURT:  Well, all people might pick different

6    parts of their forest.

7         MR. DONNELLAN:  I think that might fall within the

8    restaurant category.

9         But the magazines I think you can think of were almost

10   like different schools, precisely because when you are talking

11   about a hunting school that talks about different weapons, you

12   would have a common administration and you would have a common

13   set of protocols.  Here we don't.  That is precisely what

14   discovery has shown.  That's precisely what plaintiff was

15   trying to discover during discovery, which is whether or not

16   this was somehow administered on a corporate basis and whether

17   or not there was corporate control that was exerted over this.

18   There is not.  Each one of these magazines is completely

19   autonomous.  They are very independent and they are very

20   different.  So you have to look at it almost like dozens of

21   different schools as opposed to one school, which is the

22   analogy there.

23        Maybe if it were a different kind of company or a

24   different sort of internship program, you might have an

25   argument here by analogy to the one that you just made, your

C6rdwanm
MOTION

1   Honor, but not on the factual record that we have before us.

2   It is simply not susceptible to being tried on a class-wide

3   basis.  We would have to have discovery of each one of these

4   interns to determine what the benefit was that they derived,

5   what sort of benefit they may have contributed, and also what

6   sort of impediment it caused to the company.

7        If you are sinking a lot of time and training into

8   these people -- you have to edit their work, you have to

9   supervise them -- there is a real question about whether they

10  provided any benefit at all at the end of the day.  That is

11  going to be different with respect to each one.  And in order

12  to make a determination of liability on employee status, we are

13  entitled to take a look at each one of these interns and see

14  where that balance turns out both in the discovery phases and a

15  trial, your Honor, if it were to go forward that way.

16       On Rule 23, some of the arguments that have

17  principally been made is that this is procedurally improper or

18  premature.  There is no bar to our bringing a motion to strike

19  at the early stage.  The Dukes case makes clear that Rule 23

20  certification is an exception to the rule.

21       And it's clear at this stage right now that it is not

22  possible to resolve the central issue in this case, which is

23  employee status, in one stroke, that there are not going to be

24  common answers to any of the questions that have been raised

25  here, and at the end of the day what's going to predominate is

C6rdwanm
MOTION

1    an individual inquiry into the employee status of each

2    individual intern.

3              THE COURT:  And you think you have enough discovery

4    now for me to make a decision with respect to each --

5              MR. DONNELLAN:  Absolutely, your Honor.  I think based

6    on the factual record that we've submitted, you do have an

7    ample basis to do precisely that.

8              THE COURT:  All right.  Let me hear from your

9    adversary.

10              MS. BIEN:  Good afternoon, your Honor.

11              THE COURT:  Good afternoon.

12              MS. BIEN:  I'll take the issues in the same order that

13    counsel took them.

14              I think, first on the conditional certification

15    motion, I would agree with your Honor that it is a very low

16    standard.  The standard that Myers seem to have agreed with,

17    that had been the prevailing standard in this circuit for a

18    very long time, was that the plaintiff at this stage only need

19    make a showing -- a modest factual showing that she may be

20    similarly situated to potential collective members and that she

21    and potential collective members were subject to the same

22    policy or plan that allegedly violated their rights.

23              And here the common policy or plan, as your Honor was

24    discussing, was the determination at the corporate level to

25    treat all interns as nonemployees and the determination at the

C6rdwanm
                              MOTION

 1   corporate level not to pay them any wages for the work that

 2   they did.

 3           In addition to that common policy, which I don't think

 4   is disputed by the defendant, we've also put in declarations

 5   from five interns who worked at four different magazines.  The

 6   declarations support their claim that they had common

 7   experiences.  In fact, despite working in different magazines

 8   and despite having different tasks assigned to them, they all

 9   described doing primarily productive work that benefited Hearst

10   and also having very little training opportunities or formal

11   training provided to them.

12           THE COURT:  Well, the problem I guess is if you look

13   at the sum of all these -- I mean, I think the problem is that

14   some of these things, like the fact that they are unpaid

15   internships may be helpful, but here you have all kinds of

16   other different things other than ones you've mentioned.  I

17   mean, Hearst says itself, I guess in its brief, students visit

18   during one academic semester and different academic semesters

19   and some magazines used them in the winter and some only in the

20   summer, some at the spring break or the holidays, and they have

21   no fixed starting date, or some don't, and some don't come by

22   and some do come by on a regular basis.  And the magazines tell

23   the students that they're not going to get a job when this is

24   all over.  There is just a lot of other items that you didn't

25   include in your potpourri, and I wonder whether if you take

C6rdwanm
MOTION

1    them altogether you don't have to come out a little differently

2    than you did.

3         MS. BIEN:  Well, I would have two responses to that.

4         First, at this initial conditional certification

5    phase, factual disputes in terms of the differences between the

6    interns' experiences from one magazine to the other are not

7    considered, are not ruled on.  Those kinds of merits

8    determinations are --

9         THE COURT:  I understand that merit determinations are

10   not part of this deal.  What I'm trying to find out is how high

11   this little burden is that you have to submit.

12        We all agree that the merits aren't counting and we

13   all agree it's a low hurdle, but it is not a nonexistent

14   hurdle.

15        MS. BIEN:  Well, the hurdle is -- the hurdle basically

16   looks at the evidence that the plaintiffs have submitted and

17   does not take into account countervailing evidence that the

18   defendants have submitted, not at this stage.  Because the idea

19   is to send out notice, see who joins, and at that stage the

20   Court can later on, once the record is complete, make a

21   determination as to whether those individuals who have actually

22   joined are similarly situated to the individuals who are

23   already in the case.  If you --

24        THE COURT:  All those circuit cases that your

25   adversary cited, those seem not to go that way.

C6rdwanm
MOTION

1          MS. BIEN:  In fact, your Honor, the

2    misclassifications -- the vast majority of misclassification

3    cases involve situations where the plaintiffs make a modest

4    factual showing that they are similarly situated or they may be

5    similarly situated to other assistant store managers or others

6    in their role, and the defendants always come forward with

7    countervailing evidence at the initial certification stage

8    showing that, well, in fact, the primary duties varied from

9    location to location, or this manager had hire and fire power

10   authority and this manager didn't, and courts uniformly refuse

11   to consider that evidence at the initial certification stage

12   and wait until the defendants have an opportunity later on to

13   move to decertify the collective based on who has actually

14   joined.

15         THE COURT:  Yes.  But I'm not going to let anybody pay

16   for 1600 depositions, looking even over -- I mean, the time and

17   money for getting to the second stage makes me feel -- and this

18   may be illegal -- makes me feel reticent about going forward

19   here, even if it may sound good because of all the thoughts

20   you've expressed.

21         I mean, the discovery now, how long and how much do

22   you think it will entail?  I guess Hearst, too, has a role in

23   making that decision.

24         What is your thought?

25         MS. BIEN:  Well, your Honor, this is a pretty

C6rdwanm
                             MOTION

1    straightforward case.  I mean, it is all of the interns --

2           THE COURT:  Mr. Donnellan says it is over now.  He

3    says you don't need any -- I lost my head.  I mean, the

4    discovery is over now.

5           MS. BIEN:  The discovery hasn't even begun on our

6    side.  We haven't been able to --

7           THE COURT:  He says there is enough to come to a

8    decision now.  That's really what I mean.

9           MS. BIEN:  Well, they've put in their own evidence,

10   but we haven't had any opportunity, except for the two human

11   resources individuals that they put forward, to depose any of

12   the other 34 people that they put forward.  And I'm not saying,

13   your Honor, that we would necessarily depose each and every one

14   of them but we haven't been able to depose any of them.  We

15   haven't been able to interview potential class members about

16   what their experiences were like, what their duties were, what

17   their supervision was like, that what their training was like.

18   We haven't been able to depose the supervisors --

19          THE COURT:  I understand you but I think you might be

20   missing what I'm saying, or you are not understanding what I'm

21   saying.

22          I think this is a low hurdle, and you haven't given me

23   the precise dimensions, but let's assume that it is low enough

24   so you survive.  I am not about to go forward with 50 or 100 or

25   1,000 interviews and depositions because you would like to talk

C6rdwanm
MOTION

1    to every intern over the last six years that had some role at

2    Car & Driver.

3            MS. BIEN:  We don't believe that we need to speak to

4    every intern.  We don't believe we would have to speak to every

5    supervisor.

6            Our belief is that representative evidence from a

7    number of interns, a number of their supervisors will be able

8    to satisfy our --

9            THE COURT:  I don't know.  What does that mean in

10   terms of time and numbers?

11           MS. BIEN:  I mean, in terms of a plan going forward --

12           THE COURT:  A guesstimate.  You are not under oath.

13           MS. BIEN:  I mean, I think that the first thing that

14   we would want to do is to have access to the class.  So we

15   would want their telephone numbers and their contact

16   information so that we could conduct interviews and gather

17   evidence that we could use to support a class certification

18   motion.

19           The other -- you know, we would also propound

20   discovery requests so that we could actually take discovery

21   from the magazines about what their training policies were

22   like, about the kinds of assignments that interns got.  And we

23   would also probably want to depose some of the individuals that

24   they put forward as fact witnesses.

25           I think probably that discovery could be done in three

C6rdwanm
MOTION

1    or four months, depending on how smoothly things go with, you

2    know, working things out, but typically that's how long it

3    would take in a case of this size.

4           THE COURT:  Well, I want to read some of the cases

5    that I haven't read.  But the only possible way that you're

6    going to prevail is if you give me a report, in more or less

7    two pages, that tells me what kinds of discovery you are going

8    to take, how long you're estimating it will take, and how many

9    people you're bothering.  So keep it in mind in case you

10   survive the motion.

11          But go ahead.  Let me not interrupt you, or I guess I

12   have already.  Tell me what else you think gives you the right

13   to go forward.

14          MS. BIEN:  Well, I think what I was saying earlier was

15   that it is a low standard.  I think that courts have routinely

16   certified collectives based on a declaration from the named

17   plaintiff and a declaration from some additional potential

18   collective members and some evidence of some kind of uniform

19   policy.  And I think that we put forward much more than that.

20          And I think that the cases that we were talking about

21   earlier, the misclassification cases involving FLSA exemptions,

22   are really not dissimilar from this kind of case.  This is a

23   misclassification case as well.  Just like in an independent

24   contractor scenario where the employer has deemed the worker

25   not to be an employee, here the employer has similarly deemed

C6rdwanm
                              MOTION

 1    the interns not to be employees, and those cases are routinely

 2    certified both as, you know, collective actions and ultimately

 3    as class actions.

 4            THE COURT:  Why is this a misclassification case?

 5            MS. BIEN:  Well, if you go back to the ultimate test,

 6    which is whether or not the interns are employees or not under

 7    the FLSA and the New York Labor Law, that is ultimately the

 8    determination.  And so under the definition of what it is to

 9    employ, the question is whether Hearst suffered or permitted

10    the work that the interns did.

11            And there are certain guideposts I think that can

12    guide the Court's determination as to whether interns are

13    employees or not.  Counsel spoke about some of the cases that

14    are more on point than others -- the <u>Walling</u> case in this

15    circuit, the Archie case.  You have the Department of Labor

16    factors.

17            I think that counsel had argued that we had proposed a

18    specific version of the tests that the Court will have to apply

19    down the road when it determines the merits.  And I think our

20    position really is that at this point the Court doesn't have to

21    determine what the exact contours of the standard is.  What it

22    can do is look at what the various factors that courts have

23    looked at in determining whether or not trainees or interns are

24    employees, and those will be the guideposts for the discovery

25    to come as well as the guideposts for the Court ultimately in

C6rdwanm
MOTION

1    determining the merits.

2              And our point is that under a balancing test that

3    Hearst advocates, or a test that just looks at whether or not

4    the employer derived an immediate advantage, under either of

5    those standards at this point plaintiffs have put forth enough

6    evidence to justify conditional certification.

7              With respect to the motion to strike the class

8    allegations, the Rule 23 allegations, those kinds of motions to

9    strike are especially discouraged in this circuit.  And I think

10   that Judge Pauley, in the Chenensky v. New York Life Insurance

11   Company, really provides a very good explanation of why that

12   is.  And that is because in order to make a determination as to

13   the propriety of class certification under the Rule 23

14   standard, the Court is going to have to make factual findings.

15   And in the absence of a complete record, the Court can't make

16   those findings.

17             At this point the Court can only make factual

18   assumptions.  And that's not the standard that the Second

19   Circuit had in mind in the IPO case or in the Myers v. Hertz

20   case when it said that there needs to be a factual record upon

21   which the Court can make the determination.

22             I think class discovery -- Judge Pauley also talks

23   about the value of class discovery in refining the class

24   definition.  Many of the arguments that Hearst makes has to do

25   with the scope of the class, who the interns are that are in

C6rdwanm
MOTION

1    the class definition, defined in the Complaint, and part of

2    class discovery will hopefully enable us to determine whether

3    or not that class definition should be the one that we actually

4    move to certify down the road or whether it needs to be

5    refined.  And I think that the discovery period will offer us

6    the opportunity to do that.

7            You know, another benefit of having a full record, and

8    I think the emphasis of the Second Circuit has been, is that in

9    the event that there is an appeal, the Second Circuit needs a

10   record upon which to determine whether or not the Rule 23

11   findings made below should be, you know, affirmed or reversed.

12           So those are several reasons that Judge Pauley

13   identified and other courts have identified for allowing class

14   discovery to move forward and not adopting what Judge Pauley

15   called the harsh remedy of striking the class allegations at

16   the getgo.

17           I think that much of the evidence that has been put

18   forward by Hearst, much of its arguments really come down to

19   factual assumptions that have not been tested yet, that have

20   not been cross-examined, and plaintiff has not had an

21   opportunity to take her own discovery, and I think, you know,

22   that's what she's asking the Court to allow her to do, you

23   know, over the next few months.

24           THE COURT:  Thank you, both.

25           If you want a minute or two to respond, Mr. Donnellan,

C6rdwanm
MOTION

1  you can have it, but don't force yourself.

2          MR. DONNELLAN:  Thank you, your Honor.

3          I think at the outset that we disagree wholeheartedly

4  with plaintiffs' position that you don't need to determine the

5  standard of liability now.  It absolutely needs to be

6  determined now because it is directly tied to the analysis of

7  whether or not the class members are similarly situated.

8          The question is similarly situated as to what?  It's

9  similarly situated as to whether they are employees under the

10  FLSA.  And the <u>Myers</u> case makes clear the fact that when you're

11  talking about an unlawful policy -- and I direct the Court to

12  the Court's discussion on page 555 of the Second Circuit's

13  decision.  It says, in an FLSA exemption case, plaintiffs

14  accomplish the goal of proving that they were victims of a

15  common policy or plan to violate the law by making some showing

16  that there were other employees who were similarly situated

17  with respect to their job requirements and with regard to their

18  pay provisions on which the criteria for many FLSA exemptions

19  are based.

20          So they tailor their standard there to the exemption

21  analysis.  And it is a low threshold, as your Honor says, but

22  it is not a nonexistent one, and it is one tailored to the

23  exemption test.

24          Here how high is the burden?  The burden is high

25  enough so that the Court can determine that this case can be

C6rdwanm
MOTION

1   tried on a representative basis to determine if these interns

2   are employees.

3            The district court in -- the Second Circuit also cites

4   from the District Court in Myers, and that is on page 544.  And

5   in quoting the collective action order where the District Court

6   denied conditional certification, the reasoning is very similar

7   to what we have here.  In that case we're dealing with station

8   managers for Hertz Corporation -- "Hertz," not Hearst --

9   Corporation.

10           It says, "The Court finds that plaintiff's motion

11  suffers from a fatal flaw that further discovery cannot cure,

12  because liability as to each putative plaintiff depends upon

13  whether that plaintiff was correctly classified as exempt."

14           It goes on to say.  That, to go on, the law there

15  would require the court to make a fact-intensive inquiry into

16  each potential plaintiff's employment situation.  Any

17  determination as to their right to overtime would require a

18  highly individualized analysis as to whether the duties they

19  performed fell within that exemption.

20           Here, similarly, you need to take a look and see

21  whether or not they are correctly classed as nonemployees, and

22  that is going to require an examination of each one of these

23  interns that directly applies to the standard that's been

24  applied under Walling.

25           Now, I would like to address Walling briefly, your

C6rdwanm
MOTION

1   Honor, because it is really the seminal case in this regard.

2   And as we've cited and discussed, the circuit courts that

3   follow it have applied a balance of benefits and an economic

4   realities test which is quite fact intensive.

5           But one of the things that's key about <u>Walling</u>, which

6   a number of circuit courts have also pointed out, is that while

7   there is a very broad definition or an undefined definition of

8   "employee" under the FLSA, that <u>Walling</u> specifically limits it.

9   And it's trying to make clear here that they do not want to

10  foreclose opportunities for inexperienced workers to get

11  training when it is for their own advantage.

12          And that's why in <u>Walling</u> you had a situation where

13  the railroad company was doing this so that they would have a

14  pool of workers.  It also finds facts in the <u>Walling</u> decisions

15  that these trainees did do work.  And the Court, nonetheless,

16  says that where you're without any express or implied

17  compensation agreement, that the FLSA was not intended to stamp

18  all persons employees who might work for their own advantage on

19  the premises of another.

20          THE COURT:  OK.  This is not a reargument opportunity.

21          MR. DONNELLAN:  OK, your Honor.

22          A final point, if I may, in terms of what sort of

23  discovery would be necessary in order to determine whether or

24  not this could be done on a class basis?  You would almost have

25  to do a full merits discovery on all of the different interns

C6rdwanm
MOTION

1    in order to reach that.

2            THE COURT:  Yeah, but that was not the thrust of my

3    concern.  My concern was that that is not going to happen, and

4    what we need -- or it is up to you, I don't care -- is a couple

5    of pages that limits that significantly, willingly, and with

6    love and affection, and if they can't do it, they can't do it,

7    but it is not a problem for you; you've done yours.

8            MR. DONNELLAN:  Thank you, your Honor.

9            If they are going to make such a submission, we would

10   appreciate the opportunity to respond.

11           THE COURT:  Well, you'll certainly get a copy.

12           MR. DONNELLAN:  Thank you.

13           THE COURT:  Thanks, everybody.  We'll be in touch in

14   the not too distant future, and we'll either get going or we'll

15   avoid getting going.

16           MS. BIEN:  Thank you, your Honor.

17           MR. DONNELLAN:  Thank you, your Honor.

18

19                            -   -   -

20

21

22

23

24

25