**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Juno Turner
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: 212-245-1000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

XUEDAN WANG and ERIN SPENCER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

THE HEARST CORPORATION,

Defendant.

**Oral Argument Requested**

**12 Civ. 0793 (HB) (AJP)**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND CLASS CERTIFICATION**
**<u>PURSUANT TO FED. R. CIV. P. 23</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..... 1

PROCEDURAL HISTORY ..... 2

STATEMENT OF FACTS ..... 3

I. The Parties ..... 3

A. Hearst ..... 3

B. Plaintiffs ..... 4

1. Xuedan "Diana" Wang ..... 4

2. Erin Spencer ..... 5

3. Elizabeth Mancini ..... 5

4. Stephanie Skorka ..... 6

5. Matthew Wagster ..... 6

6. Caitlin Leszuk ..... 7

7. Alexandra Rappaport ..... 7

8. Sarah Wheels ..... 7

II. Hearst Uniformly Classifies Interns As Non-Employees Who Are Not Entitled to Pay ..... 8

A. Hearst Classifies Interns as Non-Employees Based on the Same Criterion. ..... 8

B. Hearst Interns Uniformly Perform the Routine Work of the Company ..... 9

1. Interns in Hearst's Fashion Departments Perform Productive Work. ..... 9

2. Interns in Hearst's Beauty Departments Perform Productive Work. ..... 10

3. Interns in Hearst's Editorial Departments Perform Productive Work. ..... 11

4. Interns in Hearst's Photo and Design Departments Perform Productive Work. ..... 11

5. Interns in Hearst's Sales and Marketing Departments Perform Productive Work. ........ 12

6. Interns in Hearst's Shared Services Departments Perform Productive Work. ........ 13

III. Hearst Uniformly Relies on Interns to Get More Work Done. ........ 14

A. Interns Augment Hearst's Bare-Bones Workforce. ........ 14

B. Hearst's Cost-Cutting Measures Have Made It More Reliant on Interns. ........ 16

IV. Hearst Internships Are Structured Around its Actual Operations. ........ 17

V. Hearst Interns Receive Minimal Supervision. ........ 18

VI. Hearst Interns Are Subject to Similar Hiring Practices, Evaluated Based on the Same Standards, and Work Regular Schedules. ........ 19

A. Intern Hiring Practices Are Similar Across Hearst. ........ 20

B. Interns' Performance Is Evaluated Based on the Same Criteria. ........ 21

C. Hearst Requires Interns to Follow Set Work Schedules. ........ 22

ARGUMENT ........ 22

I. Plaintiffs Are Entitled to Summary Judgment Because Hearst Willfully Violated the Law by Classifying Them as Non-Employees. ........ 22

A. Standard of Review ........ 22

B. Plaintiffs Are Covered Employees Under the FLSA and NYLL. ........ 23

1. The FLSA's Remedial and Humanitarian Goals Require the Court to Interpret its Coverage Expansively ........ 23

2. Plaintiffs Performed Work that Hearst Suffered or Permitted. ........ 25

C. Hearst Cannot Show that Plaintiffs Were Trainees Who Were Part of a Bona Fide Internship Program. ........ 26

1. *Walling*'s Narrow Exception for Trainees Does Not Apply to Plaintiffs. ........ 26

2. Hearst Cannot Satisfy the DOL's Six-Factor Test for Unpaid Interns ..... 29

a. Plaintiffs' Internships Were Not Similar to Training that Would Be Given in an Educational Environment and Benefited Hearst..... 30

b. Plaintiffs Performed Work that Hearst Otherwise Would Have Paid Workers to Do and Were Supervised as if They Were Regular Employees. ..... 32

c. Plaintiffs Expected Compensation and Opportunities for Paid Employment in Exchange for Their Work. ..... 33

d. *Laurelbrook* Is Easily Distinguished. ..... 34

e. The Fact that Certain Plaintiffs Received Academic Credit for Their Internships Did Not Excuse Hearst from Paying Them. ..... 35

II. Hearst's Violations Were Willful and Plaintiffs Are Entitled to Liquidated Damages Under the FLSA and NYLL..... 37

III. The Court Should Certify the Proposed Class Because Plaintiffs Meet All of the Rule 23 Requirements..... 39

A. Plaintiffs Meet Each Rule 23(a) Requirement..... 41

1. Numerosity..... 41

2. Commonality..... 42

a. Whether Hearst Derived an Immediate Advantage From Interns' Work. ..... 42

b. Whether Interns Displaced Paid Workers..... 43

c. Whether Hearst Internships Were Structured Around its Actual Operations as Opposed to a Classroom or Academic Experience. ..... 43

d. Whether Hearst Internships Were for the Benefit of Interns..... 44

e. Whether Interns Are Employees as a Matter of "Economic Reality" ..... 45

        3. Typicality ........................................................................................ 45

4. Adequacy ........................................................................................ 46

B. Plaintiffs Meet Rule 23(b)(3)...................................................................47

1. Common Questions Predominate ........................................................... 47

2. A Class Action Is the Superior Mechanism............................................. 47

IV. The Court Should Appoint Plaintiffs' Counsel as Class Counsel…………………..……48

CONCLUSION…………………………………………………………………..……..…49

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Archie v. Grand Central Partnership, Inc.*,
997 F. Supp. 504, 507 (S.D.N.Y. 1998)........................................................... *passim*

*Alvarez v. IBP, Inc.*,
339 F.3d 894 (9th Cir. 2003) ...............................................................................24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................22, 23

*Ansoumana v. Gristede's Operating Corp.*,
201 F.R.D. 81 (S.D.N.Y. 2001) ..........................................................................41

*Aponte v. Comprehensive Health Mgmt., Inc.*,
No. 10 Civ. 4825, 2011 WL 2207586 (S.D.N.Y. June 2, 2011)..............................41

*Ayres v. 127 Rest. Corp.*,
12 F. Supp. 2d 305 (S.D.N.Y. 1998).....................................................................39

*Baffa v. Donaldson, Lufkin & Jenrett Sec. Corp.*,
222 F. 3d 52 (2d Cir. 2000)...................................................................................46

*Bailey v. Pilots' Ass'n for the Bay & River Delaware*,
406 F. Supp. 1302 (E.D. Pa. 1976) .......................................................................28

*Benavidez v. Plaza Mexico Inc.*,
No. 09 Civ. 5076, 2012 WL 500428 (S.D.N.Y. Feb. 15, 2012) ..............................39

*Brooklyn Sav. Bank v. O'Neil*,
324 U.S. 697 (1944)..........................................................................................23, 25

*Capsolas v. Pasta Res., Inc.*,
No. 10 Civ. 5595, 2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012) ........................47, 49

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 2005).....................................................................................42

*Cuevas v. Citizens Fin. Grp., Inc.*,
283 F.R.D. 95 (E.D.N.Y. 2012).............................................................................41

*Damassia v. Duane Reade Inc.*,
250 F.R.D. 152 (S.D.N.Y. 2008) ..................................................................41, 45, 46

*Donovan v. New Floridian Hotel, Inc.*,
676 F.2d 468 (11th Cir. 1982) ....................28, 42

*Exxon Mobil Corp. v. C.I.R.*,
689 F.3d 191 (2d Cir. 2012)....................29

*Han v. Sterling Nat'l Mortg. Co.*,
No. 09 Civ. 5589, 2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011)....................41, 48

*Hart v. Rick's Cabaret Int'l Inc.*,
No. 09 Civ. 3043, 2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010)....................41

*Herman v. RSR Sec. Servs., Ltd.*,
172 F.3d 132 (2d Cir. 1999)....................37, 45

*Iglesias-Mendoza v. La Belle Farm, Inc.*,
239 F.R.D. 363 (S.D.N.Y. 2007) ....................41

*In re Initial Pub. Offering Sec. Lit.*,
471 F.3d 24 (2d Cir. 2006)....................40

*Lee v. ABC Carpet & Home*,
236 F.R.D. 193 (S.D.N.Y. 2006) ....................41

*Marisol A. v. Guiliani*,
126 F.3d 372 (2d Cir. 1997)....................40, 42, 45

*Marshall v. Baptist Hospital, Inc.*,
473 F. Supp. 465, 471-72 (M.D. Tenn. 1979) ....................34, 35

*Martin v. Malcolm Pirnie, Inc.*,
949 F.2d 611 (2d Cir. 1991)....................23

*McLaughlin v. Ensley*,
877 F.2d 1207 (4th Cir. 1989) ....................28

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988)....................37, 38

*Moore v. PaineWebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002)....................47

*Myers v. Hertz Corp.*,
624 F.3d 539 (2d Cir. 2010)....................39, 41, 47

*In re Nigeria Charter Flights Contract Litig.*,
233 F.R.D. 297 (E.D.N.Y. 2006)....................48

*Okoro v. Pyramid 4 Aegis*,
No. 11 Civ. 267, 2012 WL 1410025 (E.D. Wis. Apr. 23, 2012) ....................27, 31, 42

*Pabst v. Oklahoma Gas & Elec. Co.*,
228 F.3d 1128 (10th Cir. 2000) ....................26

*Pollis v. New Sch. for Soc. Research*,
132 F.3d 115 (2d Cir. 1997) ....................37

*Reich v. Parker Fire Prot. Dist.*,
992 F.2d 1023 (10th Cir. 1993) ....................29

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) ....................45

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
659 F.3d 234 (2d Cir. 2011) ....................40, 46

*Solis v. Laurelbrook Sanitarium & School, Inc.*,
642 F.3d 518, 519-20 (6th Cir. 2011) ....................34

*Singh v. City of New York*,
524 F.3d 361 (2d Cir. 2008) ....................26

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
471 U.S. 299 (1985) ....................24, 27, 33

*Torres v. Gristede's Operating Corp.*,
628 F. Supp. 2d 447 (S.D.N.Y. 2008) ....................38

*Torres v. Gristede's Operating Corp.*,
No. 04 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ....................47

*U.S. v. Rosenwasser*,
323 U.S. 360 (1945) ....................23

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ....................40, 42, 43

*Walling v. Portland Terminal Co.*,
330 U.S. 148 (1947) ....................23, 25, 26, 44

*Wang v. Hearst Corp.*,
No. 12 Civ. 793, 2012 WL 2864524 (S.D.N.Y. July 12, 2012) ....................40

*Wirtz v. Wardlaw*,
339 F.2d 785 (4th Cir. 1964) ....................28, 42

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ....................................................................48

*Zheng v. Liberty Apparel Co.*,
355 F.3d 61 (2d Cir. 2003)..........................................................................22, 23

**STATUTES**

29 U.S.C. § 202(a)(3)..........................................................................................24

29 U.S.C. § 203...............................................................................................23, 24

29 U.S.C. § 214(a) ..........................................................................................25

29 U.S.C. § 216(b) ........................................................................................39, 40

29 U.S.C. § 255(a) ..........................................................................................37

N.Y. Lab. Law § 198 .....................................................................................37, 39

N.Y. Lab. Law § 651 ......................................................................................24

**REGULATIONS**

29 C.F.R. § 520.300 ........................................................................................25

29 C.F.R. § 520.404(e)....................................................................................25

29 C.F.R. § 520.408(a)................................................................................25, 26

29 C.F.R. § 578.3(c)(3) ...................................................................................38

29 C.F.R. § 785.13 ..........................................................................................24

**FEDERAL RULES**

Fed. R. Civ. P. 23(g)(1)(A) .............................................................................48

Fed. R. Civ. P. 56(a) .......................................................................................22

**OTHER AUTHORITIES**

Kevin Carey, *Giving Credit, but Is It Due?*, N.Y. Times, Jan. 30, 2013, *available at*
http://www.nytimes.com/2013/02/03/education/edlife/internships-for-credit-merited-or-not.html?pagewanted=all&_r=0 (last visited Mar. 1, 2013)..........................................36

U.S. Dep't of Labor Op. Letter, 1994 WL 1004761 (Mar. 25, 1994) ..........................................29

U.S. Dep't of Labor Op. Letter, 2002 WL 32406599 (Oct. 7, 2002) ..........................................29

## PRELIMINARY STATEMENT

Plaintiffs[1] worked as interns at Hearst's magazines in New York City, packing and unpacking samples, doing research, assisting at events, doing administrative work, and drafting magazine and website content.   Like thousands of other interns who contribute to Hearst's operations by providing Hearst with productive labor, Hearst did not pay Plaintiffs for their work.

Plaintiffs respectfully move the Court for an order granting them partial summary judgment with respect to three issues.  First, they seek an order that they were "employees" as that term is broadly defined by the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").  The undisputed evidence demonstrates that Hearst "suffered or permitted" Plaintiffs' labor, which assisted in the production of its magazines and reduced its labor costs through the benefit of uncompensated work.  A reasonable jury could not conclude that Plaintiffs fall under the narrow exception for "trainees" that the U.S. Supreme Court defined more than 65 years ago for participants in a short-term training program.  Here, there is no dispute that Plaintiffs did not participate in a training program but instead performed productive work that helped Hearst, reduced the burden on Hearst's employees, and augmented Hearst's bare-bones workforce, providing an "immediate advantage" to Hearst.

Second, Plaintiffs seek an order that Hearst's violations of the law were willful based on its utter failure to take any steps to determine whether its policy of not paying interns is legal. Hearst admits that it blindly relied on its illegal policy that, if interns received college credit, Hearst did not have to pay them.  Hearst has admitted that it has *no policies*, and has taken *no*

---

[1]     The named Plaintiffs are Xuedan "Diana" Wang and Erin Spencer and the Opt-In Plaintiffs are Elizabeth Mancini, Matthew Wagster, Stephanie Skorka, Caitlin Leszuk, Alexandra Rappaport, and Sarah Wheels (collectively, "Plaintiffs").

*steps*, to ensure that its magazines and departments comply with the law with respect to interns, including by preventing them from benefitting from interns' work or using interns to displace paid workers. Even after this lawsuit was filed and complaints about intern abuses surfaced, Hearst has not reviewed its "no pay" rule in any way.

Third, Plaintiffs seek an award of liquidated damages under the FLSA and NYLL based on the evidence of Hearst's willfulness and because, as Hearst has conceded, it had no good faith basis for its policy of not paying interns.

Plaintiffs Wang and Spencer also seek to certify a class of interns pursuant to Fed. R. Civ. P. 23 whom Hearst uniformly classified as "non-employees" exempt from the FLSA and NYLL. Plaintiffs and the proposed class were all unpaid interns subject to Hearst's "no pay" policy. None of them was part of a training program that resembled a classroom or academic experience because Hearst structured its internships around its actual operations. All of them performed productive work, including packing and unpacking samples, going on errands, doing research, drafting content, planning events, and doing administrative work, that benefited Hearst. Without exception, Hearst accepted their work and relied on it to make up for cost-cutting measures that reduced the magazines' headcount and expenses and resulted in an intern workforce that frequently exceeded the magazines' own workforce.

**PROCEDURAL HISTORY**

On February 1, 2012, Plaintiff Wang filed a class and collective action complaint alleging that Hearst unlawfully failed to pay minimum wages and overtime to her and other interns for the work that they performed during their internships. Bien Decl.[2] ¶ 5. On April 4, 2012, Hearst

---

[2]    All citations to the "Bien Decl." are to the Declaration of Rachel Bien in Support of Plaintiffs' Motions for Partial Summary Judgment and Class Certification Pursuant to Fed. R. Civ. P. 23. All exhibits are attached to the Bien Decl.

moved to strike the class and collective allegations and, on June 7, 2012, Plaintiffs opposed the motion and cross-moved for conditional certification and notice pursuant to 29 U.S.C. § 216(b). *Id*. ¶¶ 6-7. On July 7, 2012, the Court granted Plaintiffs' motion for conditional certification and notice pursuant to 29 U.S.C. § 216(b) and denied Hearst's motion to strike. *Id*. ¶ 8.

During the last month of discovery, Hearst served dozens of declarations from its current employees and former interns. *Id*. ¶ 11. The Court granted Plaintiffs' application to extend the discovery deadline until February 15, 2013 in order to take discovery from Hearst's declarants. *Id*. Plaintiffs took the depositions of 39 declarants. *Id*.

On February 15, 2013, the Honorable Andrew J. Peck set a briefing schedule for Plaintiffs' motions for summary judgment and class certification and ordered Plaintiffs to file a consolidated 50-page Memorandum of Law in support of both motions, Hearst to file a consolidated 40-page opposition and cross-motion, and Plaintiffs to file a consolidated 20-page reply. *Id*. ¶ 12.

## STATEMENT OF FACTS

### I. The Parties

#### A. Hearst

Hearst is one of the world's largest publishers of monthly magazines. SOF ¶ 1.[3] Hearst is divided into several divisions, one of which is Hearst's magazine division. *Id*. ¶ 4. The magazine division currently consists of 20 U.S. magazine titles, including Car and Driver, Cosmopolitan, Country Living, ELLE, ELLE DÉCOR, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, O, The Oprah Magazine, Popular Mechanics, Redbook, Road & Track, Seventeen, Town & Country, Veranda,

---

3 All citations to the "SOF" are to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1.

and Woman's Day. *Id*. ¶ 5. Hearst's magazine division also includes several corporate departments, including Finance, Human Resources, Payroll, Circulation, Production, Brand Development, Integrated Media, Digital Media, Digital Studio, Direct Response, Controller's Office, and Consumer Marketing, which provide services to the magazines. *Id.* ¶ 6.

**B. Plaintiffs**

**1. Xuedan "Diana" Wang**

Wang interned in the Accessories Department of Harper's Bazaar ("Bazaar") from August 2011 to December 2011. SOF ¶¶ 7, 17, 164. As part of her duties as an intern at Bazaar, Wang supervised six to eight other interns who worked with her in the "fashion closet," where clothing and accessories are stored, and served as the "head intern" serving as a contact between editors and public relations representatives, coordinating the pick-up and delivery of accessories "samples" for Bazaar photo shoots, doing expenses, doing online research, cataloguing samples, maintaining the accessories closet, and doing story boards. *Id*. ¶¶ 153, 164-65, 178, 184. Wang and the interns she supervised packed and unpacked samples, went on errands to pick up and return samples, did photo research, and assisted at photo shoots. *Id*. ¶¶ 163, 166, 173, 180-81, 187. These tasks would have been performed by paid workers, including employees, freelancers, or couriers, if Wang and the other interns did not perform them. *Id*. ¶¶ 158-61, 188, 214. Wang learned how to perform her duties from the intern whose job she took over and "on the job." *Id*. ¶¶ 202-05. Wang mostly interacted with her supervisors via email, in which she provided status reports on the samples they had requested. *Id*. ¶¶ 206-07.

Wang reported to Sam Broekema, Bazaar's Senior Accessories editor. SOF ¶¶ 119, 122. According to Broekema, interns are vital to keeping Bazaar's operations running smoothly. *Id*. ¶ 124. Broekema delegates some of the work that he typically does to the head intern so that he

can focus on different responsibilities. *Id*. ¶ 140. During periods between semesters when the Accessories Department does not have interns, Broekema and other editors do the work that interns perform, requiring them to work "much longer" hours, or they hire a freelance Assistant to do the work. *Id*. ¶¶ 159-161.

**2. Erin Spencer**

Spencer interned in the Bookings Department of Cosmopolitan ("Cosmo") from June 2010 to August 2010. SOF ¶¶ 8, 215, 221. Spencer organized files, held casting calls to select models for the magazine, assisted at photo shoots, ran errands, mailed "tear sheets" (magazine pages where models appear) to models' agents, updated contact lists, and assisted in the fashion closet. *Id*. ¶ 222. Cosmo had employed a Bookings Assistant to do the work that Spencer did during her internship. *Id*. ¶ 230. Spencer received primarily on-the-job training. *Id*. ¶ 232. She also attended four one-hour sessions of "Cosmo U," at which Cosmo editors talked about how they got their jobs. *Id*. ¶ 232. Spencer worked independently and checked in with her supervisors once or twice a day. *Id*. ¶ 229.

**3. Elizabeth Mancini**

Mancini interned in the Fashion Department of Marie Claire from January 2009 to June 2009. SOF ¶¶ 9, 235, 239. Mancini worked in the fashion closet where she received, unpacked, checked in, and put away clothing. *Id*. ¶ 242. She also packed and returned clothing when it was no longer needed. *Id*. ¶ 243. Mancini worked independently and interacted with her supervisor when she checked in on her periodically to see if she had completed her assignments correctly. *Id*. ¶ 260. Mancini did not receive any training during her internship other than how to perform her day to day tasks. *Id*. ¶ 259.

**4. Stephanie Skorka**

Skorka interned in the Beauty Department of Redbook from September 2009 to December 2009. SOF ¶¶ 11, 275, 277. Skorka managed the "beauty closet," where beauty products are stored, by replacing old products with new ones and organizing products, assisted at photo shoots, pitched and wrote beauty stories, attended beauty product launches, and contacted PR firms about products to feature in the magazine. *Id*. ¶¶ 280-81. Skorka sometimes assisted the fashion editor by packing up and laying out clothing and accessories, reviewing "look books," accepting fashion show invitations, and contacting public relations ("PR") firms. *Id*. ¶ 283. Skorka's supervisors told her she was doing the work of a Beauty Assistant and tried to hire her to do the same tasks that she did as an intern as a paid consultant after her internship ended, but Redbook did not have the budget. *Id*. ¶¶ 285-88. Skorka also interned for a day at O, The Oprah Magazine, where she performed many of the same tasks that she performed at Redbook. *Id*. ¶¶ 291-92. Skorka received the same type of on-the-job training at Redbook as an intern that she received as a paid, entry-level employee at her current job. *Id*. ¶ 279. Skorka did not receive any training other than how to perform her daily tasks. *Id*.

**5. Matthew Wagster**

Wagster interned in the Marketing Department of Esquire from July 2009 to December 2009. SOF ¶¶ 10, 298, 300. Wagster ran errands, did expenses, updated guest lists for Esquire events, helped prepare for events, worked at events, and attended marketing meetings to take notes. *Id*. ¶¶ 305-11. The types of tasks Wagster performed were also performed by paid workers. *Id*. ¶ 312. Wagster was taught how to use the fax machine, answer phones, update the office Rolodex, and perform other administrative duties. *Id*. ¶ 313. He did not receive additional

training. *Id*. Wagster was not closely supervised by the Esquire assistants who assigned him tasks. *Id*. ¶ 303-04.

**6. Caitlin Leszuk**

Leszuk interned in the Sales Department of Marie Claire from January 2010 to May 2010. SOF ¶¶ 11, 316. Leszuk created "edit credit" spreadsheets, which involved reviewing Marie Claire and its competitors' magazines and entering the page, article, and other information about particular brands into a spreadsheet. *Id*. ¶¶ 322-24. Leszuk also created "edit credit books" consisting of Marie Claire pages where particular brands were featured. *Id*. ¶¶ 326, 328. These tasks were also performed by Sales Assistants. *Id*. ¶¶ 325, 327. Leszuk received training from her supervisors, with whom she interacted twice a day, on how to complete her tasks and one 20-minute session on "media math." *Id*. ¶¶ 318-21.

**7. Alexandra Rappaport**

Rappaport interned in the Fashion Department of Seventeen from May 2011 to July 2011. SOF ¶¶ 13, 338. Rappaport worked in the fashion closet organizing clothing and jewelry, hanging them on racks, packing them up, running errands to pick up and return items, sending packages, copying, faxing, and responding to emails from designers about the return of samples. *Id*. ¶ 348. These tasks were also performed by Fashion Assistants. *Id*. ¶ 349. Rappaport spoke to her supervisors about once a day and was emailed assignments. *Id*. ¶¶ 344-45. On her first day, other fashion interns showed Rappaport how to perform her tasks. *Id*. ¶ 347.

**8. Sarah Wheels**

Wheels interned in the Editorial Department of Cosmo from May 2011 to August 2011. SOF ¶¶ 14, 355-56. Wheels responded to readers' emails, did research for articles, surveyed people on the street for articles, transcribed interviews, compiled statistics on magazine sales,

located articles in Cosmo's archives, wrote content for the magazine, and fact-checked articles. *Id*. ¶ 358.  Wheels took over the responsibilities of an Editorial Assistant who resigned.  *Id*. ¶ 359.  The supervision Wheels received generally consisted of being asked to do tasks and then doing them.  *Id*. ¶ 357.  Wheels attended four, one-hour sessions of "Cosmo U," at which employees discussed Cosmo's departments and their career paths.  *Id*. ¶ 363.

## II.   Hearst Uniformly Classifies Interns As Non-Employees Who Are Not Entitled to Pay.

Hearst made a determination at the corporate level that interns are not "employees" subject to the overtime and minimum wage requirements of the law.  SOF ¶ 15.  With limited exceptions, Hearst follows a uniform practice of not paying any wages, stipends, or compensation of any kind to interns – a policy that Hearst refers to as the "no pay" rule.  *Id*. ¶¶ 16, 22-26.  Not surprisingly, unpaid internships at Hearst do not cost the magazines money, *id*. ¶ 18, and save Hearst considerably by providing it with a workforce to do tasks for which Hearst otherwise would be required to pay.  *Id*. ¶¶ 140, 155-62, 185-88, 230, 262-63, 285, 288, 312, 325, 327, 349, 359, 360.

### A.   Hearst Classifies Interns as Non-Employees Based on the Same Criterion.

Hearst's corporate-wide determination that interns are not required to be paid is based on one factor – that interns are college students who are eligible to receive academic credit for their internships.  SOF ¶¶ 31, 69-70.  Although Hearst sees credit as "a critical element to staying on the right side of the labor law," no one at the company knows who made the determination or why it makes its program lawful.  *Id*. ¶¶ 67, 71-72.  In classifying all interns as non-employees, Hearst does not consider the duties that they perform, the magazine or department where they intern, their supervision, whether they are given assignments similar to those of paid workers, or whether employees are dependent on their work.  *Id*. ¶¶ 31-32.  In fact, Hearst has not taken any

steps to prevent its magazines and departments from benefitting from interns' work or using them to displace paid workers, or to ensure that interns are the primary beneficiaries of internships and have meaningful work experiences. *Id.* ¶¶ 33-39. As a result, across every magazine and department, Hearst interns perform productive work because Hearst has failed to implement any policy preventing intern supervisors from using interns to lighten their own workloads and advance Hearst's business interests.

**B. Hearst Interns Uniformly Perform the Routine Work of the Company.**

The testimony of Hearst's declarants, Plaintiffs, and Hearst's internship descriptions and other internal documents consistently show that interns perform productive work on a day-to-day basis across Hearst's magazines and departments. Whether checking in samples, doing errands, transcribing interviews, or doing research, interns all perform work that benefits Hearst, reduces its employees' workload, and saves it money.

**1. Interns in Hearst's Fashion Departments Perform Productive Work.**

Interns who work in Hearst's fashion departments consistently perform the same kinds of productive tasks, regardless of the magazine at which they work. Fashion interns typically spend most of their time in the fashion closet, where clothing samples and accessories are stored.[4] Their duties include: logging in and out samples according to Hearst's "Fashion Closet Policy," a detailed set of instructions to minimize loss and damage;[5] organizing clothing and accessories; hanging them on racks; and packing them up for photo shoots and to be returned to vendors.[6]

---

4 Ex. 50 (Wang Tr.) 161:13-162:3; 162:24-163:12; Ex. 22 (Mancini Tr.) 144:9-13; Ex. 27 (Rappaport Tr.) 148:9-11; Ex. 201 (Redbook Magazine Fashion Closet Intern Guide) at D0017532-37.

5 Ex. 77 (Fashion Closet Policy).

6 Ex. 3 (Broekema Tr.) 23:18-24; 24:15-25; 25:9-11; 26:24-27:10; 31:11-32:6; 36:7-18; Ex. 22 (Mancini Tr.) 119:18-121:2; Ex. 27 (Rappaport Tr.) 84:12-22; Ex. 45 (Tam Tr.) 18:2-19:19; Ex. 50 (Wang Tr.) 115:7-10; 233:20-25; Ex. 167 (Cosmopolitan Fashion Intern Guide);

They also request samples from vendors; pick-up and return samples; create "look books" of fashion designers' collections; assemble "storyboards" of clothing and accessories; and assist at fashion shoots.[7]

**2. Interns in Hearst's Beauty Departments Perform Productive Work.**

Interns who work in Hearst's beauty departments consistently perform the same kinds of productive tasks, regardless of the magazine at which they work. Beauty interns manage the "beauty closet," where sample beauty products are stored, request products from vendors, unpack products when they arrive, and keep them organized in the beauty closet.[8] They also assist with photo shoots by obtaining products needed during the shoot and packing items for the

---

Ex. 177 (Elle Accessories Intern Survival Guide); Ex. 169 (Esquire Fashion Closet Guide) at D0008132-38; Ex. 55 (Harper's Bazaar Fashion Editorial Internship Guidelines); Ex. 205 (Harper's Bazaar Intern Guide) at D0019519-44; Ex. 93 (Marie Claire Fashion Intern Handbook) at D0012087-88; Ex. 201 (Redbook Magazine Fashion Closet Intern Guide) at D0017532-33; Ex. 196 (Town & Country Intern Guide) at D0017080-92; Ex. 113 (Dewitt Decl.) ¶¶ 5, 9; Ex. 125 (Kohen Decl.) ¶ 6; Ex. 210 (ELLE Fashion Internship); Ex. 211 (Esquire Fashion Internship); Ex. 225 (Internships at Good Housekeeping); Ex. 223 (Harper's Bazaar Fashion Internship); Ex. 226 (Marie Claire Fashion Internship); Ex. 227 (O Magazine Fashion Internship); Ex. 237 (Town & Country Fashion Internship).

[7] Ex. 3 (Broekema Tr.) 23:18-24; 24:15-25; 25:9-11; 26:24-27:10; 31:11-32:6; 36:7-18; Ex. 27 (Rappaport Tr.) 82:22-83:3; 83:4-22; 132:2-25; Ex. 45 (Tam Tr.) 18:2-19:19; 24:2-12; 34:24-35:8; Ex. 50 (Wang Tr.) 171:18-172:11; 255:11-256:5; Ex. 177 (Elle Accessories Intern Survival Guide) at D0011645-46; Ex. 169 (Esquire Fashion Closet Guide) at D0008136-37; Ex. 55 (Harper's Bazaar Fashion Editorial Internship Guidelines); Ex. 203 (Harper's Bazaar Italian Market Intern Reference) at D0018935-40; Ex. 205 (Harper's Bazaar Intern Guide); Ex. 93 (Marie Claire Fashion Intern Handbook) at D0012082-83; Ex. 201 (Redbook Magazine Fashion Closet Intern Guide) at D0017535-36; Ex. 113 (Dewitt Decl.) ¶¶ 5, 9; Ex. 210 (ELLE Fashion Internship); Ex. 211 (Esquire Fashion Internship); Ex. 225 (Internships at Good Housekeeping); Ex. 223 (Harper's Bazaar Fashion Internship); Ex. 226 (Marie Claire Fashion Internship); Ex. 227 (O Magazine Fashion Internship); Ex. 237 (Town & Country Fashion Internship).

[8] Ex. 9 (Elser Tr.) 21:20-22:19; 24:17-20; 24:24-25-6; 31:15-20; Ex. 30 (Ritterbeck Tr.) 93:7-94:13; Ex. 36 (Rud Tr.) 36:16-18; 98:13-23; Ex. 37 (Saltzman Tr.) 30:18-20; 33:21-35:8; Ex. 42 (Skorka Tr.) 109:3-5; Ex. 72 (Seventeen Beauty Intern Guide) at D0017063-64; Ex. 108 (Cavallaro Decl.) ¶ 6; Ex. 120 (Hackel Decl.) ¶ 5; Ex. 136 (Novello Decl.) ¶ 6.

shoot, research products, maintain and update contact and brand credit lists, file press releases and other documents, pitch stories, and write website content.[9]

### 3. Interns in Hearst's Editorial Departments Perform Productive Work.

Interns who work in Hearst's editorial departments consistently perform the same kinds of productive tasks across all magazines. Editorial interns transcribe interviews, do research for articles, fact-check, create "clip files" by collecting press clippings, pitch and draft content for the magazines and their blogs, request and organize items for photo shoots, and perform administrative work, such as photocopying, sorting mail, and answering phones.[10]

### 4. Interns in Hearst's Photo and Design Departments Perform Productive Work.

Interns who work in Hearst's photo and design departments perform similar tasks across the magazines. Photo interns research photographs to use in the magazines by finding images

---

9 Ex. 9 (Elser Tr.) 21:20-22:19; 25:15-23; 27:19-28:3; 31:15-20; Ex. 30 (Ritterbeck Tr.) 25:6-19; 29:11-24; 31:23-32:7; 57:6-17; 63:3-11; 70:4-10; 83:19-84:6, 93:17-94:13; Ex. 72 (Seventeen Beauty Intern Guide); Ex. 36 (Rud Tr.) 38:4-39:2; 82:12-15; 84:13-23; Ex. 206 (Email, dated Jan. 24, 2012); Ex. 37 (Saltzman Tr.) 28:16-21; 30:18-20; 33:6-35:8; 36:10-37:6; Ex. 86 (Saltzman Resume); Ex. 42 (Skorka Tr.) 108:14-109:2; 109:6-18; 120:4-10; 204:23-205:15; Ex. 108 (Cavallaro Decl.) ¶ 6; Ex. 120 (Hackel Decl.) ¶ 5; Ex. 136 (Novello Decl.) ¶ 6. Ex. 208 (Cosmopolitan Beauty Internship); Ex. 219 (Good Housekeeping Beauty Internship); Ex. 222 (Harper's Bazaar Beauty Internship); Ex. 216 (Town & Country Beauty Internship);

10 Ex. 115 (Elser Decl.) ¶ 5; Ex. 9 (Elser Tr.) 36:15-37:9; 38:20-25; 39:6-12; 40:11-24; Ex. 62 (Elser LinkedIn Profile); Ex. 12 (Friedlander Tr.) 60:12-62:18; 65:22-66:4; 68:14-69:3; 70:19-71:8; 75:8-16; Ex. 117 (Friedlander Decl.) ¶ 5; Ex. 63 (Seventeen Editorial Intern Manual) at D0017138-139; Ex. 17 (Hilmantel Tr.) 21:13-22; 31:7-14; 32:4-8; 42:2-6; 50:6-12; 58:3-7; 62:1-8; 80:20-22; 84:11-20; 90:21-23; Ex. 26 (Perle Tr.) 63:15-64:4; 131:11-14; Ex. 138 (Perle Decl.) ¶ 5; Ex. 33 (Rodriguez Tr.) 28:4-29:16; 34:22-35:23; 36:6-23; 43:14-44:19; Ex. 34 (Ross Tr.) 56:2-19; 71:15-72:10; Ex. 47 (Thompson Tr.) 23:24-24:11; 64:9-15; Ex. 198 (Esquire Interns: A Guidebook) at D0017160-63; Ex. 95 (Marie Claire Features Intern Handbook) at D0019138-41; Ex. 202 (Redbook Features Intern Handbook) at D0017541-43; Ex. 197 (Town & Country Intern Handbook) at D0017096; Ex. 102 (Bailey Decl.) ¶ 11; Ex. 111(Corbett Decl.) ¶ 5; Ex. 122 (Hutzler Decl.) ¶ 5; Ex. 129 (McCloskey Decl.) ¶¶ 5, 7; Ex. 132 (Mullins Decl.) ¶¶ 4, 5; Ex. 139 (Piwko Decl.) ¶¶ 6, 10; Ex. 147 (Roselli Decl.) ¶¶ 6-7; Ex. 148 (Ross Decl.) ¶¶ 5, 7, 10; Ex. 209 (Cosmopolitan Editorial Internship); Ex. 230 (Country Living Editorial Internship); Ex. 231 (ELLE Features Internship); Ex. 224 (Harper's Bazaar Features Internship); Ex. 234 (Marie Claire Editorial Internship); Ex. 240 (Woman's Day Editorial Internship).

and assembling "inspiration boards," assist at photo shoots, help find props and locations for shoots, and organize and file photos.[11] Design interns help to design layouts, update the "miniwall" (the layout of the magazine's pages in reduced size), and update the "book" (a binder of the magazine's layout true to size) by downloading images from photo shoots.[12] Bookings interns assist with model casting calls by contacting modeling agencies, inviting models to appear, photographing them, and updating their files.[13] Art interns research images and design invitations, advertorials, brochures, and other materials for magazines.[14]

**5. Interns in Hearst's Sales and Marketing Departments Perform Productive Work.**

Interns who work in Hearst's sales and marketing departments perform similar duties across the magazines. Sales interns' duties include compiling "edit credits," a spreadsheet listing advertisers in Hearst's and its competitors' magazines; researching competitor magazines; tabbing advertising in magazines; preparing "positioning reports," which show where advertisers are placed in the magazines; preparing for sales meetings by assembling binders and other documents; assembling gift bags; setting up at events and checking in guests; and mailing

---

11 Ex. 1 (Anderson Tr.) 27:2-10; Ex. 54 (Letter, dated Oct. 5, 2007); Ex. 38 (Santucci Tr.) 20:23-21:11; 29:9-30:2; 30:4-12; 37:22-38:20; 63:2-6; Ex. 87 (Santucci Resume); Ex. 46 (Thomas Tr.) 25:14-23; 26:8-15; 41:5-24; 90:2-17; Ex. 94 (Bazaar Photo & Bookings Internship); Ex. 199 (Food Network Magazine Photo Department Guidelines 2012) at D0017500-02; Ex. 204 (Marie Claire Photo Intern Guide) at D0019398; Ex. 200 (Seventeen Photo Intern Manual) at D0017508-12; Ex. 103 (Barker Decl.) ¶ 4; Ex. 105 (Brodley Decl.) ¶ 5; Ex. 110 (Cleaver Decl.) ¶ 5; Ex. 127 (Kristensen Decl.) ¶ 5; Ex. 133 (Neckles Decl.) ¶ 5; Ex. 140 (Pozsonyi Decl.) ¶ 5; Ex. 232 (Esquire Photo Internship); Ex. 233 (HGTV Art/Photo Internship); Ex. 229 (Seventeen Photo Internship); Ex. 217 (Woman's Day Photo Internship).

12 Ex. 39 (Senaydin Tr.) 24:3-15; 30:2-8; 36:21-38:19; 40:2-10; 48:1-49:21; 50:5-14; Ex. 221 (Harper's Bazaar Design Internship); Ex. 228 (Redbook Design Internship).

13 Ex. 43 (Spencer Tr.) 30:12-24; 31:7-13; Ex. 257 (Cosmopolitan Bookings Intern); Ex. 258 (Seventeen Magazine Bookings Internship); Ex. 94 (Bazaar Photo & Bookings Internship); Ex. 200 (Seventeen Photo Intern Manual).

14 Ex. 25 (Park Tr.) 37:24-38:2; 44:24-45:2; 67:22-68:15; Ex. 135 (Nelson Decl.) ¶ 10; Ex. 212 (Esquire Art Internship).

magazines to clients and potential advertisers.[15] Marketing interns prepare "premiums," or gifts sent to potential advertisers; assist with promotional events; and prepare marketing department materials.[16]

**6. Interns in Hearst's Shared Services Departments Perform Productive Work.**

Interns in Hearst's shared services departments, which provide services across the magazines, perform the same kinds of productive tasks that interns at Hearst's magazines perform. They draft content, conduct research, prepare marketing materials, prepare for and assist at events, and perform administrative tasks.[17]

---

15 Ex. 2 (Berard Tr.) 77:7-9; 81:13-23; 82:5-10; 84:20-85:10; Ex. 4 (Buchalter Tr.) 77:17-15; 78:2-9; 79:3-10; 80:18-23; 83:4-20; 85:12-24; 125:8-13; 127:3-9; 137:24-138:7; Ex. 7 (Critides Tr.) 67:10-69:23; Ex. 8 (Dunn Tr.) 50:9-15; 71:5:23; 77:15-78:6; Ex. 13 (Gonzalez Tr.) 23:7-14, 24:2-14, 31:12-18, 34:16-22, 42:14-24, 44:11-46:9; Ex. 14 (Groher Tr.) 45:2-46:17; 68:14-18; Ex. 16 (Henderson Tr.) 89:7-93:21; 96:8-97:8; Ex. 18 (Holiver Tr.) 49:20-50:25; 55:13-20; 56:7-19; 57:20-58:5; 59:17-60:21; 66:24-67:13; 89:23-90:13; 105:8-106:9; Ex. 64 (Food Network Advertising Sales Internship); Ex. 19 (Johns Tr.) 109:10-111:10; 134:12-136:8; Ex. 20 (Kommer Tr.) 27:24-33:13; 113:13-114:20; Ex. 23 (McCoy Tr.) 28:14-22; 30:7-16; 29:10-19; 42:14-17; 47:22-48:4; Ex. 242 (Reese Tr.) 34:15-35:2; 35:13-36:2; Ex. 28 (Reyes Tr.) 25:13-15, 59:3-8; 77:2-12; 86:14-23; Ex. 29 (Riordan Tr.) 48:20-23; 62:2-11; 84:25-85:8; 88:4-16; 142:10-23; Ex. 69 (Marie Claire Advertising Internship Overview); Ex. 40 (Shapiro Tr.) 56:17-57:21, 65:3-19; 69:5-16, 71:2-19; Ex. 41 (Simmons Tr.) 49:17-50:3; 50:20-51:20; 72:12-25; Ex. 88 (Simmons Resume); Ex. 155 (Sullivan Tr.) 20:1-9; 44:24-45:6; 46:22-47:16; 50:14-18; Ex. 91 (Esquire Sales and Marketing Internship); Ex. 53 (Yale Tr.) 49:19-24; 52:13-23; 76:2-77:17; 134:9-16; Ex. 99 (Yale LinkedIn Profile); Ex. 170 (Harper's Bazaar Advertising Sales Intern Guide) at D0009656-59; Ex. 179 (Marie Claire Advertising Internship Overview and Responsibilities) at D0012171-73; Ex. 238 (Veranda Advertising Internship).

16 Ex. 5 (Chelak Tr.) 26:11-28:3; 52:20-53:18; Ex. 21 (Leszuk Tr.) 207:21-208:22; 246:3-14; Ex. 242 (Reese Tr.) 30:24-31:18; Ex. 40 (Shapiro Tr.) 114:24-115:18; Ex. 48 (Tomlinson Tr.) 20:22-21:17, 23:11-23; 24:9-15; 37:19-38:15; Ex. 97 (Tomlinson Resume); Ex. 49 (Wagster Tr.) 103:4-9; Ex. 112 (Critides Decl.) ¶ 5; Ex. 124 (Kahn Decl.) ¶¶ 8-9; Ex. 150 (Safir Decl.) ¶ 5; Ex. 213 (Esquire Marketing Internship); Ex. 178 (Marie Claire Marketing Internship Overview and Responsibilities) at D0012165-70; Ex. 215 (O Marketing Internship); Ex. 236 (Town & Country Marketing Internship).

17 Ex. 247 (Hearst Communications Internship); Ex. 248 (Hearst Marketing Internship); Ex. 249 (Hearst Human Resources Internship); Ex. 250 (Hearst Public Relations Internship); Ex. 251 (Hearst Special Events Internship); Ex. 252 (Hearst Design Internship).

## III. Hearst Uniformly Relies on Interns to Get More Work Done.

### A. Interns Augment Hearst's Bare-Bones Workforce.

Hearst uses interns to get more work done across its magazines and departments.[18] Intern supervisors and interns themselves consistently testified about the helpful assistance that interns provide.[19] Supervisors' evaluations of interns frequently emphasize how helpful interns are and how much they rely on interns to get work done.[20] Hearst employees explicitly seek out interns when they find themselves shorthanded.[21]

Hearst's job descriptions for entry-level employees and employees' own descriptions of their duties show that interns perform work that otherwise would have been performed by paid workers because they list many of the same duties. For example, Hearst uses unpaid fashion

---

[18] Ex. 162 (Email, dated Mar. 19, 2007).

[19] Ex. 3 (Broekema Tr.) 84:8-20 (uses interns to do expenses, which frees him up for other work); Ex. 4 (Buchalter Tr.) 125:8-126:6 (assigns interns tasks that "help [her] out"); Ex. 9 (Elser Tr.) 24:24-25:6 (uses interns to help unpack beauty packages when "there are a lot of them that day or if I need their help"); 34:4-6; Ex. 15 (Helmus Tr.) 101:2-4 (has interns because "they help us"); Ex. 19 (Johns Tr.) 70:22-71:14 (helped complete internal marketing newsletter on a rush basis when employees were unable to complete it on time); Ex. 242 (Reese Tr.) 49:12-50:11 (intern helped with event by organizing materials); Ex. 30 (Ritterbeck Tr.) 95:11-96:9; 142:9-20 (uses interns to help department run smoothly); Ex. 72 (Seventeen Beauty Intern Guide) at D0017066 (department relies "heavily on . . . interns for very important tasks"); Ex. 26 (Perle Tr.) 55:24-56:8; 88:2-89:11 (uses interns to do editorial work); Ex. 33 (Rodriguez Tr.) 21:19-25 (intern "help[ed] her [supervisor] with her responsibilities"); Ex. 85 (Rud Evaluation) at D0007207 (helped her supervisor "with everything from research to credits to organization," and "made [her supervisor's] life so much easier"); Ex. 45 (Tam Tr.) 34:13-18 (Marie Claire editors are "constantly asking for interns to help because they are so busy"); Ex. 47 (Thompson Tr.) 61:2-62:20; Ex. 24 (Neilon Tr.) 39:16-40:14; 40:20-41:6; 74:22-75:7 (performed many of the same tasks as paid employees and helped keep work on schedule).

[20] Ex. 164 (Intern Evaluation 1); Ex. 165 (Intern Evaluation 2); Ex. 70 (Riordan Evaluation); Ex. 40 (Shapiro Evaluation); Ex. 168 (Intern Evaluation 3); Ex. 171 (Intern Evaluation 4); Ex. 172 (Intern Evaluation 5); Ex. 173 (Intern Evaluation 6); Ex. 174 (Intern Evaluation 7); Ex. 175 (Intern Evaluation 8); Ex. 176 (Intern Evaluation 9).

[21] Ex. 259 (Email, dated Dec. 27, 2011) (requesting HR's help to "get some good interns in here for the Winter/Spring semester to help with this ecommerce project"); Ex. 207 (Email, dated Jan. 31, 2012) (department was "in desperate need of a replacement" when intern backed out at last minute); *see also* Ex. 65 (Email, dated Jan. 11, 2012); Ex. 66 (Email, dated Jan. 17, 2012).

interns at its magazines to perform many of the same tasks as paid fashion assistants. Interns and fashion assistants organize the fashion closet, coordinate the delivery and return of samples, coordinate messengers, request samples, and create storyboards and look books.[22] Similarly, at Bazaar, Hearst uses unpaid "head fashion interns" to perform work usually performed by paid freelance fashion assistants.[23] Hearst uses unpaid beauty interns at its magazines to perform many of the same tasks as paid beauty assistants. Interns and beauty assistants organize the beauty closet, research and request products, and maintain brand credit and contact lists.[24] In fact, opt-in Plaintiff Skorka's supervisors at Redbook told her that she was performing beauty assistant duties.[25] Hearst uses unpaid editorial interns at its magazines to perform many of the same tasks as paid editorial assistants. Interns and editorial assistants pitch and draft content for the magazines, fact-check, transcribe interviews, and do administrative work.[26] Hearst uses

---

22 Ex. 3 (Broekema Tr.) 23:18-24; 24:15-25; 25:9-11; 26:24-27:10; 31:11-32:6; 36:7-18; Ex. 15 (Helmus Tr.) 37:18-38:5; Ex. 22 (Mancini Tr.) 119:18-121:2; Ex. 27 (Rappaport Tr.) 82:22-83:3; 83:4-22; 84:12-22; Ex. 45 (Tam Tr.) 12:25-13:8; 18:2-19:19; 24:2-25; 34:24-35:8; Ex. 50 (Wang Tr.) 115:7-10; 171:18-172:11; 233:20-25; 255:11-256:5; Ex. 92 (Tam LinkedIn Profile); Ex. 192 (Fashion Assistant II); Ex. 193 (Fashion Assistant II); Ex. 194 (Marie Claire Fashion Assistant); Ex. 195 (Marie Claire Accessories Assistant).

23 Ex. 3 (Broekema Tr.) 19:4-20:21; 23:5-17; 85:22-86:8.

24 Ex. 115 (Elser Decl.) ¶ 2; Ex. 30 (Ritterbeck Tr.) 26:12-19; 27:9-12; 44:17-45:5; Ex. 71 (Ritterbeck Resume); Ex. 36 (Rud Tr.) 82:12-23; 84:13-23; 109:3-8; Ex. 42 (Skorka Tr.) 209:6-210:5; 211:23-212:3; Ex. 191 (Town & Country Editorial Assistant/Beauty & Health) -- D0016935-36; Ex. 208 (Cosmopolitan Beauty Internship); Ex. 219 (Good Housekeeping Beauty Internship); Ex. 222 (Harper's Bazaar Beauty Internship); Ex. 216 (Town & Country Beauty Internship).

25 Ex. 42 (Skorka Tr.) 209:6-210:5.

26 Ex. 9 (Elser Tr.) 46:7-47:11; Ex. 12 (Friedlander Tr.) 64:19-65:7, Ex. 17 (Hilmantel Tr.) 6:22-8:12; 12:15-13:19; 22:19-21; Ex. 34 (Ross Tr.) 32:3-9; Ex. 47 (Thompson Tr.) 9:2-10:22; Ex. 84 (Ross LinkedIn Profile); Ex. 260 (Marie Claire Editorial Assistant); Ex 261 (Marie Claire Editorial Assistant); Ex. 191 (Town & Country Editorial Assistant/Beauty & Health); Ex. 262 (House Beautiful Editorial Assistant); Ex. 263 (Esquire Editorial Assistant); Ex. 264 (Good Housekeeping Editorial Assistant); Ex. 266 (Cosmopolitan Editorial Assistant); Ex. 267 (Cosmopolitan Editorial Assistant); Ex. 268 (Woman's Lifestyle Editorial Assistant); Ex. 209 (Cosmopolitan Editorial Internship); Ex. 230 (Country Living Editorial Internship); Ex. 231

unpaid photo interns at its magazines to perform many of the same tasks as paid photo assistants. Interns and photo assistants research photographs, scout locations for photo shoots, assist with photo shoots, and maintain and manage images.[27] Hearst uses unpaid sales interns at its magazines to perform many of the same tasks as sales assistants. Interns and sales assistants prepare positioning reports, prepare for sales meetings, compile edit credits, and tab magazines.[28]

**B. Hearst's Cost-Cutting Measures Have Made It More Reliant on Interns.**

Over the past several years, Hearst has taken cost-cutting measures across its magazines by reducing headcount and expenses that have made it even more reliant on its intern workforce.

REDACTED

SOF ¶ 107. In response to the 2008 recession, Hearst continued its reductions to offset the revenue shortfall from a decrease in advertising. *Id.* ¶ 100. Hearst gave the magazines targets for making reductions and asked them to come up with a plan to implement them. *Id.* ¶ 101. The magazines responded by making reductions in both headcount and expenses. *Id.* ¶¶ 102-103. For example, Bazaar instructed employees to reduce messenger

---

(ELLE Features Internship); Ex. 224 (Harper's Bazaar Features Internship); Ex. 234 (Marie Claire Editorial Internship); Ex. 240 (Woman's Day Editorial Internship).

[27] Ex. 46 (Thomas Tr.) 46:16-47:12; 48:8-12; Ex. 184 (Food Network Photo Assistant); Ex. 182 (Esquire Photo Assistant); Ex. 183 (Photo Assistant); Ex. 232 (Esquire Photo Internship); Ex. 233 (HGTV Art/Photo Internship); Ex. 229 (Seventeen Photo Internship); Ex. 217 (Woman's Day Photo Internship).

[28] Ex. 2 (Berard Tr.) 58:12-59:7; 91:7-92:11; 143:12-22; 144:7-9; Ex. 4 (Buchalter Tr.) 41:22-42:4, 78:2-9; Ex. 8 (Dunn Tr.) 62:4-9; 63:11-24; Ex. 11 (Fazio Tr.) 10:17-11:4; Ex. 18 (Holiver Tr.) 58:16-59:10; 64:18-65:7; Ex. 242 (Reese Tr.) 16:24-17:11; Ex. 29 (Riordan Tr.) 48:20-23; 54:4-21; 85:18-24; 86:11-17; 105:3-8; 110:18-111:10; 142:10-23; Ex. 41 (Simmons Tr.) 50:8-14; Ex. 180 (Oprah Magazine Sales Assistant); Ex. 189 (Seventeen Sales Assistant); Ex. 190 (Woman's Day Sales Assistant); Ex. 181 (Food Network Sales Assistant); Ex. 185 (Cosmo Sales Assistant); Ex. 186 (Country Living Sales Assistant); Ex. 187 (ELLE Décor Sales Assistant); Ex. 188 (Bazaar Sales Assistant); Ex. 91 (Esquire Sales and Marketing Internship); Ex. 53 (Yale Tr.) 49:19-24; 52:13-23; 76:2-77:17; 134:9-16; Ex. 99 (Yale LinkedIn Profile); Ex. 170 (Harper's Bazaar Advertising Sales Intern Guide) at D0009656-59; Ex. 179 (Marie Claire Advertising Internship Overview and Responsibilities) at D0012171-73; Ex. 238 (Veranda Advertising Internship).

costs by using interns instead of messenger services. *Id.* ¶ 104. It also limited overtime to five hours a week and required any overtime above that to be done by "overtime ineligible staff." *Id.* ¶ 105. Even after the economy improved, Hearst has continued to try to reduce costs every year. *Id.* ¶ 109. For example, to justify hiring 57 interns – more interns than its fulltime staff – Marie Claire told Hearst's human resources department in 2011 that it "use[s] interns to pick up and deliver merch to reduce our messenger costs." *Id.* ¶ 113. REDACTED *Id.* ¶ 115.

## IV. Hearst Internships Are Structured Around its Actual Operations.

Interns at Hearst receive little or no classroom training and their internships are structured around Hearst's actual operations.[29] In fact, Hearst does not have any policies, and has not taken any steps, to ensure that internships at its magazines or in its departments are structured around a classroom or academic experience.[30] Hearst's magazines do not budget any money for intern trainings or for time spent on interns. SOF ¶¶ 19-20.

Like entry-level employees at Hearst,[31] the training that interns receive is primarily on-the-job training.[32] Hearst offers little or no "classroom" training to interns. To the extent that it

---

[29] Ex. 2 (Berard Tr.) 124:21-125:22; Ex. 5 (Chelak Tr.) 63:11-64:17; Ex. 12 (Friedlander Tr.) 95:3-7; Ex. 18 (Holiver Tr.) 89:5-8; Ex. 21 (Leszuk Tr.) 226:21-227:9; Ex. 23 (McCoy Tr.) 39:13-19; Ex. 27 (Rappaport Tr.) 130:10-131:10; Ex. 30 (Ritterbeck Tr.) 54:22-55:5; 61:15-18, 67:11-68:12; 139:11-140:5; Ex. 33 (Rodriguez Tr.) 86:12-87:4; Ex. 35 (Rothman Tr.) 91:12-14; 110:8-11:19; Ex. 36 (Rud Tr.) 109:14-17; Ex. 37 (Saltzman Tr.) 29:4-11; 40:6-41:1; Ex. 39 (Senaydin Tr.) 82:5-83:3; Ex. 43 (Spencer Tr.) 107:25-108:13; 115:11-15; Ex. 49 (Wagster Tr.) 108:12-21; 144:5-16; 145:5-16: 24; Ex. 53 (Yale Tr.) 14:11-21.

[30] Ex. 15 (Helmus Tr.) 89:25-90:10; Ex. 31 (Roberts Tr. I) 72:13-21.

[31] Ex. 32 (Roberts Tr. II) 163:19-164:5.

[32] Ex. 4 (Buchalter Tr.) 120:6-13; Ex. 5 (Chelak Tr.) 67:23-68:22; Ex. 10 (Faucett Tr.) 90:13-91:5; Ex. 12 (Friedlander Tr.) 69:24-70:6; 95:8-25; 114:21-24; Ex. 13 (Gonzalez Tr.)

provides any formal training, it consists primarily of periodic lunch sessions.[33] For example, interns at Cosmo attend a few one-hour sessions of "Cosmo U," at which editors discuss their careers and the magazine's departments.[34]

**V. Hearst Interns Receive Minimal Supervision.**

Hearst evaluates all interns based on their ability to follow instructions and perform their assignments with "minimal supervision."[35] Intern supervisors, who are usually entry-level assistants,[36] typically demonstrate a task the first time they assign it and then interns do it on

---

70:11-20; Ex. 21 (Leszuk Tr.) 310:20-311:8; Ex. 25 (Park Tr.) 56:23-57:25; Ex. 26 (Perle Tr.) 80:5-81:7; Ex. 27 (Rappaport Tr.) 115:21-116:7; 166:20-21; 123:12-124:7; Ex. 30 (Ritterbeck Tr.) 54:22-57:5, 57:18-58:8; 144:21-145:17; Ex. 73 (Ritterbeck Ed2010 Article); Ex. 33 (Rodriguez Tr.) 36:4-14; 80:4-81:14; Ex. 36 (Rud Tr.) 34:12-18; 98:5-10; 104:6-10; Ex. 37 (Saltzman Tr.) 31:3-15; Ex. 38 (Santucci Tr.) 32:20-33:2; Ex. 39 (Senaydin Tr.) 41:4-9; 59:10-24; Ex. 42 (Skorka Tr.) 111:13-19; 114:16-23; 115:18-22; 118:11-119:3; 125:20-126:19; 174:20-175:15; Ex. 43 (Spencer Tr.) 127:14-128:4; Ex. 46 (Thomas Tr.) 25:5-13; 36:8-37:2; Ex. 48 (Tomlinson Tr.) 60-23-61:9; Ex. 49 (Wagster Tr.) 108:12-21; Ex. 50 (Wang Tr.) 168:4-7; 237:16-24.

[33] Ex. 2 (Berard Tr.) 124:21-125:22; Ex. 5 (Chelak Tr.) 63:11-64:17; Ex. 9 (Elser Tr.) 41:11-23; Ex. 12 (Friedlander Tr.) 95:3-7; Ex. 18 (Holiver Tr.) 89:5-8; Ex. 21 (Leszuk Tr.) 141:22-142:14; 226:21-227:7; Ex. 23 (McCoy Tr.) 39:13-19; Ex. 27 (Rappaport Tr.) 130:10-131:10; Ex. 30 (Ritterbeck Tr.) 54:22-55:5; 61:15-18, 67:11-68:12; 139:11-140:5; Ex. 33 (Rodriguez Tr.) 86:12-87:4; Ex. 35 (Rothman Tr.) 91:12-14; 110:8-11:19; Ex. 36 (Rud Tr.) 109:14-17; Ex. 37 (Saltzman Tr.) 29:4-11; 40:6-41:1; Ex. 39 (Senaydin Tr.) 82:5-83:3; Ex. 43 (Spencer Tr.) 115:11-116:15; 161:12-23; 190:10-14; Ex. 51 (Wheels Tr.) 78:7-11; 205:6-12; 205:20-206:24; Ex. 53 (Yale Tr.) 14:11-21; Ex. 102 (Bailey Decl.) ¶ 11; Ex. 107 (Cacich Decl.) ¶ 10; Ex. 113 (Dewitt Decl.) ¶ 9; Ex. 115 (Elser Decl.) ¶ 5; Ex. 123 (Johnson Decl.) ¶ 7; Ex. 135 (Nelson Decl.) ¶ 9; Ex. 150 (Safir Decl.) ¶ 9; Ex. 153 (Simmons Decl.) ¶ 7; Ex. 155 (Sullivan Decl.) ¶ 6.

[34] Ex. 2 (Berard Tr.) 124:21-125:22; Ex. 12 (Friedlander Tr.) 95:3-7; Ex. 30 (Ritterbeck Tr.) 61:15-18, 67:11-68:12; Ex. 38 (Santucci Tr.) 34:2-14; Ex. 43 (Spencer Tr.) 115:11-116:15; 161:12-23; 190:10-14; Ex. 51 (Wheels Tr.) 78:7-11; 205:6-12; 205:20-206:24.

[35] Ex. 256 (Email, dated Aug. 3, 2011).

[36] Ex. 102 (Bailey Decl.) ¶ 11; Ex. 113 (Dewitt Decl.) ¶ 9; Ex. 115 (Elser Decl.) ¶ 5; Ex. 118 (Gonzalez Decl.) ¶ 7; Ex. 21 (Leszuk Tr.) 169:21-24; Ex. 131 (Mevorach Decl.) ¶ 5; Ex. 129 (McCloskey Decl.) ¶ 5; Ex. 132 (Mullins Decl.) ¶ 4; Ex. 27 (Rappaport Tr.) 51:14-52:4; 65:9-12; 122:25-123:3; Ex. 143 (Riordan Decl.) ¶ 6; Ex. 153 (Simmons Decl.) ¶ 5; Ex. 49 (Wagster Tr.) 11:15-17; 108:22-109:9.

their own the next time.[37] Supervisors generally expect interns to work independently and may check in with them from time to time.[38] For example, interns testified that they did tasks without requiring their supervisors to look over their shoulders;[39] did work "on [their] own," with "minimal supervision," and "figur[ed] out the answers . . . without having to bother" supervisors;[40] asked other interns before going to supervisors with questions and only asked them "as a last resort;"[41] and worked independently because supervisors "do not have a lot of time to . . . spend tediously going over things."[42]

## VI. Hearst Interns Are Subject to Similar Hiring Practices, Evaluated Based on the Same Standards, and Work Regular Schedules.

Regardless of the magazine or department where they work, interns are subjected to similar hiring, evaluation, and scheduling practices.

---

37 Ex. 4 (Buchalter Tr.) 120:6-13; Ex. 5 (Chelak Tr.) 67:23-68:22; Ex. 9 (Elser Tr.) 45:13-46:6; Ex. 10 (Faucett Tr.) 90:13-91:5; Ex. 12 (Friedlander Tr.) 69:24-70:6; 95:8-25; Ex. 13 (Gonzalez Tr.) 70:11-20; Ex. 21 (Leszuk Tr.) 310:20-311:8; Ex. 25 (Park Tr.) 56:23-57:25; Ex. 26 (Perle Tr.) 80:5-81:7; Ex. 27 (Rappaport Tr.) 123:12-124:7; Ex. 30 (Ritterbeck Tr.) 144:21-145:17; Ex. 73 (Ritterbeck Ed2010 Article); Ex. 33 (Rodriguez Tr.) 36:4-14; 80:4-81:14; Ex. 36 (Rud Tr.) 34:12-18; 98:5-10; 104:6-10; Ex. 37 (Saltzman Tr.) 31:3-15; Ex. 38 (Santucci Tr.) 32:20-33:2; Ex. 39 (Senaydin Tr.) 41:4-9, 59:10-24; Ex. 43 (Spencer Tr.) 127:14-128:4; Ex. 46 (Thomas Tr.) 36:8-37:2; Ex. 48 (Tomlinson Tr.) 60-23-61:9.

38 Ex. 4 (Buchalter Tr.) 119:16-25; Ex. 5 (Chelak Tr.) 68:23-69:25; 96:7-97:19; Ex. 8 (Dunn Tr.) 70:18-71:4; Ex. 9 (Elser Tr.) 33:11-34:3; Ex. 18 (Holiver Tr.) 110:2-23; Ex. 21 (Leszuk Tr.) 312:7-25; Ex. 22 (Mancini Tr.) 156:9-157:2; Ex. 23 (McCoy Tr.) 32:18-33:13, 33:14-18; Ex. 24 (Neilon Tr.) 108:18-109:4; Ex. 27 (Rappaport Tr.) 142:2-143:5, 188:14-24; Ex. 29 (Riordan Tr.) 136:13-16; Ex. 30 (Ritterbeck Tr.) 146:17-25; Ex. 37 (Saltzman Tr.) 66:21-67:15; Ex. 38 (Santucci Tr.) 81:3-6; Ex. 43 (Spencer Tr.) 156:9-19; Ex. 46 (Thomas Tr.) 37:15-38:8, Ex. 48 (Tomlinson Tr.) 42:5-14; Ex. 42 (Skorka Tr.) 100:12-101:2; Ex. 50 (Wang Tr.) 248:17-23; Ex. 51 (Wheels Tr.) 192:15-24; Ex. 53 (Yale Tr.) 42:7-15, 87:20-24; Ex. 100 (Yale Evaluation).

39 Ex. 4 (Buchalter Tr.) 119:16-120:5.

40 Ex. 5 (Chelak Tr.) 68:23-69:25; 96:7-97:19; *see* Ex. 38 (Santucci Tr.) 81:3-6 (performed tasks with minimal supervision).

41 Ex. 27 (Rappaport Tr.) 123:18-124:7.

42 Ex. 53 (Yale Tr.) 42:7-15.

### A. Intern Hiring Practices Are Similar Across Hearst.

Hearst has uniform practices for hiring interns. Prospective interns typically apply for their internships by submitting a resume and cover letter to a Hearst magazine.[43] After applying, prospective interns are interviewed.[44] During the interviews, Hearst asks them similar general questions about their experience, anticipated duties, availability to work, and schedule.[45]

---

43 Ex. 2 (Berard Tr.) 151:5-11; Ex. 4 (Buchalter Tr.) 65:22-66:11; Ex. 5 (Chelak Tr.) 22:7-15; Ex. 8 (Dunn Tr.) 14:16-21; Ex. 12 (Friedlander Tr.) 58:8-10; Ex. 13 (Gonzalez Tr.) 17:7-11; Ex. 17 (Hilmantel Tr.) 46:17-47:2; Ex. 18 (Holiver Tr.) 35:3-7; Ex. 23 (McCoy Tr.) 13:20-14:7; Ex. 24 (Neilon Tr.) 75:9-24; Ex. 25 (Park Tr.) 29:24-30:21; Ex. 27 (Rappaport Tr.) 91:13-20; Ex. 28 (Reyes Tr.) 55:21-24; Ex. 33 (Rodriguez Tr.) 18:21-19:5; Ex. 35 (Rothman Tr.) 31:25-32:4; Ex. 38 (Santucci Tr.) 52:7-12; Ex. 37 (Saltzman Tr.) 18:10-23; Ex. 40 (Shapiro Tr.) 80:23-81:1; Ex. 42 (Skorka Tr.) 80:24-81:4; Ex. 44 (Sullivan Tr.) 30:1-8; Ex. 48 (Tomlinson Tr.) 11:5-13; Ex. 53 (Yale Tr.) 16:15-17:7.

44 Ex. 2 (Berard Tr.) 151:12-19; Ex. 4 (Buchalter Tr.) 66:12-67:18; Ex. 5 (Chelak Tr.) 38:14-24; Ex. 8 (Dunn Tr.) 14:16-21; Ex. 10 (Faucett Tr.) 69:5-8; Ex. 12 (Friedlander Tr.) 58:11-12; Ex. 13 (Gonzalez Tr.) 17:20-18:17; Ex. 17 (Hilmantel Tr.) 47:3-10; Ex. 18 (Holiver Tr.) 28:14-22; Ex. 23 (McCoy Tr.) 13:20-14:7; Ex. 24 (Neilon Tr.) 76:16-25; Ex. 25 (Park Tr.) 31:5-19; Ex. 27 (Rappaport Tr.) 94:14-19; Ex. 28 (Reyes Tr.) 56:7-57:12; Ex. 29 (Riordan Tr.) 138:22-139:14; Ex. 30 (Ritterbeck Tr.) 33:16-22; Ex. 33 (Rodriguez Tr.) 20:14-20; Ex. 35 (Rothman Tr.) 37:12-16; Ex. 36 (Rud Tr.) 49:5-7; Ex. 37 (Saltzman Tr.) 19:11-15; Ex. 38 (Santucci Tr.) 52:13-17; Ex. 39 (Senaydin Tr.) 24:25-25:7; 30:15-31:6; 32:6-8; Ex. 40 (Shapiro Tr.) 81:24-82:1; Ex. 41 (Simmons Tr.) 41:19-24; Ex. 42 (Skorka Tr.) 80:17-23; Ex. 44(Sullivan Tr.) 30:9-10; Ex. 46 (Thomas Tr.) 16:3-6; Ex. 48 (Tomlinson Tr.) 15:21-16:1; Ex. 53 (Yale Tr.)17:7-11, 22:25-23:6.

45 Ex. 4 (Buchalter Tr.) 67:19-68:9; Ex. 5 (Chelak Tr.) 39:5-40:9; Ex. 9 (Elser Tr.) 30:19-31:14; Ex. 10 (Faucett Tr.) 71:2-6; Ex. 12 (Friedlander Tr.) 58:13-59:3; Ex. 13 (Gonzalez Tr.) 19:3-12, 20:6-23; Ex. 17 (Hilmantel Tr.) 47:11-16; 48:4-13; Ex. 18 (Holiver Tr.) 29:12-25; 32:21-33:2; 34:2-9; Ex. 23 (McCoy Tr.) 14:24-15:17; Ex. 25 (Park Tr.) 31:25-32:24; Ex. 27 (Rappaport Tr.) 101:22-103:5; Ex. 242 (Reese Tr.) 29:22-30:4; 30:18-23; Ex. 29 (Riordan Tr.) 139:14-141:22; Ex. 30 (Ritterbeck Tr.) 34:13-35:15; 36:6-11; Ex. 33 (Rodriguez Tr.) 21:4-25, 22:9-23:13; Ex. 36 (Rud Tr.) 49:15-50:3; 61:2-6; Ex. 37 (Saltzman Tr.) 19:19-20:12; Ex. 39 (Senaydin Tr.) 25:8-26:10; 27:2-7; 28:14-19; 29:16-30:8; Ex. 40 (Shapiro Tr.) 118:3-119:20; Ex. 42 (Skorka Tr.) 83:10-15; Ex. 41 (Simmons Tr.) 42:9-19; Ex. 44 (Sullivan Tr.) 30:21-31:10; Ex. 46 (Thomas Tr.) 16:3-17:10; 17:20-18:2; 20:22-21:5; Ex. 48 (Tomlinson Tr.) 16:2-5; Ex. 53 (Yale Tr.) 135:22-136:13.

Hearst is interested in interns who display similar attributes, including a willingness to work hard and be organized, detail-oriented, independent, able to multi-task, and able to work well in a fast-paced environment.[46]

**B. Interns' Performance Is Evaluated Based on the Same Criteria.**

Hearst subjects all interns to a centrally designed evaluation system. Hearst evaluates all interns based on the same performance criteria.[47] Hearst requires all intern supervisors, across its magazines and departments, to complete the same "Internship Performance Review" form.[48] Hearst's centrally promulgated criteria include whether interns:

(1) "Follow[] instructions and perform[] their assignments with minimal supervision,"

(2) "Accurately and thoroughly complete assignments" and do "work that reflects neatness, attention to detail, and conformity to organizational standards,"

(3) "Interact effectively with employees and other interns" and "[i]nteract and communicate thoughts effectively,"

(4) Are "proactive" by "ask[ing] for more work when there is downtime" and by "want[ing] to get involved,"

(5) Embod[y] professionalism through punctuality, maturity, and confidence," and

(6) "Exhibit willingness to learn," are "[r]eceptive to feedback/constructive criticism," and "[a]sk[] questions if [they are] unsure."[49]

---

[46] Ex. 208 (Cosmopolitan Beauty Internship); Ex. 209 (Cosmopolitan Editorial Internship); Ex. 218 (ELLE Beauty Internship); Ex. 210 (ELLE Fashion Internship); Ex. 231 (ELLE Features Internship); Ex. 213 (Esquire Marketing Internship); Ex. 232 (Esquire Photo Internship); Ex. 219 (Good Housekeeping Beauty Internship); Ex. 222 (Harper's Bazaar Beauty Internship); Ex. 220 (Harper's Bazaar Accessories Internship); Ex. 214 (Harper's Bazaar Advertising Internship); Ex. 234 (Marie Claire Editorial Internship); Ex. 215 (O Marketing Internship); Ex. 229 (Seventeen Photo Internship); Ex. 216 (Town & Country Beauty Internship); Ex. 238 (Veranda Advertising Internship); Ex. 239 (Woman's Day Internships); Ex. 240 (Woman's Day Editorial Internship).

[47] Ex. 32 (Roberts Tr. II) 76:19-77:2.

[48] Ex. 32 (Roberts Tr. II) 67:2-70:8; Ex. 256 (Email, dated Aug. 3, 2011).

[49] Ex. 256 (Email, dated Aug. 3, 2011).

Hearst uses its evaluations in order to rate interns on whether they will be strong candidates for employment and refers to them when interns apply for jobs.[50]

### C. Hearst Requires Interns to Follow Set Work Schedules.

Interns at Hearst work according to a set schedule, typically between two to five days a week, from approximately 9 or 10 a.m. to 5 or 6 p.m.[51] Interns often work overlapping schedules so that at least one intern is present in a given department each day of the week.[52]

## ARGUMENT

## I. Plaintiffs Are Entitled to Summary Judgment Because Hearst Willfully Violated the Law by Classifying Them as Non-Employees.

### A. Standard of Review

A party is entitled to summary judgment where it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 76-77 (2d Cir. 2003). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See*

---

50 Ex. 256 (Email, dated Aug. 3, 2011); Ex. 32 (Roberts Tr. II) 70:21-71:7; 75:2-11; Ex. 30 (Ritterbeck Tr.) 121:10-20; Ex. 98 (Tomlinson Evaluation); Ex. 70 (Riordan Evaluation); Ex. 85 (Rud Evaluation).

51 Ex. 2 (Berard Tr.) 124:10-16; Ex. 8 (Dunn Tr.) 29:1-15; 47:12-23; Ex. 12 (Friedlander Tr.) 70:19-71:8; Ex. 63 (Seventeen Editorial Intern Manual); Ex. 115 (Elser Decl.) ¶ 4; Ex. 10 (Faucett Tr.) 103:8-11; Ex. 13 (Gonzalez Tr.) 20:6-14; Ex. 14 (Groher Tr.) 30:24-31:3; Ex. 17 (Hilmantel Tr.) 48:10-16; Ex. 18 (Holiver Tr.) 85:23-86:4; Ex. 19 (Johns Tr.) 27:3-7; Ex. 23 (McCoy Tr.) 7:10-17; 19:16-23; Ex. 25 (Park Tr.) 37:19-21; 53:20-22; 37:14-18; Ex. 27 (Rappaport Tr.) 47:6-10; 44:4-12; 103:6-104:2; Ex. 242 (Reese Tr.) 12:22-23:4; Ex. 29 (Riordan Tr.) 78:11-22; 141:24-142:9; Ex. 30 (Ritterbeck Tr.) 40:5-10; 48:19-22; Ex. 33 (Rodriguez Tr.) 25:5-7; Ex. 35 (Rothman Tr.) 66:3-15; Ex. 36 (Rud Tr.) 54:9-18; 100:17-19; Ex. 37 (Saltzman Tr.) 23:24-24:9; 38:15-24; Ex. 38 (Santucci Tr.) 26:5-18; 78:18-20; 80:15-22; Ex. 39 (Senaydin Tr.) 34:4-25; 47:8-25; Ex. 42 (Skorka Tr.) 97:20-98:2; 99:5-7; Ex. 44 (Sullivan Tr.) 18:15-22; Ex. 46 (Thomas Tr.) 21:15-17; 57:13-58:11; 89:14-17; Ex. 48 (Tomlinson Tr.) 20:1-13; Ex. 53 (Yale Tr.) 69:24-25; 70:2-3; 131:5-14; Ex. 213 (Esquire Marketing Internship).

52 Ex. 36 (Rud Tr.) 54:9-18; Ex. 6 (Marie Claire Advertising Internship Overview); Ex. 213 (Esquire Marketing Internship); Ex. 161 (Cosmo Interns: Spring '08); Ex. 163 (Seventeen Fall '12 Schedule).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Although Plaintiffs bear the initial burden of establishing that they were "employees" within the meaning of the FLSA and NYLL, once they have made this prima facie showing, Hearst bears the burden of establishing its defense that they fell under the narrow exception for "trainees" set forth in *Walling v. Portland Terminal Co*., 330 U.S. 148 (1947). *See Martin v. Malcolm Pirnie, Inc*., 949 F.2d 611, 614 (2d Cir. 1991) (noting that, because the FLSA is a remedial act, the employer bears the burden of proving that employees fall within an exempted category).

**B. Plaintiffs Are Covered Employees Under the FLSA and NYLL.**

**1. The FLSA's Remedial and Humanitarian Goals Require the Court to Interpret its Coverage Expansively.**

The FLSA seeks to combat unemployment and protect workers from abusive working conditions. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1944). The Act's coverage is necessarily broad, to ensure that it "aid[s] the unprotected, unorganized and lowest paid of the nation's working population . . . who lack[] sufficient bargaining power to secure for themselves a minimum subsistence wage." *Id*. "A broader or more comprehensive coverage of employees . . . would be difficult to frame" and there is "no doubt as to the Congressional intention to include all employees within the scope of the Act unless specifically excluded." *U.S. v. Rosenwasser*, 323 U.S. 360, 363 (1945).

To further its remedial and humanitarian goals, the FLSA broadly defines "employ" as "to suffer or permit to work" and defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(d), (e)(1); *Zheng*, 355 F.3d at 66. "Employer" is also defined

expansively as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"[53] 29 U.S.C. § 203(d). "Work" is any "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005). Moreover, work is compensable under the FLSA even if the employer does not request it, is unaware of it, or turns a blind eye to it, because it is the employer's duty "to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits [of workers' labor] without compensating for them." 29 C.F.R. § 785.13.

The FLSA's broad definitions of employ, employee, and employer are meant to ensure that commercial businesses do not obtain an unfair competitive advantage in the marketplace by employing individuals who voluntarily work for no wage. *See* 29 U.S.C. § 202(a)(3) (declaring Congress's intention to correct "detrimental" labor conditions that create "an unfair method of competition in commerce" through passage of the FLSA); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 299, 302 (1985) ("*Alamo Found.*") ("exceptions to [FLSA] coverage . . . exert a general downward pressure on wages in competing businesses"). "If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Alamo Found.*, 471 U.S. at 302. Broad, non-waivable coverage ensures that employers pay their workers lawful wages without "fear that [they] will be required by law to observe wage and hour standards higher than those applicable to

[53] The New York Labor Law's definition of employee is nearly identical to the FLSA's definition. *See* N.Y. Lab. Law § 651(5) (an employee is "any individual employed or permitted to work by an employer in any occupation").

[their] competitors." *Brooklyn Sav. Bank*, 324 U.S. at 710 n.25 (internal quotation marks omitted).

**2. Plaintiffs Performed Work that Hearst Suffered or Permitted.**

Plaintiffs fall comfortably within the broad definition of "employee" under the FLSA. Hearst "suffered or permitted" the work that Plaintiffs performed for its magazines, which included packing and unpacking samples, doing research, planning and assisting at events, compiling "edit credits," assisting at casting calls, and drafting magazine and website content. SOF ¶¶ 163-64, 222-27, 242-44, 280-81, 286, 305-08, 329, 358. Moreover, there is no dispute that Hearst was aware of the work that Plaintiffs performed – its employees assigned the work and supervised it. *Id.* ¶¶ 122, 216, 260, 278, 303, 320, 343, 357.

The fact that Plaintiffs lacked professional experience does not deprive them of protection under the FLSA. In fact, the FLSA specifically provides a mechanism for employers to apply to the Secretary of Labor for a certificate authorizing them to pay "learners" who are "being trained for an occupation" and "who, when initially employed produce[] little or nothing of value" at 95% of the minimum wage for up to 240 hours of work.[54] *See* 29 U.S.C. § 214(a); 29 C.F.R. § 520.300; 29 C.F.R. § 520.408(a). Section 214 appropriately balances the need for inexperienced workers who would otherwise be unemployable to gain job experience while preventing the "wholesale evasions" of the minimum wage laws that would result from "a blanket exemption" for inexperienced workers. *See Walling*, 330 U.S. at 151. Nothing in the FLSA allows employers to do what Hearst has done here – employ students to perform the work

---

[54] To obtain such a permit, the employer must demonstrate that "[r]easonable efforts [] have been made to recruit workers paid at least the minimum wage in those occupations in which certificates to employ learners at subminimum wages have been requested." 29 C.F.R. § 520.404(e).

of entry-level employees or contingency staff for no wages at all. This is exactly the kind of "wholesale evasion" that Congress sought to prevent by enacting Section 214. *See id*. at 151-52.

**C. Hearst Cannot Show that Plaintiffs Were Trainees Who Were Part of a Bona Fide Internship Program.**

**1. *Walling*'s Narrow Exception for Trainees Does Not Apply to Plaintiffs.**

The FLSA does not define the word "intern" and there is no exception for "interns" anywhere in the statute. In 1947, the U.S. Supreme Court in *Walling* carved out a narrow exception to the definition of an employee for "trainees" to whom railroad companies provided seven to eight days of "the same kind of instruction" offered by a "public or private vocational school." 330 U.S. at 152-53. Central to the Court's decision, it was "undisputed" that "the railroads receive[d] *no* 'immediate advantage' from any work done by the trainees," the trainees worked "*solely* for [their own] personal purpose or pleasure," and their "work serve[d] *only* [their] own interest." *Id*. at 152-53 (emphasis added).

*Walling*'s outcome would have been different if the railroads had obtained an immediate advantage from the trainees. *See id*. at 152. When an employer obtains a direct or immediate benefit from work, it has "suffered or permitted" work and must compensate it.[55] *See id*. The Court cautioned future courts to be wary of circumstances where "an employer has evasively accepted the services of beginners at pay less than the legal minimum[.]" *Id.* at 153. Heeding *Walling*, courts and the DOL have refused to extend the trainee exception beyond *Walling*'s narrow circumstances to excuse employers from paying workers whose work benefits them.

55 In fact, an employer can "suffer" work even where the employee does not affirmatively perform any tasks, such as when an employer requires an employee to be "on call" in case the need for work arises. *Singh v. City of New York*, 524 F.3d 361, 368 (2d Cir. 2008); *Pabst v. Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1134-35 (10th Cir. 2000).

In *Alamo Foundation*, the U.S. Supreme Court held that individuals who themselves claimed to be "volunteers" with no expectation of compensation were employees and unlike the trainees in *Walling*. 471 U.S. at 300-01. The volunteers were unlike trainees because they actually staffed the Foundation's commercial businesses from which it derived most of its income. *Id*. at 292. The fact that the volunteers "vehemently protest[ed]" any expectation of compensation was not dispositive because "the purposes of the [FLSA] require that it be applied even to those who would decline its protections." *Id*. at 302.

In *Archie v. Grand Central Partnership, Inc.*, a court in this district found that homeless individuals participating in a "Pathways to Employment" employment training program who performed outreach, food service, maintenance, and administrative tasks for a social services agency were employees because they "d[id] work that had a direct economic benefit for the defendants." 997 F. Supp. 504, 507 (S.D.N.Y. 1998) (Sotomayor, J.). In addition to performing productive work, the plaintiffs also benefited the defendants by providing them with services "at below market rates," thereby giving them a competitive advantage over businesses that paid minimum wages. *Id*. at 533. The court held that the "trainee" exception did not apply *even though* the plaintiffs "benefitted enormously from the work opportunities provided by the defendants" by, for example, gaining "basic job skills and the ability to create an employment history." *Id*. at 533-35.

In *Okoro v. Pyramid 4 Aegis*, although the plaintiff "wanted to learn and indeed did learn" about the defendant's business, she was an employee, not a trainee, because "the nature of the work that she performed, such as cleaning, picking up prescriptions, appearing in court on behalf of clients at the facility, and calling in hours for caregivers to Paychex, was undeniably of

substantial assistance to [the company]." No. 11 Civ. 267, 2012 WL 1410025, at *10 (E.D. Wis. Apr. 23, 2012).

In *Donovan v. New Floridian Hotel, Inc.*, the Eleventh Circuit held that former patients who performed assigned tasks during a post-release placement in a retirement home were covered employees under the FLSA. 676 F.2d 468, 471 (11th Cir. 1982). Although the defendants claimed that the tasks were merely "to keep [the plaintiffs] occupied," the court held that the plaintiffs were employees because their work "was of economic benefit" to the defendants. *Id.* at 470-71. The fact that the plaintiffs may have performed their tasks poorly did not matter because "the evidence indicate[d] that the[y] perform[ed] meaningful work" that was compensable even if "someone else could have performed the duties better or in less time." *Id.* at 475 n.3.

In *Wirtz v. Wardlaw*, the Fourth Circuit held that high school students who performed office tasks in an insurance company were employees despite the defendant's claim that the purpose of the work was to help them "determine whether they would be interested in preparing for careers in the insurance business after completion of their high school courses." 339 F.2d 785, 787 (4th Cir. 1964). The court held that the students' work, which included preparing and mailing newspaper clippings, monthly newsletters, and business cards to customers benefited the defendant "no less than [the students] themselves," in that their work furthered the company's promotional activities. *Id.* at 787-88.[56]

---

56 *See also McLaughlin v. Ensley*, 877 F.2d 1207, 1209-10 (4th Cir. 1989) (snack food distribution "trainees," who accompanied and assisted full-time employees during a week-long orientation period, were employees; even though they learned on the job, their work driving trucks, loading and unloading trucks, restocking retail store shelves and vending machines, and performing simple paperwork benefited the defendant); *Bailey v. Pilots' Ass'n for the Bay & River Delaware*, 406 F. Supp. 1302, 1305, 1307 (E.D. Pa. 1976) (although apprentice river boat driver obtained "some educational benefit" from his apprenticeship and "did not contemplate

Here, the work that Plaintiffs performed during their internships provided an immediate advantage to Hearst because it contributed to the day-to-day running of its operations and would have been performed by paid employees, freelancers, or messengers if Plaintiffs did not do it. *See* SOF ¶¶ 140, 155-62, 185-88, 230, 262-63, 285, 288, 312, 325, 327, 349, 359, 360.

**2. Hearst Cannot Satisfy the DOL's Six-Factor Test for Unpaid Interns.**

Although the Court can grant summary judgment to Plaintiffs based solely on the "suffer or permit" standard, Hearst also cannot show that the DOL's six-factor test, in which the DOL set forth the circumstances under which *Walling*'s trainee exception applies to interns, is met.[57] *See* Ex. 241 (U.S. Dep't of Labor Fact Sheet #71) ("DOL Factors").[58] In accordance with *Walling*, the DOL's exception is "narrow" and presumes that internships in the "'for-profit' private sector will most often be viewed as employment[.]" *See id*. at 1. Courts have held that the DOL Factors are entitled to deference as a reasonable application of the FLSA and *Walling*. *See Archie*, 997 F. Supp. at 532. The DOL's commentary on the factors, as set forth in Fact Sheet #71, also reasonably interprets the FLSA and *Walling* and similarly warrants deference. *See Exxon Mobil Corp. v. C.I.R.*, 689 F.3d 191, 200 n.13 (2d Cir. 2012).

According to the DOL, an employer *must meet all of the factors* to show that an intern is a "trainee" outside the protections of the FLSA:

---

compensation for the apprenticeship period," he performed the duties of a regular crew member and thus should have been paid); U.S. Dep't of Labor Op. Letter, 2002 WL 32406599, at *2-3 (Oct. 7, 2002) (students who bagged groceries for tips and donations were employees of a supermarket); U.S. Dep't of Labor Op. Letter, 1994 WL 1004761, at *1-2 (Mar. 25, 1994) (interns who worked at a youth hostel assisting in its daily operations were employees).

[57] A version of the test, replacing the word "intern" for "trainee" and "internship" for "training period" "ha[s] appeared in Wage and Hour Administrator opinions since at least 1967." *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1026 (10th Cir. 1993). *See, e.g.*, *Archie*, 997 F. Supp. at 531-32 (citing 1980 U.S. DOL Wage & Hour Manual).

[58] The New York Department of Labor's internship criteria ("NYSDOL Factors") incorporate the DOL Factors and add others. *See* Ex. 276 (N.Y. Dep't of Labor, Wage Requirements for Interns in For-Profit Businesses).

(1) The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

(2) The internship experience is for the benefit of the intern;

(3) The intern does not displace regular employees, but works under close supervision of existing staff;

(4) The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

(5) The intern is not necessarily entitled to a job at the conclusion of the internship; and

(6) The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

Ex. 241 (DOL Factors) at 1.

**a. Plaintiffs' Internships Were Not Similar to Training that Would Be Given in an Educational Environment and Benefited Hearst.**

Hearst cannot satisfy the first, second, and fourth factors because Plaintiffs' internships were not structured around a classroom or academic experience and were entirely structured to benefit the magazines' actual operations. *See* Ex. 241 (DOL Factors) at 2 ("The more that an internship program is structured around a classroom or academic experience as opposed to the employer's actual operations, the more likely the internship will be viewed as an extension of the individual's educational experience"); *Archie*, 997 F. Supp. at 507 (defendant did not "structure a training program as that concept is understood in case law and regulatory interpretations but instead structured a program that required the plaintiffs to do work that had a direct economic benefit for the defendants"). Plaintiffs received almost no classroom training and Hearst did not budget for any. SOF ¶¶ 19-21, 202-05, 232, 259, 297, 313, 318-19, 347, 363-64. The instruction they received was on-the-job and related to their assigned duties. *Id*. ¶¶ 205, 232, 259, 297, 313, 347. Moreover, Plaintiffs regularly performed work that directly contributed to the magazines'

actual operations, including packing and unpacking samples, doing research, planning and assisting at events, compiling "edit credits," holding casting calls, and drafting magazine and website content.  *Id.* ¶¶ 163-64, 222-27, 242-44, 280-81, 286, 305-08, 329, 358.  Their work facilitated Hearst's operations, saving it from having to pay employees, freelance workers, and/or messengers, and did not impede Hearst from getting the work done or cost it any money. *Id.* ¶¶ 18, 20-21, 104-06, 110-11, 113, 124, 129-32, 137, 140, 155-62, 185-88, 230, 249-50, 262-63, 285, 288, 312, 325, 327, 349, 359, 360.  Where, as here, interns perform "the routine work of the business on a regular and recurring basis" by "engag[ing] in the operations of the employer or  . . . performing productive work (for example, filing, performing other clerical work, or assisting customers)," the interns are not trainees and must be paid.  Ex. 241 (DOL Factors) at 2; *see Archie*, 997 F. Supp. at 532-33.

The fact that Plaintiffs may have learned some skills on-the-job during their internships is not sufficient to satisfy the first and second factors because on-the-job learning is not similar to that provided by an educational environment and because the fruits of any on-the-job learning benefited Hearst.  Ex. 241 (DOL Factors) at 2 ("[T]he fact that [interns] may be receiving some benefits in the form of a new skill or improved work habits will not exclude them from the FLSA's minimum wage and overtime requirements because the employer benefits from the interns' work"); *see Archie*, 997 F. Supp. at 533 (although trainees gained basic job skills that might help them in the job market, such on-the-job training was not similar to that which would be provided in a vocational school and benefited the defendant by allowing it to offer its services at below market rate); *Okoro*, 2012 WL 1410025, at *10 ("the nature of the work that [the trainee] performed, such as cleaning, picking up prescriptions, appearing in court on behalf of clients at the facility, and calling in hours for caregivers to Paychex," was not akin to the "course

of practical training" that the railroad trainees in *Walling* received, because "one hardly needs to be trained in how to clean a facility, how to pick up prescriptions, and how to call in hours for caregivers" and "was undeniably of substantial assistance to [the company]").[59]

**b. Plaintiffs Performed Work that Hearst Otherwise Would Have Paid Workers to Do and Were Supervised as if They Were Regular Employees.**

Hearst also cannot satisfy the third factor because Plaintiffs performed the same or similar duties performed by the entry-level employees who supervised them, reduced the workloads of their supervisors, and/or cut down on costs that Hearst otherwise would have had to pay to freelance workers and messengers. SOF ¶¶ 18, 20-21, 104-06, 110-11, 113, 124, 129-32, 137, 140, 155-62, 185-88, 230, 249-50, 262-63, 285, 288, 312, 325, 327, 349, 359, 360. Interns must be paid if employers use them as substitutes for regular workers or to augment their existing workforce. *See* Ex. 241 (DOL Factors) at 2. If an employer "would have hired additional employees or required existing staff to work additional hours had interns not performed the work, then the interns will be viewed as employees and entitled to compensation under the FLSA." *Id.*; *see also Archie*, 997 F. Supp. at 533 (where defendant used the services provided by the alleged trainees and avoided having to pay others at market rates, alleged trainees were employees covered by the FLSA).

Plaintiffs also did not "shadow[]" their supervisors or train under their "close and constant" supervision. Ex. 241 (DOL Factors) at 2. To the extent that they were supervised at

---

59 Because Hearst did not operate an educational training program, *see* SOF ¶¶ 19-21, 202-05, 232, 259, 297, 313, 318-19, 347, 363-64, it also cannot meet the additional NYSDOL Factors. *See, e.g.*, Factor 7 (persons providing "clinical training" must be competent to "fulfill the educational goals and requirements of the training program"); Factor 9 ("training that is specific to the employer and its operations is conclusive evidence that an employment relationship exists"). Hearst's internship postings also did not "discuss education or training" (Factor 11). *See* SOF ¶¶ 24, 118, 281.

all, Plaintiffs "received the same level of supervision as [Hearst's] regular workforce." *Id.*; *see also Archie*, 997 F. Supp. at 516-17 (plaintiffs did not receive "close supervision" where they were left to perform their tasks alone after receiving initial instruction).

**c. Plaintiffs Expected Compensation and Opportunities for Paid Employment in Exchange for Their Work.**

Hearst also cannot satisfy the fifth and sixth factors. With respect to the fifth factor, "internships generally should not be used by the employer as a trial period for individuals seeking employment." Ex. 241 (DOL Factors) at 2. Here, while an internship at Hearst did not guarantee a job, Hearst used internships to assess interns' skills and "fit" with the company, requiring intern supervisors to evaluate interns' performance based on the kinds of metrics used to evaluate employees and to state whether they would recommend interns for paid positions. SOF ¶¶ 53-65. In addition, Plaintiffs expected that if they worked hard and performed well, they would be considered for employment at Hearst. *Id*. ¶¶ 208, 218, 273-74, 294, 315, 337, 366. In fact, some Plaintiffs were explicitly told this by their supervisors. *Id*. ¶¶ 218, 274, 315.

With respect to the sixth factor, both Plaintiffs and Hearst had an expectation that Plaintiffs would be paid for their work, even if the pay was in the form of in-kind compensation. *See Alamo Found.*, 471 U.S. at 292, 301 (a compensation agreement can be "implied" or "express" and could involve the payment of in-kind benefits, such as housing or food, rather than money) (citing *Walling*, 330 U.S. at 152). Hearst contends that the opportunity to receive academic credit offered Plaintiffs something "tangible" and of "monetary value" in exchange for their work. SOF ¶ 68. To the extent that credit was of any value, which Plaintiffs do not concede, the FLSA does not permit an employer to choose an alternate in-kind method of compensation in lieu of wages. *See Alamo Found.*, 471 U.S. at 301-02. Plaintiffs also expected

in-kind benefits in exchange for their work: job references and a chance at paid employment. *Id.* ¶¶ 208, 218, 273-74, 294, 315, 337, 366.

**d. *Laurelbrook* Is Easily Distinguished.**

Hearst will likely rely on *Solis v. Laurelbrook Sanitarium & School, Inc.*, a case that is not binding on this Court and is easily distinguished from the facts here. In *Laurelbrook*, the Secretary of Labor sued a Seventh Day Adventist boarding school for having its students perform tasks at the school's sanitarium that provided the students with practical training. 642 F.3d 518, 519-20 (6th Cir. 2011). Students spent four hours each day in the classroom and four hours learning practical skills at the sanitarium. *Id.* at 520. The sanitarium's sole purpose was to serve as a training vehicle for students. *Id.*

The Sixth Circuit held that the students were not employees of the sanitarium because the students did not displace paid workers, their work cost the sanitarium money because instructors focused on them instead of doing productive work, and they received training comparable to vocational school courses that were approved by the state accreditation agency. *Id.* at 530-31. The Sixth Circuit distinguished the facts in *Marshall v. Baptist Hospital, Inc.*, a case that is much closer to the facts of this case than *Laurelbrook.* In *Marshall*, the court held that radiological students, who spent 20 or more hours a week in "clinical practicum training" in the x-ray department of a hospital, were employees. 473 F. Supp. 465, 471-72 (M.D. Tenn. 1979), *rev'd on other grounds,* 668 F.2d 234 (6th Cir. 1981). The students performed administrative and clerical functions, in addition to x-rays, that would otherwise have been performed by employees, and functioned as members of their departments. *Id.* at 472-73. Moreover, the court found that the training they received was "deficient" because the students performed a limited

subset of mostly routine tasks, many of their tasks were not closely tied to their training, and they were not closely supervised. *Id*. at 474.

Here, Hearst does not operate solely to train interns like the sanitarium in *Laurelbrook*, interns do not cost Hearst money, and, like the students in *Marshall*, Plaintiffs displaced paid workers, augmented Hearst's workforce, and functioned as regular staff members. SOF ¶¶ 18, 20-21, 104-06, 110-11, 113, 124, 129-32, 137, 140, 155-62, 185-88, 230, 249-50, 262-63, 285, 288, 312, 325, 327, 349, 359, 360. Moreover, the training that Plaintiffs received was "deficient:" they learned how to perform mostly routine tasks on-the-job, were not closely supervised, and received little or no classroom training. *Id*. ¶¶ 19-21, 202-05, 232, 259, 297, 313, 318-19, 347, 363-64.

**e. The Fact that Certain Plaintiffs Received Academic Credit for Their Internships Did Not Excuse Hearst from Paying Them.**

Hearst is wrong that the fact that some schools provide credit for internships insulates it from its wage and hour obligations. First, Hearst's credit "requirement" is inconsistently enforced, asks almost nothing of the schools, and is really just a cover for attempting to "stay[] on the right side of the labor law." SOF ¶¶ 67, 74-84. Hearst does not do anything to verify that interns actually receive school credit. *Id*. ¶¶ 79-80. For example, even though their schools initially said that Wang and Wagster were eligible for credit, they ultimately were not awarded credit. *Id*. ¶¶ 151-52, 301-02. Mancini also did not receive credit and was not even required to submit a letter saying that she was eligible to receive credit. *Id*. ¶¶ 264-69. Even when Hearst applies its policy, its requirements are minimal. Hearst will accept interns who are not actually eligible for credit if they receive a notation on their transcripts or can enroll in "zero credit" courses. *Id*. ¶¶ 81-83. Hearst will accept credits from schools in which the interns are not actually enrolled if their own schools will not award credit. *Id*. ¶¶ 84, 361-62. Moreover, Hearst

does not evaluate the reasons that schools award credit: in fact, it does not care what reasons the schools have for awarding credit or whether they bear any relation to the DOL Factors and does not ask them. *Id.* ¶¶ 75-77.

Second, the schools require little of interns in order for them to be eligible for credit. The Plaintiffs who earned credit were merely required to write journal entries, do a paper, and/or obtain an evaluation from their supervisor. SOF ¶¶ 234, 296, 333. Only one Plaintiff's professor visited Hearst to see what she was doing and, in that case, her professor raised concerns about the tasks that she was assigned and her level of supervision. *Id.* ¶¶ 334-36. Plaintiffs' experiences are not uncommon: a 2011 study of over 8,000 undergraduate interns found that, of those who received credit, only 15% reported that an adviser or faculty member visited their work site; 33% did not receive a formal supervisor evaluation; and 45% did not receive guidance from an advisor or faculty member.[60] In fact, schools have an incentive to award credit for internships, even if they are not academically rigorous: internships allow schools to obtain tuition from students without having to pay for staff to teach them.[61] In other words, "[t]uition for for-credit internships is free money."[62]

Third, receipt of credit is not one of the DOL Factors. Instead, the DOL Factors require internships to provide training "similar to training which would be given in an educational environment." Ex. 241 (DOL Factors) at 1. Internships structured around a company's "actual operations" that provide little or no academic training, like Hearst's internships, fail this test. *See id.* at 2; *Archie*, 997 F. Supp. at 532-33 (a "work experience program with informal on-the-job

---

[60] Kevin Carey, *Giving Credit, but Is It Due?*, N.Y. Times, Jan. 30, 2013, *available at* http://www.nytimes.com/2013/02/03/education/edlife/internships-for-credit-merited-or-not.html?pagewanted=all&_r=0 (last visited Mar. 1, 2013).

[61] *Id.*

[62] *Id.* (noting that, "[i]nstead of receiving no wages, students are, in effect, receiving a negative wage. They are paying for the privilege of working").

training provided only as needed" is not similar to what would be provided in a vocational school). Moreover, nothing in the DOL Factors or the commentary interpreting them suggests that academic credit alone is sufficient to excuse an employer from paying for work. For example, even when discussing credit, the DOL's commentary contemplates circumstances where the "*college or university exercises oversight over the internship program and* provides educational credit." Ex. 241 (DOL Factors) at 2 (emphasis added). Here, Hearst employees, who are not teachers or trained on the FLSA's requirements and who are often entry-level workers themselves, oversaw Plaintiffs' work. SOF ¶¶ 41-42, 122, 172, 216, 221, 229, 235, 275, 278, 298, 303, 320, 338, 343.

## II. Hearst's Violations Were Willful and Plaintiffs Are Entitled to Liquidated Damages Under the FLSA and NYLL.

Hearst willfully violated the law by admittedly taking no steps to ensure that interns participated in a *bona fide* training program other than requiring them to show that they were eligible for – but not necessarily awarded – academic credit. Hearst conceded that it had no good faith basis for its intern policy by withdrawing its good faith affirmative defense in the face of Plaintiffs' discovery demands. SOF ¶ 52.

Under the FLSA, the statute of limitations is three years for "a cause of action arising out of a willful violation." 29 U.S.C. § 255(a).[63] An employer commits a "willful" violation where it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute[.]" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999). Plaintiffs need not show that Hearst had actual knowledge of its FLSA violations or that it "acted with intent" or "in bad faith." *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997). Hearst acted willfully if the Court

[63] The limitations period for NYLL claims is six years. N.Y. Lab. Law § 198(3).

finds that it "should have inquired further into whether its conduct was in compliance with the

Act, and failed to make adequate further inquiry."  29 C.F.R. § 578.3(c)(3).  Plaintiffs' burden of

proof is a light one.  *See McLaughlin*, 486 U.S. at 133-35.

Here, Hearst was aware of the requirements of the FLSA and specifically of the DOL

Factors, yet made no effort to ensure that these requirements were met with respect to its interns.

In fact, Hearst has admitted that it took no steps to:

(1)    Examine the duties that interns perform, their supervision, whether interns are given
assignments similar to those given to paid employees, or whether its employees are
dependent on the work that interns perform in determining that it need not pay interns
minimum wages (SOF ¶ 31);

(2)    Ensure that internships at its magazines or in its departments are structured around a
classroom or academic experience (SOF ¶ 33);

(3)    Ensure that interns are the primary beneficiaries of their internship experiences (SOF
¶ 34); or

(4)    Ensure that interns do not displace the work of paid employees (SOF ¶ 35).

Hearst's failure to take any steps to ensure that its internships complied with the

requirements of the FLSA is sufficient for the Court to find that its conduct was willful.  *See

Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 465 (S.D.N.Y. 2008) (employer's

"failure to demonstrate that it undertook to inquire whether its conduct was in compliance with

the FLSA" supported willfulness finding).

Instead of verifying that its internships complied with the DOL Factors, Hearst relied

exclusively on its school credit requirement, without actually verifying that interns did, in fact,

receive credit, or inquiring into the criteria that the schools consider in awarding credit and

whether those criteria bore any relation to the DOL Factors.  SOF ¶¶ 67, 69. 75-77, 79-80.

Hearst's mantra in this case – that the magazines ran their own internship programs – is no

defense because it was Hearst's responsibility as the employer and the magazines' corporate

owner to make sure that the magazines complied with the law. Even after this lawsuit was filed and in the face of numerous instances of interns performing productive work, Hearst has still done nothing to review its policy of not paying interns. *Id.* ¶¶ 29, 43-51. *See Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305, 309 (S.D.N.Y. 1998) (failure of individuals with knowledge of legal requirements to inquire once they learned of potential violations is evidence of willfulness).

Because Hearst withdrew its good faith affirmative defense, Plaintiffs are entitled to liquidated damages under both the FLSA and NYLL. *See* 29 U.S.C. § 216(b) (an employer who violates the FLSA's minimum wage and/or overtime provisions is liable for unpaid wages and "an additional equal amount as liquidated damages"); N.Y. Lab. Law § 198(1-a) (authorizing payment of 100% liquidated damages "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law"). Because liquidated damages under the FLSA and the NYLL serve different purposes, *see Benavidez v. Plaza Mexico Inc.*, No. 09 Civ. 5076, 2012 WL 500428, at *8 (S.D.N.Y. Feb. 15, 2012), an award of damages under both statutes is appropriate. *Id.*

## III. The Court Should Certify the Proposed Class Because Plaintiffs Meet All of the Rule 23 Requirements.

Plaintiffs' NYLL claims are well suited for class certification. Hearst uniformly classified all class members as non-employees based on one factor – that interns are college students who are eligible to receive academic credit for their internships – and substantial evidence shows that interns performed productive work without pay and participated in internships structured around Hearst's actual operations and not a classroom or academic experience. These circumstances, which were the same across the class, will drive the resolution of the key question in this case: whether interns are covered "employees" or fell under *Walling*'s narrow exception for "trainees." *See Myers v. Hertz Corp.*, 624 F.3d 539, 549 (2d Cir. 2010)

(class certification is appropriate where "evidence generally applicable to the class" may answer the key issues in the case); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (certification is warranted where the evidence is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation") (internal quotation marks omitted).

Plaintiffs seek to certify the following class under Rule 23 for violations of Article 19 of the NYLL:

> All persons who have worked as unpaid interns at Hearst Magazines in New York between February 1, 2006 and the date of final judgment in this matter.

Courts in this Circuit give Rule 23 a "liberal rather than restrictive construction," and "adopt a standard of flexibility" when they apply it. *Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997) (internal quotation marks omitted). The Court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re Initial Pub. Offering Sec. Lit.*, 471 F.3d 24, 41 (2d Cir. 2006). "[I]n making such determinations, [the Court] should not assess any aspect of the merits unrelated to a Rule 23 requirement;" however, where a Rule 23 requirement and a merits issue overlap, the Court must resolve those disputes that are necessary to determining whether Rule 23 has been met. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) (internal quotation marks omitted).

The Court has already granted conditional certification in this case under 29 U.S.C. § 216(b) based on evidence that Hearst "made a uniform determination that interns were not employees," "required interns to submit college credit letters," and "used interns to performed entry-level work with little supervision." *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2012 WL 2864524, at *2 (S.D.N.Y. July 12, 2012). The evidence today is far more substantial. Courts in this Circuit routinely certify cases involving the uniform classification of workers as non-

employee "independent contractors,"[64] or as "exempt" from wage and hour requirements,[65] which raise comparable issues and rely on similar types of proof, including uniform compensation policies. *See, e.g.*, *Iglesias-Mendoza*, 239 F.R.D. at 373 ("common question[] of . . . whether [alleged independent contractors] were supposed to be paid the minimum wage as a matter of law" is "about the most perfect question[] for class treatment"); *Damassia*, 250 F.R.D. at 159-64 (certifying class based on uniform classification policy and evidence that class members had similar types of duties and responsibilities).

This case is no different. Hearst classified all interns in one fell swoop regardless of the particular tasks they were assigned, the magazine or department in which they worked, who supervised them, and what they gained from their internships. The proof that will drive the merits – the nature of Hearst's internships, including interns' immersion in day-to-day operations, Hearst's reliance on interns to perform productive work and fill gaps resulting from its cost-cutting measures, and the lack of classroom or academic training – is "generally applicable to the class" and capable of generating common answers to the merits questions. *See Myers*, 624 F.3d at 549.

### A. Plaintiffs Meet Each Rule 23(a) Requirement.

#### 1. Numerosity

Rule 23(a)(1) requires Plaintiffs to show that "the class is so numerous that joinder of all

---

[64] *See Hart v. Rick's Cabaret Int'l Inc.*, No. 09 Civ. 3043, 2010 WL 5297221, at *6-7 (S.D.N.Y. Dec. 20, 2010); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 370-73 (S.D.N.Y. 2007); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 203-05 (S.D.N.Y. 2006); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85-88 (S.D.N.Y. 2001).

[65] *See Cuevas v. Citizens Fin. Grp., Inc.*, 283 F.R.D. 95, 97-101 (E.D.N.Y. 2012); *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10 Civ. 4825, 2011 WL 2207586, at *9-12 (S.D.N.Y. June 2, 2011); *Han v. Sterling Nat'l Mortg. Co.*, No. 09 Civ. 5589, 2011 WL 4344235, at *4 (E.D.N.Y. Sept. 14, 2011); *Damassia v. Duane Reade Inc.*, 250 F.R.D. 152, 159-64 (S.D.N.Y. 2008).

members if impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 2005). Here, there are more than 3,000 members of the proposed class. Bien Decl. ¶ 13.

**2. Commonality**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single common question of law or fact will suffice. *Marisol A.*, 126 F.3d at 376; *accord Wal-Mart*, 131 S. Ct. at 2556. The commonality requirement is met where a common question of fact or law is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original) (internal quotation marks omitted). Here, there are several common questions:

**a. Whether Hearst Derived an Immediate Advantage From Interns' Work.**

Whether Hearst derived an immediate advantage from Plaintiffs' and the class members' work is a common question that will generate a common answer. *See Archie*, 997 F. Supp. at 534 ("If a defendant gains an immediate advantage from a plaintiff's labor, courts have held that the plaintiff is an employe[e] for purposes of the FLSA."); Ex. 241 (DOL Factors). This question is appropriate for classwide resolution because it looks to *the nature of the work performed* – not the specific tasks. *Archie*, 997 F. Supp. at 535 (plaintiffs who performed a variety of tasks were employees because they "performed productive work for the defendants"); *Okoro v. Pyramid 4 Aegis*, No. 11 Civ. 267, 2012 WL 1410025, at *10-11 (E.D. Wis. Apr. 23, 2012) (individual whose duties were "undeniably of substantial assistance to [the company]" was an employee); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 (11th Cir. 1982) (patients who "did work which was of economic benefit" to defendant were employees); *Wirtz*, 339 F.2d at 786-88 (high school students who helped to perform office tasks were employees).

The answer to this question will not vary from intern to intern and "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

The proof capable of generating a common answer this question includes, but is not limited to: (1) testimony from interns, including Plaintiffs, Opt-In Plaintiffs, and Hearst's declarants, regarding the productive work they performed; (2) testimony from intern supervisors; (3) internship job postings; (4) descriptions of interns' productive work in Hearst's intern evaluation forms; and (5) descriptions of interns' productive work in intern manuals and guidelines produced by Hearst. *See* Statement of Facts, *supra* Section II.B.

**b. Whether Interns Displaced Paid Workers.**

A second common question is whether Plaintiffs and class members displaced paid workers by performing work that paid workers typically perform or by augmenting Hearst's existing workforce. *See* Ex. 241 (DOL Factors); *Archie*, 997 F. Supp. at 533 (where defendant used services provided by alleged trainees and avoided having to pay others at market rates, alleged trainees were employees covered by the FLSA). Much of the proof discussed above will generate a common answer to this question. In addition, Hearst's documents and witness testimony show that Hearst used interns instead of paid messengers and freelancers and Hearst's entry-level job descriptions show that interns performed many of the same tasks as paid employees. *See* Statement of Facts, *supra* Section III.

**c. Whether Hearst Internships Were Structured Around its Actual Operations as Opposed to a Classroom or Academic Experience.**

A third common question is whether Hearst internships were structured around a classroom or academic experience as opposed to its actual operations. *See* Ex. 241 (DOL Fact Sheet); *Archie*, 997 F. Supp. at 507 (finding plaintiffs were not trainees where the defendant did

not "structure a training program as that concept is understood in case law and regulatory interpretations but instead structured a program that required the plaintiffs to do work that had a direct economic benefit for the defendants"). Evidence that Hearst provided interns with little classroom training, consisting of periodic lunch sessions, and instead primarily structured internships around its day-to-day operations will be common to Plaintiffs and all class members. *See* Statement of Facts, *supra* Sections IV & V.

**d. Whether Hearst Internships Were for the Benefit of Interns.**

A fourth common question is whether Hearst's internships were "for the benefit" of the interns or whether Hearst benefited from them. "If the interns are engaged in the operations of the employer or are performing productive work (for example, filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude [interns] from . . . minimum wage . . . requirements because the employer benefits from the interns' work." *See* Ex. 241 (DOL Factors); *Walling*, 330 U.S. at 152-53 (citing undisputed evidence that training was "solely for [plaintiffs'] personal purpose or pleasure," and that the "work serve[d] only [plaintiffs'] own interest"); *Archie*, 997 F. Supp. at 533 (although plaintiffs gained basic job skills that might help them in the job market, they were not trainees because their work benefited defendant by allowing it to offer services at below market rate).

In addition to the evidence discussed above, including documents reflecting interns' productive work and Hearst's reliance on interns to cut costs, Hearst's Internship Performance Reviews and other company documents demonstrate that Hearst uses internships to assess interns' skills for entry-level employment. *See* Statement of Facts, *supra* Section VI.B. This common evidence is relevant to whether Hearst used internships to try out potential employees

before hiring them. *See* Ex. 241 (DOL Factors) ("[U]npaid internships generally should not be used by the employer as a trial period for individuals seeking employment . . . ").

**e. Whether Interns Are Employees as a Matter of "Economic Reality."**

A fifth common question is whether interns are Hearst's employees as a matter of "economic reality." *See Herman*, 172 F.3d at 139. Where a key issue is the existence of an employer-employee relationship, courts consider "any relevant evidence" that may aid in evaluating the economic relationship. *Id.* Here, there is common evidence that Hearst treats interns like employees. Hearst: (1) relies on interns to perform productive work that overlaps with work that paid workers perform; (2) subjects interns to a regular hiring process in which they submit a resume and cover letter and are interviewed about their experience, availability, and job expectations; (3) evaluates interns using criteria akin to those used for regular employees; and (4) requires interns to follow set schedules. *See* Statement of Facts, *supra* Section VI.

**3. Typicality**

Rule 23(a)(3) is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376. "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the named plaintiff and the class. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). The claims of the plaintiff and the class "only need to share the same essential characteristics, and need not be identical." *Damassia*, 250 F.R.D. at 158 (internal quotation marks omitted). The typicality requirement is not "highly demanding." *Id.*

Here, Plaintiffs are typical of the class they seek to represent. They had unpaid

internships, performed productive work, participated in Hearst's regular operations, and received primarily on-the-job training not classroom or academic training. *See* Statement of Facts, *supra* Section I.B.

Plaintiffs' claims are based on the same legal theory as the members of the Class – that Hearst misclassified them as non-employees and failed to pay them minimum wages, overtime, and spread-of-hours pay under the NYLL. *See Damassia*, 250 F.R.D. at 158 ("all class members' claims . . . are based on the same course of events and legal theory, namely, that [defendant]'s decision to classify [them] . . . is inconsistent with the requirements of the NYLL").

**4. Adequacy**

Rule 23(a)(4) tests whether the class representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). Where the "class representatives are prepared to prosecute fully the action and have no known conflicts with any class member," the adequacy requirement is met. *Shahriar*, 659 F.3d at 253. "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class." *Damassia*, 250 F.R.D. at 158. Plaintiffs have no conflicts with the class. In furtherance of their duties as class representatives, each traveled to New York, sat for a full-day deposition, responded to interrogatories, and produced documents. Bien Decl. ¶ 14.

Plaintiffs' counsel are "qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrett Sec. Corp.*, 222 F. 3d 52, 60 (2d Cir. 2000). Outten & Golden LLP ("O&G") has substantial experience prosecuting wage and hour class and collective actions and has a very good reputation in the field of employment law. *See, e.g., Capsolas v. Pasta Res.*,

*Inc.*, No. 10 Civ. 5595, 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

**A. Plaintiffs Meet Rule 23(b)(3).**

**1. Common Questions Predominate.**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3). A common question predominates when "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, generalized proof will "tend to show" that Plaintiffs and class members were similar in ways that are material to the principal issue in this case: whether interns were employees or trainees. *See Myers*, 624 F.3d at 549. The common questions Plaintiffs have identified, which generalized proof can answer, are substantial and predominate over any individual questions because they will be determinative of the merits issue. *See Walling*, 330 U.S. at 152-53 (decisive issues are whether the employer "receive[d] [an] 'immediate advantage' from any work done by the trainees," whether the trainees worked "solely for [their own] personal purpose or pleasure," and whether their "work serve[d] only [their] own interest"); *see also Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316, 2006 WL 2819730, at *14-16 (S.D.N.Y. Sept. 29, 2006) (where an issue is "outcome determinative," it predominates).

**2. A Class Action Is the Superior Mechanism.**

Rule 23(b)(3) requires the Court to determine "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether superiority is met, the Court may consider the following:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiffs satisfy each of the four factors. First, class members' interests would not be served by individually controlling the prosecution of the action because most lack the resources to even "contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003). "[A] class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses." *Han*, 2011 WL 4344235, at *11. Second, there is no other litigation of which Plaintiffs are aware raising the issues raised here. Third, the litigation should be concentrated in this forum because Plaintiffs and the class interned in New York City and Hearst is based here. Bien Decl. ¶ 15. Fourth, any "difficulties of managing this class action . . . are far outweighed by the common-sense efficiencies achieved in certifying this class." *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 306 (E.D.N.Y. 2006) (certifying class of between 3,000 and 4,000 individuals).

## I. The Court Should Appoint Plaintiffs' Counsel as Class Counsel.

The Court should appoint O&G as Class Counsel because they satisfy the requirements of Rule 23(g). *See* Fed. R. Civ. P. 23(g)(1)(A). O&G has performed significant litigation and discovery work. Bien Decl. ¶ 20. O&G has committed significant resources to representing the proposed class and will continue to do so. *Id*. Courts have recognized O&G's "substantial experience prosecuting and settling . . . wage and hour class actions," and found them to be

"well-versed in wage and hour law and class action law." *See Capsolas*, 2012 WL 4760910, at *3 (citation and internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) grant partial summary judgment to Plaintiffs Wang and Spencer and Opt-In Plaintiffs Mancini, Skorka, Wagster, Leszuk, Rappaport, and Wheels with respect to liability, willfulness, and liquidated damages; (2) certify the proposed Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (3) appoint Plaintiffs' Counsel as Class Counsel; (4) approve Plaintiffs' proposed class action notice, Bien Decl. Ex. 246; (5) order Defendant to undertake a thorough search for the contact information of class members and certify the steps that it takes to the Court; and (6) order Defendant to produce an updated computer-readable data file containing the names, last known mailing addresses, last known telephone numbers, last known email addresses, and internship dates for all Class Members.

Dated: March 4, 2013
New York, New York

Respectfully submitted,

**OUTTEN & GOLDEN LLP**
By:

/s/ Rachel Bien
Rachel Bien

Adam T. Klein
Rachel Bien
Juno Turner
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

*Attorneys for Plaintiffs, the Collective, and the Proposed Class*