**Outten & Golden LLP**
Adam T. Klein
Rachel Bien
Juno Turner
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  212-245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

XUEDAN WANG and ERIN SPENCER on
behalf of themselves and all others similarly
situated,

    Plaintiffs,

     v.

THE HEARST CORPORATION,

    Defendant.

**12 Civ. 0793 (HB) (AJP)**

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
## PURSUANT TO LOCAL CIVIL RULE 56.1

## I.     The Parties

### A.     Defendant

1.      Defendant The Hearst Corporation ("Hearst") is one of the world's largest

publishers of monthly magazines, with 20 U.S. titles and more than 300 international editions.

Pls.' Third Am. Class Action Compl., ECF No. 72 ("Compl.") ¶ 1; Def.'s Am. Ans. to Third

Am. Class Action Compl., ECF No. 82 ("Ans.") ¶ 1.

2.      Hearst is a Delaware corporation registered with the New York Department of

State as an Active Foreign Business Corporation with its principal offices located in the Hearst

Tower, 300 West 57th St., New York, New York 10019.  Compl. ¶ 17; Ans. ¶ 17.

3.      Hearst is an employer under the Fair Labor Standards Act and New York Labor

Law.  *See* Ex. 31 (Roberts Tr. I) 5:8-22; 7:6-12; Ex. 15 (Helmus Tr.) 6:21-7:3; 44:4-46:2; Ex.

245 (Letter from F. Bennack, Jr. re 2012 annual review).

4.      Hearst is divided into several divisions, one of which is Hearst's magazine

division.  Ex. 31 (Roberts Tr. I) 10:14-11:2.

5.      Hearst's magazine division currently consists of 20 U.S. magazine titles,

including Car and Driver, Cosmopolitan, Country Living, ELLE, ELLE DÉCOR, Esquire, Food

Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful,

Marie Claire, O, The Oprah Magazine, Popular Mechanics, Redbook, Road & Track, Seventeen,

Town & Country, Veranda, and Woman's Day.  Ex. 253 (Hearst Magazines website).

6.      Hearst's magazine division also includes several corporate departments, including

Finance, Human Resources, Payroll, Circulation, Production, Brand Development, Integrated

Media, Digital Media, Digital Studio, Direct Response, Controller's Office, and Consumer

Marketing, that provide services to the magazines.  Ex. 6 (Chirichella Tr.) 18:6-19; Ex. 145 (Roberts Decl.) ¶ 5.

      **B.**     **Plaintiffs and Opt-In Plaintiffs**

     7.     Plaintiff Xuedan "Diana" Wang was an intern at Harper's Bazaar from approximately August 2011 to December 2011.  Ex. 159 (Wang Decl.) ¶ 1.  Wang filed this lawsuit and her consent to join form on February 1, 2012.  ECF No. 1.

     8.     Plaintiff Erin Spencer was an intern at Cosmopolitan from approximately June 1, 2010 to August 15, 2010.  Ex. 90 (2010 Summer Interns).  Spencer filed a consent to join form on October 9, 2012.  ECF No. 56.

     9.     Opt-in Plaintiff Elizabeth Mancini was an intern at Marie Claire from approximately January 2009 through June 2009.  Ex. 128 (Mancini Decl.) ¶ 1.  Mancini filed a consent to join form on February 8, 2012.  ECF No. 3-1.

     10.     Opt-in Plaintiff Matthew Wagster was an intern at Esquire from approximately July 2009 through December 2009.  Ex. 158 (Wagster Decl.) ¶ 1.  Wagster filed a consent to join form on February 8, 2012.  ECF No. 3-1.

     11.     Opt-in Plaintiff Stephanie Skorka was an intern at Redbook from approximately September 2009 through December 2009.  Ex. 154 (Skorka Decl.) ¶ 1.  Skorka filed a consent to join form on April 26, 2012.  ECF No. 17.

     12.     Opt-in Plaintiff Caitlin Leszuk was an intern at Marie Claire from January 11, 2010 to May 15, 2010.  Ex. 21 (Leszuk Tr.) 191:11-15.  Leszuk filed a consent to join form on November 12, 2012.  ECF No. 67.

13.     Opt-in Plaintiff Alexandra Rappaport was an intern at Seventeen from May 23, 2011 to July 26, 2011.  Ex. 27 (Rappaport Tr.) 106:10-13; 115:18-20; Ex. 69 (Rappaport Resume).  Rappaport filed a consent to join form on October 16, 2012.  ECF No. 59.

14.     Opt-in Plaintiff Sarah Wheels was an intern at Cosmopolitan from approximately May 20, 2011 to August 10, 2011.  Ex. 51 (Wheels Tr.) 116:2-13.  Wheels filed a consent to join form on October 19, 2012.  ECF No. 62.

## II.     Hearst Willfully Failed to Pay Interns Minimum Wages and Overtime

### A.     Internships at Hearst

15.     Hearst made a determination at the corporate level that interns are not "employees" subject to the overtime and minimum wage requirements of the law.  Ex. 15 (Helmus Tr.) 59:22-24; 63:7-12; Ex. 31 (Roberts Tr. I) 14:3-24; 50:24-51:5; 52:15-53:3.

16.     With limited exceptions, interns at Hearst are not paid any wages.  Ex. 15 (Helmus Tr.) 76:5-77:5; 107:20-24; Ex. 31 (Roberts Tr. I) 60:3-10; 69:3-25; 73:22-74:1; Ex. 74 (Hiring Criteria Email); Ex. 76 (December 2005 Memo) ("Interns can *only* be brought on who can receive college (or possibly high school) credit; we will not pay any interns either a weekly salary or stipend of any kind.").

17.     Hearst has had more than 3,000 interns over the past six years.  Def.'s Mem. in Supp. of Mot. to Strike the Class and Collective Allegations, ECF No. 10, at 1.

18.     Unpaid internships at Hearst do not cost the magazines money.  Ex. 6 (Chirichella Tr.) 80:11-18.

19.     The magazines do not budget money for intern trainings.  Ex. 6 (Chirichella Tr.) 80:19-24.

20.     The magazines' budgets do not include allocations for time that employees spend on interns.  Ex. 6 (Chirichella Tr.) 81:7-10.

21.     The overtime budgets for the magazines do not include allocations for time that employees spend on interns.  Ex. 6 (Chirichella Tr.) 81:7-14.

22.     Other than interns who are part of Hearst's diversity internship program, some interns at O, The Oprah Magazine, and Esquire, and certain interns whom Hearst considers to be "high priority referrals" from Hearst's clients or executives, Hearst does not pay interns.  Ex. 15 (Helmus Tr.) 76:5-77:5; 107:20-24; Ex. 31 (Roberts Tr. I) 60:4-10; 69:3-25; 78:2-12; 78:23-79:1; Ex. 32 (Roberts Tr. II) 23:10-24:16; Ex. 74 (Hiring Criteria Email).

23.     Hearst's diversity internship program offers paid internships to six college students during the summer.  Ex. 31 (Roberts Tr. I) 44:14-21; 46:25-47:3.

24.     O, The Oprah Magazine has advertised for both paid and unpaid fashion interns using the same internship description.  Ex. 255 (Oprah Paid/Unpaid Posting).

25.     Interns at O, The Oprah Magazine, are not paid for hours that they work in excess of 35 a week.  Ex. 52 (Wright Tr.) 85:25-87:4; Ex. 254 (A. Wright Email).

26.     The Human Resources Department sometimes pays high priority referrals out of its own budget when the magazines do not have the money.  Ex. 32 (Roberts Tr. II) 25:19-24; 26:19-28:5; 32:15-19.

27.     Harper's Bazaar has offered internships as contest prizes.  Ex. 32 (Roberts Tr. II) 78:7-12.

28.     At least one contest winner was not paid and did not receive school credit for her internship at Harper's Bazaar.  Ex. 32 (Roberts Tr. II) 78:19-79:12.

**B.      Hearst Has Taken No Steps to Ensure that Internships at the Company Are Lawful**

29.      Hearst has not reviewed its policy of not paying interns in any way after this lawsuit was filed.  Ex. 32 (Roberts Tr. II) 56:20-23.

30.      Hearst has not consulted with the Department of Labor regarding whether its policy of not paying interns is legal.  Ex. 32 (Roberts Tr. II) 56:24-57:3.

31.      Hearst does not examine the duties that interns perform, their supervision, whether interns are given assignments similar to those given to paid employees, or whether its employees are dependent on the work that interns perform in determining that it need not pay interns minimum wages.  Ex. 32 (Roberts Tr. II) 13:11-15:9.

32.      Hearst does not make any distinctions among its magazines with respect to its policy of not paying interns, except for the two magazines, Esquire and O, The Oprah Magazine, that have some paid interns.  Ex. 32 (Roberts Tr. II) 15:10-16:13.

33.      Hearst does not have any policies, and has not taken any steps, to ensure that internships at its magazines or in its departments are structured around a classroom or academic experience.  Ex. 15 (Helmus Tr.) 89:25-90:10; Ex. 31 (Roberts Tr. I) 72:13-21.

34.      Hearst has not taken any steps to ensure that interns are the primary beneficiaries of their internship experiences.  Ex. 31 (Roberts Tr. I) 71:12-72:12.

35.      Hearst does not have any policy to ensure that interns do not displace the work of paid employees.  Ex. 31 (Roberts Tr. I) 72:2-73:15.

36.      Hearst has not taken any steps to ensure that it is not benefitting from interns' work.  Ex. 31 (Roberts Tr. I) 72:9-12.

37.      Hearst has not taken any steps and has no policy to ensure that interns receive meaningful work during their internships.  Ex. 31 (Roberts Tr. I) 75:9-16.

38.     Hearst has no policy limiting the amount of administrative work that interns can perform during their internships.  Ex. 31 (Roberts Tr. I) 75:17-24.

39.     Hearst has no policy limiting the amount of manual labor that interns can perform during their internships.  Ex. 31 (Roberts Tr. I) 75:25-76:3.

40.     Hearst does have policies in place to ensure compliance with minimum wage and overtime laws with respect to its employees at the magazines and in corporate departments.  Ex. 31 (Roberts Tr. I) 85:5-9.

41.     Hearst's Human Resources Department plays a role in ensuring that the magazines and departments are in compliance with wage and hour laws.  Ex. 31 (Roberts Tr. I) 86:12-16.

42.     Hearst does not delegate wage and hour compliance with respect to its employees to the magazines and departments because they are busy producing the company's product.  Ex. 31 (Roberts Tr. I) 85:17-86:16.

43.     After this lawsuit was filed, Sherri Roberts, Defendant's Senior Vice President of Human Resources, received an anonymous complaint from an individual who claimed to be a Hearst intern.  Ex. 32 (Roberts Tr. II) 83:8-24; Ex. 79 (Email, dated Feb. 8, 2012).

44.     The complaint purported to be from a Hearst intern who said he or she was "writing [ ] to file a complaint against Hearst for [its] intern policy."  The complainant stated that he or she was "working as a modern slave," worked 12 hours a day on average, and that Hearst "replaces the most menial jobs with a hoard of free labor from eager college students excited to learn about the industry."  The complainant said that he or she felt "abused" and attached a copy of the U.S. Department of Labor's six-factor internship test, which the complainant claimed

7

"Hearst is currently violating."  The complainant "urge[d]" Hearst to investigate the complaint, including how late interns were working.  Ex. 79 (Email, dated Feb. 8, 2012).

45.     The information in the complaint raised concerns for Roberts.  Ex. 32 (Roberts Tr. II) 86:7-10.

46.     As the Senior Vice President of Human Resources, Roberts' duties include helping to investigate and resolve issues concerning Hearst employees.  Ex. 31 (Roberts Tr. I) 8:14-18.

47.     Roberts told the complainant that Hearst was "investigating" the complaint, but did not undertake an investigation of the claims in the complaint.  Ex. 32 (Roberts Tr. II) 84:4-9; 89:23-90:12; Ex. 79 (Email dated February 22, 2012).

48.     After the lawsuit was filed and receiving the complaint, Roberts did not do anything to determine whether interns at Hearst were performing menial work at the magazines.  Ex. 32 (Roberts Tr. II) 89:23:90:7.

49.     Roberts forwarded the complaint to Hearst's legal department.  Ex. 32 (Roberts Tr. II) 84:25-85:3.

50.     Roberts did not follow up on whether anything was done to investigate the complaint.  Ex. 32 (Roberts Tr. II) 84:14-19; 85:7-10.

51.     The only investigation that Roberts was aware of was an attempt by Hearst's Information Technology department to uncover the source of the complainant's email to try to identify him or her.  Ex. 32 (Roberts Tr. II) 88:15-89:4.

52.     Hearst withdrew its good faith affirmative defense.  *See* ECF No. 80.

### C.   Hearst Uses Internships to Find Candidates for Employment

53.   Hearst has used internships to find people who have an interest in its business and who want to work for the company after they graduate, and to assess their skills and "fit" with the company.  Ex. 76 (December 2005 Memo).

54.   It is Hearst's practice to ask intern supervisors to evaluate interns' performance on Internship Performance Review forms after they have completed their internship.  Ex. 32 (Roberts Tr. II) 67:2-10; 67:22-68:25; 70:4-8; Ex. 256 (Email, dated Aug. 3, 2011) at D0014358.

55.   Hearst uses Internship Performance Reviews to evaluate interns who apply for entry-level positions at the company.  Ex. 32 (Roberts Tr. II) 70:21-71:7; 75:2-11.

56.   Hearst uses the same Internship Performance Review forms for interns at all of its magazines and corporate departments.  Ex. 32 (Roberts Tr. II) 76:19-77:2.

57.   Internship Performance Reviews are completed by Hearst employees who either supervise interns or have knowledge of what interns do during their internships.  Ex. 32 (Roberts Tr. II) 69:11-17.

58.   Hearst has hired interns to be entry-level employees and freelancers.  Ex. 101 (Anderson Decl.)  ¶¶ 2-3; Ex. 104 (Berard Decl.)  ¶¶ 2-3; Ex. 106 (Buchalter Decl.)  ¶¶ 2-3; Ex. 109 (Chelak Decl.)  ¶¶ 2-3; Ex. 112 (Critides Decl.)  ¶¶ 2-3; Ex. 114 (Dunn Decl.)  ¶¶ 2-3; Ex. 115 (Elser Decl.) ¶¶ 2-3; Ex. 119 (Groher Decl.)  ¶¶ 2-3; Ex. 121 (Henderson Decl.)  ¶¶ 2-3; Ex. 126 (Kommer Decl.)  ¶¶ 2-3; Ex. 130 (McCoy Decl.)  ¶¶ 2-3; Ex. 134 (Neilon Decl.)  ¶¶ 2-3; Ex. 137 (Park Decl.)  ¶¶ 2-3; Ex. 138 (Perle Decl.)  ¶¶ 2-3; Ex. 141 (Reyes Decl.)  ¶¶ 2-3; Ex. 143 (Riordan Decl.)  ¶¶ 2-3; Ex. 144 (Ritterbeck Decl.)  ¶¶ 2-3; Ex. 148 (Ross Decl.)  ¶ 2; Ex. 149 (Rud Decl.)  ¶¶ 2-3; Ex. 152 (Shapiro Decl.)  ¶¶ 2-3; Ex. 155 (Sullivan Decl.) ¶¶ 2-3; Ex. 157 (Tomlinson Decl.)  ¶¶ 2-3; Ex. 160 (Yale Decl.)  ¶¶ 2-3; Ex. 32 (Roberts Tr. II) 140:10-23.

59.     The fact that someone has interned at Hearst will carry a lot of weight in determining whether to hire them as an entry-level employee or freelancer.  Ex. 32 (Roberts Tr. II) 162:10-16.

60.     Hearst does not share Internship Performance Reviews with the interns who are evaluated.  Ex. 32 (Roberts Tr. II) 74:16-25.

61.     Hearst believes that the comments that intern supervisors include in Internship Performance Reviews are "helpful when contemplating future hires."  Ex. 256 (Email, dated Aug. 3, 2011) at D0014358.

62.     Hearst evaluates interns using a 1 through 5 rating system based on the following criteria: (1) Intern follows instructions and performs assigned tasks with minimal supervision; (2) Accurately and thoroughly completes assignments.  Work reflects neatness, attention to detail, and conformity to organizational standards; (3) Interacts effectively with employees and other interns.  Interacts and communicates thoughts effectively; (4) Organizes and prioritizes assignments given.  Able to complete multiple projects simultaneously; (5) Proactive, asks for more work when there is downtime. Wants to get involved; (6) Embodies professionalism through punctuality, maturity, and confidence; (7) Exhibits willingness to learn.  Receptive to feedback/constructive criticism.  Asks questions if unsure.  Ex. 256 (Email, dated Aug. 3, 2011) at D0014359.

63.     The Internship Performance Review form asks intern supervisors how interns "rank against other interns" they have had in the past year.  Ex. 256 (Email, dated Aug. 3, 2011) at D0014359.

64.     The Internship Performance Review form asks intern supervisors whether the intern would "strongly be considered a viable candidate if an opening were to become available[.]"  Ex. 256 (Email, dated Aug. 3, 2011) at D0014359.

65.     The criteria in the Internship Performance Review form are the only criteria on which Hearst evaluates interns' performance.  Ex. 32 (Roberts Tr. II) 77:3-6.

**D.     Hearst Believes that School Credit Offers Interns "Something of Value"**

66.     Hearst's Human Resources Department asks Hearst magazines and departments that have interns to provide it with "school credit letters," which state the intern's name and whether they are eligible to receive credit for their internship.  Ex. 15 (Helmus Tr.) 80:10-81:7; Ex. 32 (Roberts Tr. II) 64:2-7; Ex. 74 (Hiring Criteria Email).

67.     Hearst views school credit letters as "a critical element to staying on the right side of the labor law."  Ex. 74 (Hiring Criteria Email); Ex. 75 (Internship Guideline 2007); Ex. 31 (Roberts Tr. I) 76:9-16 (Hearst insures its internship programs are lawful by "collect[ing] letters of credit that the interns give to their magazines . . .").

68.     Hearst believes that school credit is its "way to make sure that the interns receive something of value" for their internships.  Ex. 31 (Roberts Tr. I) 74:22-75:7; 93:7-17; 101:15-102:2; Ex. 74 (Hiring Criteria Email) (school credit provides something of "monetary value"); Ex. 75 (Internship Guideline 2007) (school credit provides something of "tangible value").

69.     Hearst determined that as long as an intern is in college and can provide a letter stating that they are eligible to earn school credit for their internship, it does not need to pay them.  Ex. 32 (Roberts Tr. II) 8:10-22; 102:9-15.

70.     The only criteria on which Hearst relies to not pay interns are whether the intern is in college and is eligible to receive academic credit.  Ex. 32 (Roberts Tr. II) 8:16-21; 11:8-17.

71.     Hearst does not know who at the company made the determination or when it was made.  Ex. 32 (Roberts Tr. II) 8:23-9:22.

72.     According to Hearst's Fed. R. Civ. P. 30(b)(6) corporate representative, information surrounding the determination was "lost in the midst of time."  Ex. 32 (Roberts Tr. II) 11:24-12:2.

73.     Hearst's credit policy has been in place at least since 2006.  Ex. 32 (Roberts Tr. II) 9:16-22.

74.     According to Hearst's Fed. R. Civ. P. 30(b)(6) corporate representative, Sherri Roberts, the Senior Vice President of Human Resources, Hearst's credit policy is "an imprecise, imperfect system" because "things slip through the sieve[.]"  Ex. 32 (Roberts Tr. II) 105:2-13; 108:11-12; 115:16-23.  The policy is not observed "a hundred percent of the time."  Ex. 31 (Roberts Tr. I) 113:12-20.

75.     Hearst does not evaluate the reasons why schools award academic credit for internships at the company.  Ex. 32 (Roberts Tr. II) 16:19-17:5.

76.     As long as a school awards credit, it does not matter to Hearst what the basis for the school's decision to award credit is.  Ex. 32 (Roberts Tr. II) 17:16-20.

77.     If a school awarded credit for internships that benefitted Hearst, it would not matter to Hearst's decision that it is not required to pay the interns.  Ex. 32 (Roberts Tr. II) 18:7-16.

78.     Interns can meet Hearst's credit policy even if the credit that they are eligible for does not count towards their degree.  Ex. 32 (Roberts Tr. II) 125:19-126:19; Ex. 83 (K. Morse school credit letter).

79.     Hearst does not verify whether interns are actually awarded credit for their internships at the company.  Ex. 32 (Roberts Tr. II) 35:13-23.

80.     Hearst does not have a practice of following up with schools to verify the information in the school credit letters.  Ex. 32 (Roberts Tr. II) 119:19-120:6.

81.     Megan Condon, who submitted a school credit letter that did not state that she was entitled to receive credit, interned at Hearst.  Ex. 80 (M. Condon school credit letter); Ex. 269 (Email, dated Jan. 12, 2012); Ex. 270 (Email, dated Feb. 14, 2012); Ex. 271 (Spring 2012 Intern List) at D0173576.

82.     Camilla Burchfield, who submitted a school credit letter stating that she would receive a "transcript notation" but that did not state that she was entitled to receive credit, interned at Hearst.  Ex. 81 (C. Burchfield school credit letter); Ex. 272 (Summer 2011 Intern List) at D0177080.

83.     Katherine Hughes, who submitted a school credit letter stating that she would receive zero credits for the course that accompanied her internship and that she "will not receive any credit toward her graduation requirements" for her internship, interned at Hearst.  Ex. 82 (K. Hughes school credit letter); Ex. 272 (Summer 2011 Intern List) at D0177065.

84.     Hearst does not require interns to obtain school credit letters from their own school if it will not award credit for their internship.  In such circumstances, Hearst will accept a school credit letter from another school.  Ex. 15 (Helmus Tr.) 86:15-88:22; Ex. 32 (Roberts Tr. II) 35:24-36:9.

III.   **Hearst's Cost-Cutting Measures Have Increased its Reliance on Interns**

*Hearst's Budgeting Process*

85.   ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

86.   Each magazine has a budget that includes amounts allocated to payroll costs, including salaries, overtime, taxes, benefits, and bonuses, and expenses, such as rent, contingency workers, including freelance workers, travel and entertainment, office supplies, and courier costs.  Ex. 6 (Chirichella Tr.) 47:21-24; 48:5-21; 50:22-51:7; Ex. 59 (Magazine Budgets).

87.   █████████████████████████████████████████████████

███████████████████████████████

88.   ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

89.   ████████████████████████████████████████████████

████████████████████████████████████.

90.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

91.   ███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████

92. 

93.

94.

95.

96.

97.

98.

99.     Requests by the magazines to hire additional staff require approval at the corporate level.  Ex. 6 (Chirichella Tr.) 79:14-80:2.

*Hearst's Cost-Cutting Measures*

100.    In response to the decrease in advertising revenue caused by the recession, in 2009, Hearst worked to reduce costs, including by reducing headcount and expenses at the magazines.  Ex. 6 (Chirichella Tr.) 30:15-22; 32:5-13; 33:22-34:5; 36:4-8.

101.    As part of these cost-cutting measures, the Finance Department gave every magazine a target for reductions based on their expense base and then asked them to come up with a plan and execute on it.  Ex. 6 (Chirichella Tr.) 33:24-34:5.

102.    The magazines reduced their headcount by letting people go, consolidating positions, not filling open positions, and reducing the size of the magazine, which meant that fewer people would be required to produce content.  Ex. 6 (Chirichella Tr.) 35:2-36:3.

103.    The magazines also reduced their spending on expenses as part of their cost-cutting measures.  Ex. 6 (Chirichella Tr.) 36:11-21.

104.    In an email dated December 4, 2008, Andrea Rosengarten, the Executive Managing Editor of Harper's Bazaar, instructed staff members that "[t]here needs to be a 20% reduction in the use of messengers.  Vendors need to send and pick up product.  In the event this is not possible (a rare occurrence), please use your interns to do Manhattan runs (using the subway).  If you don't have an intern please check with Lisa who will look into finding you one for this purpose."  Ex. 61 (Email, dated Dec. 4, 2008) at D0005583.

105.    In the same email, Ms. Rosengarten stated, with respect to overtime, "Five hour per week maximum will be enforced.  If work cannot get done within these limits, please use your overtime ineligible staff to achieve these functions."  Ex. 61 (Email, dated Dec. 4, 2008) at D0005583.

106.    ███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████

107. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████.

108.     The cost-cutting measures that the magazines took helped to offset the revenue

shortfall that the magazines experienced.  Ex. 6 (Chirichella Tr.) 39:23-40:3.

109.     Even after the economy improved in 2010, Hearst has continued to try to adhere

to the cost-saving measures that it took, including by trying to reduce costs every year.  Ex. 6

(Chirichella Tr.) 40:5-41:2.

110.     In an email dated July 21, 2011, Leslie Smith, the Managing Editor of Marie

Claire, told Sherri Roberts, Hearst's Executive Vice President of Human Resources, that Marie

Claire "use[s] interns to pick up and deliver merch to reduce our messenger costs."  Ex. 60

(Email, dated July 21, 2011) at D0012247; Ex. 32 (Roberts Tr. II) 36:19-21.

111.     After reviewing the email, Roberts did not have any response to Smith's

statement that interns were used to reduce messenger costs and did not take any action except to

pass on the information to the Finance Department.  Ex. 32 (Roberts Tr. II) 38:8-16; 39:25-13.

112.     Some magazines have retained the same level of staffing that they had during the

recession in order to meet their margins.  Ex. 6 (Chirichella Tr.) 41:3-18.

113.     There have been occasions where Hearst magazines have had more interns than

full-time staff.  For the summer of 2011, Marie Claire hired 57 interns for a staff of between 45

to 55 people.  Ex. 32 (Roberts Tr. II) 41:7-13; Ex. 60 (Email, dated July 21, 2011) at D0012247.

*Executive Bonuses*

114.



115.

116.

## IV.   Plaintiffs and Opt-In Plaintiffs Performed Work that Directly Contributed to the Production of Hearst's Magazines

### A.   Wang

117.    Wang applied for an internship in the Accessories Department of Harper's Bazaar ("Bazaar") by responding to a posting on the website, Ed2010.com.  Ex. 50 (Wang Tr.) 135:4-24; Ex. 56 (Broekema Decl.) ¶ 7.

118.    The posting stated that the Bazaar Accessories Department was looking for highly-motivated, hard-working, and detail-oriented interns to work with the Accessories editors. The posting sought candidates who demonstrated a "high level of efficiency, the ability to follow instructions and multitask, and a strong willingness to learn," and who could work at least three days a week and would receive school credit.  Ex. 57 (Accessories Internship Posting).

119.    Sam Broekema, who was then the Senior Accessories Editor at Bazaar, reviewed the posting before asking an intern, Taylor McNeil, to post it online.  Ex. 3 (Broekema Tr.) 7:21-23; 79:12-23.

120.    Broekema was told by another Bazaar editor to ask McNeil for a copy of the posting to use to hire interns.  Ex. 3 (Broekema Tr.) 80:11-81:3.

121.    Wang submitted a cover letter and resume to Broekema in response to the posting. Ex. 50 (Wang Tr.) 136:12-13.

122.    Broekema interviewed and supervised Wang.  Ex. 50 (Wang Tr.) 57:21-25; 84:2-10.

123.    Broekema typically supervises between 4 to 8 interns.  Ex. 3 (Broekema Tr.) 40:25-41:5.

124.    Broekema believes that interns in the Accessories Department have responsibilities that are vital to keeping operations running smoothly.  Ex. 3 (Broekema Tr.) 56:8-12.

125.    During the interview, Wang and Broekema discussed "why [Wang] wanted to work in fashion, and [they] talked about designers.  [Broekema] said that he likes to get an idea of an intern's aesthetic sense when he meets them."  Ex. 50 (Wang Tr.) 139:9-20.

126.    Broekema believes that it is beneficial to the Accessories Department for interns to have previous accessories experience at another magazine or at a public relations firm because the more knowledge they have, the better job they can do.  Ex. 3 (Broekema Tr.) 76:13-22.

127.    When interns come in with previous experience, this assures Broekema that they will bring a new perspective that will help improve Bazaar's processes.  Ex. 3 (Broekema Tr.) 94:4-10.

128.    This is because every magazine is organized differently and so an intern who has had an experience at another magazine will know how that magazine is organized and can compare it to Bazaar and be helpful in finding different ways of solving problems.  Ex. 3 (Broekema Tr.) 94:11-95:2.

129.   Broekema is looking for interns who are willing to work hard.  Ex. 3 (Broekema Tr.) 77:3-5.

130.   Broekema is looking for interns who are willing to roll up their sleeves and get down to work.  Ex. 3 (Broekema Tr.) 6-13.

131.   Broekema is upfront with interns that some of the work that they will be doing is not glamorous.  Ex. 3 (Broekema Tr.) 17-23.

132.   Broekema tells interns that much of their work will be about "getting things from point A to point B" as quickly as possible.   Ex. 3 (Broekema Tr.) 78:7-13.

133.   Broekema frequently asks interns whom he has interviewed to come in for a follow-up interview with another editor so that he can get a second opinion on whether the intern is a good fit.  Ex. 56 (Broekema Decl.) ¶ 5; Ex. 3 (Broekema Tr.) 74:6-13.

134.   During Wang's interview, Broekema told Wang about a more senior "Head Accessories Intern" role that would require her to work five days per week.  Ex. 50 (Wang Tr.) 140:2-13.

135.   The Accessories Department typically designates an intern to serve as Head Intern when there is a good candidate and when the department is very busy.  Ex. 3 (Broekema Tr.) 41:9-19.

136.   The Accessories Department is typically busiest in October and March.  Ex. 3 (Broekema Tr.) 43:25-44:16.

137.   The Accessories Department typically has more interns during the periods when there is more work to do.  Ex. 3 (Broekema Tr.) 45:2-5.

### *Head Interns*

138.    Being Head Intern provides an opportunity for an intern to "step up to the plate." Ex. 3 (Broekema Tr.) 41:9-19.

139.    A good candidate for Head Intern is someone who is mature, well-spoken, calm under pressure, capable of taking on responsibility, and able to work more days than regular interns so that they are always available to address any issues that arise.  Ex. 3 (Broekema Tr.) 41:20-42:10,

140.    When there is a Head Intern, Broekema is able to delegate some of the work that he typically does to the Head Intern so that he can focus on different work responsibilities.  Ex. 3 (Broekema Tr.) 43:13-24.

141.    Broekema interacts more with Head Interns than regular interns because the Head Intern serves as a conduit of information from Broekema to other interns.  Ex. 3 (Broekema Tr.) 83:15-20.

142.    Broekema can go to the Head Intern first for everything.  Ex. 3 (Broekema Tr.) 84:6-7.

143.    Head Interns have Hearst email accounts to which Broekema sends instructions. Ex. 3 (Broekema Tr.) 83:18-84:2.

144.    Head Interns interact directly with public relations representatives and are able to develop their own relationships with them.  Ex. 3 (Broekema Tr.) 84:3-6.

145.    Head Interns play a role in interviewing prospective interns for the Accessories Department by doing an initial screening interview to assess a prospect's seriousness and experience.  Ex. 3 (Broekema Tr.) 49:4-19.

21

146.    If a Head Intern determines that the prospective intern does not have the
seriousness or experience level to be an intern, he or she advises Broekema of their assessment.
Ex. 3 (Broekema Tr.) 50:7-11.

147.    Broekema does not do a follow-up interview with a prospective intern whom the
Head Intern determines does not have the seriousness or experience level to be an intern.  Ex. 3
(Broekema Tr.) 50:7-13.

148.    Head Interns also assist in coordinating the days and hours that interns can work.
Ex. 3 (Broekema Tr.)  49:13-19.

149.    Head Interns sometimes make the formal internship offer to prospective interns.
Ex. 3 (Broekema Tr.) 50:14-21.

150.    During her internship, Wang was asked to obtain school credit letters from the
interns whom she supervised and provide them to Hearst's Human Resources Department.  Ex.
50 (Wang Tr.) 79:7-80:14.

151.    Wang provided a school credit letter for her own internship to the previous Head
Intern.  Ex. 50 (Wang Tr.) 157:25-158:20.

152.    Wang was not ultimately awarded academic credit for her internship.  Ex. 50
(Wang Tr.) 152:24-157:24

153.    Broekema offered Wang the Head Intern role because of her availability to work
more and her seniority in school and because she is calm and well spoken.  Ex. 3 (Broekema Tr.)
82:19-83:5.

154.    Wang's calm demeanor was significant to Broekema because it indicated that she
would be calm under stress and levelheaded, which is very important.   Ex. 3 (Broekema Tr.)
83:4-9.

155.     During the period when Wang interned at Bazaar, there were no fulltime Hearst employees in the Accessories Department who held the entry-level Assistant position.  Ex. 3 (Broekema Tr.) 18:11-21.

156.     From time to time, Bazaar hires paid "freelance" Assistants to work in the Accessories Department whose duties include coordinating incoming and outgoing sample accessories, supervising interns, making requests for samples, and doing expense reports, among other things.  Ex. 3 (Broekema Tr.) 19:4-20:21.

157.     During periods when there are no freelance Assistants, the work that they perform is performed by Broekema and unpaid interns.  Ex. 3 (Broekema Tr.) 23:5-17; 85:22-86:8.

158.     Between semesters, when students are on break, the Accessories Department typically does not have any interns.  Ex. 3 (Broekema Tr.) 107:14-19.

159.     When the Accessories Department does not have interns, Broekema or another editor has to do their work or Broekema hires a freelance Assistant to do it.  Ex. 3 (Broekema Tr.) 107:14-23.

160.     When Broekema has to do the work that interns typically do, his hours are "much longer."  Ex. 3 (Broekema Tr.) 108:25-109:9.

161.     Broekema does not hire a freelance Assistant during periods when there is a Head Intern.  Ex. 3 (Broekema Tr.) 86:11-24.

162.     It cuts down on error for one person – either a freelance Assistant or a Head Intern – to coordinate the pick-up and delivery of accessory samples at any given time.  Ex. 3 (Broekema Tr.) 86:11-24.

*Interns' Duties*

163.    Interns in the Accessories Department check in samples and prepare them to be returned to publicists, maintain the Accessories Closet, do photo research, make requests for samples, do expense reports, generate ideas for accessories to be used in Bazaar, go on errands to return or pick up samples, assist at photo shoots, make copies, and make story boards.  Ex. 3 (Broekema Tr.) 23:18-24; 24:15-25; 25:9-11; 26:24-27:10; 31:11-32:6; 36:7-18; Ex. 55 (Harper's Bazaar Fashion Editorial Internship Guidelines).

164.    During her internship, Wang's duties included, but were not limited to, serving as a contact between editors and public relations representatives, doing online research, cataloguing samples, maintaining the Accessories Closet, and doing story boards.  Ex. 3 (Broekema Tr.) 105:3-106:11; Ex. 58 (Internship Agreement).

165.    Wang also supervised between six and eight other interns who performed tasks in the Accessories Closet.  Ex. 50 (Wang Tr.) 172:12-16.

166.    Checking in samples involves receiving the sample from Hearst's messenger center or the messenger himself, opening the bag, unwrapping the sample, taking a photograph of it, making a list of everything in the bag, cross-referencing the list against the invoice sent with the bag, and placing the sample with other samples that have been received.  Ex. 3 (Broekema Tr.) 27:11-22.

167.    Between 5 and 100 samples are delivered to the Accessories Department on a daily basis.  Ex. 3 (Broekema Tr.) 32:7-13.

168.    For instance, on one particular day, the Accessories Department received at least 30 samples.  Ex. 3 (Broekema Tr.) 33:12:16.

169.    Samples are photographed in photo shoots that are used for Bazaar articles.  Ex. 3 (Broekema Tr.) 32:15-22.

170.    Bazaar follows a set procedure for checking in samples in order to prevent against loss.  Ex. 3 (Broekema Tr.) 29:9-14; Ex. 77 (Fashion Closet Policy).

171.    If samples are lost, public relations firms might not agree to loan them out or might charge Bazaar for the lost items.  Ex. 3 (Broekema Tr.) 29:21-30:9.

172.    Interns are taught how to check in samples by Broekema, a freelance Assistant, or a Head Intern.  Ex. 3 (Broekema Tr.) 28:4-7.

173.    Returning samples involves locating the paperwork that was filed for the incoming sample, dating and initialing the paperwork, packing up the sample in a bag, labeling the bag, and having the messenger sign for the bag so that Bazaar will know who picked it up.  Ex. 3 (Broekema Tr.) 30:25-31:10.

174.    Maintaining the Accessories Closet involves making sure that shoes are kept in pairs and grouped with similar shoes, bags are separated so that they do not damage each other, scarves are folded with other scarves, hats are kept with other hats, belts are on the belt rack, jewelry is arranged in trays by designer, and that accessories are color-coded so that they can be found more easily or separated according to the article they are being used for.  Ex. 3 (Broekema Tr.) 33:25-34:24.

175.    Interns spend a lot of their day maintaining the Accessories Closet.  Ex. 3 (Broekema Tr.) 88:8-14.

176.    Maintaining the Accessories Closet in an organized manner helps Bazaar to safeguard against loss or damage.  Ex. 3 (Broekema Tr.) 34:23-24.

177.    Broekema believes that interns' responsibilities to keep the Accessories Closet organized and to keep meticulous records of incoming and outgoing samples are vital to operations running smoothly in the Accessories Department.  Ex. 3 (Broekema Tr.) 56:8-19.

178.    The Accessories Closet is housed in the same location as the Fashion Closet that contains clothing samples.  Ex. 3 (Broekema Tr.) 34:25-35:4.

179.    The Fashion Closet is approximately 20 feet by 15 feet.  Ex. 3 (Broekema Tr.) 35:15-19.

180.    Doing photo research involves going into Bazaar's archives and going through past issues to pull images that interns think might be inspirational for a current story.  Ex. 3 (Broekema Tr.) 36:11-18.

181.    Interns assist at photo shoots by bringing "styling notes" – images of how the accessory should be photographed – to the photographer and retrieving samples from the photographer that have already been shot or that are needed back urgently.  Ex. 3 (Broekema Tr.) 37:3-24.

182.    Making requests for samples involves emailing a public relations representative with images of the accessories that Bazaar is requesting.  Ex. 3 (Broekema Tr.) 25:2-8.

183.    Doing expense reports entails collecting receipts from Broekema, including for work-related travel, scanning the receipts, and inputting them into the computer system so that they can be submitted to Bazaar for its records.  Ex. 3 (Broekema Tr.) 25:9-26:6.

184.    Wang did Broekema's expenses every month when she was an intern.  Ex. 56 (Broekema Decl.) ¶ 8.

185.    It was helpful for Wang to do Broekema's expense reports because it is time-consuming and it was time that Broekema could devote to other tasks that he had to perform. Ex. 3 (Broekema Tr.) 84:8-20.

186.    Interns are sent to return samples instead of messengers when the public relations firm that loaned out the sample needs it back urgently and cannot send someone themselves, and when it is important for Bazaar that they have the sample back faster than a messenger could bring it.  Ex. 3 (Broekema Tr.) 31:14-20.

187.    Interns are sent to pick up samples instead of messengers when Bazaar needs an item quickly and the public relations firm is unable to send it.  Ex. 3 (Broekema Tr.) 31:21-32:6.

188.    Bazaar also uses interns instead of messengers for pick-ups and deliveries in order to reduce costs.  Ex. 61 (Email, dated Dec. 4, 2008) at D0005583.

189.    Head Interns do not typically make pick-ups or returns because they are required to be physically present in the office in order to coordinate the pick-ups and returns.  Ex. 3 (Broekema Tr.) 85:3-17.

190.    Coordinating the delivery and pick-up of samples is an important part of what Head Interns do.  Ex. 3 (Broekema Tr.) 87:21-88:2.

191.    During Wang's internship, she served as the point of contact for obtaining samples to be used in Bazaar's photo shoots and coordinating their return.  Ex. 50 (Wang Tr.) 171:18-172:11.

192.    Making story boards involves cutting out images that Broekema had provided and putting them onto a board for Broekema to use at presentations with Bazaar editors.  Ex. 3 (Broekema Tr.) 57:12-58:8.

*Hours*

193.    Broekema typically starts work between 8:30 and 9:30 a.m. and leaves between 7 and 10 p.m. or later.  Ex. 3 (Broekema Tr.) 37:25-38:11.

194.    His workdays are almost always busy.  Ex. 3 (Broekema Tr.) 38:13-15.

195.    The other editors with whom Broekema works in the Accessories Department also generally have busy workdays.  Ex. 3 (Broekema Tr.) 38:16-19.

196.    Interns in the Accessories Department are expected to arrive at the office between 9 and 9:30 a.m. and typically leave between 6 and 8 p.m.  Ex. 3 (Broekema Tr.) 58:9-17.

197.    Interns sometimes work later than 8 p.m. if a larger than normal volume of samples arrive and the department needs to prepare for a priority photo shoot or multiple photo shoots.  Ex. 3 (Broekema Tr.) 58:18-59:3.

198.    Wang interned five days a week, typically from 9 a.m. to 8 p.m.  Ex. 50 (Wang Tr.) 166:22-167:5.

199.    Wang sometimes stayed later than 8 p.m., until after 10 p.m.  Ex. 50 (Wang Tr.) 257:4-6.

200.    Interns are expected to let someone in the Accessories Department know when they leave the office.  Ex. 3 (Broekema Tr.) 59:9-12.

201.    Interns are expected to ask for additional work when they do not have any assignments to do.  Ex. 3 (Broekema Tr.) 59:13-16.

*Wang's Training*

202.    On her first day, Wang was trained by another intern who showed her how to perform her duties.  Ex. 50 (Wang Tr.) 160:4-21.

203.    The departing Head Intern, Abigail Hirsch, provided Wang with a "pass-over note" from which Wang learned how to perform her duties.  Ex. 50 (Wang Tr.) 173:13-23.

204.    Other than the initial training that Wang received and instructions from Hirsch, Wang did not receive any formal or informal training during her internship.  Ex. 50 (Wang Tr.) 249:22-250:2.

205.    Wang learned how to perform her duties "on the job."  Ex. 50 (Wang Tr.) 173:24-174:4.

206.    Wang's interactions with Bazaar editors consisted primarily of email correspondence in which she provided them with status reports about samples that they had requested.  Ex 50 (Wang Tr.) 248:24-249:14.

207.    Wang had expected to work more closely with her supervisors during her internship.  Instead, they just expected assignments to get done.  Ex. 50 (Wang Tr.) 248:17-23.

208.    Wang believed that if she worked hard, her internship would lead to a paid position and a positive job reference.  Ex. 50 (Wang. Tr.) 111:9-22.

### *Wang's Performance Issues*

209.    In late November 2011, Broekema told Wang she was "not doing a good job."  Ex. 50 (Wang Tr.) 134:7-14.

210.    Broekema felt that Wang was not clear or accurate in giving directions to other interns.  Ex. 56 (Broekema Decl.) ¶ 12; Ex. 3 (Broekema Tr.) 88:15-89:3.

211.    Broekema felt that Wang was not doing a good job coordinating the pick-up and return of samples.  For example, Wang sent interns to the wrong address.  Ex. 3 (Broekema Tr.) 89:4-17.

212.     Broekema felt that the mistakes that Wang made risked preventing photo shoots from happening on time or at all.  Ex. 3 (Broekema Tr.) 90:19-24.

213.     Beginning in or around November 2011, Wang spent less time supervising other interns and more time working on tasks, including going on runs to pick up and return accessories and other assignments in the Accessories Closet.  Ex. 50 (Wang Tr.) 134:15-135:3; 175:16-176:8.

214.     A freelance Assistant took over Wang's role supervising interns after she was demoted from a Head Intern to a regular intern.  Ex. 50 (Wang Tr.) 176:9-14.

**B.     Spencer**

215.     Spencer applied for a position as a "Bookings" intern at Cosmopolitan by submitting a cover letter and her resume.  Ex. 43 (Spencer Tr.) 19:9-15; 88:11-13; Ex. 89 (Email, dated Apr. 13, 2010).

216.     Spencer was interviewed by Sandra Wilson, the Bookings Director at Cosmopolitan.  Ex. 43 (Spencer Tr.) 93:17-23.

217.     During the interview, Wilson told Spencer that her internship would involve being Wilson's assistant, participating in casting, corresponding with agents, organizing Polaroids and casting forms, and keeping Wilson organized.  Ex. 43 (Spencer Tr.) 94:7-14.

218.     During the interview Wilson and Spencer discussed that one of the goals for the internship would be for Spencer to work as hard as she could and stand out as an intern so that she "could possibly come back and work for Cosmo."  Ex. 43 (Spencer Tr.) 94:15-17.

219.     During the interview, Wilson asked Spencer whether she had experience with organizing because organizing and administrative tasks would be an important part of her role. Ex. 43 (Spencer Tr.) 99:15-24; 100:5-17.

220.    Wilson and Spencer also discussed Spencer's past experience styling models.  Ex. 43 (Spencer Tr.) 99:24-100:4.

221.    Wilson's assistant Lauren Finney ("Finney") offered Spencer the internship, and Spencer accepted it.  Ex. 43 (Spencer Tr.) 101:4-16.

222.    Spencer's duties included organizing files, holding casting calls for models, assisting at photo shoots, running errands, mailing "tear sheets," or magazine pages where models appear, to models' agents, updating contact lists, and assisting in the fashion closet.  Ex. 43 (Spencer Tr.) 30:12-24; 108:11-23; 125:13-126:22; 140:16-141:15.

223.    For model casting calls, Spencer's duties included inviting models to Cosmopolitan's office, collecting information about their height and weight, taking Polaroid photos of them, and filing the photos.  Ex. 43 (Spencer Tr.) 30:12-24.

224.    Spencer selected the models who were invited to attend casting calls based on the "look" that Cosmopolitan wanted.  Ex. 43 (Spencer Tr.) 31:7-13.

225.    Occasionally, Finney assisted Spencer to select the models, but often Spencer made the decision on her own.  Ex. 43 (Spencer Tr.) 34:5-35:13.

226.    Initially, Wilson and Spencer held casting calls together, but Spencer later held them on her own.  Ex. 43 (Spencer Tr.) 156:9-19.

227.    After the casting call, Spencer gave the Polaroids to Wilson to select the models that would ultimately appear in the story.  Ex. 43 (Spencer Tr.) 33:14-34:4; 127:14-128:4.

228.    Spencer attended two photo shoots during her internship.  Ex. 43 (Spencer Tr.) 128:5-8.  On one occasion, Wilson asked Spencer to act as a messenger and bring a document to the photo shoot.  Ex. 43 (Spencer Tr.) 128:14-24.  On the other occasion, Spencer unpacked

trunks, hung clothes on racks, organized and steamed the clothes, and helped the models get

dressed.  Ex. 43 (Spencer Tr.) 129:4-17.

229.    Spencer checked in with Wilson and Finney once or twice a day.  Ex. 43 (Spencer

Tr.) 189:23-190:4.  Spencer typically received her assignments verbally or by email.  Ex. 43

(Spencer Tr.) 191:3-6.

230.    Cosmopolitan previously employed a bookings assistant to perform the tasks that

Spencer performed during her internship.  Ex. 43 (Spencer Tr.) 152:6-15.

231.    Spencer interned four days per week from 9 a.m. to 5 or 5:30 p.m.  Ex. 43

(Spencer Tr.) 97:23-25.

232.    The only training that Spencer received during her internship other than on-the-

job training consisted of four, one-hour sessions of "Cosmo U."  Ex. 43 (Spencer Tr.) 161:12-23;

190:10-14.  At each session, a Cosmopolitan editor talked about how they got their job.  *Id.*

115:11-116:15.

233.    Spencer received school credit for her internship.  Ex. 43 (Spencer Tr.) 104:12-19.

234.    To receive credit, Spencer was required to work 200 hours, submit some initial

paperwork, complete an interim evaluation form and student interim assessment, and complete a

final report and evaluation.  Ex. 43 (Spencer Tr.) 120:19-121:3; Ex. 275 (Course Syllabus).

### C.    Mancini

235.    Mancini was interviewed for an internship in Marie Claire's Fashion Department

by Abby Kalicka, a fashion assistant, in December 2008.  Ex. 22 (Mancini Tr.) 114:20-115:10.

236.    Mancini submitted a copy of her resume prior to the interview.  Ex. 22 (Mancini

Tr.) 115:9-10.

237.    During the interview, Kalicka asked Mancini about her favorite designer and her duties at her current internship.  Ex. 22 (Mancini Tr.)  115:13-20.  Kalicka explained in general terms what Mancini's duties as an intern would be.  Ex. 22 (Mancini Tr.) 119:8-121:20.

238.    Mancini and Kalicka also discussed Mancini's schedule and availability to intern. Ex. 22 (Mancini Tr.) 117:15-23.

239.    Kalicka offered Mancini the internship after the interview.  Ex. 22 (Mancini Tr.) 121:21-122:5.

240.    Mancini worked alongside between 20 to 30 other fashion interns.  Ex. 22 (Mancini Tr.) 144:9-16.

241.    The other fashion interns performed substantially the same tasks that Mancini performed.  Ex. 22 (Mancini Tr.) 222:18-223:10.

242.    Mancini's duties as a fashion intern included: receiving clothing ordered for photo shoots by Marie Claire staff, unpacking the items and checking to make sure that everything ordered was received and not broken, photographing the items, filing invoices, and putting the items on garment racks for Marie Claire staff to review.  Ex. 22 (Mancini Tr.) 119:18-120:11.

243.    Mancini also returned clothing to designers and sent clothing to other magazines, which entailed locating the clothing, wrapping it, and sending it by messenger or carrying the item personally to the designer or magazine.  Ex. 22 (Mancini Tr.) 120:12-121:2.

244.    Fashion interns at Marie Claire are involved in "trafficking samples," which means picking them up, dropping them off, or returning them through a messenger, packing trunks for photo shoots, keeping the fashion closet organized, and helping editors to make look books and research trends and other information.  Ex. 45 (Tam Tr.) 18:2-19:19.

245.    Keeping the fashion closet organized makes it easier for the stylists to be able to go through the racks to pick out the clothes they want to use in the magazine.  Ex. 45 (Tam Tr.) 22:19-24:1.

246.    Fashion interns at Marie Claire spend from 70 to 80 percent of their time trafficking samples and packing trunks.  Ex. 45 (Tam Tr.) 25:14-26:1.

247.    Lisa Tam, a fashion assistant at Marie Claire, showed new interns around and showed them their responsibilities.  Ex. 45 (Tam Tr.) 31:18-32.

248.    Tam usually had one intern stay on to be the "go-to" person that new interns could go to for questions.  Ex. 45 (Tam Tr.) 31:19-22.

249.    Editors at Marie Claire are "constantly asking for interns to help because they are so busy."  Ex. 45 (Tam Tr.) 34:13-18.

250.    Editors request interns to help them with making "inspiration boards," which means finding images online that fit the idea for a particular story and printing the "looks" requested by a stylist and cutting them out and pinning them to a board, and with administrative tasks, like filing paperwork.  Ex. 45 (Tam Tr.) 24:2-12; 34:24-35:8.

251.    A handbook used for fashion interns at Marie Claire identifies the following duties that fashion interns are expected to perform: cleaning the fashion closet, arranging the racks and labeling them for the specific story that they relate to, checking in incoming samples, and returning samples to public relations companies and showrooms.  Ex. 93 (Marie Claire Fashion Intern Handbook) .

252.    Checking in samples involves logging them on a log-in sheet, checking the invoice to make sure it is consistent with what was received, labeling the samples, photographing

the samples, placing them on the appropriate rack, and filing the invoice that came with the sample. Ex. 93 (Marie Claire Fashion Intern Handbook).

253.    Returning samples involves marking an "X" on the invoice that came with the samples, packing the samples up the same way that they were delivered, and arranging for pickup by a messenger service or UPS. Ex. 93 (Marie Claire Fashion Intern Handbook).

254.    Fashion interns at Marie Claire replenish supplies, run errands, file invoices, answer phones, and check email. Ex. 93 (Marie Claire Fashion Intern Handbook).

255.    Fashion interns at Marie Claire make storyboards and assist at photo shoots. Ex. 93 (Marie Claire Fashion Intern Handbook).

256.    Making storyboards involves printing photos selected by an editor, cutting them out, and pinning them onto a board. Ex. 93 (Marie Claire Fashion Intern Handbook).

257.    When Marie Claire fashion interns assist at photo shoots, their "basic duties are to pack, unpack, steam clothes, help models with their looks, and assist the editor with anything they need." Ex. 93 (Marie Claire Fashion Intern Handbook).

258.    Marie Claire informs interns that attending a photo shoot is "an extreme privilege," and tells them that their "sole purpose there is to work." Ex. 93 (Marie Claire Fashion Intern Handbook).

259.    Mancini did not receive any training during her internship other than how to perform the day to day tasks she was assigned. Ex. 128 (Mancini Decl.) ¶ 7.

260.    Kalicka did not closely supervise Mancini, but instead checked in on her during the day to make sure that she had completed her assigned tasks correctly. Ex. 22 (Mancini Tr.) 156:9-157:2.

261.    On one occasion, Tam, a fashion assistant, reprimanded Mancini and other interns for "doing a poor job" of keeping the fashion closet organized and running on time.  Ex. 22 (Mancini Tr.) 164:20-165:9.

262.    Marie Claire uses interns to pick up and deliver items to cut down on its messenger costs.  Ex. 22 (Mancini Tr.) 56:12-57:24; Ex. 60 (Email, dated July 21, 2011) (Marie Claire uses "interns to pick up and deliver merch to reduce [its] messenger costs").

263.    Hearst pays its messengers on a per-trip basis.  Ex. 45 (Tam Tr.) 40:10-12.

264.    During Mancini's initial interview, Kalicka told Mancini that Marie Claire would "look the other way" with respect to the fact that Mancini was no longer in school and could not receive school credit for her internship.  Ex. 22 (Mancini Tr.) 116:23-117:14.

265.    During Mancini's internship, Kalicka, Tam, and other fashion assistants held a meeting with the fashion interns about receipt of school credit.  Ex. 22 (Mancini Tr.) 129:25-130:13.

266.    During the meeting, the assistants announced that Hearst was trying to "crack down on the policy of having it be necessary that you have school credit as an intern."  Ex. 22 (Mancini Tr.) 130:6-13.

267.    The interns who were not receiving school credit were instructed to obtain school credit or some documentation saying that they were receiving school credit, or they would be let go.  Ex. 22 (Mancini Tr.) 130:11-18.

268.    No one at Marie Claire ever followed up with Mancini about whether she was eligible to receive credit.  Ex. 22 (Mancini Tr.) 130:24-131:4.

269.    Mancini did not receive academic credit for her internship.  Ex. 22 (Mancini Tr.) 128:17-19.

270.    Mancini interned three to four days a week.  Ex. 22 (Mancini Tr.) 144:23-145:3-7.

271.    She typically arrived between 8:30 and 9 a.m.  Ex. 22 (Mancini Tr.) 148:22-24.

272.    Mancini typically left Marie Claire around 8:30 or 9 p.m., but sometimes stayed as late as 11:30 p.m. or midnight.  Ex. 22 (Mancini Tr.) 148:11-21; 149:18-25.   One day a week, Mancini left at around 4 p.m. because she had a paid job as a waitress.  Ex. 22 (Mancini Tr.) 150:16-21.

273.    Mancini believed that her internship would lead to a paid position at Hearst.  Ex. 22 (Mancini Tr.) 128:8-16; 134:11-14; 225:5-15.

274.    During meetings that Mancini and other interns attended, fashion assistants told them that "if you work hard enough, if you stay there long enough, if people like you, if you do what you're told, then it will result in a paid position within the fashion industry."  Ex. 22 (Mancini Tr.) 162:11-163:25.

**D.    Skorka**

275.    Skorka was interviewed for an internship by Krista Demaio, Redbook's Beauty Editor.  Ex. 42 (Skorka Tr.) 82:22-83:17.  Skorka submitted a resume and cover letter in advance of the interview.  Ex. 42 (Skorka Tr.) 80:12-81:4.

276.    During the interview, Demaio and Skorka discussed Skorka's interest in beauty, her duties as an intern, and the skills and experience that Redbook was looking for in an intern.  Ex. 42 (Skorka Tr.) 83:10-84:23.

277.    Demaio offered Skorka the internship, and Skorka accepted.  Ex. 42 (Skorka Tr.) 86:14-24.

278.    Skorka reported to Demaio and Cheryl Kramer Kaye, Redbook's Beauty Director.  Ex. 42 (Skorka Tr.) 49:7-8; 83:18-19; 100:9-11.

279.     The supervision Skorka received at Redbook is similar to the supervision that she

receives currently in her paid, entry-level position as a Marketing Coordinator at Intercos.  For

example, in both positions, her supervisor initially taught her how to do her tasks, and then

Skorka performed them on her own.  In both positions, Skorka's supervisor provided her with

periodic feedback.  Ex. 42 (Skorka Tr.) 32:12-17; 100:12-101:2; 101:6-17; 208:7-9; 208:16-

209:5.

280.     Skorka's responsibilities as a beauty intern involved managing the beauty closet,

which entailed rotating products and replacing old beauty products with new ones and organizing

and keeping the products neat so that editors could find them easily.  Ex. 42 (Skorka Tr.) 204:23-

205:15; Ex. 235 (Redbook Beauty Internship).

281.     Skorka's duties also included assisting with photo shoots, coming up with beauty

story ideas, writing posts for the website, attending beauty product launches and reporting back

to Redbook's editors about the products, and contacting public relations firms about products to

include in the magazine.  Ex. 42 (Skorka Tr.) 108:14-109:5; 123:21-124:23; Ex. 154 (Skorka

Decl.) ¶ 7; Ex. 235 (Redbook Beauty Internship).

282.     Skorka also selected beauty products for potential inclusion in Redbook and

participated in "desksides" where public relations personnel discussed beauty products.  Ex. 42

(Skorka Tr.) 118:11-119:17; 122:8-123:10.

283.     Skorka sometimes assisted Redbook's fashion editor with tasks when she "really

needed help."  Ex. 42 (Skorka Tr.) 156:9-157:7.  For example, Skorka packed up clothing and

accessories, laid out items so that Christina could determine whether they would be appropriate

for a story, reviewed "look books," accepted fashion show invitations, and contacted public

relations personnel.  Ex. 42 (Skorka Tr.) 156:2-8.

284.   Skorka also helped Redbook's health editor sort through health books to determine whether they were relevant to the stories that the editor was writing.  Ex. 42 (Skorka Tr.) 157:17-158:6.

285.   Kaye told Skorka she was doing the work that a paid beauty assistant would do. Ex. 42 (Skorka Tr.) 209:6-17.

286.   Paid beauty assistants organize the beauty closet, research and request products, and maintain brand credit and contact lists.  Ex. 30 (Ritterbeck Tr.) 26:12-19; 27:9-12; 44:17-45:5; Ex. 71 (Ritterbeck Resume); Ex. 36 (Rud Tr.) 82:12-23; 84:13-23; 109:3-8; Ex. 191 (Town & Country Editorial Assistant/Beauty & Health) -- D0016935-36.

287.   Skorka's supervisors wanted her to stay on as a paid consultant after her internship ended, doing the same tasks that she had done as an intern.  Ex. 42 (Skorka Tr.) 158:17-163:25.

288.   Skorka's supervisors asked Redbook's finance department whether Skorka could be employed as a consultant, but were told that the magazine did not have the budget to employ her. Ex. 42 (Skorka Tr.) 162:13-163:20.

289.   Skorka ultimately took a paid internship at Estee Lauder instead of staying on at Redbook.  Ex. 42 (Skorka Tr.) 30:4-31:14; 163:21-25.

290.   Skorka interned at Redbook three days a week, from approximately 10 a.m. to 6 or 7 p.m.  Ex. 42 (Skorka Tr.) 97:20-98:2; 99:5-7.

291.   After her internship at Redbook ended, Skorka spent a day working at O, The Oprah Magazine, as an unpaid intern.  Ex. 42 (Skorka Tr.) 71:6-23.

292.   At O, Skorka spoke to public relations companies, helped organize the beauty closet, and attended a meeting to discuss skincare products.  Ex. 42 (Skorka Tr.) 71:18-23.

293.    Skorka was being considered for an internship at O.  Ex. 42 (Skorka Tr.) 71:24-72:2.

294.    Skorka believed that she would earn job reference through her internship.  She also believed that if she performed her duties well, she would be considered for a paid position at Redbook.  Ex. 154 (Skorka Decl.) ¶¶ 12-13; Ex. 42 (Skorka Tr.) 200:23-201:5.

295.    Skorka received school credit for her internship.  Ex. 42 (Skorka Tr.) 92:11-13.

296.    To receive credit, Skorka took an online internship class.  Ex. 42 (Skorka Tr.) 88:10-12.  The course required her to work a certain number of hours at her internship and submit a paper every two weeks about her experiences.  Ex. 42 (Skorka Tr.) 89:4-12; 91:13.

297.    Skorka did not receive any training at Redbook other than how to perform her day-to-day tasks.  Ex. 154 (Skorka Decl.) ¶ 6.

**E.    Wagster**

298.    Wagster was interviewed for an internship at Esquire by Worth Turner, the assistant to the Director of Marketing, and Meg Chaffee, the assistant to the Publisher.  Ex. 49 (Wagster Tr.) 11:15-23; 58:9-15; 74:8-13.

299.    During the interview, Wagster discussed his past experiences doing administrative and clerical work.  Ex. 49 (Wagster Tr.) 85:23-86:12.  Turner and Chaffee told Wagster that the internship involved administrative tasks and assisting with events.  Ex. 49 (Wagster Tr.) 85:10-20.

300.    Turner told Wagster that Esquire was very busy and needed help, and asked whether Wagster could begin interning the next day.  Ex. 49 (Wagster Tr.) 76:20-77:5.  Wagster agreed.  Ex. 49 (Wagster Tr.) 77:3-5.

301.    Turner told Wagster that he needed to provide documentation stating that he was eligible for academic credit for his internship. Ex. 49 (Wagster Tr.) 77:6-19. Wagster provided the requested documentation. Ex. 49 (Wagster Tr.) 77:20-21.

302.    After Wagster completed the internship, his university declined to award him credit because the work he performed was not applicable to his major or any other skill set for future career advancement. Ex. 49 (Wagster Tr.) 79:18-22; 129:13-18.

303.    Wagster primarily reported to Turner, although he also performed tasks for other assistants. Ex. 49 (Wagster Tr.) 11:15-17; 108:22-109:9.

304.    Wagster was not closely supervised. Ex. 49 (Wagster Tr.) ¶¶ 15-16.

305.    As an intern in the Publishing department at Esquire, Wagster ran errands, updated guest lists for events held at Esquire's Soho event space, helped prepare for events, and worked at the doors at the events. Ex. 49 (Wagster Tr.) 103:4-9.

306.    Wagster spent the majority of his time compiling guest lists for events. Ex. 49 (Wagster Tr.) 107:3-10. Compiling guest lists involved entering guests' names into a spreadsheet, confirming that the guests were properly invited, and relaying any guest requests to Esquire staff. Ex. 49 (Wagster Tr.) 107:11-108:6.

307.    Wagster helped to prepare for events by setting up heat lamps, arranging glasses, cleaning, and fetching promotional materials from Esquire's offices. Ex. 49 (Wagster Tr.) 103:11-19.

308.    During events, Wagster checked guests in and sometimes took them upstairs where the event was taking place, or worked the elevator to transport guests up and down. Ex. 49 (Wagster Tr.) 103:20-104:5.

309.    Wagster's duties also included delivering copies of Esquire to other Hearst magazines in the Hearst Tower.  Ex. 49 (Wagster Tr.) 66:18-24.  He also delivered hard copies of proposed layouts to advertisers and to Esquire events.  Ex. 49 (Wagster Tr.) 104:15-105:10.

310.    Wagster's duties included preparing expense reports for Esquire staff.  Ex. 49 (Wagster Tr.) 106:11-15.

311.    Wagster attended weekly marketing meetings where he took minutes for Esquire executives.  Ex. 49 (Wagster Tr.) 144:5-22.

312.    Some of the same duties Wagster performed are performed by paid employees at Esquire.  *See* Ex. 243 (Esquire Marketing Integration Associate); Ex. 244 (Esquire Marketing Assistant).

313.    Other on-the-job training on his first day at Esquire, in which he was taught how to use the fax machine, answer phones, update the office Rolodex, and perform other administrative tasks, Wagster did not receive any formal or informal training as part of his internship.  Ex. 158 (Wagster Decl.) ¶¶ 7-8.

314.    Wagster interned three days a week, generally from 9 a.m. to 6 p.m.  Ex. 49 (Wagster Tr.) 83:24-84:6.  He stayed later on the nights when he was required to attend marketing events.  Ex. 49 (Wagster Tr.) 44:14-45:24.

315.    Based on a conversation with Turner, in which Turner told him that having an internship at Esquire would make it easier to get a job at Hearst, Wagster believed that his internship would lead to potential opportunities for paid employment at Hearst.  Ex. 49 (Wagster Tr.) 49:6-50:3.

### F.     Leszuk

316.     Leszuk was interviewed by Zarah Burstein, a sales assistant, Christina Elliot, an advertising assistant, and Amy Katz, a sales associate and media sales executive at Marie Claire. Ex. 21 (Leszuk Tr.) 133:7-9; 308:2-14.  Leszuk met with each for approximately 20 minutes.  *Id.* 133:11-18.

317.     During her interviews, Leszuk discussed her background, experience, interests, her goals for the internship, and what her duties would be.  Ex. 21 (Leszuk Tr.) 133:19-24; 135:25-136:6.

318.     Elliot told Leszuk that, during her internship, she would attend a series of lectures run by different members of the advertising department, covering topics including presentation skills and "media math."  Ex. 21 (Leszuk Tr.) 141:22-142:14.

319.     Other than a brief, approximately 20-minute session about "media math," these lectures never occurred.  Ex. 21 (Leszuk Tr.) 226:21-227:7.

320.     Leszuk initially reported to Elliot.  Ex. 21 (Leszuk Tr.) 90:8-9.  After Elliot left Hearst, Paige Dubeshter and Rula Sawaf, who were both assistants, primarily assigned Leszuk tasks.  Ex. 21 (Leszuk Tr.) 90:18-23; 239:10-16.

321.     Leszuk generally interacted with her supervisors twice a day.  Ex. 21 (Leszuk Tr.) 312:7-25.

322.     Leszuk spent the majority of her time during her internship creating "edit credit" spreadsheets.  Ex. 21 (Leszuk Tr.) 65:20-66:9; 234:17-235:10.

323.     Doing edit credits involved a line-by-line review of Marie Claire and its competitors' magazines.  Each time a particular brand was mentioned, Lezuk entered the page,

article, and other information into a spreadsheet.  Ex. 21 (Leszuk Tr.) 65:22-66:4; Ex. 67 (Email, dated Jan. 28, 2010).

324.    Marie Claire used the information in the edit credits to pitch clients and to demonstrate to advertisers that the magazine had featured their brand.  Ex. 21 (Leszuk Tr.) 234:24-235:10; 312:3-7.

325.    Paid sales assistants at Hearst also compile edit credits.  Ex. 2 (Berard Tr.) 58:12-59:7; Ex. 4 (Buchalter Tr.) 41:22-42:4; 78:2-9; Ex. 29 (Riordan Tr.) 48:20-23; 111:4-10; Ex. 41 (Simmons Tr.) 50:8-14; Ex. 180 (Oprah Magazine Sales Assistant); Ex. 189 (Seventeen Sales Assistant); Ex. 190 (Woman's Day Sales Assistant); Ex. 181 (Food Network Sales Assistant); Ex. 185 (Cosmo Sales Assistant); Ex. 186 (Country Living Sales Assistant); Ex. 187 (ELLE Décor Sales Assistant); Ex. 188 (Bazaar Sales Assistant).

326.    Leszuk also created "edit credit books" containing pages of Marie Claire in which certain brands were featured.  Ex. 21 (Leszuk Tr.) 197:5-13; 309:13-310:7.  Edit credit books are used by Marie Claire sales representatives during their meetings with clients.  Ex. 21 (Leszuk Tr.) 310:8-15.

327.    Paid sales assistants at Hearst also compile edit credit books.  Ex. 4 (Buchalter Tr.) 41:22-42:4; 78:2-9; Ex. 29 (Riordan Tr.) 142:10-23.

328.    Marie Claire's sales representatives present their clients with edit credit books to help build the client's relationship with Marie Claire, demonstrate the editorial support Marie Claire has given their brand, and to help ensure that the client advertises with Marie Claire.  Ex. 29 (Riordan Tr.) 83:8-84:8.

329.    During her internship, Leszuk assisted the Marketing Department at a model casting call by bringing the models from the waiting area into the casting room.  Ex. 21 (Leszuk

Tr.) 207:21-208:22.  She also assisted with a marketing event held at a store called Mango by maintaining a waiting list for customers waiting to get makeovers.  Ex. 21 (Leszuk Tr.) 246:3-14.

330.     Leszuk interned four days a week, from approximately 9 a.m. until approximately 6 p.m.  Ex. 21 (Leszuk Tr.) 198:5-8.

331.     On one occasion, when she was required to attend an event at a store in Soho, she interned until 9 p.m.  Ex. 21 (Leszuk Tr.) 81:7-18.

332.     Leszuk received school credit for her internship.  Ex. 21 (Leszuk Tr.) 155:24-156:2.

333.     To receive credit, Leszuk was required to work for a certain number of hours, keep a weekly journal, and attend a weekly seminar on Fridays.  Ex. 21 (Leszuk Tr.) 178:8-21; 183:24-184:17.

334.     During her internship, a professor at Lezsuk's school performed a site visit at Marie Claire.  Ex. 21 (Leszuk Tr.) 162:17-23; 163:3-164:10.

335.     Leszuk had previously told her professor that she had not received the classes that had been discussed in her interview and that she was unsatisfied with the work she was doing.  Ex. 21 (Leszuk Tr.) 184:20-185:12.

336.     Leszuk's professor was concerned  that she was supervised by entry-level employees.  Ex. 21 (Leszuk Tr.) 169:12-170:20.

337.     Lezuk believed her internship would lead to a paid position at Hearst.  Ex. 21 (Leszuk Tr.) 136:13-19; 289:9-17.

**G.     Rappaport**

338.     Rappaport was interviewed for her internship as a fashion intern at Seventeen by an assistant, Ryan Jin.  Ex. 27 (Rappaport Tr.) 100:25-101:9.

339.    During the interview, Jin asked Rappaport questions about her resume and Seventeen, and told her about the hours that she could expect to work.  Ex. 27 (Rappaport Tr.) 102:22-103:13.

340.    Jin told Rappaport that the internship would involve putting outfits together and organizing in the fashion closet.  Ex. 27 (Rappaport Tr.) 104:13-22.

341.    Jin told Rappaport that because interns fell within Seventeen's target market, they could have input and help improve the magazine.  Ex. 27 (Rappaport Tr.) 104:23-105:4.

342.    Rappaport and Jin also discussed her start date, and with whom she would be working.  Ex. 27 (Rappaport Tr.) 106:6-22.

343.    Rappaport reported to Jin and Andrew Mukamal, another assistant.  Ex. 27 (Rappaport Tr.) 51:14-52:4; 65:9-12; 122:25-123:3.

344.    Rappaport spoke to Jin and Mukamal about once a day.  Ex. 27 (Rappaport Tr.) 65:17-19.

345.    Rappaport received assignments via email that went to a single email account shared by all of the fashion closet interns.  Ex. 27 (Rappaport Tr.) 65:20-66:7.

346.    Mukhamal and Jin told Rappaport and the other interns that they should talk to each other if they had questions before asking them.  Ex. 27 (Rappaport Tr.) 123:18-124:7.

347.    On her first day at Seventeen, Mukamal introduced Rappaport to the other fashion interns, who showed her how to perform her tasks.  Ex. 27 (Rappaport Tr.) 115:21-116:12.

348.    As an intern in the fashion closet, Rappaport's duties included organizing clothes, hanging them on racks, packing them for fashion shoots or to be returned to public relations firms, picking up and returning clothing to public relations firms and designers, organizing

jewelry, sending packages, copying, faxing, and responding to emails from designers about the return of samples.  Ex. 27 (Rappaport Tr.) 82:14-83:22.

349.    Paid, entry-level fashion assistants at Hearst are also tasked with organizing the fashion closet.  Ex. 15 (Helmus Tr.) 37:10-38:5.

350.    On one or two occasions, Rappaport attended a photo shoot.  Ex. 27 (Rappaport Tr.) 126:14-20.  At the shoot, she unpacked clothes and shoes for the stylist and model, set up jewelry, unpacked equipment, purchased flowers, and packed up when the shoot was over.  Ex. 27 (Rappaport Tr.) 127:12-128:8.

351.    Rappaport interned four days a week, from about 9:20 a.m. to between 6:30 and 7:30 p.m.  Ex. 27 (Rappaport Tr.) 47:6-8; 103:17-104:2.

352.    Rappaport received school credit for her internship.  Ex. 27 (Rappaport Tr.) 45:12-46:8.

353.    To receive school credit, Rappaport registered for a one-credit class, wrote weekly journal entries, and submitted a final paper.  Ex. 27 (Rappaport Tr.) 55:25-57:5.

**H.     Wheels**

354.    Wheels applied for an internship at Cosmopolitan by sending a letter and her resume to Caryn Kanare, a business coordinator.  Ex. 51 (Wheels Tr.) 79:2-80:16; 94:5-6.

355.    Wheels had two phone interviews before she was hired.  Ex. 51 (Wheels Tr.) 90:19-91:5.  The first interview was with Esther Crain, a deputy articles editor.  Ex. 51 (Wheels Tr.) 91:6-19.  Crain asked Wheels to complete an "edit test," during which Wheels was asked to draft a "mock up" of an article and submit it for review.  Ex. 51 (Wheels Tr.) 91:24-92:4.

356.    After Wheels completed the edit test, she had a second interview with Kanare. Ex. 51 (Wheels Tr.) 94:4-6.  During the interview, Wheels and Kanare discussed Wheels' start date and a potential end date.  Ex. 51 (Wheels Tr.) 95:14-96:14.

357.    Wheels did not report to a particular supervisor, but instead performed tasks for a number of different Cosmopolitan employees.  The supervision Wheels received generally consisted of Cosmopolitan employees asking her to do projects and Wheels turning in what was asked.  Ex. 51 (Wheels Tr.) 53:3-57:11; 186:15-22; 192:15-193:3.

358.    As an editorial intern at Cosmopolitan, Wheels responded to emails from readers, did research for articles, surveyed people on the street for articles, transcribed interviews, compiled statistics on magazine sales, located articles in Cosmopolitan's archives, wrote content for the magazine, and fact-checked articles.  Ex. 51 (Wheels Tr.) 136:16-138:6; 139:19-143:7.

359.    After an editorial assistant, Gabrielle Frank, resigned, Wheels took over some of her responsibilities, including interviewing bachelors from each state and writing short biographies about eleven of them for the magazine.  Ex. 51 (Wheels Tr.) 137:8-15; 138:18-139:19; 145:9-146:19.

360.    Paid editorial assistants also do research for articles, write magazine content, transcribe interviews, interview bachelors, and write profiles about them.  Ex. 17 (Hilmantel Tr.) 6:22-8:12; 22:19-22; Ex. 34 (Ross Tr.) 32:3-9; Ex. 47 (Thompson Tr.) 9:2-10:22; Ex. 260 (Marie Claire Editorial Assistant); Ex. 261 (Marie Claire Editorial Assistant); Ex. 191 (Town & Country Editorial Assistant); Ex. 262 (House Beautiful Editorial Assistant); Ex. 263 (Esquire Editorial Assistant); Ex. 264 (Good Housekeeping Editorial Assistant); Ex. 265 (Good Housekeeping Editorial Assistant); Ex. 266 (Cosmopolitan Editorial Assistant); Ex. 267 (Cosmopolitan Editorial Assistant); Ex. 268 (Woman's Lifestyle Editorial Assistant).

361.    Wheel's college, Reed College, refused to award credit for her internship, so she purchased credit from Portland Community College.  Ex. 51 (Wheels Tr.) 104:12-105:22.

362.    The career services department at Reed College told Wheels that it would not award her academic credit because it is "a way that businesses get around paying their interns" and can be "exploitative."  Ex. 51 (Wheels Tr.) 106:4-9.

363.    During her internship, Wheels attended four, one-hour sessions of "Cosmo U." Ex. 51 (Wheels Tr.) 78:7-11; 205:6-12.  At the sessions, employees discussed the various departments of Cosmopolitan and their career paths.  Ex. 51 (Wheels Tr.) 205:20-206:24.

364.    Wheels felt that she "could have used a lot more . . .  basic training."  Ex. 51 (Wheels Tr.) 192:25-193:6; 216:21-24.

365.    Wheels worked at Cosmopolitan four days a week.  Ex. 51 (Wheels Tr.) 130:22-131:13.  She typically arrived around 9:15 a.m. and left at around 6 p.m.  Ex. 51 (Wheels Tr.) 127:8-12.

366.    Wheels hoped that her internship would lead to a paid position at Cosmopolitan. Ex. 51 (Wheels Tr.) 81:7-82:8.

Dated: New York, New York
       March 4, 2013

Respectfully submitted,

/s/ Rachel Bien
Rachel Bien

Adam T. Klein
Rachel Bien
Juno Turner
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, NY  10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005