IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

XUEDAN WANG and ERIN SPENCER, on behalf
of themselves and all others similarly situated,

                                     Plaintiff,

                     v.

THE HEARST CORPORATION,

                             Defendant.

**ECF**

12-cv-00793 (HB)(AJP)

**ORAL ARGUMENT REQUESTED**

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR
## SUMMARY JUDGMENT AND CLASS CERTIFICATION

**HEARST CORPORATION**

Office of General Counsel
Eve B. Burton
Jonathan R. Donnellan
Kristina E. Findikyan
Courtenay B. O'Connor
Andrea R. Butler
Kristen Hauser Glass
Christine Bateup
300 W. 57th Street, 40th Floor
New York, New York 10019
Tel: (212) 841-7000
Fax: (212) 554-7000

*Attorneys for Defendant Hearst Corporation*

Of Counsel:

Proskauer Rose LLP
Mark W. Batten
One International Place
Boston, MA  02110-2600
Tel: (617) 526-9850
Fax: (617) 526-9899

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

COUNTER-STATEMENT OF FACTS ................................................................ 4

    I.     Hearst's 19 Diverse Magazines and Multiple Magazine Departments
          Operate Independent, Varied Internship Programs ................................ 4

    II.    Each Intern Had a Unique Internship Experience ................................. 10

          A.     Each Internship Benefitted In Different Ways ........................... 11

          B.     Each Internship Had Differing Alleged Benefits to Hearst ....... 21

ARGUMENT ..................................................................................................... 25

    I.     PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT
          AND CLASS CERTIFICATION MUST BE DENIED BECAUSE
          THEY ARE PREMISED ON A "STANDARD" THAT IS FLATLY
          CONTRADICTED BY LAW .................................................... 25

          A.     *Walling* Delineated the FLSA's Scope and Rejected Plaintiffs'
                Proposed Standard For Determining if an Intern is an Employee ............ 25

          B.     The Legal Standard For Determining Whether An Intern Is
                An Employee Is A Balancing Of The Benefits Test ................... 28

    II.    THE BALANCE OF THE BENEFITS TEST CANNOT BE APPLIED
          ON A CLASS BASIS TO THE INTERNSHIPS IN THIS CASE ...... 32

          A.     Plaintiffs Cannot Satisfy The Commonality Requirement ....... 33

                1.     Plaintiffs Have Not And Cannot Establish Commonality
                      Under The Proper Legal Standard ................................. 34

                 2.     Plaintiffs Cannot Manufacture Commonality By Forbidding
                      Consideration Of Academic Credit and By Unilaterally
                      Requiring That Unpaid Internships Must Be Structured
                      Around Classroom Experiences .................................... 38

       B.     Plaintiffs Cannot Show That Common Questions
Predominate Over The Thousands of Individual Issues,
Or That Class Determination Is Superior To Individual Lawsuits ...........40

III.    SUMMARY JUDGMENT MUST BE DENIED BECAUSE UNDER THE
PROPER STANDARD, MATERIAL ISSUES OF FACT PRECLUDE
JUDGMENT AS A MATTER OF LAW ..............................................................42

IV.    PLAINTIFFS MISSTATE THE LAW GOVERNING WILLFULNESS, AND
HAVE NO EVIDENCE OF ANY WILLFUL VIOLATION ...............................49

CONCLUSION..............................................................................................................50

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **Page**

*Archie v. Grand Cent. P'ship, Inc.,*
   997 F. Supp. 504 (S.D.N.Y. 1998) ............................................................... *passim*

*Bailey v. Pilots' Ass'n for Bay & River Del.,*
   406 F. Supp. 1302 (E.D. Pa. 1976) ...............................................................30n

*Blair v. Wills,*
   420 F.3d 823 (8th Cir. 2005) .............................................29, 29n, 30n, 39n

*Cannon v. Douglas Elliman, LLC,*
   No. 06 Civ. 7092 (NRB), 2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007)............................26n

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)......................................................................................42

*Christensen v. Harris County,*
   529 U.S. 576 (2000)....................................................................................31n

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,*
   502 F.3d 91 (2d Cir. 2007)...........................................................................41

*Copantitla v. Fiskardio Estiatorio, Inc.,*
   788 F. Supp. 2d 253 (S.D.N.Y. 2011).........................................................49

*DeMayo v. Palms W. Hosp., L.P.,*
   --- F. Supp. 2d ---, No. 11-CV-81211,
   2013 WL 264691 (S.D. Fla. Jan. 23, 2013) ............................................ *passim*

*Donovan v. Am. Airlines, Inc.,*
   686 F.2d 267 (5th Cir. 1982) ......................................................................29n

*Donovan v. New Floridian Hotel, Inc.,*
   676 F.2d 468 (11th Cir. 1982) ....................................................................30n

*Ealy v. Pinkerton Govt. Servs., Inc.,*
   No. 12-1252, 2013 WL 980035 (4th Cir. Mar. 14, 2013)....................................33n

*Espenscheid v. DirectSat USA, LLC,*
   705 F.3d 770 (7th Cir. 2013) ......................................................................42n

*Exxon Mobile Corp. v. C.I.R.,*
   689 F.3d 191 (2d Cir. 2012)........................................................................31n

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)...................................................................................35

*In re IPO Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)......................................................................34n

*Kaplan v. Code Blue Billing & Coding, Inc.*,
   No. 12-12011, 2013 WL 238120 (11th Cir. Jan. 22, 2013)............29n, 30n, 39, 39n

*Marshall v. Regis Educ. Corp.*,
   666 F.2d 1324 (10th Cir. 1981) ...............................................................40n

*McLaughlin v. Ensley*,
   877 F.2d 1207 (4th Cir. 1989) .................................................................29n

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128 (1988)...................................................................................49

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)........................................34n, 40, 41, 41n

*Myers v. Hertz Corp.*,
   No. 02 Civ. 4325, 2007 WL 2126264 (E.D.N.Y. July 24, 2007) ...........36

*Okoro v. Pyramid 4 Aegis*,
   Case No. 11-C-267, 2012 WL 1410025 (E.D. Wis. Apr. 23, 2012)..........30n

*Regents of Univ. of Michigan v. Ewing*,
   474 U.S. 214 (1985)...................................................................................39

*Reich v. Parker Fire Prot. Dist.*,
   992 F.2d 1023 (10th Cir. 1993) .........................................28, 29n, 31, 31n

*Saunders v. City of New York*,
   594 F. Supp. 2d 346 (S.D.N.Y. 2008)......................................................49

*Severin v. Project OHR, Inc.*,
   No. 10 Civ. 9696 (DLC), 2012 WL 2357410 (S.D.N.Y. June 20, 2012) ..............42

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
   642 F.3d 518 (6th Cir. 2011) ..................................................... *passim*

*Sologub v. City of New York*,
   202 F.3d 175 (2d Cir. 2000)......................................................................43

*Todaro v. Township of Union*,
   27 F. Supp. 2d 517 (D.N.J. 1998) ...........................................................27n

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
 471 U.S. 290 (1985)................................................................26n, 27, 28n

*Velez v. Sanchez*,
 693 F.3d 308 (2d Cir. 2012).......................................................27, 28, 29

*Wal-Mart Stores, Inc. v. Dukes*,
 131 S. Ct. 2541 (2011).................................................................... *passim*

*Walling v. Portland Terminal Co.*,
 330 U.S. 148 (1947)........................................................................ *passim*

*Wang v. Chinese Daily News, Inc.*,
 623 F.3d 743 (9th Cir. 2010) .................................................................33n

*Wang v. Chinese Daily News, Inc.*,
 132 S. Ct. 74 (2011)...............................................................................33n

*Wirtz v. Wardlaw*,
 339 F.2d 785 (4th Cir. 1964) .................................................................30n

STATUTES AND OTHER AUTHORITIES

Fair Labor Standards Act .................................................................... *passim*

NY Labor Law. ....................................................................................2, 26n

Fed. R. Civ. P. 23 ...................................................................32, 33n, 34n

Fed. R. Civ. P. Rule 23(a) ..........................................................................32

Fed. R. Civ. P. Rule 23(a)(2) ...............................................................33, 40

Fed. R. Civ. P. Rule 23(b)(3) ...............................................................32, 40

Local Civ. R. 56.1 ....................................................................................43n

DOL Fact Sheet #71................................................................31, 31n, 32, 38n

Janet Eyler, *The Power of Experiential Education*, Liberal Education, Fall 2009,
 published by The Association of American Colleges and Universities, available at
 http://www.aacu.org/liberaleducation/le-fa09/documents/LEFall09_Eyler.pdf, last
 visited March13, 2013 ..............................................................................39n

Joseph Auon, *Protect Unpaid Internships*, Inside Higher Ed, July 13, 2010, available at
 http://www.insidehighered.com/views/2010/07/13/aoun, last visited March 13, 2013........39n

Richard M. Freeland, *Liberal Education and the Necessary Revolution in Undergraduate Education*, Liberal Education, Winter 2009, published by The Association of American Colleges and Universities, available at http://www.aacu.org/liberaleducation/le-wi09/documents/LE-WI09_Freeland.pdf, last visited 3/13/13....................................................................................................39n

## INTRODUCTION

Seven federal Circuits – every Circuit court to consider the matter – have held that whether an individual is an "employee" under the law requires consideration of the "totality of the circumstances" surrounding each individual's relationship with the supposed employer.  That analysis considers not just whether the individual performed productive work, as plaintiffs would have it, but a careful evaluation of the individual's expectations about payment, the tangible and intangible benefits the individual received from the experience, its educational value, the extent of training and supervision, burdens imposed on the employer, and more.  The substantial evidence before the Court demonstrates beyond question that plaintiffs' claims here are far too reliant on individual stories, questions of credibility, and varying experiences to be tried as a class action.

Because the evidence shows that none of the plaintiffs has any knowledge about internships at other Hearst magazines, or even in other departments in the magazines where they interned, their evidence at trial would consist primarily of a collection of individual anecdotes, from a tiny subset of the thousands of potential class members.  The eight plaintiffs will testify about their unhappiness with their own internships, in which most but not all of them feel that they learned little and contributed much.  They then will ask a jury to apply the results of those individual stories to decide the claims of thousands of others, without any further inquiry into the experiences of those interns.  As the 136 declarations and 60 depositions in this case attest, there are many interns who not only loved the time they spent at Hearst magazines, but who attest under oath that they learned lessons they could never learn in school, gained contacts, and took a solid first step toward a rewarding career.  The factual variety is so great, and the applicable legal test so fact-specific, that the legality of these internships can only be assessed individually.

Struggling to simplify the unique stories in the record so that they may be crammed into a homogenized collection suitable for class determination, plaintiffs ignore most of the relevant facts and insist on an inflexible legal test that has been rejected by every court to consider the matter.  They focus exclusively on a single factor, the performance of "productive work," and would transform any intern who performed any productive work into an employee for purposes of the FLSA and NY Labor Law.  That has never been the law.  In *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), the Supreme Court rejected the very standard advanced here, ruling that productive work by itself does ***not*** make someone an employee.  While plaintiffs' reason for advancing their simple one-stroke theory is clear enough – the varied facts of this case make class certification and summary judgment impossible under any other view – it is without precedent and runs counter to a long line of clear and consistent law.

Plaintiffs' myopic view of the facts, focusing only on those that serve their legal theory, is equally extreme.  It leads them to ignore facts critical to answering the case-determinative question central to their motions:  who was the primary beneficiary of the internships – Hearst's magazines or the interns – and whether that question can be resolved on a class-wide basis. More specifically, plaintiffs ignore the fact that there are no central policies, practices, protocols or procedures by which to assess the many different internships offered by Hearst's magazines, much less take measure of the benefits derived by students, the detriment to the magazines' operations by hosting the interns, or the benefits, if any, to those magazines.  It also leads them to brush off a fact long considered critical in finding unpaid student internships to be legal – the students' receipt of academic credit.  Over one hundred colleges have independently determined that Hearst's internships are worthy of academic credit; indeed, one Opt-In Plaintiff's academic advisor specifically urged her to pursue an internship with Hearst.  Of those, some even require

students to complete an internship in order to graduate; others prohibit students from receiving

pay (which is true for another Opt-In, even though she is now suing for payment).  The Supreme

Court has stated that courts are not in a position to second-guess the academic judgment of

colleges.  Plaintiffs provide no basis to do so here.  Plaintiffs' assertion of 366 alleged material

facts and their attachment of more than 3000 pages of exhibits belie their contention that all the

Court needs to know is that each student did some productive work during her internship to

warrant summary judgment and class certification.  The record makes clear that this cannot be

done on a representative basis in this case.

     The bigger picture obscured by plaintiffs is that these internships are desirable learning

opportunities for college students who have not yet entered the job market.  These students all

knew in advance that their internships would be unpaid, they knew the internships were limited

to those who could earn academic credit, they knew the internships were of short duration

spanning a semester or summer vacation, and they knew there was no job waiting for them at the

end.  They accepted all of these terms willingly, coming for their own purposes to gain insights

and experiences not obtainable in a classroom.  The students typically made their internships

work for them, revolving their hours around class obligations and other commitments, some

interning for as little as one day a week.  These internships exposed them to an exciting

workplace environment and possible career path while also earning them academic credit.  That

the students undertook these internships for their own purposes, and found them valuable, by and

large, is reflected in almost 100 declarations voluntarily submitted by former interns.

     The Supreme Court made clear long ago that the wage and hour laws may not be read to

foreclose unpaid learning opportunities for those who seize them for their own purposes.  This is

true even if those opportunities involve the performance of work.  And it is particularly true, the

Court stressed in *Walling*, for those with "so little experience in particular vocations that they are unable to get and hold jobs at standard wages." 330 U.S. at 151. This is exactly the case with the interns at issue here, who undertook the internships for their own purposes, as students earning credit, seeking basic experience in a vocation where they had little or none, to help them prepare for a job after graduation. It is axiomatic that plaintiffs' proposed standard, which would transform every intern into an employee, would also foreclose countless learning and training opportunities for the student interns who seek them out. In this way, plaintiffs' standard goes against the very purpose and policy that animates the wage and hour laws. Their legal claims defy both law and logic. And their motions cannot withstand the facts. Plaintiffs' motions for summary judgment and class certification should be denied.

## COUNTER-STATEMENT OF FACTS

The sworn testimony in this case, from 136 declarations and 60 depositions (51 from former interns), establishes that 19 diverse Hearst magazines host independent unpaid internship programs, with interns in more than 100 different magazine departments experiencing unique internships. For some, their internship remains "one of the most rewarding experiences [they've] ever had."[1] Others say they learned nothing.[2] Plaintiffs' suggestion that all 3000 internships during the six year class period were substantially the same is belied by the evidence in this case.

**I.     Hearst's 19 Diverse Magazines And Multiple Magazine Departments Operate Independent, Varied Internship Programs**

Nineteen of Hearst's twenty U.S. magazine titles have had unpaid internship programs during the past six years.[3] Each magazine contains several non-uniform departments ranging

---

[1] Declaration of Kristina E. Findikyan dated March 18, 2013 (hereinafter "F.D.") at Ex. 26 (Chiang) ¶ 6.

[2] F.D. Ex. 174 (Wagster Tr.) 145:23-146:2; 113:7-11.

[3] These include Cosmopolitan, Country Living, Elle, Elle Décor, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, O, The Oprah Magazine, Popular

from photography to art to marketing, sales, features and the like.  Depending on their content, certain magazines make finer distinctions among departments.[4]  A number of magazine corporate departments also have unpaid internship programs.[5]  Together, there are more than 100 different magazine departments that likely had unpaid interns in the past six years.

The precise number of unpaid interns, including the location and the department, is unknown because each of the 19 magazines' departments and the corporate departments operate autonomously in running their internship programs.[6]  There is no central corporate control and no centralized, formal recordkeeping of intern information.[7]  Human Resources, one of the magazines' shared departments, exerts no control over these programs, but performs just two administrative functions: HR receives interns' letters of academic credit and ensures an intern is appropriately given a security badge to enter the building; and by request, HR assists a magazine

---

Mechanics, Redbook, Road & Track, Seventeen, Town&Country, Veranda and Woman's Day.  F.D. Exs. 1 (Abbey), 9 (Baugh), 10 (Baughman), 11 (Bauman); 12 (Bell);  19 (Cain), 21 (Carbone), 23 (Cazzola), 25 (Cheney), 33 (DelGuidice),  34 (DeLorenzo); 35 (Denholtz); 49 (Greenblatt); 50 (Greene), 51 (Grippo); 56 (Healy); 66 (Kakstys); 75 (Mariola), 81 (Mitnick), 91 (Officer), 94 (Perri); 102 (Riess), 107 (Rockefeller), 112 (Rosengarten), 115 (Rubin), 116 (Rubinstein), 122 (Schmidt), 123 (Scrymser), 131 (Smith), 130 (Soucy); 133 (S. Sullivan), 137 (Truelove) [*collectively, and hereinafter,* "F.D. Managing Editor Decls."]; Car & Driver has not had any unpaid interns since 2001.  F.D. Ex. 4 (Alterman) ¶ 4.  Many of Hearst's magazines have offices located in New York, some also have offices in California, others in Chicago, where participating students intern. *See* F.D. Exs. 40 (Dziedzina) ¶ 2; 39 (Dunn) ¶ 3; 55 (Harris) ¶ 3; 68 (Kohen) ¶ 2; 77 (McCoy) ¶ 3.

[4] Harper's Bazaar, for example, has not only a Features department but also a Fashion Features department.  F.D. Ex. 112 (Rosengarten) ¶¶ 5, 10, 11.

[5] These include Human Resources, Brand Development, Integrated Media, Digital Media, Digital Studio (Studio D), Controller's Office and Consumer Marketing.  F.D. Ex. 106 (Roberts) ¶ 5.

[6] *See* F.D. Exs. 106 (Roberts) ¶ 3; 165 (Roberts I Tr.) 44:2-13; F.D. Managing Editor Decls. Indeed, plaintiffs concede they know nothing of the details of internships at magazines other than the one at which they interned, and even very little of internships in departments other than their own at the same magazine. *See* F.D. Exs. 158 (Leszuk Tr.) 117:2-118:19 (describing lack of knowledge about internships other than her own); 159 (Mancini Tr.) 99:10-101:22, 104:12-110:17; 161 (Rappaport Tr.) 41:21-42:18; 170 (Skorka Tr.) 73:18-75:4; 171 (Spencer Tr.)  81:19-88:10 (describing lack of specific knowledge re: internships at other magazines); 174 (Wagster Tr.) 65:21-67:22 (no personal knowledge of other internships); 175 (Wang Tr.) 102:5-14 (only interns knew what interns were doing at Harper's Bazaar); 176 (Wheels Tr.) 74:17-77:9, 78:12-25 (doesn't know what other interns did at magazines or what magazines had interns).

[7] F.D. Exs. 106 (Roberts) ¶ 3; 166 (Roberts II Tr.) 57:15-58:7.

department by posting its internship opportunity on various websites and forwarding any resumes received to the magazine.[8]

Devoid of central control, each magazine and department individually determines how many interns it will host in a particular semester, and during some periods of the year various departments have no interns.[9]  Each independently interviews and selects its interns,[10] and also independently coordinates directly with the student the days and hours the student wishes to intern, based on the student's academic schedule (and, in some cases, course requirements).[11]  Some students intern as little as one day/week,[12] some two or three days,[13] others wish to intern five days a week, often during their summer break from school.[14]  While many internships last one academic semester, others are for shorter periods of time.[15]

---

[8] F.D. Ex. 57 (Helmus) ¶ 5.

[9] See, e.g., F.D. Exs. 11 (Bauman) ¶ 6; 12 (Bell) ¶ 4; 17 (Burfield) ¶¶ 11, 13 (when no interns for about three months, marketing department accomplishes its tasks within regular hours); 25 (Cheney) ¶ 8; 44 (Feil) ¶ 10 (there are times of the year when there are no interns, hours and workloads for magazine staff do not increase, and staff chose not to have second part-time intern because they didn't have enough projects to keep the student meaningfully involved); 37 (Diegel) ¶ 6 ("we often have no interns at all"); 59 (Hilmantel) ¶ 13; 58 (Henderson) ¶ 9; 66 (Kakstys) ¶ 5; 86 (Neilon) ¶ 8 (several times a year no interns and no intern in fall 2012); 50 (Greene) ¶ 5; 133 (S. Sullivan) ¶ 8.

[10] See, e.g., F.D. Exs. 17 (Burfield) ¶ 5; 105 (Ritterbeck) ¶ 9; 1 (Abbey) ¶ 9; 9 (Baugh) ¶ 7; 12 (Bell) ¶ 5; 21 (Carbone) ¶ 8; 35 (Denholtz) ¶ 6; 50 (Greene) ¶ 7; 75 (Mariola) ¶ 6; 112 (Rosengarten) ¶ 5; 123 (Scrymser) ¶ 8; 131 (Smith) ¶ 4.

[11] See, e.g., F.D. Exs. 28 (Cleaver) ¶ 4; 37 (Diegel) ¶ 5 (each intern sets his or her own hours based on their interests, availability and other commitments); 95 (Piwko) ¶ 5; 114 (Rothman) ¶ 4; see also 11 (Bauman) ¶ 6; 50 (Greene) ¶ 6; 56 (Healy) ¶ 8; 66 (Kakstys) ¶ 7; 91 (Officer) ¶ 4; 115 (Rubin) ¶ 5; 133 (S. Sullivan) ¶ 8.

[12] F.D. Ex. 8 (Barker) ¶¶ 2-3; 68 (Kohen) ¶¶ 2-5; 96 (Pozsonyi) ¶¶ 3, 4.

[13] See, e.g., F.D. Ex. 8 (Barker) ¶¶ 2, 7-8; 24 (Chelak) ¶ 6; 38 (Dotson) ¶¶ 3-4; 85 (Neckles) ¶¶ 2, 4; 86 (Neilon) ¶ 4; 98 (Ramirez) ¶¶ 3, 4; 119 (Saltzman) ¶ 5; 128 (Snowden) ¶ 4; 140 (Yale) ¶ 5.

[14] F.D. Exs. 14 (Brodley) ¶ 4; 36 (DeWitt) ¶ 8; 42 (Faucett) ¶¶ 2, 5; 43 (Fazio) ¶¶ 3, 5; 44 (Feil) ¶¶ 3-4; 93 (Perle) ¶ 4.

[15] F.D. Exs. 13 (Berard) ¶ 3 (six weeks); 14 (Brodley) ¶ 3 (6 weeks); 61 (Hunt) ¶¶ 3-4 (3 weeks); 89 (Niemiec) ¶¶ 3-4 (4 to 5 weeks); 92 (Park) ¶ 3 (2.5 weeks).

The more than 100 different magazine departments share only 3 common elements. First, it is undisputed that each intern understood prior to the start of their internship that it was an unpaid position.[16] This was communicated in a variety of ways, including through internship postings at their universities and online, and by magazine staff during interviews for the internship.[17] Each intern in the proposed class applied for and accepted an unpaid internship and was free to end their magazine internship at any time.[18] Interns sought these positions for their own benefit and advantage such as to fulfill a graduation requirement, get first-hand experience in a magazine or particular department, to cultivate professional connections, and more.[19]

Second, Hearst sought confirmation that interns would receive college credit for the internships.[20] Each Hearst magazine and department required prospective interns to submit a letter or other proof from a post-secondary institution stating that the student would receive

---

[16] *See* F.D. Exs. 2, 3, 5-9, 13, 14, 16-18, 20, 22, 24, 26, 28-32, 37, 38-49, 52-56, 59-65, 67-73, 76-80, 82, 85-90, 92, 93, 95-101, 103-105, 108-111, 113-117, 119-121, 124-126, 128, 132, 134-136, 138-141; 158 (Leszuk Tr.) 130:5-13; 74 (Mancini) ¶ 21; 159 (Mancini Tr.) 114:20-116:5, 161 (Rappaport Tr.) 99:2-13; 127 (Skorka) ¶ 12; 170 (Skorka Tr.) 81:11-20; 171 (Spencer Tr.) 91:8-10; 174 (Wagster Tr.) 74:14-16; 175 (Wang Tr.) 136:20-137:5; Ex. 176 (Wheels Tr.) 90:8-10. While there are a handful of small paid internship programs through certain Hearst magazines and departments, Plaintiffs have limited the proposed class to unpaid interns. *See* Pl. Br. at 2, 40.

[17] *See, e.g.*, F.D. Exs. 2 (Afuang) ¶ 4 (interview); 29 (Corbett) ¶ 3 (application process and interview); 105 (Ritterbeck) ¶ 3 (initial application process); 121 (Santucci) ¶ 3 (ed2010.com and interview); 18 (Cacich) ¶ 4; *see also* Bien Decl. Ex. 208-211, 217, 219-221, 223-232; 234, 235, 237-240, 249, 255, 257, 258 (internship postings indicate unpaid).

[18] *See, e.g.,* F.D. Exs. 175 (Wang Tr.) 137:3-5; 159 (Mancini Tr.) 114:20-116:5; 176 (Wheels Tr.) 90:8-10; 108 (Rodriguez I) ¶ 3. Opt-in plaintiff Wagster did leave. *See* F.D. Ex. 174 (Wagster Tr.) 161:25-162:23.

[19] *See, e.g.*, F.D. Exs. 2 (Afuang) ¶ 3; 5 (Anderson) ¶ 3; 6 (Andrews) ¶ 3; 20 (Caldwell) ¶ 3; 39 (Dunn) ¶ 3; 40 (Dziedzina) ¶ 3; 42 (Faucett) ¶ 3; 46 (Fisher) ¶ 3; 71 (Lindig) ¶ 3; 79 (Mevorach) ¶ 3; 87 (Nelson) ¶ 3; 88 (Nhan) ¶ 3; 89 (Niemiec) ¶ 3; 90 (Novello) ¶ 4; 92 (Park) ¶ 3; 97 (Pratt) ¶ 3; 98 (Ramirez) ¶ 3; 110 (Roelant) ¶ 3; 132 (C. Sullivan) ¶ 3; 136 (Tomlinson) ¶ 4; 141 (Zick) ¶ 3. Indeed, none of the opt-in plaintiffs accepted their internships for the purpose of seeking wages. *See* F.D. Exs. 158 (Leszuk Tr.) 130:5-13; 74 (Mancini) ¶¶ 19, 21; 159 (Mancini Tr.) 114:20-116:5, 161 (Rappaport Tr.) 99:2-13; 127 (Skorka) ¶ 12; 170 (Skorka Tr.) 81:11-20; 171 (Spencer Tr.) 91:8-10; 174 (Wagster Tr.) 74:14-16; 175 (Wang Tr.) 136:20-137:5; 176 (Wheels Tr.) 90:8-10.

[20] *See* F.D. Exs. 57 (Helmus) ¶ 3; 106 (Roberts) ¶ 3.

academic credit for the internship.[21]  Many interns received academic credit; others flouted this

requirement.[22]

Over 100 different colleges and universities have awarded credit to unpaid interns at

Hearst's magazines.[23]  Many of the interns' universities required that the students complete an

internship to graduate;[24] others "strongly recommended" or encouraged an internship.[25] To

receive credit for their internships at Hearst magazines, in addition to the time spent at the

internship, some universities required students to write academic papers and complete other

school projects,[26] maintain and submit journals of internship activities,[27] attend classes,[28] or

---

[21] F.D. Exs. 57 (Helmus) ¶ 3; 166 (Roberts Tr. II) 35:6-12; *see also, e.g.,* F.D. Exs. 1 (Abbey) ¶ 7;  9 (Baugh) ¶ 4; 17 (Burfield) ¶ 5; 10 (Baughman) ¶ 6; 12 (Bell) ¶ 5; 19 (Cain) ¶ 5; 21 (Carbone) ¶ 4; 23 (Cazzola) ¶  6; 33 (DelGuidice) ¶ 3; 35 (Denholtz) ¶ 4; 49 (Greenblatt) ¶ 3; 51 (Grippo) ¶5; 66 (Kakstys) ¶ 7; 75 (Mariola) ¶ 4; 94 (Perri) ¶ 5; 102 (Riess) ¶ 3; 107 (Rockefeller) ¶ 6; 115 (Rubin) ¶ 6; 116 (Rubinstein) ¶ 5; 123 (Scrymser) ¶ 4; 131 (Smith) ¶ 5; 133 (S. Sullivan) ¶ 7; 137 (Truelove) ¶ 4.

[22] *Compare, e.g.,* F.D. Exs. 171 (Spencer Tr.) 104:12-19 (received credit); 170 (Skorka Tr.) 88:10-14 (same); 158 (Leszuk Tr.) 155:24-156:2 (same); 161 (Rappaport Tr.) 45:12-46:8 (same); *with* F.D. Exs. 175 (Wang Tr.) 157:25-158:20, 152:24-157:24 (Wang provided credit letter but was not awarded credit); 159 (Mancini Tr.) 128:17-19 (Mancini did not receive credit); 174 (Wagster Tr.) 77:6-21 (provided document showing eligible for credit but did not receive credit); *see also* F.D. Ex. 109 (Rodriguez Supp. Decl.) ¶ 3.

[23] F.D. Exs. 57 (Helmus) ¶ 4; 118 (Rush) ¶¶ 4-9.

[24] *See, e.g.,* F.D. Exs. 2 (Afuang) ¶ 3; 5 (Anderson) ¶ 3; 6 (Andrews) ¶ 3; 20 (Caldwell) ¶ 3; 39 (Dunn) ¶ 4; 40 (Dziedzina) ¶ 3; 42 (Faucett) ¶ 3; 46 (Fisher) ¶ 3; 69 (Kommer) ¶3; 71 (Lindig) ¶ 3; 79 (Mevorach) ¶ 3; 87 (Nelson) ¶ 3; 88 (Nhan) ¶ 3; 89 (Niemiec) ¶ 3; 90 (Novello) ¶ 4; 92 (Park) ¶ 3; 97 (Pratt) ¶ 3; 98 (Ramirez) ¶ 3; 110 (Roelant) ¶ 3; 132 (C. Sullivan) ¶ 4; 136 (Tomlinson) ¶ 4; 141 (Zick) ¶ 3; 158 (Leszuk Tr.) 134:10-17; 156:3-8; 158:17-159:3.

[25] *See, e.g.,* F.D. Exs. 44 (Feil) ¶ 3; 58 (Henderson) ¶ 3; 59 (Hilmantel) ¶ 3; 62 (Hutzler) ¶ 3; 68 (Kohen) ¶ 2; 70 (Kristensen) ¶ 2; 80 (Miller) ¶ 3; 84 (Nagi) ¶ 5; 104 (Riordan) ¶ 3; 134 (Taylor) ¶ 2; 135 (Thomas) ¶ 3. Opt-in plaintiff Skorka's college specifically recommended a Hearst magazine internship. F.D. Ex. 170 (Skorka Tr.) 133:14-22; *see also* F.D. Ex. 77 (McCoy) at ¶ 3; 160 (McCoy Tr.) 12:5-16.

[26] *See, e.g.,* F.D. Exs. 3 (Ajlouni) ¶ 4; 6 (Andrews) ¶ 4; 7 (Bailey) ¶ 3; 8 (Barker) ¶ 2; 13 (Berard) ¶ 3; 16 (Buchalter) ¶¶ 3, 7; 18 (Cacich) ¶ 3; 22 (Cavallaro) ¶ 3; 30 (Critides) ¶ 3; 31 (Cubria) ¶ 4; 32 (Degnan) ¶ 3; 38 (Dotson) ¶ 3; 39 (Dunn) ¶ 4; 40 (Dziedzina) ¶ 3; 43 (Fazio) ¶ 4; 44 (Feil) ¶ 3; 45 (Feuer) ¶ 3; 46 (Fisher) ¶ 3; 48 (Gonzalez) ¶ 4; 52 (Groher) ¶ 4; 53 (Hackel) ¶ 3; 58 (Henderson) ¶ 3; 59 (Hilmantel) ¶ 3; 60 (Holiver) ¶ 4; 61 (Hunt) ¶ 3; 62 (Hutzler) ¶ 3; 63 (Johns) ¶ 4; 64 (Johnson) ¶ 3; 71 (Lindig) ¶ 3; 77 (McCoy) ¶ 3; 78 (Melvin) ¶ 4; 85 (Neckles) ¶ 3; 88 (Nhan) ¶ 4; 95 (Piwko) ¶ 3; 100 (Richard) ¶ 3; 101 (Rickert) ¶ 3; 104 (Riordan) ¶ 3; 105 (Ritterbeck) ¶ 3; 108 (Rodriguez) ¶ 3; 110 (Roelant) ¶ 4; 111 (Roselli) ¶ 3; 113 (Ross) ¶ 3; 117 (Rud) ¶ 3; 120 (Salzberg) ¶ 3; 124 (Senaydin) ¶ 3; 125 (Shapiro) ¶ 3; 126 (Simmons) ¶ 3; 132 (C. Sullivan) ¶ 4; 136 (Tomlinson) ¶ 4; 139 (Williams) ¶ 3; 140 (Yale) ¶ 4.

[27] *See, e.g.,* F.D. Exs. 3 (Ajlouni) ¶ 4; 13 (Berard) ¶ 3; 29 (Corbett) ¶ 3; 30 (Critides) ¶ 3; 32 (Degnan) ¶ 3; 38 (Dotson) ¶ 4; 39 (Dunn) ¶ 4; 43 (Fazio) ¶ 4; 46 (Fisher) ¶ 3; 48 (Gonzalez) ¶ 4; 52 (Groher) ¶ 4; 55 (Harris) ¶ 4; 60 (Holiver) ¶ 4; 63 (Johns) ¶ 4; 70 (Kristensen) ¶ 3; 77 (McCoy) ¶ 3; 80 (Miller) ¶ 3; 84 (Nagi) ¶ 5; 101 (Rickert) ¶ 3;

write blog posts about their internships.[29]  Some universities graded students on their

internships,[30] and some required completed evaluations by the intern's supervisor at Hearst.[31]

Because the students were receiving academic credit for their internships, some

universities prohibited the students from receiving any payment for their internship

experiences.[32]  Indeed, one intern testified that she viewed her internship as a class and the

receipt of academic credit towards her major as a form of payment for her internship.[33]  Many

interns confirmed that their internships provided the learning experience the magazines intended

to offer and that those opportunities could not be gained in school, impacting their college

coursework in a positive way;[34] others denied any such benefit.[35]

---

103 (Rinder) ¶ 3; 104 (Riordan) ¶ 3; 108 (Rodriguez) ¶ 3; 110 (Roelant) ¶ 4; 111 (Roselli) ¶ 3; 125 (Shapiro) ¶ 3; 128 (Snowden) ¶ 3; 132 (C. Sullivan) ¶ 4; 134 (Taylor) ¶ 3; 136 (Tomlinson) ¶ 4.

[28] *Compare* F.D. Exs. 60 (Holiver) ¶ 4; 77 (McCoy) ¶ 3; 85 (Neckles) ¶ 3; 101 (Rickert) ¶ 3; 105 (Ritterbeck) ¶ 3 *to* F.D. Ex. 31 (Cubria) ¶ 11 (college professor waived requirement that she complete news-oriented web class as part of journalism minor because she was so well-versed in online media as a result of her Seventeen magazine internship).

[29] *See, e.g.*, F.D. Exs. 53 (Hackel) ¶ 3; 62 (Hutzler) ¶ 3.

[30] *See, e.g.*, F.D. Exs. 22 (Cavallaro) ¶ 3; 43 (Fazio) ¶ 4; 45 (Feuer) ¶ 3; 46 (Fisher) ¶ 3; 48 (Gonzalez) ¶ 4; 52 (Groher) ¶ 4; 53 (Hackel) ¶ 3; 63 (Johns) ¶ 4; 64 (Johnson) ¶ 3; 73 (Lovaglio) ¶ 3; 80 (Miller) ¶ 3; 85 (Neckles) ¶ 3; 87 (Nelson) ¶ 3; 95 (Piwko) ¶ 3; 108 (Rodriguez) ¶ 3; 128 (Snowden) ¶ 3; 132 (C. Sullivan) ¶ 4.

[31] *See, e.g.*, F.D. Exs. 48 (Gonzalez) ¶ 4; 59 (Hilmantel) ¶ 3; 72 (Lokuta) ¶ 3; 73 (Lovaglio) ¶ 3; 111 (Roselli) ¶ 3; 117 (Rud) ¶ 3.

[32] F.D. Exs. 84 (Nagi II) ¶ 5; 104 (Riordan) ¶ 3; 161 (Rappaport Tr.) 113:18-114:3; 194 (Rappaport Dep. Ex. 9).

[33] F.D. Ex. 163 (Riordan Tr.) 30:4-14.

[34] F.D. Exs. 65 (Kahn) ¶ 12 (internship influenced course selection and gave useful examples for topics later learned about in school); 80 (Miller) ¶ 11 (wrote school paper about emergence of iPad and tablets in magazines, based on her internship); 55 (Harris) ¶ 12 (gained knowledge that helped in college media class); 64 (Johnson) ¶ 9 (gained knowledge could not have gained in school); 3 (Ajlouni) ¶ 13 (internship taught how to better communicate, present ideas more effectively and to allocate responsibilities and expectations on group projects); 63 (Johns) ¶ 11 (internship created bridge between college classes and made the big picture make sense); 7 (Bailey) ¶ 13 (internships helpful when student returned to school); 8 (Barker) ¶ 10 (Studio D internship enhanced school performance); 18 (Cacich) ¶ 11 (internship helpful in college by showing how magazine and newspaper writing differ and improved writing skills); 22 (Cavallaro) ¶ 9; 32 (Degnan) ¶ 6 (internship complemented English and literature studies by "allowing me to explore my creative side because it focused more on styling than on writing…. [My internship] provided me with the kind of firsthand, real-world experience that I never would have encountered in my English classes."); 36 (DeWitt) ¶10 (internship "filled hole" in coursework);  40 (Dziedzina) ¶ 7 (internship helped in public relations classes and enhanced creative thinking skills); 43 (Fazio) ¶ 10 (internships made more driven and focused

The third common element to all internships was that there was no promise or expectation of a job following the conclusion of the internship.  Numerous interns testified that they knew prior to the start of their internship that there would be no guarantee of a job or job reference, but hoped that the relationships formed during the internship would lead to a reference in the future.[36]  No intern testified that she was promised or otherwise told that she would receive a job at the end of her internship, nor were the vast majority of interns qualified for many entry-level jobs.

The similarities among internships end beyond the facts that each internship was unpaid, was supposed to be for academic credit, and did not contain a promise of a job upon its completion.

## II.    Each Intern Had A Unique Internship Experience

---

in classes, grades improved in classes with marketing component where she directly applied knowledge gained during internship); 48 (Gonzalez) ¶ 10 (internship contributed to classroom learning); 53 (Hackel) ¶ 9 (internship had positive impact on coursework, strengthened performance in magazine editing and design classes, and made student more motivated); 54 (Hard) ¶ 9 (internship experience helped with  senior thesis); 59 (Hilmantel) ¶ 7 (viewed editors with more legitimacy than professors because of real world experience); 60 (Holiver) ¶ 9 (internship gave context to advertising terms heard in classroom); 72 (Lokuta) ¶ 8 (internship helped student succeed in media management graduate courses); 78 (Melvin) ¶ 11 (internship inspired student to take journalism classes with marketing focus, immersion in digital media and skills learned benefited schoolwork); 92 (Park) ¶ 7 (design experience improved performance in graphic design classes); 95 (Piwko) ¶ 3 (internship contributed to student's ability to graduate in three years); 111 Roselli ¶ 9 (internship improved writing skills and performance in journalism classes); 132 (Sullivan) ¶ 7 (was able to use real-world examples from internship in classroom); 139 (Williams) ¶ 7 (internship provided perspective, had better understanding of why professors included certain media-related subjects); 140 (Yale) ¶ 12 (internship experiences helped student offer insights from her internship to college group projects; gave student "glimpse into the real-world application of the conceptual theories" she studied in college); 170 (Skorka Tr.) 135:11-20 (opt-in's experience was educational and supplemented school performance); 118 (Rush Decl.) ¶¶ 4-5.

[35] F.D. Ex. 174 (Wagster Tr.) 113:7-11, 145:23-146:2.

[36] *See, e.g.,* F.D. Exs. 2 (Afuang) ¶ 3 (Ajlouni) ¶ 5; 6 (Andrews) ¶ 4; 18 (Cacich) ¶ 4; 22 (Cavallaro) ¶ 4; 31 (Cubria) ¶ 13; 32 (Degnan) ¶ 10; 36 (DeWitt) ¶ 10; 39 (Dunn) ¶ 5; 40 (Dziedzina) ¶ 3; 42 (Faucett) ¶ 4; 43 (Fazio) ¶ 5; 45 (Feuer) ¶ 4; 48 (Gonzalez) ¶ 5; 52 (Groher) ¶ 5; 54 (Hard) ¶ 3; 60 (Holiver) ¶ 5; 63 (Johns) ¶ 5; 65 (Kahn) ¶ 5; 67 (Klotzman) ¶ 3; 68 (Kohen) ¶ 4; 70 (Kristensen) ¶ 4; 76 (McCloskey) ¶ 8; 82 (Mullins) ¶ 4; 89 (Niemiec) ¶ 7; 95 (Piwko) ¶ 4; 110 (Roelent) ¶ 5; 111 (Roselli) ¶ 3; 117 (Rud ) ¶ 4; 119 (Saltzman) ¶ 4; 121 (Santucci) ¶ 7; 126 (Simmons) ¶ 4; 132 (C. Sullivan) ¶ 5; 136 Tomlinson ¶ 5; 139 (Williams) ¶ 7; 140 (Yale) ¶ 5; 141 (Zick) ¶ 10; *see also* F.D. Exs.158 (Leszuk Tr.) 136:13-19; 159 (Mancini Tr.) 113:9-11, 114:12-19, 114:20-116:5; 161 (Rappaport Tr.) 107:3-6; 170 (Skorka Tr.) 86:5-7; 171 (Spencer Tr.) 171:5-11; 174 (Wagster Tr.) 74:14-16, 86:16-18; 175 (Wang Tr.) 200:11-18; 176 (Wheels Tr.) 95:11-13; *see generally* F.D. Exs. Managing Editor Decls.

### A.      Each Intern Benefitted In Different Ways

Each magazine and corporate department intended to provide experiential learning opportunities to students as part of its internship program.[37]  Each intern's experience was influenced by the responsibilities and focus of the host department, the approach taken by that department, the amount of training and supervision provided, and the tangible and intangible benefits the intern received.

The distinct editorial focus and function of each of the 19 magazines and magazine corporate departments initiates the diversity in each internship.  The editorial pages of Cosmopolitan magazine featuring provocative content about relationships, pop culture and entertainment for women[38] differ from the laboratories of the Good Housekeeping Research Institute testing products ranging from home appliances to food,[39]  which differ from the personnel work of Human Resources,[40] and from the activities of the magazines' Consumer

---

[37] *See, e.g.,* F.D. Exs. 1 (Abbey) ¶ 13 (goal is for interns to be provided with collaborative hands-on training and guidance 100% of interns' hours);  17 (Burfield) ¶ 4 ("The purpose of offering internships at Hearst Digital Media is to teach students about marketing, offer a glimpse into the inner workings of our digital business, and provide them with real-world experience and networking opportunities which we hope helps students determine their professional interests, including whether they want to pursue a career in marketing or magazines."); 9 (Baugh) ¶ 12 (opportunity to experience magazine publishing from inside through meaningful assignments);  10 (Baughman) ¶ 14 (internship goal is to provide opportunity to young people to acquire crucial skills to prepare for employment); 19 (Cain) ¶ 14 (primary goal to provide interns with experiences could not get in classroom); 21 (Carbone) ¶ 14 (internships teach enhanced skills and provide opportunities to show leadership, and train with real-world magazine professionals); 25 (Cheney) ¶ 12 (goal is to provide training and learning 100% of the time) ; 50 (Greene) ¶ 11 (interns spend majority of time on projects that give a glimpse into magazine);  51 (Grippo) ¶¶ 4, 16 (provide students with opportunity to learn about magazines); 107 (Rockefeller) ¶ 10 (goal to mentor students who are interested in business aspects of magazine industry); 112 (Rosengarten) ¶ 19 (committed to providing young people with real world experience; give firsthand knowledge of magazine operations); 115 (Rubin) ¶ 8 (magazine goal is for interns to learn, train and get sense of the business side of publishing); 123 (Scrymser) ¶12;  122 (Schmidt) ¶ 10 (learn about aspects of magazine industry they might not have thought of before); 131 (Smith) ¶ 6 (give interns opportunity to learn magazine business through first-hand experience); 137 (Truelove) ¶ 6.

[38] F.D. Ex. 50 (Greene) ¶ 2.

[39] F.D. Ex. 123 (Scrymser) ¶ 6.

[40] F.D. Exs. 154 (Helmus Tr.) 99:18-101:1; 2 (Afuang) ¶¶ 6-8 (learned how to structure and effectively conduct interviews with job applicants and also how to conduct reference checks).

Marketing department.[41]  Interns' tasks and overall experiences also varied from magazine to magazine, department to department, and from intern to intern.  For example:

- Prominent professional photographer Philip Friedman took a Studio D intern "under his wing," where she trained in all aspects of the photo shoot and learned fine points unique to still life photography, how to style models and still-life subjects and "gained confidence in [her] own attempts to do so."  F.D. Ex. 8 (Barker) ¶ 9.  By contrast, plaintiff Diana Wang attended a photo shoot but received no such personal attention. F.D. Ex. 175 (Wang Tr.) 93:12-94:12.

- As head accessories intern, Wang directed other interns by coordinating the pick-up, storage and return of the accessories Harper's Bazaar considered featuring in the magazine.[42]  No other intern had such responsibilities.

- A Good Housekeeping Research Institute intern learned to test consumer electronics products such as toys, toothbrushes and light bulbs in the lab, following the Institute's scientific methodology.  F.D. Ex. 110 (Roelant) ¶ 7.

- A Harper's Bazaar ad sales intern shadowed the magazine's Jewelry and Watch Director on sales calls to the important JA NY Jewelry Trade Show to learn sales techniques and gain introductions to industry contacts. F.D. Ex. 58 (Henderson) ¶ 5.   Opt-in plaintiff Leszuk also interned in sales, but did not attend any sales calls. F.D. Ex. 158 (Leszuk Tr.) 66:9-16; 71:13-18.

- In "[o]ne of the best learning experiences during [her] summer," a Veranda marketing intern assisted in the planning of the magazine-sponsored Greenwich Garden Tour, attended the Connecticut event with her supervisor and wrote the first draft of the event recap, which was edited and published. F.D. Ex. 78 (Melvin) ¶ 8. Opt-in Matthew Wagster attended an Esquire event, but said he didn't learn "anything." F.D. Ex. 174 (Wagster Tr.) 103:3-104:5, 113:2-11.

- A Cosmopolitan features intern researched the 2008 Presidential candidates' stances on issues and interviewed the most winning female Jeopardy contestant. F.D. Ex. 59 (Hilmantel) ¶ 6 (wrote article and received byline in magazine).

- A Woman's Day beauty & style department intern assisted in the fashion closet, attended "run-throughs" where editors set out clothing for consideration in the magazine, conducted research, shadowed staff at "desksides" with publicists,

---

[41] F.D. Ex. 43 (Fazio) ¶¶ 5, 6 ("My first summer was spent learning about the promotional side of the consumer marketing business; my second focused more on the circulation side, and included the opportunity to get a view into the higher levels of the department and the company through my shadowing of Beth.")

[42] F.D. Ex. 112 (Rosengarten) ¶ 6; 145 (Broekema Tr.) 83:18-20, 85:7-17; *see also id*. F.D. Ex. 15 (Broekema) ¶ 10.

attended photo shoots, and drafted an article with the editorial department.  F.D. Ex. 36 (DeWitt) ¶¶ 5-6.

• An Oprah Magazine digital intern helped with content management on the magazine's website by adding articles and images from O print issues to the web using HTML coding and other web techniques she was taught by her internship supervisor. F.D. Ex. 101 (Rickert) ¶¶ 5, 9.

Training is a central feature of each internship program but they vary in their approach. Some intern programs offer formal educational seminars.  For instance, some magazine departments pay for their interns to attend Magazine University, an off-site summer seminar series presented by MPA – The Association of Magazine Media – in which interns learn about all aspects of magazine publishing.[43]  Harper's Bazaar instead provides a series of weekly seminars called "Bazaar Backstage" on various topics relating to the magazine business.[44]  In Cosmopolitan's "Cosmo U," advertising sales and marketing interns hear from editors about their career paths; other Cosmopolitan interns are offered less frequent meetings.[45]  Food Network Magazine offers a "Star in Training" program for advertising sales interns in which they learn about how the magazine is produced, but no organized training for interns in other departments.[46]  ELLE, Esquire, Redbook, Seventeen and Woman's Day host lunch sessions with speakers.[47]  Some magazines and departments have no formal training programs at all.[48]

---

[43] *See* F.D. Exs. 3 (Ajlouni) ¶ 11; 16 (Buchalter) ¶ 7; 43 (Fazio) ¶ 8; 44 (Feil) ¶ 9; 45 (Feuer) ¶ 8; 65 (Kahn) ¶ 11; 80 (Miller) ¶ 9; 104 (Riordan) ¶ 6; *see also* F.D. Exs. 23 (Cazzola) ¶ 8; 115 (Rubin) ¶ 11; 49 (Greenblatt) ¶ 10.

[44] *See* F.D. Exs. 58 (Henderson) ¶ 6; 41 (Elser) ¶ 5; 91 (Officer) ¶ 9; 124 (Senaydin) ¶ 7; 125 (Shapiro) ¶ 7; 126 (Simmons) ¶ 7; 169 (Simmons Tr.) 89:10-22.

[45] *See* F.D. Exs. 7 (Bailey) ¶ 7; 13 (Berard) ¶ 5; 143 (Berard Tr.) 124:21-125:6; 30 (Critides) ¶ 5; 50 (Greene) ¶ 10; 122 (Schmidt) ¶ 7; 105 (Ritterbeck) ¶ 6; 121(Santucci) ¶ 6; Bien Decl. Ex. 51 (Wheels Tr.) 78:7-11; 205:6-12; 205:20-206:24; Bien Decl. Ex. 43 (Spencer Tr.) 161:12-23; 190:10-14; 115:11-116:15.

[46] *See* F.D. Exs. 60 (Holiver) ¶ 7; 63 (Johns) ¶ 14; 157 (Johns Tr.) 113:9-114:23; 9 (Baugh) ¶¶ 7-12; 59 (Hilmantel) ¶¶ 9-12.

[47] *See* F.D. Exs. 1 (Abbey) ¶ 14; 7 (Bailey) ¶ 11; 18 (Cacich) ¶ 10; 29 (Corbett) ¶ 8; 32 (Degnan) ¶ 8; 36 (DeWitt) ¶ 9; 64 (Johnson) ¶ 7; 93 (Perle) ¶ 7; 128 (Snowden) ¶5; 132 (Sullivan) ¶ 6; 140 (Yale) ¶ 8; 178 (Yale Tr.) 14:12-21.

[48] *See, e.g.,* F.D. Exs. 123 (Scrymser) ¶ 9; 19 (Cain) ¶ 4.

Some programs permit interns to shadow staffers in their everyday activities, though the scope of shadowing opportunities varies from magazine to magazine, category to category, and manager to manager.  In some cases, departments design internships to be a "piggy back ride" around the department, providing an internship experience where shadowing predominates.[49]  In others, interns shadow staff  but also are given hands-on assignments so that they can develop practical skills.[50]  In still others, departments provide interns with little to no shadowing.[51] Differences in the shadowing opportunities available are common even within magazine categories: for example, while plaintiffs Wang and Rappaport testified that they had few, if any, shadowing opportunities in the fashion departments at Harper's Bazaar and Seventeen,[52] fashion interns at other titles such as ELLE, Good Housekeeping, TeenProm and Woman's Day are provided with regular opportunities to shadow and learn by observing their supervisors.[53] Indeed, even within the fashion department at Seventeen, where plaintiff Rappaport interned, the extent of intern shadowing experiences can vary dramatically.[54]

---

[49] *See* F.D. Exs. 43 (Fazio) ¶ 6; 152 (Fazio Tr.) 35:12-36:3; *see also* F.D. Exs. 8 (Barker) ¶ 9; 44 (Feil) ¶ 8; 85 (Neckles) ¶¶ 5-6.

[50] *See, e.g.,* F.D. Exs. 2 (Afuang) ¶¶ 5-6; 14 (Brodley) ¶¶ 5-6; 16 (Buchalter) ¶¶ 5-8; 18 (Cacich) ¶¶ 7-9; 20 (Caldwell) ¶¶ 5-6, 8-9; 24 (Chelak) ¶¶ 7-9; 36 (DeWitt) ¶¶ 5-7, 9; 37 (Diegel) ¶¶ 4-6; 179 (Diegel Tr.) 31:12-33:10 (describing typical intern day as involving shadowing and hands-on tasks); 39 (Dunn) ¶¶ 6-7; 42 (Faucett) ¶¶ 6-8; 45 (Feuer) ¶¶ 5-6; 47 (Friedlander) ¶¶ 5-7; 52 (Groher) ¶¶ 7-8; 153 (Groher Tr.) 61:10-65:11 (describing mix of shadowing and hands-on experience during internship); 53 (Hackel) ¶¶ 5-6; 58 (Henderson) ¶ 5; 63 (Johns) ¶¶ 7-8; 67 (Klotzman) ¶¶ 6-9; 73 (Lovaglio) ¶¶ 6-9; 78 (Melvin) ¶¶ 7-9; 82 (Mullins) ¶¶ 4-6; 88 (Nhan) ¶¶ 6-9; 90 (Novello) ¶¶ 6-8; 92 (Park) ¶¶ 5-6; 93 (Perle) ¶¶ 5, 6; 97 (Pratt) ¶¶ 6-9; 101 (Rickert) ¶¶ 5-7; 103 (Rinder) ¶¶ 5-6; 104 (Riordan) ¶¶ 5-6; 105 (Ritterbeck) ¶ 10; 110 (Roelant) ¶¶ 6-8; 111 (Roselli) ¶¶ 6-8; 114 (Rothman) ¶¶ 5-6; 120 (Salzberg) ¶¶ 5-9; 125 (Shapiro) ¶¶ 5-6, 8-10; 128 (Snowden) ¶¶ 5-7; 134 (Taylor) ¶¶ 6-11; 136 (Tomlinson) ¶¶ 7-8.

[51] *See, e.g.,* F.D. Exs. 6 (Andrews) ¶¶ 6-8; 7 (Bailey) ¶¶ 6, 11; 54 (Hard) ¶¶ 5-7; 68 (Kohen) ¶¶ 6-7; 70 (Kristensen) ¶¶ 5-6; 132 (Sullivan) ¶ 6; 135 (Thomas) ¶ 5-6.

[52] F.D. Exs. 175 (Wang Tr.) 248:9-250:2; 161 (Rappaport Tr.) 139:21-140:13, 126:9-13.

[53] *See* F.D. Exs. 36 (DeWitt) ¶¶ 5-7, 9; 38 (Dotson) ¶¶ 5-6; 18 (Cacich) ¶¶ 7-8; 68 (Kohen) ¶¶ 6-7; 100 (Richard) ¶¶ 5-6.

[54] *Compare* F.D. Ex. 161 (Rappaport Tr.) 105:15-24, 82:14-83:5, 126:9-13, 139:21-140:13; *with* 32 (Degnan) ¶¶ 5-7.

Some departments train interns by assigning them discrete tasks to learn more about the day-to-day activities of the magazine, while other departments design mock projects designed to broaden their interns' learning experience.  For example, in order to develop a feel for a magazine's brand "voice," some (but not all) editorial interns are given the chance to pitch stories,[55] while others might research and write short blurbs or blog posts.[56]  Other editorial interns are given the opportunity to conduct interviews to work on their interviewing skills.[57] Interns in the photo department at Redbook have been given the opportunity to put together mock photo shoots solely as a learning tool so that they can have the experience of doing a photo editor's job;[58] while some magazines' advertising sales and marketing interns are given a semester-long project wherein they create a "mock" advertising or marketing proposal, which they present at the end of their internship to the department staff.[59]  These projects are not typically used by the department or magazine in question, but are designed for interns to apply the concepts they are learning in their daily tasks on a larger scale.[60]

---

[55] *See* F.D. Exs. 7 (Bailey) ¶¶ 6,12; 29 (Corbett) ¶ 5; 31 (Cubria) ¶ 8; 37 (Diegel) ¶ 4; 59 (Hilmantel) ¶ 10; 155 (Hilmantel Tr.) 39:2-42:1; 62 (Hutzler) ¶ 6; 95 (Piwko) ¶ 7; 119 (Saltzman) ¶ 7; 111 (Roselli) ¶ 6.

[56] *See* F.D. Exs. 47 (Friedlander) ¶ 5; 90 (Novello) ¶ 7; 98 (Ramirez) ¶ 5; 113 (Ross) ¶ 5; 117 (Rud) ¶ 6; *see also* F.D. Exs. 54 (Hard) ¶ 6; 59 (Hilmantel) ¶ 6; 63 (Johns) ¶ 8; 88 (Nhan) ¶ 8; 97 (Pratt) ¶ 8.

[57] *See* F.D. Exs. 59 (Hilmantel) ¶ 6; 79 (Mevorach) ¶ 10; 93 (Perle) ¶ 5.

[58] *See* F.D. Exs. 67 (Klotzman) ¶ 8; 85 (Neckles) ¶ 6.

[59] *See, e.g.,* F.D. Exs. 16 (Buchalter) ¶ 8; 24 (Chelak) ¶8; 30 (Critides) ¶ 9; 43 (Fazio) ¶ 9; 45 (Feuer) ¶ 10; 52 (Groher) ¶ 8; 80 (Miller) ¶ 8; 102 (Riess) ¶ 15; 104 (Riordan) ¶ 7; 125 (Shapiro) ¶ 10; 126 (Simmons) ¶¶ 8-9; 169 (Simmons Tr.) 73:11-74:7; 140 (Yale) ¶¶ 9-10.

[60] *See, e.g.,* F.D. Exs. 22 (Cavallaro) ¶ 8 (beauty intern assigned research project on women sporting the "nude look" to teach her about audience and unique "voice" of Town & Country); 42 Faucett ¶ 9 (market and style intern at HGTV given various projects, "the sole purpose of which was to teach me about the job of a style editor and help develop my eye for a particular brand voice"); 59 (Hilmantel) ¶ 10; 62 (Hutzler) ¶ 6; 94 (Perri) ¶ 8;  102 (Riess) ¶ 15; 123 (Scrymser) ¶ 12 (although magazine doesn't use intern projects, magazine engages in exercise to show intern how editors edit their product); 125 (Shapiro) ¶ 10.

Supervision of interns varied significantly from supervisor to supervisor.  Some interns report doing tasks alongside their supervisors;[61] others received careful direction and guidance on how to complete specific tasks and then worked independently, receiving substantial feedback;[62] while still other supervisors had little involvement and gave little feedback.[63] Contrary to Plaintiffs' suggestion, this supervision was not provided solely for purposes of having interns complete tasks better.[64]  Some supervisors made a point of ensuring that their interns learn the broader purpose and context of the tasks they are performing (such as why edit credits matter to publishers and advertisers, or how organizing samples in a fashion closet assists editors in selecting outfits for inclusion in a magazine),[65] while others do not.[66]  Some

---

[61] *See* F.D. Exs. 54 (Hard) ¶ 5; 97 (Pratt) ¶¶ 6-7, 10 (invaluable to learn from and cook next to top people in the field); 90 (Novello) ¶¶ 6, 9; 103 (Rinder) ¶ 5; 110 (Roelant) ¶ 7; 114 (Rothman) ¶ 6; 117 (Rud) ¶ 9; 141 (Zick) ¶¶ 6-7; 162 (Reyes Tr.) 78:22-79:6; 170 (Skorka Tr.) 110:14-16, 111:16-19, 117:14-23 (with supervisor sat in on pitch meetings with high-level editors), 117:14-23, 118:4-6 (attended meetings with supervisor), 122:8-21 (sat in on desksides with supervisor).

[62] *See, e.g.*, F.D. Exs. 3 (Ajlouni) ¶¶ 7-10; 7 (Bailey) ¶ 11; 8 (Barker) ¶ 8; 14 (Brodley) ¶ 6; 17 (Burfield) ¶¶ 8, 9, 11 (describing teaching and feedback); 18 (Cacich) ¶ 6; 29 (Corbett) ¶ 7; 44 (Feil) ¶ 8; 61 (Hunt) ¶ 7; 62 (Hutzler) ¶ 5; 67 (Klotzman) ¶¶ 6-8; 79 (Mevorach) ¶ 7; 87 (Nelson) ¶¶ 6-10; 95 (Piwko) ¶ 10; 100 (Richard) ¶ 5; 117 (Rud) ¶¶ 5, 9; 108 (Rodriguez) ¶¶ 6-8; 119 (Saltzman) ¶¶ 6-7; 124 (Senaydin) ¶¶ 5-6; 126 (Simmons) ¶¶ 5, 8-9; 157 (Johns Tr.) 52:16-53:8; 181 (Miller Tr.) 45:23-46: 12 (repeated instruction on edit credits); 170 (Skorka Tr.) 101:11-17; 111:23-112:14; 125:20-126:6 (feedback on writing useful).

[63] *See* F.D. Exs. 174 (Wagster Tr.) 101:6-17; 158 (Leszuk Tr.) 72:15-20.

[64] *See, e.g.*, F.D. Exs. 3 (Ajlouni) ¶ 7; 17 (Burfield) ¶ 8 (explains broader context of assignments, how it fits into big picture and not just, mechanically, how to perform task or increase efficiency, but as a learning experience); 37 (Diegel) ¶¶ 3, 4; 48 (Gonzalez) ¶¶ 7, 10; 59 (Hilmantel) ¶ 9 (to provide learning experience); 67 (Klotzman) ¶ 7; 103 (Rinder) ¶ 5; 181 (Miller Tr.) 44:18-45:22, 47:2-48:10; 162 (Reyes Tr.) 78:22-79:6 (sat by supervisor to learn how to do RFPs but never did task herself as an intern).

[65] *See, e.g.*, F.D. Exs. 5 (Anderson) ¶ 5; 7 (Bailey) ¶ 11; 8 (Barker) ¶ 9; 40 (Dziedzina) ¶ 5; 36 (DeWitt) ¶¶ 7, 9; 43 (Fazio) ¶ 6; 52 (Groher) ¶ 7; 153 (Groher Tr.) 62:5-10; 62 (Hutzler) ¶ 8; 63 (Johns) ¶¶ 14, 15; 72 (Lokuta) ¶ 5; 78 (Melvin) ¶ 6;  80 (Miller) ¶ 6; 117 (Rud) ¶ 9; 125 (Shapiro) ¶¶ 5, 8-9;  138 (Verdone) ¶ 6; 140 (Yale) ¶ 6.

[66] F.D. Ex. 158 (Leszuk Tr.) 65:14-70:12; *see also* F.D. Exs. 182 (Novello Tr.) 50:13-19 (internship supervisor didn't tell her why she was completing a particular assignment); 173 (Thomas Tr.) 105:1-3, 108:13-16, 108:21-24.

supervisors facilitated interns' exposure to other in-magazine departments to enhance their overall learning experience;[67] others trained entirely in a single department.[68]

Even different supervisors in the same department dramatically altered the intern experience. One intern testified to one department supervisor who "never gave me any shadowing opportunities and, in fact, would routinely shut the door to her office when she was on calls with clients," yet described a subsequent supervisor who "went out of her way to make sure that the internship was an educational experience for me," by, among other things, having the intern "shadow . . . on calls with clients, in sales meetings and during client lunch meetings."[69]

The degree that interns recognized tangible and intangible benefits also varied internship by internship. While some felt their internship was "worthless" and they received nothing tangible from it,[70] one Opt-In admitted that "just because I didn't benefit from the internships doesn't mean that other interns aren't benefiting in some other ways."[71] Indeed, others left their internship with tangible additions to their resumes and their futures, things like:

---

[67] *See, e.g.,* F.D. Exs. 5 (Anderson) ¶ 5; 29 (Corbett) ¶¶ 7, 9 ("Overall I had a well rounded internship experience because Bernadette facilitated opportunities for me to assist multiple editors from different departments at Seventeen with a variety of projects."); 32 (Degnan) ¶ 5 (supervisor introduced to all editors and arranged informational interviews); 100 (Richard) ¶ 5 (supervisor arranged fashion intern's attendance at photo shoots in Studio D); *see also* F.D. Exs. 20 (Caldwell) ¶ 6 (intern set up informational interviews with other staffers outside her department); 43 (Fazio) ¶ 7; 47 (Friedlander) ¶ 7 (gained exposure to other departments within magazine); 18 (Cacich) ¶ 9 (completed project in another magazine department); 88 (Nhan) ¶ 10; 159 (Mancini Tr.) 167:12-18; 167:22-168:9 (fashion supervisor exposed to editor outside of fashion to help get a job).

[68] *See, e.g.,* F.D. Exs. 86 (Neilon) ¶¶ 3, 5-7 (Video); 89 (Niemiec) ¶ 3, 5, 6 (editorial features); 98 (Ramirez) ¶ 3, 5-6 (web); 99 (Reyes) ¶¶ 3, 5-6 (ad sales); 113 (Ross) ¶¶ 2, 4-5 (editorial features).

[69] *See, e.g.,* F.D. Ex. 55 (Harris) ¶¶ 6-11. *Compare, e.g.,* Ex. 158 (Leszuk Tr.) 64:15-68:14 *with* Ex. 104 (Riordan) ¶¶ 5-8 (Marie Claire ad sales interns with vastly different experiences).

[70] F.D. Ex. 174 (Wagster Tr.) 145:23-146:2 ("for the most part" educational training was "worthless"); 113:2-11 (tasks not rewarding, didn't learn anything), 144:17-145:4 (no benefit sitting in on meetings); *see also* F.D. Ex. 175 (Wang Tr.) 236:22-25, 237:6-15, 237:16-22.

[71] F.D. Ex. 176 (Wheels) 236:22-238:25.

- Knowledge of the magazine industry;[72]
- Office skills;[73]
- Skills in areas new to the intern, such as editorial writing, advertising, scientific testing methodology, and web publishing;[74]
- Skills transferrable to other industries and careers;[75]
- Industry contacts,[76] career advice[77] and job references;[78]
- Experience (or portfolio clips) that helped them later secure a job.[79]

---

[72] F.D. Exs. 14 (Brodley) ¶ 8 (mastered industry specific lingo related to photography and design); 16 (Buchalter) ¶ 9; 30 (Critides) ¶¶ 7, 8; 32 (Degnan) ¶ 6; 39 (Dunn) ¶ 8; 150 (Dunn Tr.) 59:18-60:5; 40 (Dziedzina) ¶¶ 6-7 (editorial process); 42 (Faucett) ¶ 12; 43 (Fazio) ¶ 10; 152 (Fazio Tr.) 80:9-81:11; 48 (Gonzalez) ¶¶ 8, 10; 52 (Groher) ¶¶ 8, 10; 58 (Henderson) ¶ 7; 64 (Johnson) ¶ 9; 70 (Kristensen) ¶ 6; 71 (Lindig) ¶ 7; 79 (Mevorach) ¶ 11 (editorial process); 85 (Neckles) ¶¶ 6, 7; 90 (Novello) ¶ 10 (internship invaluable for "learning the ropes" of magazine business); 99 (Reyes) ¶¶ 5-6; 162 (Reyes Tr.) 105:6-15; 101 (Rickert) ¶ 10; 121 (Santucci) ¶¶ 5-7.

[73] *Compare* F.D. Exs. 3 (Ajlouni) ¶ 9 (learned to make professional calls and send professional emails); 13 (Berard) ¶ 6; 16 (Buchalter) ¶ 9; 22 (Cavallaro) ¶ 9; 44 (Feil) ¶ 7 ("seemingly simple tasks like emailing with a vendor highlighted the importance of professionalism and proper etiquette"); 73 (Lovaglio) ¶ 10 (how to formulate a professional email and be organized); 77 (McCoy) ¶ 7 (learned how to operate Outlook email, answer the phone, write and speak like a professional); 80 (Miller) ¶ 10 (learned phone and email etiquette and how to use office technology like photocopier and fax machine); 87 (Nelson) ¶ 7 (learned styles and branding through help with Photoshop); 100 (Richard) ¶ 7 (emails sharpened communication skills); 104 (Riordan) ¶ 8 (office tasks like scanning, faxing, answering phones and crafting professional emails); 108 (Rodriguez) ¶¶ 6, 8, 10; 110 (Roelant) ¶ 9 (learned Excel); 111 (Roselli) ¶ 9 (learned Photoshop and other computer techniques); 119 (Saltzman) ¶¶ 6, 9; 125 (Shapiro) ¶ 5; 134 (Taylor) ¶ 11 *with* F.D. Exs. 37 (Diegel) ¶ 5; 179 (Diegel Tr.) 73:22-74:25.

[74] *See, e.g.,* F.D. Exs. 2 (Afuang) ¶¶ 6,8; 6 (Andrews) ¶ 6; 13 (Berard) ¶ 6; 14 (Brodley) ¶ 8; 16 (Buchalter) ¶ 9; 71 (Lindig) ¶ 8; 79 (Mevorach) ¶ 11; 86 (Neilon) ¶ 6; 124 (Senaydin) ¶ 6; 135 (Thomas) ¶¶ 5-7; 138 (Verdone) ¶ 8.

[75] *See, e.g.,* F.D. Exs. 14 (Brodley) ¶ 8 (skills transferrable to photo agency); 28 (Cleaver) ¶ 6 (learned skills applied in non-magazine job); 38 (Dotson) ¶ 7; 48 (Gonzalez) ¶ 10; 73 (Lovaglio) ¶ 10; 76 (McCloskey) ¶ 7; 89 (Niemiec) ¶ 7; 96 (Pozsonyi) ¶ 8; 126 (Simmons) ¶ 10.

[76] F.D. Exs. 20 (Caldwell) ¶ 6; 29 (Corbett) ¶¶ 6, 8; 149 (Critides Tr.) 32:14-20; 32 (Degnan) ¶ 5; 41 (Elser) ¶ 8; 42 (Faucett) ¶ 7; 43 (Fazio) ¶ 7; 78 (Melvin) ¶ 9; 79 (Mevorach) ¶ 9; 89 (Niemiec) ¶ 6; 104 (Riordan) ¶¶ 6, 8; 119 (Saltzman) ¶ 8; 120 (Salzberg) ¶ 11; 125 (Shapiro) ¶¶ 10-11; 128 (Snowden) ¶ 7; 132 (Sullivan) ¶ 7; 136 (Tomlinson) ¶ 7; 140 (Yale) ¶ 11.

[77] F.D. Exs. 7 (Bailey) ¶ 7; 16 (Buchalter) ¶ 7; 22 (Cavallaro) ¶ 8; 26 (Chiang) ¶ 7; 31 (Cubria) ¶ 13; 38 (Dotson) ¶ 7; 41 (Elser) ¶ 8; 46 (Fisher) ¶¶ 7-8; 53 (Hackel) ¶ 7; 54 (Hard) ¶ 7; 59 (Hilmantel) ¶ 5; 60 (Holiver) ¶ 7; 76 (McCloskey) ¶ 6; 78 (Melvin) ¶ 9; 87 (Nelson) ¶ 9; 98 (Ramirez) ¶ 7; 108 (Rodriguez) ¶ 9; 110 (Roelant) ¶ 6; 111 (Roselli) ¶ 8; 134 (Taylor) ¶ 9; 139 (Williams) ¶ 6.

[78] *See, e.g.,* F.D. Exs. 42 (Faucett) ¶ 12; 68 (Kohen) ¶ 8 (recommendation letter from editor-in-chief); 84 (Nagi) ¶ 11; 90 (Novello) ¶ 11; 100 (Richard) ¶¶ 6, 7; 120 (Salzberg) ¶11. This was even the case for opt-in plaintiff Leszuk. *See* F.D. Ex. 158 (Leszuk Tr.) 278:6-279:10.

[79] *See, e.g.,* F.D. Exs. 13 (Berard) ¶ 7; 31 (Cubria) ¶ 12; 32 (Degnan) ¶ 6; 38 (Dotson) ¶ 7; 39 (Dunn) ¶ 9; 40 (Dziedzina) ¶ 7; 42 (Faucett) ¶ 12; 43 (Fazio) ¶ 10; 47 (Friedlander) ¶ 5; 52 (Groher) ¶ 10; 59 (Hilmantel) ¶ 6; 60 (Holiver) ¶ 11; 61 (Hunt) ¶ 6; 63 (Johns) ¶ 12; 70 (Kristensen) ¶7; 76 (McCloskey) ¶ 8;  79 (Mevorach) ¶ 12; 82 (Mullins) ¶ 10; 85 (Neckles) ¶ 8; 86 (Neilon) ¶ 6 (job as college lecturer); 90 (Novello) ¶ 11; 92 (Park) ¶ 3, 5 (built graphic design portfolio essential for finding a job); 98 (Ramirez) ¶ 5; 110 (Roelant) ¶ 9; 111 (Roselli) ¶ 6 (clippings to show on interviews); 113 (Ross) ¶ 5; 126 (Simmons) ¶ 11; 138 (Verdone) ¶ 8; 141 (Zick) ¶ 10; 170 (Skorka Tr.) 136:21-23.

For some, their internships were more valuable to them than their college courses,[80] and

provided supplemental learning experiences that could not be replicated in school.[81]  For others,

their internships energized them academically and improved their focus and drive.[82]  Others

claim to have received no such benefits.[83]

Many interns walked away from their internship having grown in additional, intangible

ways, such as learning responsibility and work ethic,[84] navigating the nuances of a professional

environment,[85] gaining confidence in their abilities,[86] and deciding whether to pursue a career in

---

[80] F.D. Exs. 44 (Feil) ¶ 7 (internship "was more valuable to me than any class'); 13 (Berard) ¶ 7; 48 (Gonzalez) ¶ 10 (found it easier to learn in professional setting than classroom); 58 (Henderson) ¶ 7 ("As compared to my college courses, I would rank my Harper's Bazaar internship much higher because it was career-focused and I could see how selling and marketing all comes together in a monthly publication."); 62 (Hutzler) ¶¶ 8, 13 (learned more in internship than could have learned in 100 college classes, internship more beneficial than any college course); 71 (Lindig) ¶ 10; 77 (McCoy) ¶ 8 (internship more useful in career development than college courses); 46 (Fisher) ¶ 8.

[81] F.D. Exs. 46 (Fisher) ¶ 8 ("Classes have no direct relation to the industry, whereas my internship was hands on and I learned in the moment."); 39 (Dunn) ¶ 9 (learned how advertising works at a major publication, something not covered in college coursework); 87 (Nelson) ¶ 13; *see also* n.34, *supra*.

[82] F.D. Exs. 26 (Chiang) ¶ 8 ("After I completed the internship and returned to Barnard, I was a more productive, energized student because the experience had given me something to look forward to after graduation, a career goal I could pursue."); 64 (Johnson) ¶ 9 (she became a more focused student); 42 (Faucett) ¶ 11 (internship positively affected how student approached school and projects her senior year); 43 (Fazio) ¶ 10 ("I found my experiences from my internship helped me when I returned to college each fall.  I found that I was more driven and focused in my classes, and my grades improved, especially in classes that included a consumer marketing component, where I was able to apply the knowledge I gained during my internships."); 36 (DeWitt) ¶ 10; *see also* n.34, *supra*.

[83] *See, e.g.,* F.D. Ex. 174 (Wagster Tr.) 145:23-146:2 ("for the most part" educational training was "worthless"); 113:2-11 (tasks not rewarding, didn't learn anything), 144:17-145:4 (no benefit sitting in on meetings). Plaintiff Wang testified that her experience could have been more beneficial with more mentoring, supervision and substantive work. *See* F.D. Ex. 175 (Wang Tr.) 236:22-25, 237:6-15, 237:16-22.

[84] F.D. Exs. 2 (Afuang) ¶ 8 (acquired many basic skills, such as learning how to work with others in a team and how to take initiative in the workplace, which greatly benefits intern in subsequent internships and jobs); 26 (Chiang) ¶¶ 6-8 (learned time management, organizational systems, phone and email etiquette, and how to interact with colleagues); 36 (DeWitt) ¶ 10 (gained sense of professionalism and sharpened communication skills; 38 (Dotson) ¶ 7 (developed ability to effectively and professionally communicate, which she uses in current non-magazine job); 53 (Hackel) ¶ 8 (acquired range of communication and organization skills, sense of professionalism); 55 (Harris) ¶ 11 (learned importance of strong work ethic); 80 (Miller) ¶ 10 (skills in teamwork); 100 (Richard) ¶ 7 (sense of professionalism, sharpened communication skills); 101 (Rickert) ¶¶ 8-10; 124 (Senaydin) ¶ 9 (learned collaborative skills not learned in college); 128 (Snowden) ¶¶ 7-8 (improved oral and written communication skills); 134 (Taylor) ¶ 6 (learned people and presentation skills).

[85] F.D. Exs. 3 (Ajlouni) ¶ 12 (learned how to handle herself in a professional manner and how to interact with people with different personalities); 5 (Anderson) ¶¶ 5-6 (first time in environment of large corporation and office

---

- 19 -

the magazine industry after graduation.[87]  For example, some interns testified that their

internship helped them mature and develop a sense of professionalism, including becoming more

assertive and even learning how to dress for the office.[88]  Some interns found the office routine

---

building); 7 (Bailey) ¶ 12 (learned to be proactive and professional in everything I do); 14 (Brodley) ¶ 8; 18 (Cacich) ¶ 11; 20 (Caldwell) ¶¶ 3, 6, 7, 9; 24 (Chelak) ¶ 11 (how to interact in a corporate environment and understand corporate hierarchy); 39 (Dunn) ¶ 9 (learned importance of office decorum); 45 (Feuer) ¶ 9 (first experience in office setting); 46 (Fisher) ¶¶ 7-8 (learned how to present herself in corporate office and function in a workplace team); 54 (Hard) ¶ 9 (improved ability to function in professional work environment); 58 (Henderson) ¶ 7; 60 (Holiver) ¶ 11 (people skills in professional setting); 62 (Hutzler) ¶ 7 (office etiquette); 64 (Johnson) ¶ 9 (learned how to behave in a professional office); 70 (Kristensen) ¶ 7 (being in office environment and large corporation); 78 (Melvin) ¶ 10 (learned how to be professional and interact with high-level managers at large corporation, is now complemented on professional skills by colleagues at current job where she "show[s] a lot of maturity in my communications with others"); 79 (Mevorach) ¶ 11 (what it would be like to work in office setting and how to communicate professionally with colleagues); 87 (Nelson) ¶ 13 (learned how to function in professional setting and integration of corporate departments, something never learned in school); 90 (Novello) ¶ 10 (importance of having a professional attitude and demeanor); 110 (Roelant) ¶ 9 (first experience in corporate environment); 121 (Santucci) ¶ 5; 140 (Yale) ¶ 12; 141 (Zick) ¶ 9 (first experience in large workplace, taught how it would be to work in that kind of environment and how to get along with professional colleagues).

[86] F.D. Exs. 7 (Bailey) ¶¶ 9, 12; 16 (Buchalter) ¶¶ 8-9 (group intern project gave opportunity to practice public speaking); 29 (Corbett) ¶ 10 (more confident and comfortable talking with supervisors in a business setting); 71 (Lindig) ¶ 8; 104 (Riordan) ¶ 8; 121 (Santucci) ¶ 7; 125 (Shapiro) ¶ 5; 135 (Thomas) ¶ 7.

[87] F.D. Exs. 48 (Gonzalez) ¶ 7; 6 (Andrews) ¶ 9 (internship sparked interest in nutrition research as possible career); 8 (Barker) ¶ 10 (realized primary interest not in magazine production  but in styling for photo shoots); 20 (Caldwell) ¶ 9; 28 (Cleaver) ¶ 6 (despite positive internship experience, intern learned she did not want to pursue career in magazines or publishing); 29 (Corbett) ¶ 8; 31 (Cubria) ¶ 12 (internship confirmed intern wanted to pursue career in journalism rather than public relations, and that she wanted to work in web rather than features); 36 (DeWitt) ¶ 10; 39 (Dunn) ¶ 8; 41 (Elser) ¶ 8; 44 (Feil) ¶ 7 (internship reinforced decision to pursue magazine career); 46 (Fisher) ¶ 7; 47 (Friedlander) ¶¶ 3, 10; 54 (Hard) ¶ 9 (influenced desire to pursue food-related issues from an academic perspective); 59 (Hilmantel) ¶ 8; 61 (Hunt) ¶ 6 (learned she wanted to pursue food or lifestyle magazine rather than women's magazine); 62 (Hutzler) ¶¶ 3, 8 (reinforced desire to become an editor); 65 (Kahn) ¶ 12; 68 (Kohen) ¶¶ 7-8; 70 (Kristensen) ¶ 6; 71 (Lindig) ¶ 9 (more interested now in transition of print magazines to digital); 88 (Nhan) ¶ 7 (learned many avenues to pursue in nutrition field other than clinical setting); 86 (Neilon) ¶ 6 (internship helped his selection as undergraduate lecturer in radio/television production); 93 (Perle) ¶¶ 3, 5 (viewed internship as opportunity to learn as much as she could and explore career); 97 (Pratt) ¶ 10 (helped think more broadly about different culinary jobs); 101 (Rickert) ¶ 10 (informed decision to pursue career in online, rather than print, media); 111 (Roselli) ¶ 9; 120 (Salzberg) ¶ 8 (changed career focus to photography); 126 (Simmons) ¶ 11; 138 (Verdone) ¶ 9 (internships helped her decide she preferred publishing and business aspects of marketing, which was "surprising as I had always thought I was more interested in editorial careers."); 161 (Rappaport Tr.) 135:8-12; 168:24-169:15); 175 (Wang Tr.) 201:10-15, 189:7-12, 190:10-17, 260:6-10.

[88] F.D. Exs. 13 (Berard) ¶ 6; 16 (Buchalter) ¶ 9 (presenting herself in meetings); 45 (Feuer) ¶ 9; 62 (Hutzler) ¶ 12; 77 (McCoy) ¶ 7 (internship built confidence); 108 (Rodriguez) ¶¶ 6-10.

and monotonous,[89] while others testified that they benefited "from just being in a creative environment all day."[90]

### B.    Each Internship Had Differing Alleged Benefits To Hearst

There is no evidence in the record that establishes that interns are mission critical for any magazine, though some interns' work was more useful than others.   Not all magazines or departments consistently have interns, there are periods of time for all magazines when there are no interns, and the functioning of the magazines continues uninterrupted without interns.

Because internships are principally learning opportunities, interns often impede operations or slow down magazine staff.[91]  Supervisors testified that interns cause them more

---

[89] *See, e.g.*, F.D. Exs. 158 (Leszuk Tr.) 65:17-66:9 (boring); 67:11-21, 290:7-292:20 (Leszuk spending time on Facebook); 189 (Leszuk Ex. 24) (same); 174 (Wagster Tr.) 126:22-127:24 (spent 50% of time doing nothing); 178 (Yale Tr.) 25:15-26:6 (co-intern openly spending time texting ); *see also* F.D. Ex. 17 (Burfield) ¶ 7 (tells interns to do homework during downtime); 41 (Elser) ¶ 5 (internship not demanding); 96 (Pozsonyi) ¶ 5 (experienced downtime).

[90] F.D. Ex. 8 (Barker) ¶ 6 (discussing exposure to editorial decision-making); *see also* F.D. Ex. 42 (Faucett) ¶ 9 (internship taught her curiosity, which carried over into intern's everyday life).

[91] *See, e.g.,* F.D. Exs. 12 (Bell) ¶ 13; 13 (Berard Decl.) ¶ 8 (interns shadow her, she is not dependent on interns); 17 (Burfield) ¶¶ 6, 7, 11, 13, 15 (interns are a net time loss to Hearst Digital Media); 19 (Cain) ¶ 15;  39 (Dunn) ¶ 10 ("[H]aving interns makes it more difficult for me to do my work because I typically spend about 20 percent of my day supervising them.  Moreover, it is often faster to complete certain tasks myself than to have an intern do them."); 42 (Faucett) ¶¶ 6, 7, 9 (describing Frances Bailey's supervision); 44 (Feil) ¶ 8 ("While I do not need the intern to draft the recap, and in fact it would take me much less time to complete it myself, I believe it to be an educational exercise for the intern."); 59 (Hilmantel) ¶ 11, 13 (intern research was incorrect and supervisor had to redo the research herself; supervisor is more efficient during the times when her department does not have interns and also feels less pressure because she doesn't have to come up with assignments for and provide feedback to interns); 67 (Klotzman) ¶ 10 ("I was able to complete tasks more quickly and efficiently myself than if I had an intern assist me"); *id.* at ¶ 7 (generally spent 45 minutes a day supervising interns); 82 (Mullins) ¶ 10; 105 (Ritterbeck)  ¶ 9 (describing the significant time it took her as a beauty assistant at Seventeen to advertise internship opportunities, review resumes, schedule and interview candidates, and training and supervising interns); 113 (Ross) ¶ 10 (sometimes faster to do things myself); 114 (Rothman) ¶¶ 6, 7 (teaching Excel to interns is more time consuming than doing data entry herself and "[w]hen we do not have interns in the lab, we are able to concentrate more fully on the tasks at hand, and are often more efficient in our work because we are not overseeing interns."); 117 (Rud) ¶ 9; 122 (Schmidt) ¶ 9; 123 (Scrymser) ¶ 12; 179 (Diegel. Tr.) 10:18-11:5, 25:4-17, 32:16-24 (interns are a lot of work, time spent with interns) (doesn't always have interns because they are a lot of work); 150 (Dunn Tr.) 78:15-17, 79:24-80:5; 180 (Feil Tr.) 110:8-110:25, 114:18-116:19 (discussing how her workload increases when interns assist with drafting); 155 (Hilmantel Tr.) 22:22-23:8, 82:12-25 (same); 167 (Rothman Tr.) 111:20-112:8; 164 (Ritterbeck Tr.) 139:11-140:18 (describing time spent training and supervising interns). The magazine and department staff additionally sink resources into reviewing the numerous intern applications received, interviewing and selecting interns, training and supervising them, all for the brief period of the student's internship and a repetition of the process the next semester.

work (not less) and that they are more efficient workers when there are no interns.[92]  Had interns

not been present to assist them, magazine staff report that they simply would have completed the

tasks assigned to interns themselves, without a substantial change to the employee's day.[93]

Plaintiffs' suggestion that reduced employee headcount during the 2008 recession meant

more reliance on interns is not based on any record evidence, is speculative and is counterfactual.

REDACTED ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[92] F.D. Exs. 17 (Burfield) ¶ 15 ("When balanced against the amount of time spent by me (and my colleagues) supervising and interacting with interns, in my opinion, in terms of time spent, it takes more time to have interns in Hearst Digital Media than it saves."); 39 (Dunn) ¶ 10 ("[H]aving interns makes it more difficult for me to do my work because I typically spend about 20 percent of my day supervising them.  Moreover, it is often faster to complete certain tasks myself than to have an intern do them."); 150 (Dunn Tr.) 78:15-17, 79:24-80:5 (same); 44 (Feil) ¶ 8 ("While I do not need the intern to draft the recap, and in fact it would take me much less time to complete it myself, I believe it to be an educational exercise for the intern."); 180 (Feil Tr.) 110:8-110:25, 114:18-116:19 (discussing how her workload increases when interns assist with drafting recaps); 59 (Hilmantel) ¶ 11 (intern research was incorrect and supervisor had to redo the research herself); 155 (Hilmantel Tr.) 82:12-25 (same); 59 (Hilmantel) ¶ 13 (supervisor is more efficient during the times when her department does not have interns and also feels less pressure because she doesn't have to come up with assignments for and provide feedback to interns); 155 (Hilmantel Tr.) at 22:22-23:8); 67 (Klotzman) ¶ 10 ("I was able to complete tasks more quickly and efficiently myself than if I had an intern assist me"); 82 (Mullins) ¶ 10; 113 (Ross) ¶ 10; 114 (Rothman) ¶ 6 (teaching Excel to interns is more time consuming than doing data entry herself; ¶ 7 ("[w]hen we do not have interns in the lab, we are able to concentrate more fully on the tasks at hand, and are often more efficient in our work because we are not overseeing interns."); 167 (Rothman Tr.) 111:20-112:8 (same); 117 (Rud) ¶ 9; 122 (Schmidt) ¶ 9.

[93] F.D. Exs. 17 (Burfield) ¶¶ 13, 15; 24 (Chelak) ¶ 10; 30 (Critides) ¶ 10 (realize now, and even started to understand during internship, that my contributions were minimal compared to department's productivity); 36 (DeWitt) ¶ 10; 39 (Dunn) ¶ 10; 42 (Faucett) ¶ 7; 44 (Feil) ¶ 10; 180 (Feil Tr.) 105:4-114:17; 60 (Holiver) ¶ 10; 63 (Johns) ¶¶ 10, 13, 14, 15; 67 (Klotzman) ¶ 10; 99 (Reyes) ¶ 7; 117 (Rud) ¶ 9; 140 (Yale) ¶ 13.

███████  ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███  **REDACTED**

The degree to which the completion of intern tasks benefits Hearst magazines varies from internship to internship.   On the one hand, numerous intern supervisors testified that while they appreciate the help they may provide from time-to-time, the interns are not needed or relied upon,[94] one admitting that when she asks an intern to assist her with a task, "I don't expect any of the content to be usable."[95]   Conversely, Wang, Spencer, Wagster, Mancini and Leszuk testified that their participation greatly assisted Hearst.[96]

Nor is there any uniformity in the method by which magazines receive and return clothing and accessory samples being considered for publication.  Some rely on designers' public relations firms to deliver and pick-up products at no expense to the magazine, others use a messenger service, and still others use interns for the return of products in situations where the

---

[94] F.D. Exs. 13 (Berard) ¶ 8; 17 (Burfield) ¶¶ 6, 7, 8, 11, 13, 15; 37 (Diegel) ¶ 4 (interns are not relied on because they aren't able to write the kinds of technical stories the Popular Mechanics website needs); ¶ 6 ("Although I enjoy having and mentoring interns, and appreciate any help they may provide from time to time, neither I nor my department is dependent on or needs interns to complete our work; indeed, we often have no interns at all.  And content interns create under my supervision is not content we need or would otherwise seek to include on the website; rather it is created for the sole purpose of advancing an intern's education and, I hope, their career, by teaching them how to create a story and giving them something tangible to show to potential future employers."); 44 (Feil) ¶ 8 (does not need an intern to draft recap and it takes longer for an intern to do so); 180 (Feil Tr.) 109:4-114:17; 60 Holiver ¶ 10 (when she supervises interns she asks them to help with certain tasks for the learning experience not because she can't complete them herself); 114 (Rothman) ¶ 7 ("I am not dependent on interns to complete my work (nor is my department)").

[95] F.D. Ex. 59 (Hilmantel) ¶ 10; *see also* F.D. Ex. 155 (Hilmantel Tr.) 39:2-42:1 (describing intern food blog research, which has not resulted in any successful story ideas pitched by interns).

[96] F.D. Exs. 158 (Leszuk Tr.) 64:15-68:14; 159 (Mancini Tr.) 223:11-23; 224:10-22; 171 (Spencer Tr.) 193:6-20; 175 (Wang Tr.) 240:10-17; 174 (Wagster Tr.) 138:9-139:2.

delivery is time-sensitive.[97] And, interns do not pick-up or deliver samples at all at others.[98] Moreover, some magazines do not even have fashion closets.[99]

Because the "focus of the internship is to provide training opportunities,"[100] and interns have few skills and generally no experience in the inner workings of a magazine, the tasks they are assigned to complete are often either designed as a learning experience that would be of no use whatsoever to the magazine or department,[101] or else to teach about the particular department's operations through the tasks of an entry-level employee.[102]  For this reason, many interns assist entry-level employees with their tasks for the purpose of learning the building blocks necessary for anyone new to the industry.  Because of interns' lack of experience, some supervisors do not regularly involve interns in time-sensitive assignments,[103] while others do.[104]

---

[97] F.D. Ex. 12 (Bell) ¶ 9; 120 (Salzberg) ¶ 5 (Redbook); 145 (Broekema Tr.) 31:14-32:6.

[98] F.D. Ex. 36 (DeWitt) ¶ 9.

[99] *See, e.g.*, F.D. Exs. 9 (Baugh) ¶ 3; 19 (Cain) ¶¶ 11-12; 21 (Carbone) ¶ 4; 75 (Mariola) ¶¶ 8-10; 137 (Truelove) ¶ 8.

[100] F.D. 30 (Critides) ¶ 11; *see also, e.g.,* F.D. Exs. 17 (Burfield) ¶ 4; 19 (Cain) ¶ 14 (primary goal to provide interns with experiences could not get in classroom); 10 (Baughman) ¶ 14 (opportunity to young people to acquire crucial skills to prepare for employment); 106 (Rockefeller) ¶ 10 (goal to mentor students who are interested in business aspects of magazine industry); 131 (Smith) ¶ 6 (give interns opportunity to learn magazine business through first-hand experience).

[101] *See* n.60, *supra.*

[102] F.D. Exs. 25 (Cheney) ¶ 12; 16 (Buchalter) ¶ 5 (compiled edit credit books, assembled presentations and tabbed magazine issues, mailed issues to clients); 31 (Cubria) ¶¶ 8-9 (drafted blog posts and online quizzes, created online videos, pitched blog post ideas, conducted occasional interviews); 59 (Hilmantel) ¶¶ 6, 10-12 (performed interviews, story research, drafted article; as supervisor, gives interns opportunity to write stories, research stories, conduct interviews on own); 66 (Kahn) ¶¶ 8-9 (conducted potential brand campaign and event research, designed sell sheet, maintained email and phone correspondence with clients); 80 (Miller) ¶¶ 6, 12 (assisted with preparation of edit credit books, sales presentations, tabbing issues to send to clients; current interns do same); 92 (Park) ¶¶ 5-7 (helped produce brochure for promotional event, emailed vendors and communicated with printers, researched stock images, created presentations); 96 (Pozsonyi) ¶ 5 (organized film from photo shoots, scouted potential shoot locations, coded invoices); 101 (Rickert) ¶¶ 5-6 (helped with content management, added photo credits to online content); 105 (Ritterbeck) ¶¶ 5-10 (organized beauty closet, communicated with publicists to acquire samples, researched new beauty products; as supervisor, interns did same).  *See also* F.D. 1 (Abbey) ¶ 13; 21 (Carbone) ¶ 14; 23 (Cazzola) ¶ 12; 25 (Cheney) ¶ 12; 51 (Grippo) ¶ 15; 56 (Healy) ¶ 11; 102 (Riess) ¶ 10; 130 (Soucy) ¶ 14.

[103] F.D. Exs. 30 (Critides) ¶ 11; 80 (Miller) ¶ 12.

[104] *See, e.g.*, F.D. Ex. 145 (Broekema Tr.) 31:14-32.6.

Nevertheless, there is a wide difference between unpaid interns and employees,[105] demonstrating

that unpaid interns have very little in the way of responsibilities, accountability and

productivity.[106]  As one former intern, who after graduation secured a magazine job, testified:

> Despite the knowledge [from my internship], when I started my current job I was
> shell shocked upon arrival, because being an assistant is so different than being an
> intern.  During my internship, everyone at HGTV would take time out of their day
> to help me learn what they were doing, and if something I was helping with did
> not go as planned, it was used as a "teaching moment."  As an assistant, my
> colleagues are understandably more "hands off" with respect to my duties, and
> expect me to take responsibility figure things out, and to not just be accountable
> for my work, but to be perfect.[107]

## ARGUMENT

I.  **PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION MUST BE DENIED BECAUSE THEY ARE PREMISED ON A "STANDARD" THAT IS FLATLY CONTRADICTED BY LAW**

A.  *Walling* **Delineated the FLSA's Scope and Rejected Plaintiffs' Proposed Standard For Determining if an Intern is an Employee**

The Supreme Court's decision in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947),

delineated the scope of the FLSA in a way that cannot be reconciled with plaintiffs' claims, and

specifically rejected the single-focus "productive work" standard that plaintiffs propose to

---

[105] F.D. Exs. 16 (Buchalter)  ¶ 10 (must juggle many tasks for multiple supervisors as employee whereas while interns only assisted with a few projects at a time, usually with generous and malleable deadlines); 30 (Critides) ¶ 10 (same); 42 (Faucett) ¶ 12; 151 (Faucett Tr.) 97:9-18 (received a lot of guidance from her supervisors as an intern, which you don't receive as an assistant); 47 (Friedlander) ¶ 8; 52 (Groher) ¶ 9 (assistant job entails "far more responsibility and accountability"); 153 (Groher Tr.) 61:5-6 (as an intern, "I was never responsible directly for things that I did"); 59 (Hilmantel) ¶ 9; 61 (Hunt) ¶ 7; 63 (Johns) ¶ 13.

[106] F.D. Exs. 147 (Chelak Tr.) 20:6-16 (compared to internship, in current position "responsible for learning a lot of things on my own, and far more, and responsible for a lot of activities on my own, entirely"); 30 (Critides) ¶ 10 (assignments as an intern were "minimal when compared to the department's overall productivity and workload"); 45 (Feuer)  ¶ 9 (intern given "easier things to handle that were not particularly time sensitive"); 52 (Groher) ¶ 9 (assistant job entails  work that is necessary for office function and does not include working on projects solely for personal benefit); 59 (Hilmantel) ¶ 9; 60 (Holiver) ¶ 10; 63 (Johns) ¶ 13 (if employee does not do her work, things necessary for functioning of office would not get done, which is not true for intern projects); 99 (Reyes) ¶ 7; 132 (Sullivan) ¶ 8; 140 (Yale) ¶ 13.

[107] F.D. Ex. 42 (Faucett) ¶ 12; *see also* F.D. Ex. 58 (Henderson) ¶ 8 (Even with knowledge and experience from internship, still only knew the basics, had a lot to learn, needed training regarding entry-level job specific tasks).

determine whether they were employees.  Moreover, plaintiffs' arguments take no account of the specific purposes of the FLSA at issue here, which drove the Supreme Court's analysis and led it to place special emphasis on workers' expectation of compensation and the benefits to be gained through unpaid work.

*Walling* spelled out the scope of the FLSA by reference to its purposes.[108]  "The Act's purpose as to wages," the Court stated, "was to insure that every person **whose employment contemplated compensation** should not be compelled to sell his services for less than the prescribed minimum wage."  330 U.S. at 152 (emphasis added).  Conversely, those who had **no expectation of compensation**, but worked without pay for some other personal advantage or purpose, were held to be outside the scope of the FLSA, as there was "obviously" no intent to outlaw such relationships.  *Id.*  In fact, the Court stated, applying the FLSA on those terms might actually *defeat* another of the Act's purposes, which is to increase employment opportunities for inexperienced workers.  *Id.* at 151.  In other words, *Walling* makes clear that the purpose of the FLSA is not to ensure that everyone who performs work is paid, as plaintiffs claim, but rather to ensure that everyone who works for pay (and not some other reason) is paid properly.[109]  This explains the Court's conclusion that the railroad trainees at issue, who performed actual work without pay or promise of employment, but to complete the training required for employment by the railroad, were not employees under the FLSA.  330 U.S. at 152-53.

---

[108] Plaintiffs bring claims under both the New York Labor Law and the Fair Labor Standards Act ("FLSA" or the "Act").  The definition of "employee" is nearly identical under both acts and courts apply FLSA cases regarding employee determinations to New York Labor Law Claims.  *See e.g., Cannon v. Douglas Elliman, LLC*, No. 06 Civ. 7092 (NRB), 2007 WL 4358456, at *4 (S.D.N.Y. Dec. 10, 2007).  Plaintiffs concede this point.  *See* Plaintiffs' Mem. in Opp'n to Defendant's Mot. to Strike and Cross-Motion for Conditional Certification, Dockt #22 at 11 n.21. Accordingly, this brief focuses on FLSA cases, just as plaintiffs' moving papers do.

[109] The Supreme Court explained in a later case that pay or "compensation" under the FLSA means either cash wages or "wages in another form," specifically "board, food, lodging, and similar benefits customarily furnished by the employer to the employees."  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 & n.23 (1985). This is consistent with the FLSA's definition of "wage."  *Id.* (citing 29 U.S.C. § 203(m)).

*Walling* weighed multiple factors in its employee determination and is accordingly the origination point for the balance of the benefits/totality of the circumstances test explained more fully below. *Walling* also links the FLSA's scope and purposes with the balance of the benefits analysis, repeatedly stating that those who perform work for another without any expectation of compensation are not employees within the scope of the FLSA. *Id.* at 152. Consistently, the Second Circuit recently cited *Walling* for the point that a regular salary arrangement is a "significant" factor in finding an employment relationship. *Velez v. Sanchez*, 693 F.3d 308, 330 (2d Cir. 2012); *see also Alamo Found.*, 471 U.S. at 301, 302 (FLSA reaches only those who work in expectation of compensation). This point is reflected also in the outcomes of numerous cases applying the totality of the circumstances test derived from *Walling*.

Plaintiffs' claims cannot be reconciled with the scope of the FLSA articulated by *Walling*. Hearst's student interns had no expectation of compensation, and willingly engaged in their internships for academic credit and other personal purposes.[110] Moreover, plaintiffs cite *Walling* and the FLSA's definition of "employee" as support for their central argument that employee status hinges on the performance of "productive work" only (Pl. Br. at 23-26),[111] but *Walling* says no such thing. It reached the opposite conclusion. It held that the trainees there who performed "actual work" were ***not*** employees, and further stated that the FLSA definition of employee "cannot be interpreted" to cover them or others who perform unpaid work for their own purpose or advantage. *See* 330 U.S. at 149, 152. Plaintiffs' arguments and interpretation of

---

[110] Plaintiffs claim that, even though they knew the internships were unpaid prior to undertaking them, they had "an expectation that [they] would be paid" in the form of "job references and a chance at paid employment." (Pl. Br. at 33) Whatever hopes they had do not amount to an expectation of compensation. *See* n.109, *supra*; *Todaro v. Township of Union*, 27 F. Supp. 2d 517, 539 (D.N.J. 1998) (declining to "extend the commonsense definition of 'compensation' [from *Alamo Foundation*] to incorporate … intangible benefits ….").

[111] Plaintiffs' citation to cases evaluating what constitutes compensable work by those conceded to be employees (Pl. Br. at 24, 26 n.55) are irrelevant because they deal with employees, not with the determination as to whether someone is an employee.

the FLSA thus were expressly rejected by *Walling*.  Consistent with *Walling* – and directly at

odds with plaintiffs' claim – later courts have similarly held that the performance of work alone

does not make someone an employee.[112]

Finally, *Walling* provides no support for plaintiffs' effort to shift their burden of proving

that they are employees.  (Pl. Br. at 23, 26)  *Walling* did not create an "exception" to the

definition of employee; it analyzed whether the trainees in that case were subject to that

definition, a contention that must be proven by the one making it.  In this case, that burden rests

with plaintiffs.  Under *Walling* and the balance of the benefits standard it spawned, guided by the

policies and purposes of the FLSA, that is a burden they cannot meet, much less on a class basis.

### B.  The Legal Standard For Determining Whether An Intern Is An Employee Is A Balancing Of The Benefits Test

Whether an individual is an employee or not is determined by the "economic reality" of

the situation, which requires consideration of the totality of the circumstances.  *Velez,* 693 F.3d

at 326, 328-31.[113]  Courts apply different multi-factored totality of the circumstances tests

depending on the context of the relationship at issue.  *Velez,* 693 F.3d at 326-27, 330 (identifying

different tests for claims involving independent contractors, joint employers, domestic service

workers, and students/trainees).  Each test is flexibly applied on a case-by-case basis to capture

---

[112] *See, e.g., Alamo Found.*, 471 U.S. at 299-300 ("An individual may work for a covered enterprise and nevertheless not be an 'employee.'"); *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1028-29 (10th Cir. 1993)  (rejecting employee status where "productive work" performed by trainees resulted in *de minimus* benefit to employer); *Demayo v. Palms W. Hosp., L.P.*, --- F. Supp. 2d ---, No. 11-CV-81211, 2013 WL 264691, at *5 (S.D. Fla. Jan. 23, 2013) (although type of work plaintiff performed may generally be covered by the FLSA, plaintiff was not an employee); *cf. Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 535 (S.D.N.Y. 1998) (considering multiple factors to determine whether plaintiffs benefitted more than defendants and thus were employees, including that plaintiffs performed productive work).

[113] *See also Archie*, 997 F. Supp. at 531-32, 535 (court considered "all the factors" to determine which party benefited more and thus whether the economic reality favored an employment determination); *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (whether an employment relationship exists under a given set of circumstances depends on the economic reality, which is determined on a case-by-case basis considering the whole of the circumstances).

the totality of the individual circumstances in determining whether someone is an employee. *Id.* at 326, 329-30; *Solis*, 642 F.3d at 522. *Walling* consistently has been cited as the source of the test that applies here. *See, e.g., Solis*, 642 F.3d at 526 & n.2.

The test for determining whether students or trainees are employees is a balance of the benefits analysis. The Second Circuit made this clear last summer in *Velez*. 693 F.3d at 330 (The "approach taken by courts determining if trainees and students providing services as part of their education are also employees" is a primary beneficiary analysis.) (citing *Solis* and *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005)). The most recent of two decisions cited by the Second Circuit – *Solis v. Laurelbrook* – in turn collects cases from around the country that have applied a balance of the benefits analysis in the context of students or trainees. *Solis*, 642 F.3d at 528-29 (collecting twelve cases from outside the Sixth Circuit). In addition to the Second Circuit in *Velez* and the Sixth Circuit in *Solis*, the Fourth, Fifth, Eighth, Tenth and Eleventh Circuits, as well as the Southern District of New York, have established that a balance of the benefits analysis is to be used in determining whether students, externs or trainees are employees.[114] No court that defendant is aware of has applied any other test in these contexts.

The dispositive question in a balance of the benefits analysis is whether the trainee or the putative employer was the primary beneficiary of the relationship. *See, e.g., Velez*, 693 F.3d at 330 ("[W]ho is the primary recipient of benefits from the relationship."). As demonstrated by the Sixth Circuit in *Solis*, determining the primary beneficiary requires a balancing of (a) the tangible and intangible benefits derived by the student, (b) the detriment to the employer, and (c) the benefit to the employer from the student's activities. 642 F.3d at 530-32. The court placed

---

[114] *Kaplan v. Code Blue Billing & Coding, Inc.*, No. 12-12011 et al., 2013 WL 238120, at *2-3 (11th Cir. Jan. 22, 2013) (implicitly balancing the benefits to determine that two student externs were not employees); *Blair*, 420 F.3d at 829; *Reich*, 992 F.2d at 1028; *McLaughlin v. Ensley*, 877 F.2d 1207, 1209 (4th Cir. 1989); *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 271-72 (5th Cir. 1982); *Archie*, 997 F. Supp. at 534-35; *see also Demayo,* 2013 WL 264691, at *5.

special emphasis on the intangible benefits that the students derived from the work, which taught them responsibility, the dignity of manual labor, the importance of working hard, seeing a task through to completion, sensitivity and respect for the elderly and infirm, leadership skills, work ethic and other practical skills.  *Id.* at 531.[115]  The court concluded that while the school and sanitarium benefited from the students' activities, the totality of the circumstances showed that the primary benefit went to the students and, as such, they were not employees.  642 F.3d at 529-31.  The court found that the intangible benefits in particular were of "significant value" to the students and tipped the balance in their favor.  *Id.* at 531.

Plaintiffs' narrow focus on "productive work" willfully ignores the relevant analysis, just as it ignores the meaning of *Walling*.[116]  (*See* Section I.A., *supra*)  Plaintiffs cite no case that supports their productive work test.  To the contrary, each of the cases they cite is consistent with the controlling test.[117]  Not only do they all use a totality of the circumstances test, not one even

---

[115] *See also Archie*, 997 F. Supp. at 533, 535 (considering training, whether defendant received a direct economic benefit, whether employees were displaced, supervision, whether defendant received an immediate advantage, whether alleged employees understood that they were not entitled to wages, and intangible benefits such as that the program at issue would help participants obtain jobs after the experience and would teach participants "the most basic of job skills," including avoiding absenteeism, being prompt for work, working a full day, and punching a time clock); *Blair*, 420 F.3d at 829 (considering teamwork, responsibility, accomplishment and pride and whether the work defrayed costs for the alleged employer); *Kaplan*, 2013 WL 238120, at *2 (considering educational value of hands-on work, receipt of academic credit and that externship made plaintiffs eligible for their degrees, economic benefit to alleged employer, and detriment to alleged employer, including from training and supervision); *Demayo*, 2013 WL 264691, at *5-*6 (considering whether compensation was expected, whether extern was guaranteed a job at the end of the externship, training, whether defendant reduced staffing levels or payroll, supervision and feedback provided for extern, whether defendant's operations were impeded, and gain of responsibility, knowledge and experience by extern, whether extern received credit, and whether extern worked for the immediate advantage of the employer or for her own advantage).

[116] Plaintiffs suggest that courts have equated "productive work" with "immediate advantage" (Pl. Br. 42-43), which is a factor in the balancing analysis, but no court has and *Walling* makes clear they are not one in the same.  In *Walling*, the trainees performed "actual" productive work yet the Court found that the railroad received no immediate advantage.  330 U.S. at 149, 153.

[117] In *Okoro v. Pyramid 4 Aegis,* Case No. 11-C-267, 2012 WL 1410025, at *5, 9 (E.D. Wis. Apr. 23, 2012), the test of employment was one of the "economic reality . . . of the working relationship" in which all the circumstances were examined and no one factor controlled.  In *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 470 (11th Cir. 1982), the court judged the employment relationship by the "economic realities of the individual case."  In *Wirtz v. Wardlaw*, 339 F.2d 785, 787-88 (4th Cir. 1964), the court balanced the benefits.  In *Bailey v. Pilots' Ass'n for Bay & River Del.,* 406 F. Supp. 1302, 1306-07 (E.D. Pa. 1976), the court stated that employment relationships are

considered simple "work" as part of the calculation.  Plaintiffs likely chose to rely upon these cases because the plaintiffs in each were held to be employees.  These outcomes are neither surprising nor relevant here, given that the workers in each of those cases expected compensation, while the interns in this case did not.  All that is relevant about plaintiffs' cases is their application of the controlling legal standard.

Without a single case supporting their "productive work" theory, plaintiffs cite DOL Fact Sheet #71.  However, the DOL's fact sheet is not a statement of binding legal authority.[118] Moreover, courts have specifically rejected it as plaintiffs attempt to apply it, as a rigid checklist. *See, e.g., Solis*, 642 F.3d at 525 (calling it "a poor method for determining employee status," "overly rigid and inconsistent with a totality-of-the-circumstances approach," and inconsistent with [*Walling*] itself"); *Reich*, 992 F.2d at 1026-27 (DOL's "all or nothing" approach unsupported by *Walling* and "unreasonable").  Even the DOL itself has not applied its fact sheet as plaintiffs suggest.[119]

Where courts have cited the DOL factors, they have generally acknowledged them merely as part of the totality of the circumstances to be considered in determining who receives

---

determined based on the totality of the circumstances and not isolated factors.  Moreover, plaintiffs' attempt to distinguish *Solis v. Laurelbrook* on its facts (Pl. Br. at 34-35) misses the point that it sets forth the controlling analytical framework for this case.

[118] Plaintiffs' reliance on *Exxon Mobil Corp. v. C.I.R.*, 689 F.3d 191, 200 n.13 (2d Cir. 2012), is misplaced.  That Tax Reform Act case had nothing to do with the FLSA or the DOL, let alone a DOL fact sheet.  Nor does it show in any way that Fact Sheet #71 is entitled to any level of judicial deference. The DOL guidelines are not law and no judicial deference is required under established Supreme Court precedent.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000).  Plaintiffs do not contend that the NYSDOL fact sheet concerning internships is legal authority and there are no cases of which we are aware even interpreting those criteria.

[119]*See* F.D. Ex.129 (Slate) ¶¶ 3-4 (Former DOL compliance officer charged with enforcement: "In my [31 year] tenure . . . the earning of post-secondary school academic credit was the key factor in determining that an intern was not an employee of the host business;" "[i]f the educational institution deemed the internship worthy of academic credit, it was clear to me that the student intern was the primary beneficiary of the relationship."); *see also Reich*, 992 F.2d at 1027 (finding that the DOL itself has not rigidly applied each one of its factors; the *Reich* court quoting Op. Wage Adm'r No. 638 (July 18, 1967) --"The Court has made clear that there is no single rule or test for determining whether an individual is an employee, but that the total situation controls.  The Court has indicated a number of factors which help to determine whether an employment relationship exists.").

the "primary benefit" in a particular case.  For example, *Archie* cited several but not all of the

DOL factors in considering the totality of the circumstances.  The court observed that the DOL

factors "are not exhaustive and are intended to be consistent with" *Walling*, noting that both

eschew reliance on any single factor and instead require "consideration of all the circumstances."

997 F. Supp. at 532.  In short, the DOL fact sheet may inform the totality of the circumstances

balance of the benefits test applicable in this case, but provides no basis to supplant it.

## II.   THE BALANCE OF THE BENEFITS TEST CANNOT BE APPLIED ON A CLASS BASIS TO THE INTERNSHIPS IN THIS CASE

To justify aggregating over 3,000 interns' employee or non-employee status into a single

litigation, plaintiffs must "affirmatively demonstrate," by a preponderance of the evidence, that

the requirements of Fed. R. Civ. P. 23 are met.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

2550-51 (2011).  *Dukes* fundamentally changed the nature of the showing required under Rule

23, making clear that class certification is an "exception" to the usual rule.  *Id*.  A class may not

be certified unless a "rigorous analysis" demonstrates that, among other things, the case satisfies

the commonality test of Rule 23(a) – that there are not merely common questions, but that

common evidence is likely to supply a single answer to those questions – as well as Rule

23(b)(3)'s requirement that those common questions "predominate over any questions affecting

only individual [class] members."  Fed. R. Civ. P. 23(b)(3); *Dukes*, 131 S. Ct. at 2551.  There is

no such common evidence in this case.

Plaintiffs would like to try this case on a representative basis: to ask the jury to draw

factual conclusions about the experiences of thousands of interns based on the testimony of the

named plaintiffs.  To do so would defy logic and, for that matter, due process.  A hypothetical

jury verdict that Harper's Bazaar benefited from Diana Wang's internship more than Wang did

would say nothing about the experience of any other intern.  Nor could a jury decide, on the basis

of gripes from eight disgruntled interns, that Hearst was the primary beneficiary of every one of thousands of internships in every department at every magazine.  The stark differences between Ms. Wang and the many interns who benefited repeat throughout the record (see pp. 4-25, *supra*).  For every Matthew Wagster who claims that his internship was "worthless," there are ten in this record alone who attest that they received enormous value from their internship, far outstripping the value to them of minimum wage.  Permitting a class-wide verdict on an individualized question about the relative benefit of each internship, dependent on the totality of the circumstances for each intern, cannot possibly result in an accurate or fair verdict on this record.

## A.  Plaintiffs Cannot Satisfy The Commonality Requirement

The party seeking class certification must prove "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This requires "not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Dukes*, 131 S. Ct. at 2551 (emphasis in original, internal quotation marks omitted).  A court cannot find commonality under *Dukes* unless it concludes that the plaintiffs' articulated common question "is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*[120] Certification must be denied if plaintiffs fail to demonstrate that such a question can be answered

---

[120] There can be no argument that *Dukes* applies only in discrimination cases and not to wage and hour matters. First, the Court interpreted Rule 23, which applies regardless of subject matter.  Second, the Court itself vacated and remanded the Ninth Circuit's decision in *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743 (9th Cir. 2010), a wage and hour case, for reconsideration in light of *Dukes*.  132 S. Ct. 74 (2011).  And just last week the Fourth Circuit applied *Dukes* to vacate a class certification ruling in a wage and hour matter to require more "rigorous analysis." *Ealy v. Pinkerton Govt. Servs., Inc.*, No. 12-1252, 2013 WL 980035, at *1, 5-7 (4th Cir. Mar. 14, 2013).

in the same way for each class member based on representative evidence. *Dukes*, 131 S. Ct. 2551. Such is the case here.

### 1.  Plaintiffs Have Not And Cannot Establish Commonality Under The Proper Legal Standard

Plaintiffs fail to establish commonality because they are moving under an incorrect legal standard that omits most of the relevant liability analysis. Determining the truth or falsity of plaintiffs' common contention of productive work will not resolve an issue that is central to the validity of their claims in one stroke.[121] *Dukes*, 131 S. Ct. at 2551. Moreover, they would not fare any better under the right legal standard.

The central question in this case is whether the primary beneficiary of each internship was Hearst or the interns, because only that answer can determine whether or not each intern was an employee. This critical question requires a jury to assess: (a) what were the tangible and intangible benefits to each intern; (b) what was the detriment to Hearst in each case; and (c) what benefit did Hearst obtain from the work of each intern. *Solis*, 642 F.3d at 530-32. The questions can be broken down even further into each of the individual factors that will be considered to balance the benefits. Under either formulation, these are the questions "apt to drive the litigation" because only they can determine whether an intern was an employee. These are the "central questions" for which there must be uniform, class-wide answers. *Dukes*, 131 S. Ct. at 2551. But there are no common class-wide answers to these questions here. *Id.*

---

[121] The legal standard for determining liability in the case is fundamental to the analysis of whether Rule 23 certification is proper. In order to grant certification, the Court must be "persuaded to rule, based on the relevant facts *and the applicable legal standard*," that each Rule 23 requirement is met. *In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (emphasis added); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 548-51 (2d Cir. 2010) (analyzing legal requirements for proving plaintiffs' claim to determine whether Rule 23 certification proper; *Dukes*, 131 S. Ct. at 2551-52 ("The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal quotation marks omitted); *id.* at 2551 (in order to certify class under Rule 23, need commonality "apt to drive the resolution of the litigation"). Plaintiffs' reliance on an incorrect legal standard is fatal to their motion for class certification.

First and foremost, "there is a wide gap" between an individual's claim that she was an employee and "the existence of a class of persons who have suffered the same injury." *Dukes*, 131 S. Ct. at 2553 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157-58 (1982)).  That gap can be bridged by "significant proof" of a general policy that resulted in a class-wide violation.  *Dukes,* 131 S. Ct. at 2553.  There is no such "significant proof" here.  Discovery has proven that Hearst does not have a general policy or practice that could lead to liability in this case.  With no uniform policies or practices among magazines prescribing what interns must do, it cannot be said that Hearst uniformly benefited from each intern's activities, nor could all interns have benefited in the same way or to the same extent.  The record bears this out – the benefits to both Hearst and the interns varied widely from internship to internship.  (*See supra*, pp. 11-25).[122]  Similarly, Hearst's operations could not have been uniformly impeded.  (*See supra*, pp. 21-22)  For instance, some supervisors, like Jeff Burfield, devoted significant time out of their day to teaching interns while others, like Ryan Jin, barely interacted with them. *Compare* F.D. Ex. 17 (Burfield) ¶¶ 7-15 *with* Ex. 161 (Rappaport Tr.) 65:9-66:17; 121:25-122:11.  Some magazines paid for interns to attend outside seminars while others provided seminars in their offices and still others provided no seminars.  The lack of policies or practices means that each department was left to its own devices for administering its internship programs.  Accordingly, there was no uniform experience.[123]

---

[122] For example, some interns quickly acquired the skill to take on additional tasks, like Sarah Wheels, who was permitted to perform phone interviews and write biographies of the interview subjects, (F.D. Ex. 176 (Wheels Tr.) 138:18-139:19; 145:9-146:24), while others, like Matthew Wagster, needed more attention and were given less to do.  Indeed, Wheels testified that her abilities allowed her to take on more work, while interns with less advanced knowledge, writing skills and phone etiquette could have benefitted from acquiring those skills during a Cosmo editorial internship.  F.D. Ex. 176 (Wheels Tr.)146:2-24; 236:22-238:24 ("I could think of all sorts of skills that I already had going into the internship that maybe other people would have acquired."); *see also*  F.D. Ex. 159 (Mancini Tr.) 204:14-17 ("It's possible that other interns could value their internships" more than she did).

[123] For example, interns came to the internships with different levels of experience and different skill levels – those with less experience and skills, like Alexandra Feuer, who had never been in a corporate environment, (F.D. Ex. 45 (Feuer) ¶¶ 2, 9, 11), stood to learn more from her experience than former Opt-in Jessica Best, who had two prior

In short, discovery has proven "the opposite of a uniform employment practice that would provide the commonality needed for a class action." *Dukes*, 131 S. Ct. at 2554.  The only common evidence is that (a) interns did not expect compensation; (b) interns were not entitled to jobs upon completion of their internships; and (c) interns were expected to receive academic credit for their internships.  None of this supports class certification because it does not begin to answer the relevant questions about the balance of benefits.  *See, e.g., Dukes*, 131 S. Ct. at 2551. Beyond these three common factors, the disparate nature of internships at the nineteen magazines necessitates an individualized, fact-intensive inquiry into each internship to determine its legality.  This is precisely the type of situation in which commonality is non-existent.  *See, e.g., Myers v. Hertz Corp.*, No. 02 Civ. 4325, 2007 WL 2126264, at *4 (E.D.N.Y. July 24, 2007) (no commonality when the conduct alleged to be illegal would require a fact-intensive inquiry into each class member).

Plaintiffs' five proposed common questions and answers buttress the conclusion that this case is not certifiable.  The questions are patently insufficient because they consider only one side of the balance – the alleged benefits to Hearst – while foregoing any inquiry at all into the benefits plaintiffs received and the detriments caused Hearst.  Plaintiffs' questions fail because their answers, even if common, do not answer anything: they represent only a portion of what is needed to resolve an issue central to their claim "in one stroke."  *See Dukes*, 131 S. Ct. at 2551. The common question as to each intern is not "did Hearst benefit," as plaintiffs suggest, but rather "who benefited more?" – and while the question is common, its answer on this record cannot be.

---

publishing internships at Glamour magazine, where she had "been there longer and knew what was going on."  F.D. Ex. 144 (Best Tr.) 29:12-30:16; 36:6-14.

Plaintiffs' commonality argument thus ignores two-thirds of the question to be answered and focuses narrowly on only that part of the inquiry to which "productive work" may be relevant.  Even accepting their arguments about the frequency of productive work at face value, they do not establish commonality because proof of productive work does not prove liability, or even take a substantial step toward that determination, under *Walling*, *Solis*, and every other case to consider the issue.

Further, their arguments cannot be taken at face value, because rather than being proof of employee status, productive work may just as well show the benefits derived by interns.  Wang herself testified that the more substantive the work, the more valuable it was to her.  (D227)  Moreover, in *Demayo*, the plaintiff complained that she spent a significant percentage of her externship doing menial, non-educational tasks.  2013 WL 264691, at *1 n.1, *5.  The court responded:

> The gist of Plaintiff's argument . . . rests in the fact that she performed nonsurgical work, such as stocking instruments and supplies, organizing files, and taking out the garbage.  Plaintiff's argument misses the point, however.  While this type of work may, generally, be the type of work covered by the FLSA, it is part-in-parcel to the tasks a surgical technologist performs.  And, the central purpose of Plaintiffs' externship was to perform the work of a surgical technologist. . . . Plaintiff benefited not only from the hands-on training she received by participating in surgical procedures, but also from a general gain of responsibility, knowledge, and experience earned from less glamorous parts of her work, such as sterilizing instruments, stocking supplies, and setting up surgery rooms and cleaning them afterward.

*Id.* at *5.  In short, to make productive work part of the employee analysis, there would need to be record proof of what tasks each plaintiff did and how they either economically benefited Hearst or displaced a paid worker.  There is nothing close to uniform evidence in this regard.[124]

---

[124] Plaintiffs try to make this point by arguing that the magazines uniformly used interns in lieu of messengers, but the evidence establishes that there was no uniform practice in this regard.  (*See* pp. 24-25 & nn. 97-99.)  They also point to evaluation forms in an effort to argue that Hearst hosted interns in order to assess them for entry-level employment, but again they seek to prove too much.  There is nothing nefarious about using evaluations to assess

Moreover, the productive work analysis is only complete after considering the other side of the balance – *i.e.*, how the work benefited interns, whether because it was "part-in-parcel" to the career experience the intern wanted, because it provided hands-on training, or because it provided intangible benefits such as a gain of responsibility, knowledge and experience. *Id.* There is a wealth of evidence of these varied benefits, and each would factor differently in an individual intern's totality of the circumstances, making class certification improper.

### 2. Plaintiffs Cannot Manufacture Commonality By Forbidding Consideration Of Academic Credit And By Unilaterally Requiring That Unpaid Internships Must Be Structured Around Classroom Experiences

As fundamental as plaintiffs' attempt to transform productive work into a central element of the case is their attempt to declare by *ipse dixit* the dual notions that (a) academic credit provided to interns may not be considered in the employee determination analysis and (b) only internships that mimic classroom experiences may potentially be considered lawfully unpaid experiences. (Pl. Br. at 43-44; *id.* at 30-31; *id.* at 35-37) In other words, plaintiffs argue that Hearst magazines must act like schools and that when actual schools determine the internships worthy of academic credit, the schools' judgment should be disregarded. Not surprisingly, plaintiffs' contentions are counter to all law on the subject.[125]

Academic credit and other educational value provided to students are considered by courts and the DOL alike in making employee determinations, regardless of whether the alleged

---

former interns who apply for jobs after graduation. *See Walling*, 330 U.S. at 150 (trainees certified as competent became "pool of qualified workmen available to the railroad when needed"). This was simply a byproduct of the intern program, not its purpose. *See* F.D. Ex. 166 (Roberts II) 70:21-71:7.

[125] Plaintiffs cite Fact Sheet #71, claiming that academic credit may not be considered in the employee determination analysis merely because it is not mentioned in there. In fact, academic credit has long been given significant weight by DOL. Moreover, as discussed above, Fact Sheet #71 is not legal authority, its factors are "non-exhaustive," and it specifically includes a factor inquiring into the benefit to interns, which would cover receipt of academic credit. *See* pp. 31-32 & n.119, *supra*.

employment situation mirrored a classroom experience.[126]  Indeed, it would be illogical to require internships to be centered around classroom experiences.  The very purpose of an internship is to get out of the classroom and gain real-word, hands on experience, which is precisely why many students undertake them.[127]

As *Kaplan* and *Demayo* make clear, academic credit is a factor in the employee analysis because it represents a benefit to students.  In some instances schools even required internships to graduate and forbade paid internships.  Academic credit also signifies that accredited institutions of higher education have determined Hearst's internship to be of genuine educational value.  These determinations may not be second-guessed by plaintiffs' attorneys.[128]  *See, e.g., Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision… they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.").

---

[126] *Kaplan*, 2013 WL 238120, at *2 (considering receipt of academic credit and fact that externship made plaintiffs eligible for their degrees); *Demayo*, 2013 WL 264691, at *5-*6 (considering educational benefits and whether extern received credit, as well as "hands on training," without qualifying that it must be the type given in an educational environment); *Solis*, 642 F.3d at 530-31 (considering general educational value and that the program at issue was accredited by the Department of Education); *Blair*, 420 F.3d at 829; *see also, e.g., Archie*, 997 F. Supp. 504, 533 (considering both general training and training that is similar to that received in a vocational school); *see also* F.D. Ex. 129 (Slate) ¶¶ 3-4.

[127] *See* n.80, *supra*.

[128] In fact, while plaintiffs like to portray unpaid internships as purely exploitation by corporations, academic experts think otherwise.  As leaders of a number of universities have stated, "[t]he integration of rigorous classroom study with real-world experiences, including internships, is a powerful way to learn.  Recognizing the value of experiential learning, a growing number of colleges and universities are expanding and integrating internships into their curriculum.  Some internships are paid, and some, on a mutually agreed upon basis, are uncompensated."  *See* F.D. Ex. 221 (April 28, 2010 Letter to Hon. Hilda Solis, U.S. Department of Labor from Thirteen University Presidents, including John Sexton, NYU and Joseph Auon, Northeastern); *see also* Ex. 222 (Joseph Auon, *Protect Unpaid Internships*, Inside Higher Ed, July 13, 2010, available at http://www.insidehighered.com/views/2010/07/13/aoun, last visited March 13, 2013); Ex. 223 (Janet Eyler, *The Power of Experiential Education*, Liberal Education, Fall 2009, at 24-31, published by The Association of American Colleges and Universities, available at http://www.aacu.org/liberaleducation/le-fa09/documents/LEFall09_Eyler.pdf, last visited March13, 2013; Ex. 224 (Richard M. Freeland, *Liberal Education and the Necessary Revolution in Undergraduate Education*, Liberal Education, Winter 2009, pp. 6- 13, published by The Association of American Colleges and Universities, available at http://www.aacu.org/liberaleducation/le-wi09/documents/LE-WI09_Freeland.pdf, last visited 3/13/13).

Hearst's academic credit requirement reflects that its internships are learning opportunities for college students who have not yet entered the job market.  The internships are opportunities to experiment with potential career paths and gain experience useful for securing jobs upon graduation. Semester-long internships for college students provide at least these benefits, in addition to the academic credit towards graduation.  Moreover, they entail a detriment to Hearst, which also must be considered in the balance of the benefits analysis. Semester-long internships for students mean that every few months each magazine department undertakes anew the process of finding and selecting interns, accommodating their class schedules and other obligations, and integrating and training them.[129]

In sum, academic credit is a factor in employee determinations, as is any other education or training received by interns, regardless of whether the internships are centered around a classroom experience.  Plaintiffs' wish to forbid consideration of these benefits has no basis in law or logic and betrays their inability to maintain this case when the full facts are disclosed.

### B.   Plaintiffs Cannot Show That Common Questions Predominate Over The Thousands of Individual Issues, Or That Class Determination Is Superior To Individual Lawsuits

Even more demanding than the Rule 23(a)(2) commonality requirement, Rule 23(b)(3) requires the party seeking certification to show that common questions would "predominate" in a class trial.  Fed. R. Civ. P. 23(b)(3); *Myers*, 624 F.3d at 547.  The purpose of the predominance requirement is "to ensure that the class will be certified only when it would 'achieve economies

---

[129] If all internships have to be paid, as plaintiffs urge, many college internships will disappear.  Generally speaking, it will not make sense for employers to hire broad numbers of young people with little or no experience to work for them for short stints during college, during which student schedules are accommodated, and then for the employer to repeatedly hire and integrate new employees throughout the year.  Fewer college students would get internships.  In other words, if plaintiffs are victorious in bringing an end to unpaid internships, they and their attorneys will receive a monetary reward while leaving many would-be interns with far fewer internship prospects.  *See, e.g.*, *Marshall v. Regis Educ. Corp.*, 666 F.2d 1324, 1327 n.5 (10th Cir. 1981) (commenting that, were the court to determine that resident-hall assistants were employees, it would be reasonable for the college to eliminate the RA program, in which case the "RA's who were to have benefited by becoming 'employees' . . . might well be without 'employment'").

of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id.* (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007)). This means that issues central to the determination of liability must be susceptible to generalized proof for all class members. *Myers*, 624 F.3d at 548-51. Generalized proof will not predominate here because plaintiffs' internships were not similar to those of all other interns with respect to the governing legal standard, *i.e.*, the benefit they derived, the benefit Hearst derived, and the detriment to Hearst.[130]

Plaintiffs do not even try to meet their burden. Their "proof," in its totality, amounts to a conclusion: "The common questions Plaintiffs have identified, which generalized proof can answer, are substantial and predominate over any individual questions because they will be determinative of the merits issue." (Pl. Br. at 47) Predominance imposes a higher burden than commonality – plaintiffs cannot satisfy it by simply reciting their commonality claims (which were inadequate themselves). Nor can they satisfy it by stating that Hearst uniformly classified interns as non-employees, as they do. (Pl. Br. at 39-40) Uniform classification as interns is not itself determinative of "the main concern in the predominance inquiry: the balance between individual and common issues." *Myers*, 624 F.3d at 549 ("the fact of common exemption does not establish whether all plaintiffs were *actually* entitled to overtime pay") (emphasis in original).

---

[130] Hearst does not contend that the benefits balancing analysis applicable to determining whether an intern is an employee is ***incapable*** of class treatment. Rather, the context of Hearst's varied types of internships and its varied relationships with interns, makes ***this case*** incapable of class treatment. *See Myers*, 624 F.3d at 549 (denying class certification in an employee exemption case because the exemption inquiry requires examination of the duties the employee actually performs and there was insufficient proof that the plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria).

Indeed, the Second Circuit has established that, even when a purported class of plaintiffs includes persons with the same job title and same job duties, when the legal test at issue requires a fact-specific inquiry that could vary among plaintiffs based on those with whom they worked, the predominance requirement is not satisfied. *Severin v. Project OHR, Inc.*, No. 10 Civ. 9696 (DLC), 2012 WL 2357410, at *10 (S.D.N.Y. June 20, 2012). In *OHR*, class certification was improper because "[r]esolving the plaintiffs' minimum wage claims will require, at a minimum, establishing the truth or falsity of a plaintiff's sleep deprivation contentions, the frequency with which the issue arose for a plaintiff, whether the plaintiff reported the problems to OHR, and OHR's response." *Id.* The same sort of plaintiff-specific determinations are necessary in this case, where the truth of each intern's claimed lack of benefit would have to be examined, as would the individual ways in which each intern benefitted Hearst and was detrimental to Hearst, to finally conclude whether, considering all relevant information, the balance tips in favor of Hearst or the intern.

For the same reasons, a class action is not a superior mechanism for adjudicating the claims of each class member. It would be deeply unfair both to Hearst and the absent interns to try this case on a class basis, because any verdict reached on a representative basis, whether in favor of the plaintiffs or Hearst, would fail to consider each intern's individual circumstances.[131]

## III. SUMMARY JUDGMENT MUST BE DENIED BECAUSE UNDER THE PROPER STANDARD, MATERIAL ISSUES OF FACT PRECLUDE JUDGMENT AS A MATTER OF LAW

To succeed on a motion for summary judgment, plaintiffs must show that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. *Celotex*

---

[131] Further counseling against class certification in this case is the inability to determine damages without individually evaluating each class member. With no genuinely representative evidence possible for the hours worked by class members, "separate hearings loom[] even if the [Court] bifurcate[s] the proceedings . . . Bifurcation would not eliminate variance in damages across class members." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) (affirming denial of class certification).

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "When reasonable persons, *applying the proper legal standards*, could differ in their responses to the [legal question raised in the case] on the basis of the evidence presented, the question is one for a jury. . . ."  *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000) (emphasis added).  Summary judgment must be denied because plaintiffs' motion is premised entirely on an incorrect legal standard, *i.e.*, that the performance of productive work makes them employees.

Material issues of fact preclude any summary determination of plaintiffs' claims.  *See* D1-D279.[132]  Plaintiffs must prove that Hearst was the primary beneficiary of each of their internships.  This means they must show that reasonable persons could not differ on whether Hearst received the primary benefit considering the benefits plaintiffs received, balanced with the detriments to Hearst, balanced with the economic benefit to Hearst.  This they have not done and cannot do.

**Stephanie Skorka**.  Asked how she currently feels about her Redbook beauty department internship, Skorka reported that it was "magnificent."  (D104)  She received close supervision and two mentors who gave her feedback and "helpful" career advice.  She was also provided with a wealth of shadow opportunities that were "major" learning experiences.  The internship taught Skorka about the editorial industry and how the beauty department of a magazine works, among many other things.  (D105-D130; D143-D150)  Moreover, Skorka's internship satisfied a college graduation requirement, and she received an 'A' for it.  (D100; D97)  Through the internship, Skorka gained knowledge that complemented her school studies and enabled her to put her school learning into a real-world context, enhancing her academic preparation.  (D122,

---

[132]  All citations to "D" are to Defendant's Counter-Statement of Additional Material Facts, filed concurrently herewith in response to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1.

D126; D150)  Skorka's internship also helped her identify a career path and gave her experience and contacts useful to break into that path.  (D127-D129)   She did not expect compensation from her internship and knew she was not necessarily entitled to a job upon completion of the internship.  (D92, D93) On the other side of the balance, there is no admissible evidence that Skorka economically benefited Hearst or displaced paid workers.

Undeterred by the overwhelming facts indicating Skorka does not have a valid claim, plaintiffs concocted new facts.  They filed a sworn declaration in court suggesting that Skorka interned at O, The Oprah Magazine in addition to her Redbook internship, and did the same things in both internships.  Skorka never interned for O.  (D141-D142)  Moreover, plaintiffs added Skorka as a named class representative in this case, and asserted in their Second Amended Complaint that Skorka worked alongside other interns at Redbook.  She did not.  (D140)  Indeed, Skorka testified that she became class representative through a "miscommunication" with counsel.  (D137)  Plaintiffs' resort to strained – if not false – facts speaks volumes.  There are material issues of fact.  (D92-D150)  Accordingly, summary judgment for Skorka should be denied.

***Matthew Wagster.***  Wagster obtained his Esquire marketing internship through family connections, represented that he would get academic credit for the experience and then did not (D195), and left the internship early (D217).  He had no expectation of compensation (D192), he knew the position would not necessarily lead to a job (D193) and he knew prior to starting the types of tasks it would entail (D193).  Yet, he testified that the internship was "worthless" and that he did not learn anything.  He also testified that statements he made in job application materials weeks before his deposition were false, including when he stated that his Esquire internship gave him the opportunity to gain skills in sales and developed his abilities to work in a

team setting, self-direct and multitask.  (D201, D211)  Wagster's testimony is incredible on its

face, and is further belied by testimony from other interns who received great benefit from some

of the same types of tasks Wagster was involved with.  (D199, D204-D210, D215)  Not

surprisingly, there is no record evidence that Wagster saved Hearst money or displaced paid

workers.  In fact, he testified that 50% of his time interning, he would solicit tasks because he did

not have anything to do.  (D212, D 213)  There are material issues of fact (see D192-D218) and

summary judgment for Wagster should be denied.

   ***Elizabeth Mancini.***  Prior to starting her Marie Claire fashion internship, Mancini had

full knowledge of what it would entail, including that it was unpaid, did not guarantee a job, and

the tasks involved.  Mancini decided that participating in the internship was in her best interest,

and she left the internship when "it was time for [her] to pursue a full-time position."  (D36-D40)

   During her internship, Mancini thought it was "sort of amazing" and she was "sooo

loving Marie Claire."  (D45)  She had a one-on-one relationship with her supervisor (D41-D42),

who wanted the internship to be a valuable experience and wanted Mancini to discover through

the internship what interested her (D42).  She thought her supervisor was an "amazing and

inspirational woman."  (D50)  Mancini received "pretty regular" feedback, learned how the

fashion department at a major magazine works, and gained knowledge about fashion and

designers.  (D47, D48, D66-D68)  Mancini's supervisor gave her career advice and helped her to

find a paying job.  (D49, D53-54)  In fact, her supervisor's reference helped her get her next

position, and what she learned from her internship was useful in that position.  (D78; D54-56)

   Mancini also knew before starting her internship that academic credit was required.

(D63-64)  Mancini asked her advisor from college to falsely represent that she was receiving

credit; the advisor refused. (D64)  Heedless of these facts, the sworn declaration plaintiffs filed in court for Mancini stated that she was not told of the academic credit requirement.  (D62)

The expectations Mancini had for the internship, the benefits she received and her credibility create material issues of fact for the jury.  Summary judgment should be denied.

*Caitlin Leszuk.*  LIM College approved Leszuk's Marie Claire sales department internship, finding it to have sufficient educational value to satisfy a Senior Co-op Program graduation requirement, including after being provided a description of Leszuk's tasks and performing a site visit at Marie Claire.  (D4-D5; D7-D8)  Leszuk knew the position was unpaid and did not guarantee her a job.  (D1-D2)  Leszuk's internship taught her about the sales department of a magazine, and gave her the opportunity to participate in marketing events. (D11-D13, D15; D25; D30-D35)  Leszuk did not benefit Marie Claire – her work was riddled with careless mistakes that recurred even after they were pointed out to her, she also was "uninterested" and spent much of her time in the internship on the internet and her phone.  (D20)  Leszuk admitted that Marie Claire employees could have a different opinion than she on whether her contributions were useful.  (D21)  Further, Leszuk testified that a prior statement she made about attending weekly classes at Marie Claire was false.  (D27-D28)  She also stated in a cover letter that she participated in sales pitches to clients and that her internship gave her a fantastic insight into the business.  She testified that both those statements are false.  (D27-D28)

There are material issues of fact as to whether Hearst or Leszuk received the greater benefit from her internship (*see* D36-D68) and a jury should be able to gauge Leszuk's credibility, particularly in light of her testimony that certain pre-lawsuit statements she made are false.

***Alexandra Rappaport.***  Rappaport received credit from her college for her *Seventeen* magazine fashion closet internship, and her college *required that the internship be unpaid*. (D72-D73)  Rappaport therefore knew the internship was unpaid, and she also knew that it did not guarantee her a job.  (D69-D70)  Rappaport learned about the process by which a magazine chooses clothing and determines precisely how it will be placed in the magazine, she also gained "many good life skills" from her internship, including better organizational skills and greater proficiency in Excel.  (D75-D77; D84-D87)  The internship enabled her to gauge her interest in a specific career and get a taste of the work and what the environment is like.  (D78)  Indeed, Rappaport's internship helped her to learn the "valuable lesson" that she did not want to pursue a career in the magazine business.  (D79; *see also* D91)  Rappaport considers herself "110 percent lucky to get that kind of [internship] opportunity;" she "chose Seventeen for a reason, to get a real-life experience."  (D83)  There is no record evidence as to how, if at all, Rappaport enabled Hearst to save money.  There is also no basis on which to grant summary judgment to Rappaport, particularly in light of significant tangible and intangible benefits she received.

***Erin Spencer.***  Spencer was required to complete her *Cosmopolitan* bookings department internship in order to graduate from college, and she knew the position was unpaid and did not guarantee a job (D151, D152, D154).  Spencer trained closely with her supervisor, whom she viewed as a mentor and who provided Spencer career and industry advice.  (D161)  Spencer was eager to learn and increase her experiences, eventually achieving one of her stated goals of the internship – to hold her own model casting.  (D156, D177)  The knowledge and skills Spencer developed could not be learned in a college class.  (D180)  Spencer was also provided training in the form of "Cosmo U" sessions.  (D164)  She "loved" her time at Cosmopolitan, it was a "very

positive experience" that "generously contributed" to her "overall career development; it "was an experience full of opportunities to observe, improve, learn and participate."  (D163-D181)

There are material issues of fact as to whether the tremendous benefits Spencer received outweigh any supposed cost-savings she provided.  (*See* D151-D191)  Summary judgment should be denied.

**Diana Wang.**  After graduating from college, Wang aspired to be a fashion stylist but had no experience in the fashion industry.  (D221)  She "had always dreamed of working [at Harper's Bazaar];" it would be a "dream fulfilled to support the accessories department at Harper's Bazaar as an intern."  (D222)  She knew that her intern position in the accessories department of Bazaar would be unpaid and did not guarantee a job.  (D219-D220)  She also determined, after having the position explained to her, that she wanted to intern full-time as the head accessories intern.  (D223)  Through the internship, Wang learned many things that can't be learned in a classroom, including how a fashion closet works, the role each person fills at a magazine, and that she may not be interested in pursuing fashion as a career.  (D225, D230-D234, D237-D244)  Upon completion of the internship, she reflected that it had "provided [her] unrivaled skills for working in fashion" and was her "most valuable work experience."  (D228-D229)  Wang knew there was a policy that she must receive academic credit and she submitted a letter to Hearst HR stating that she would receive credit, even though she did not.  (D224)  All of these benefits (*see*, in addition, D235-D236) and credibility determinations preclude summary judgment.

**Sarah Wheels.**  Wheels received credit for her internship in the editorial department of Cosmopolitan.  (D248)  She knew in advance that the internship was unpaid and did not guarantee a job.  (D245-D246)  She learned how the editorial side of a magazine works and was

given the chance to do reporting and writing.  (D249-D253, D255, D260-D264)  Wheels also

attended "Cosmo U" and found the presentations "super informative."  (D256-D258)  In her

evaluation of the internship, Wheels said it "exceeded expectations," that she "learned a whole

lot," and had "great interactions with supervisors."  (D259, D265-D273)  Reflecting how little, if

at all, she economically benefited Hearst, Wheels' internship included substantial downtime and

"a lot of slow days."  (D213-230)  Summary judgment for Wheels should be denied.

## IV.    PLAINTIFFS MISSTATE THE LAW GOVERNING WILLFULNESS, AND HAVE NO EVIDENCE OF ANY WILLFUL VIOLATION

The FLSA permits a finding of a willful violation only where the employer knew that its

conduct violated the statute, or acted with reckless disregard for whether its actions were in

compliance.  There is no uncertainty about that standard; it has been the rule since the Supreme

Court established it 25 years ago in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 133, 135

(1988).  Plaintiffs unaccountably insist that their "burden of proof is a light one," citing *Richland

Shoe*, which says nothing of the kind.  (Pl. Br. at 38)  In fact the Supreme Court there rejected

more lenient standards and specifically held that it was not enough to prove that the employer

was negligent, or even that the employer acted without a reasonable basis for believing that it

was complying with the statute.  486 U.S. at 134.  Actual knowledge or recklessness is required.

*Id.* at 133.

Plaintiffs offer no evidence of recklessness, relying entirely on the notion that Hearst

should have done more affirmatively to look into the matter.  *See, e.g.*, Pl. Br. at 38.  But courts

since *Richland Shoe* have specifically rejected the notion that "the failure of an employer to take

any steps to determine the lawfulness of its conduct constitutes evidence of willful violations."

*Copantitla v. Fiskardio Estiatorio, Inc.*, 788 F. Supp. 2d 253, 318 n.28 (S.D.N.Y. 2011); *see also

Saunders v. City of New York*, 594 F. Supp. 2d 346, 364 (S.D.N.Y. 2008) (denying summary

judgment where plaintiffs presented no evidence of "conscious disregard" "apart from the contested existence of the violations themselves").

Even if plaintiffs had evidence of willfulness, which as a matter of law they do not, whether a violation was willful is a question for the jury.   In this case, where no court has ever passed on the legality of unpaid internships, or even directly on the factors that weigh in that determination; where the analogous case law holds that legality turns on an ad hoc consideration of the totality of the circumstances; where DOL's own practice[133] declares that receipt of academic credit renders unpaid internships presumptively lawful; and where plaintiffs present no evidence of knowledge or reckless disregard, summary judgment for Hearst on the willfulness question is appropriate.  But even if the Court declines to go that far, the question is at most one for the jury.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' motions for class certification and for summary judgment should be denied.

Respectfully submitted,

Dated: March 18, 2013

**HEARST CORPORATION**

     /s/ Jonathan R. Donnellan

Of Counsel:
Proskauer Rose LLP
Mark W. Batten

Eve B. Burton
Jonathan R. Donnellan
Kristina E. Findikyan
Courtenay B. O'Connor
Andrea R. Butler
Kristen Hauser Glass
Christine Bateup

*Attorneys for Defendant Hearst Corporation*

---

[133] *See* n.119 (citing F.D. Ex. 129 (Slate) ¶¶ 3-4), *supra.*

- 50 -

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing to be served on all counsel of record, this 18th day of March, 2013, by operation of the Court's CM/ECF electronic filing system.

   /s/  **Kristina E. Findikyan**      
Kristina E. Findikyan
