IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

XUEDAN WANG and ERIN SPENCER, on behalf
of themselves and all others similarly situated,

                              Plaintiffs,

                v.

THE HEARST CORPORATION,

                              Defendant.

ECF

Civil Action No. 1:-cv-00793 (HB)(AJP)

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF
UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE
56.1 AND COUNTER-STATEMENT OF FACTS**

**HEARST CORPORATION**

Office of General Counsel
Eve B. Burton
Jonathan R. Donnellan
Kristina E. Findikyan
Courtenay B. O'Connor
Andrea R. Butler
Kristen Hauser Glass
Christine Bateup
300 W. 57th Street, 40th Floor
New York, New York 10019
Tel: (212) 841-7000
Fax: (212) 554-7000

*Attorneys for Defendant Hearst Corporation*

Of Counsel:

Proskauer Rose LLP
Mark W. Batten
One International Place
Boston, MA  02110-2600
Tel: (617) 526-9850
Fax: (617) 526-9899

Pursuant to Rule 56.1 (b) and (c) of the Local Rules of the United States District Court for the Southern District of New York and Rule 56 of the Federal Rules of Civil Procedure, Defendant The Hearst Corporation ("Hearst"), by and through its counsel, respectfully submits the following additional material facts and response to Plaintiffs' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1.  Hearst's agreement that a given factual or other statement is not disputed should not be construed as an agreement that the factual or other statement is material to any issue in this case, nor should it be construed to be adopting any particular definition (legal or otherwise) of vague and ambiguous terms such as, *inter alia*, "duty," "hire," "responsibilities," "wages," and "work."

## Defendant's Specific Responses to Plaintiffs' Rule 56.1 Statement

1.      Defendant The Hearst Corporation ("Hearst") is one of the world's largest publishers of monthly magazines, with 20 U.S. titles and more than 300 international editions. Pls.' Third Am. Class Action Compl., ECF No. 72 ("Compl.") ¶ 1; Def.'s Am. Ans. to Third Am. Class Action Compl., ECF No. 82 ("Ans.") ¶ 1.

    **Undisputed.**

2.      Hearst is a Delaware corporation registered with the New York Department of State as an Active Foreign Business Corporation with its principal offices located in the Hearst Tower, 300 West 57th St., New York, New York 10019. Compl. ¶ 17; Ans. ¶ 17.

    **Undisputed.**

3.      Hearst is an employer under the Fair Labor Standards Act and New York Labor Law. *See* Ex. 31 (Roberts Tr. I) 5:8-22; 7:6-12; Ex. 15 (Helmus Tr.) 6:21-7:3; 44:4-46:2; Ex. 245 (Letter from F. Bennack, Jr. re 2012 annual review).

    **Undisputed, but disputed as to the interns at issue in this action.**

-1-

4.      Hearst is divided into several divisions, one of which is Hearst's magazine division. Ex. 31 (Roberts Tr. I) 10:14-11:2.

**Undisputed.**

5.      Hearst's magazine division currently consists of 20 U.S. magazine titles, including Car and Driver, Cosmopolitan, Country Living, ELLE, ELLE DÉCOR, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, O, The Oprah Magazine, Popular Mechanics, Redbook, Road & Track, Seventeen, Town & Country, Veranda, and Woman's Day. Ex. 253 (Hearst Magazines website).

**Undisputed.**

6.      Hearst's magazine division also includes several corporate departments, including Finance, Human Resources, Payroll, Circulation, Production, Brand Development, Integrated Media, Digital Media, Digital Studio, Direct Response, Controller's Office, and Consumer Marketing, that provide services to the magazines. Ex. 6 (Chirichella Tr.) 18:6-19; Ex. 145 (Roberts Decl.) ¶ 5.

**Undisputed.**

7.      Plaintiff Xuedan "Diana" Wang was an intern at Harper's Bazaar from approximately August 2011 to December 2011.  Ex. 159 (Wang Decl.) ¶ 1. Wang filed this lawsuit and her consent to join form on February 1, 2012. ECF No. 1.

**Undisputed.**

8.      Plaintiff Erin Spencer was an intern at Cosmopolitan from approximately June 1, 2010 to August 15, 2010. Ex. 90 (2010 Summer Interns). Spencer filed a consent to join form on October 9, 2012. ECF No. 56.

**Undisputed.**

-2-

9.      Opt-in Plaintiff Elizabeth Mancini was an intern at Marie Claire from approximately January 2009 through June 2009. Ex. 128 (Mancini Decl.) ¶ 1. Mancini filed a consent to join form on February 8, 2012. ECF No. 3-1.

**Undisputed.**

10.     Opt-in Plaintiff Matthew Wagster was an intern at Esquire from approximately July 2009 through December 2009. Ex. 158 (Wagster Decl.) ¶ 1. Wagster filed a consent to join form on February 8, 2012. ECF No. 3-1.

**Undisputed.**

11.     Opt-in Plaintiff Stephanie Skorka was an intern at Redbook from approximately September 2009 through December 2009. Ex. 154 (Skorka Decl.) ¶ 1. Skorka filed a consent to join form on April 26, 2012. ECF No. 17.

**Undisputed.**

12.     Opt-in Plaintiff Caitlin Leszuk was an intern at Marie Claire from January 11, 2010 to May 15, 2010. Ex. 21 (Leszuk Tr.) 191:11-15. Leszuk filed a consent to join form on November 12, 2012. ECF No. 67.

**Undisputed.**

13.     Opt-in Plaintiff Alexandra Rappaport was an intern at Seventeen from May 23, 2011 to July 26, 2011. Ex. 27 (Rappaport Tr.) 106:10-13; 115:18-20; Ex. 69 (Rappaport Resume). Rappaport filed a consent to join form on October 16, 2012. ECF No. 59.

**Undisputed.**

14.     Opt-in Plaintiff Sarah Wheels was an intern at Cosmopolitan from approximately May 20, 2011 to August 10, 2011. Ex. 51 (Wheels Tr.) 116:2-13. Wheels filed a consent to join form on October 19, 2012. ECF No. 62.

**Undisputed.**

15.     Hearst made a determination at the corporate level that interns are not "employees" subject to the overtime and minimum wage requirements of the law. Ex. 15 (Helmus Tr.) 59:22-24; 63:7-12; Ex. 31 (Roberts Tr. I) 14:3-24; 50:24-51:5; 52:15-53:3.

**Undisputed.**

16.     With limited exceptions, interns at Hearst are not paid any wages. Ex. 15 (Helmus Tr.) 76:5-77:5; 107:20-24; Ex. 31 (Roberts Tr. I) 60:3-10; 69:3-25; 73:22-74:1; Ex. 74 (Hiring Criteria Email); Ex. 76 (December 2005 Memo) ("Interns can *only* be brought on who can receive college (or possibly high school) credit; we will not pay any interns either a weekly salary or stipend of any kind.").

**Disputed.** There are paid internship programs at some Hearst magazines and departments. Findikyan Decl. Ex. 57 (Helmus Decl.) ¶ 6; Ex. 106 (Roberts Decl.) ¶ 4. Other interns who cannot receive academic credit also receive pay. *See* Pls. SOF ¶ 22 below (referring to other interns who receive pay).

17.     Hearst has had more than 3,000 interns over the past six years. Def.'s Mem. in Supp. of Mot. to Strike the Class and Collective Allegations, ECF No. 10, at 1.

**Undisputed.**

18.     Unpaid internships at Hearst do not cost the magazines money. Ex. 6 (Chirichella Tr.) 80:11-18.

**Disputed.** Although magazine budgets do not explicitly include internship programs as an expense (Pls. Ex. 6 (Chirichella Tr.) 80:19-81:6), internships do cost the magazines in terms of time and other resources. *See* Pls. Ex. 6 (Chirichella Tr.) 80:11-18. Intern training and supervision require that employees spend time away from other duties, some interns

attend training programs at the magazines' expense, and overhead (including office space, computers and other items) is committed to unpaid interns.  *See* Pls. Ex. 32 (Roberts Tr. II) 38:8-16, 39:25-40:13 (Roberts referred email re: number of interns to Finance to address space considerations); Findikyan Decl. Ex. 10 (Baughman Decl.) ¶ 8 (staff puts in more work when interns involved); Ex. 23 (Cazzola Decl.) ¶ 8; Ex. 49 (Greenblatt Decl.) ¶ 10 (send interns to MPA "Magazine U" at magazine's expense); Ex. 51 (Greene Decl.) ¶ 7 (editors spend a great deal of time on recruitment and selection of interns), ¶ 18 (interns pose a significant time cost); Ex. 115 (Rubin Decl.) ¶ 11; Ex. 116 (Rubinstein Decl.) ¶ 7 (selection process time consuming); Ex. 122 (Schmidt Decl.) ¶ 9 (interns require time and effort); Ex. 123 (Scrymser Decl.) ¶ 12 (interns take time); Ex. 15 (Broekema Decl.) ¶ 19 (at least half his day is devoted to interacting with interns); Ex. 17 (Burfield Decl.) ¶¶ 6, 11, 13 (amount of time spent supervising interns), ¶ 15 (interns net time loss); Ex. 179 (Diegel Tr.) 10:18-11:5, 25:4-17, 32:16-24 (interns are a lot of work, time devoted to interns); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 43 (Fazio Decl.) ¶ 8 (attended MPA Magazine U at Hearst's expense; Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns).

19.    The magazines do not budget money for intern trainings.  Ex. 6 (Chirichella Tr.) 80:19-24.

**Disputed.**  Although magazine budgets may not explicitly include "intern trainings" as a budgeted expense, magazines do budget for employee salaries and other expenses that are necessary to the training of interns.  *See* Findikyan Decl. Ex. 148 (Chirichella Tr.) 19:15-20, 47:21-24, 80:11-18; *see also* Ex. 10 (Baughman Decl.) ¶ 8 (staff puts in more work when interns involved); Ex. 23 (Cazzola Decl.) ¶ 8; Ex. 49 (Greenblatt Decl.) ¶ 10 (send interns to MPA "Magazine U" at magazine's expense); Ex. 51 (Greene Decl.) ¶ 7 (editors spend a great deal of time on recruitment and selection of interns), ¶ 18 (interns pose a significant time cost); Ex. 115 (Rubin Decl.) ¶ 11; Ex. 115 (Rubinstein Decl.) ¶ 7 (selection process time consuming); Ex. 122 (Schmidt Decl.) ¶ 9 (interns require time and effort); Ex. 123 (Scrymser Decl.) ¶ 12 (interns take time); Ex. 17 (Burfield Decl.) ¶¶ 6, 11, 13, 15 (interns a net time loss); Ex. 179 (Diegel Tr.) 10:18-11:5, 25:4-17, 32:16-24 (interns are a lot of work, time spent with interns); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 43 (Fazio Decl.) ¶ 8 (attended MPA Magazine U at Hearst's expense); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex.105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns).  Intern training and supervision requires that employees spend time away from other duties.  *See, e.g.,* Findikyan Decl. Ex. 17 (Burfield Decl.) ¶ 11, ¶ 15 (interns a net time loss); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex.105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns).

20.     The magazines' budgets do not include allocations for time that employees spend on interns. Ex. 6 (Chirichella Tr.) 81:7-10.

> **Disputed.** Although magazine budgets may not explicitly include allocations for time that employees spend on interns, magazines do budget for employee salaries and other expenses that are necessary to the training of interns. *See* Findikyan Decl. Ex. 27 (Chirichella Tr.) 19:15-20, 47:21-24, 80:11-18; *see also* Findikyan Decl. Ex. 10 (Baughman Decl.) ¶ 8 (staff puts in more work when interns involved); Ex. 23 (Cazzola Decl.) ¶ 8; Ex. 49 (Greenblatt Decl.) ¶ 10 (send interns to MPA "Magazine U" at magazine's expense); Ex. 51 (Greene Decl.) ¶ 7 (editors spend a great deal of time on recruitment and selection of interns), ¶ 18 (interns pose a significant time cost); Ex. 115 (Rubin Decl.) ¶ 11; Ex. 116 (Rubinstein Decl.) ¶ 7 (selection process time consuming); Ex. 122 (Schmidt Decl.) ¶ 9 (interns require time and effort); Ex. 123 (Scrymser Decl.) ¶ 12 (interns take time); Ex. 17 (Burfield Decl.) ¶¶ 6, 11, 13 (amount of time spent supervising interns), ¶ 15 (interns a net time loss); Ex. 179 (Diegel Tr.) 10:18-11:5, 25:4-17, 32:16-24 (interns are a lot of work, time spent with interns); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 43 (Fazio Decl.) ¶ 8 (attended MPA Magazine U at Hearst's expense); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns). Intern training and supervision requires that employees spend time away from other duties. *See, e.g.,* Findikyan Decl. Ex. 17 (Burfield Decl.) ¶ 11 (spends more than 10% of his time supervising interns), ¶ 15 (interns a net time loss); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns).

21.     The overtime budgets for the magazines do not include allocations for time that employees spend on interns. Ex. 6 (Chirichella Tr.) 81:7-14.

> **Disputed.** Although magazine overtime budgets may not explicitly include allocations for time that employees spend on interns, magazines do budget for employee salaries and other expenses that are necessary to the training of interns. *See* Findikyan Decl. Ex. 27 (Chirichella Tr.) 19:15-20, 47:21-24, 80:11-18; *see also* Findikyan Decl. Ex. 10 (Baughman Decl.) ¶ 8 (staff puts in more work when interns involved); Ex. 23 (Cazzola Decl.) ¶ 8; Ex. 49 (Greenblatt Decl.) ¶ 10 (send interns to MPA "Magazine U" at magazine's expense); Ex. 51 (Greene Decl.) ¶ 7 (editors spend a great deal of time on recruitment and selection of interns), ¶ 18 (interns pose a significant time cost); Ex. 115 (Rubin Decl.) ¶ 11; Ex. 116 (Rubinstein Decl.) ¶ 7 (selection process time consuming); Ex. 122 (Schmidt Decl.) ¶ 9 (interns require time and effort); Ex. 123 (Scrymser Decl.) ¶ 12

(interns take time); Ex. 17 (Burfield Decl.) ¶¶ 6, 11, 13 (amount of time spent supervising interns); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 179 (Diegel Tr.) 10:18-11:5, 25:4-17, 32:16-24 (interns are a lot of work, time spent with interns); Ex. 43 (Fazio Decl.) ¶ 8 (attended MPA Magazine U at Hearst's expense); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns). Intern training and supervision requires that employees spend time away from other duties. *See, e.g.*, Findikyan Decl. Ex. 17 (Burfield Decl.) ¶ 11 (spends more than 10% of his time supervising interns), ¶ 15 (interns a net time loss); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns).

22.     Other than interns who are part of Hearst's diversity internship program, some interns at O, The Oprah Magazine, and Esquire, and certain interns whom Hearst considers to be "high priority referrals" from Hearst's clients or executives, Hearst does not pay interns. Ex. 15 (Helmus Tr.) 76:5-77:5; 107:20-24; Ex. 31 (Roberts Tr. I) 60:4-10; 69:3-25; 78:2-12; 78:23-79:1; Ex. 32 (Roberts Tr. II) 23:10-24:16; Ex. 74 (Hiring Criteria Email).

**Disputed.**  There are paid internship programs at additional Hearst magazine departments. Findikyan Decl. Ex. 57 (Helmus Decl.) ¶ 6; Ex. 106 (Roberts Decl.) ¶ 4; Ex. 12 (Bell) ¶ 11; Ex. 116 (Rubinstein Decl.) ¶ 13.

23.     Hearst's diversity internship program offers paid internships to six college students during the summer. Ex. 31 (Roberts Tr. I) 44:14-21; 46:25-47:3.

**Undisputed.**

24.     O, The Oprah Magazine has advertised for both paid and unpaid fashion interns using the same internship description.  Ex. 255 (Oprah Paid/Unpaid Posting).

**Undisputed.**

25.     Interns at O, The Oprah Magazine, are not paid for hours that they work in excess of 35 a week. Ex. 52 (Wright Tr.) 85:25-87:4; Ex. 254 (A. Wright Email).

**Disputed.**  The cited evidence does not support the statement made.  Wright's testimony and the related email refer only to a particular "style internship" during Wright's tenure.  Plaintiffs have offered no evidence that all paid interns at O, The Oprah Magazine are not paid for hours, if any, that they work in excess of 35 a week.

26.     The Human Resources Department sometimes pays high priority referrals out of its own budget when the magazines do not have the money. Ex. 32 (Roberts Tr. II) 25:19-24; 26:19-28:5; 32:15-19.

**Undisputed.**

27.     Harper's Bazaar has offered internships as contest prizes. Ex. 32 (Roberts Tr. II) 78:7-12.

**Disputed.**  The use of the term "internship" in this context is vague and ambiguous, and the referenced testimony does not support the statement as written.  Roberts testified that a contest winner spent a week at Harper's Bazaar "observing" the magazine's operations, not as an intern.  Pls. Ex. 32 (Roberts Tr. II) 78:19-79:12 (noting they did not allow the contest winner to intern, only observe for a few weeks).  The related exhibit about which Roberts was asked questions, however, involves an email from a Marie Claire employee discussing a contest for a two-week shadowing "internship."  *See* Findikyan Decl. Ex. 196 (Roberts Ex. 4).  Plaintiffs have offered no evidence that Harper's Bazaar has ever offered an "internship" as a contest prize.

28.     At least one contest winner was not paid and did not receive school credit for her internship at Harper's Bazaar. Ex. 32 (Roberts Tr. II) 78:19-79:12.

**Disputed.**  The use of the term "internship" in this context is vague and ambiguous, and the referenced testimony does not support the statement as written.  Roberts testified that a contest winner spent a week at Harper's Bazaar "observing" the magazine's operations, not as an intern.  Pls. Ex. 32 (Roberts Tr. II) 78:19-79:12 (noting they did not allow the contest winner to intern, only observe for a few weeks).  The related exhibit about which Roberts was asked questions, however, involves an email from a Marie Claire employee discussing a contest for a two-week shadowing "internship."  *See* Findikyan Decl. Ex. 196 (Roberts Ex. 4).  Plaintiffs have offered no evidence that Harper's Bazaar has ever offered an "internship" as a contest prize.

29.     Hearst has not reviewed its policy of not paying interns in any way after this

lawsuit was filed. Ex. 32 (Roberts Tr. II) 56:20-23.

> **Disputed.** The statement is vague and ambiguous and the cited testimony does not
> support the statement made.  Roberts was asked only whether Hearst had reviewed its
> "intern policies."  Pls. Ex. 32 (Roberts Tr. II) 56:20-23.  Plaintiffs have offered no
> evidence that Hearst has a "policy of not paying interns."  *See also* responses to ¶¶ 22-23
> above.

30.     Hearst has not consulted with the Department of Labor regarding whether its

policy of not paying interns is legal.  Ex. 32 (Roberts Tr. II) 56:24-57:3.

> **Disputed.**  The statement is vague and ambiguous and the cited testimony does not
> support the statement made.  Roberts was asked only whether Hearst had consulted the
> Department of Labor with respect to Hearst's "intern policies."  Pls. Ex. 32 (Roberts Tr. II)
> 56:24-57:3.  Hearst has offered testimony from a former compliance officer, assistant
> district director and regional enforcement coordinator for the U.S. Department of Labor's
> Wage and Hour Division ("WHD") to the effect that during her tenure, the earning of
> post-secondary school academic credit for an internship was the key factor in determining
> that an intern was not an employee, and that if a student was required to fulfill an
> internship in their selected field of study or otherwise received academic credit in lieu of
> classroom studies by fulfilling an internship, the WHD would not assert an employment
> relationship under the Fair Labor Standards Act.  *See* Findikyan Decl. Ex. 129 (Slate
> Decl.); *see also* Findikyan Decl. Ex. 229 (WHD opinion letter).

31.     Hearst does not examine the duties that interns perform, their supervision,

whether interns are given assignments similar to those given to paid employees, or whether its

employees are dependent on the work that interns perform in determining that it need not pay

interns minimum wages. Ex. 32 (Roberts Tr. II) 13:11-15:9.

> **Disputed.**  The cited testimony does not support the statement.  Hearst does not dispute
> that it does not examine the assignments interns are given or their supervision, or whether
> its employees "are dependent on the work that interns perform."  Individual magazines
> and supervisors, however, are aware of the tasks that interns perform, their supervision,
> and how assignments given to interns compare to those of paid employees and the degree
> to which interns assist or deter employees in their regular tasks.  *See, e.g.*, Findikyan
> Decl. Exs. 1, 4, 9-12, 15, 19, 21, 23, 25, 33, 34-35, 49-51, 56, 66, 75, 81, 91, 94, 102, 107,
> 112, 115, 116, 122-23, 130-31, 133, 137 (describing knowledge of tasks interns perform);
> *see also* Ex. 13 (Berard Decl.) ¶ 8 (interns shadow her, she is not dependent on interns);
> Ex. 37 (Diegel Decl.) ¶ 3 (role is 100% mentor), ¶ 4 (interns not capable of doing work of

Popular Mechanics writers), ¶ 6 (not dependent on interns); Ex. 114 (Rothman Decl.) ¶¶ 5-6, 7 (Good Housekeeping Research Institute lab not dependent on interns).  In addition, in order to receive academic credit, interns often must provide a record of their experience to their academic institution.  *See* Findikyan Decl. Ex. 7 (Bailey Decl.) ¶ 3; Ex. 13 (Berard Decl.) ¶ 3; Ex. 29 (Corbett Decl.) ¶ 3; Ex. 39 (Dunn Decl.) ¶ 4; Ex. 48 (Gonzalez Decl.) ¶ 4; Ex. 52 (Groher Decl.) ¶ 4 (describing school journal and paper requirements for internship); Ex. 53 (Hackel Decl.) ¶ 3 (same); Ex. 60 (Holiver Decl.) ¶ 4, Ex. 156 (Holiver Tr.) 98:12-103:18 & Ex. 180-182 (Holiver Exs. 4-6) at KH 00001-15; Ex. 140 (Yale Decl.) ¶ 4 (describing credit requirements), ¶¶ 9-10 (describing projects worked on as intern) & Ex. 220 (Yale school papers) at MY 00001-16.

32.     Hearst does not make any distinctions among its magazines with respect to its policy of not paying interns, except for the two magazines, Esquire and O, The Oprah Magazine, that have some paid interns. Ex. 32 (Roberts Tr. II) 15:10-16:13.

> **Disputed.**  The statement is vague and ambiguous and the cited testimony does not support the statement made.  Plaintiffs have offered no evidence that Hearst has a "policy of not paying interns."  Hearst has no policies with respect to internships except that unpaid interns must offer proof that an educational institution has deemed the internship worthy of academic credit.  *See* ¶ 69 and Hearst's response to ¶ 69.

33.     Hearst does not have any policies, and has not taken any steps, to ensure that internships at its magazines or in its departments are structured around a classroom or academic experience. Ex. 15 (Helmus Tr.) 89:25-90:10; Ex. 31 (Roberts Tr. I) 72:13-21.

> **Disputed.**  Internships at Hearst's magazines or in its departments provide students with an educational experience; Hearst's policy that students offer proof that an educational institution has deemed the internship worthy of academic credit ensures that this is the case; and individual magazines and supervisors take additional steps to ensure that their interns receive an experience relevant to their academic credit requirements.  *See* Findikyan Decl Ex. 118 (Rush Decl.) ¶¶ 4-10 (describing how internships are an integral part of the educational experience for an FIT student); Ex. 129 (Slate Decl.) ¶ 4 (if educational institution deemed an internship worthy of credit, DOL viewed student as primary beneficiary of the internship and not an employee); Ex. 7 (Bailey Decl.) ¶ 3; Ex. 13 (Berard Decl.) ¶ 3; Ex. 29 (Corbett Decl.) ¶ 3; Ex. 39 (Dunn Decl.) ¶ 4; Ex. 48 (Gonzalez Decl.) ¶ 4; Ex. 52 (Groher Decl. ) ¶ 4 (describing school journal and paper requirements for internship); Ex. 53 (Hackel Decl.) ¶ 3 (same); Ex. 60 (Holiver Decl.) ¶ 4, Ex. 156 (Holiver Tr.) 98:12-103:18 & Exs. 180-182 (Holiver Exs. 4-6) at KH 00001-15; Ex. 170 (Skorka Tr.) 135:16-20 (internship is a significant enhancement to an academic experience); Ex. 140 (Yale Decl.) ¶ 4 (describing credit requirements), ¶¶ 9-10 (describing projects worked on as intern) & Ex. 220 (Yale School Papers) at MY 00001-16; *see also*

-10-

Ex. 57 (Helmus Decl.) ¶ 3, Ex. 106 (Roberts Decl.) ¶ 3; Findikyan Decl. Exs. 1, 4, 9-12, 15, 19, 21, 23, 25, 33, 34-35, 49-51, 56, 66, 75, 81, 91, 94, 102, 107, 112, 115, 116, 122-23, 130-31, 133, 137; Pls. Ex. 15 (Helmus Tr.) 80:10-81:7; Pls. Ex. 31 (Roberts Tr. I) 74:22-75:7, 93:7-17, 101:15-102:2; Pls. Ex. 32 (Roberts Tr. II) 9:16-22, 64:2-7.

34.    Hearst has not taken any steps to ensure that interns are the primary beneficiaries

of their internship experiences. Ex. 31 (Roberts Tr. I) 71:12-72:12.

> **Disputed.**  Interns are intended to be the primary beneficiaries of their internship experiences.  Internships at Hearst's magazines or in its departments provide students with an educational experience; Hearst's policy that students offer proof that an educational institution has deemed the internship worthy of academic credit ensures that this is the case; and individual magazines and supervisors take additional steps to ensure that their interns receive an experience relevant to their academic credit requirements. *See* ¶ 69 and Hearst's response to ¶ 69.  *See also*, by way of example only, Findikyan Decl. Ex. 37 (Diegel Decl.) ¶ 3 (role is 100% mentor), ¶ 4 (interns not capable of doing work of Popular Mechanics writers), ¶ 6 (not dependent on interns); Ex. 114 (Rothman Decl.) ¶¶ 5-6, 7 (Good Housekeeping Research Institute lab not dependent on interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 17 (Burfield Decl.) ¶ 11 (spends more than 10% of his time supervising interns), ¶ 15 (interns a net time loss); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 114 (Rothman Decl.) ¶ 7 (more efficient without interns); Ex. 42 (Faucett Decl.) ¶¶ 6, 7, 9 (describing Frances Bailey's supervision and mentoring); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 13 (Berard Decl.) ¶ 8 (interns shadow her, she is not dependent on interns); Findikyan Decl. Exs. 1, 4, 9-12, 15, 19, 21, 23, 25, 33, 34-35, 49-51, 56, 66, 75, 81, 91, 94, 102, 107, 112, 115, 116, 122-23, 130-31, 133, 137.  *See also* Pls. Ex. 15 (Helmus Tr.) 80:10-81:7; Pls. Ex. 31 (Roberts Tr. I) 74:22-75:7, 93:7-17, 101:15-102:2; Pls. Ex. 32 (Roberts Tr. II) 9:16-22, 64:2-7; Findikyan Decl. Ex. 129 (Slate Decl.); Ex. 229 (WHD opinion letter).

35.    Hearst does not have any policy to ensure that interns do not displace the work of

paid employees. Ex. 31 (Roberts Tr. I) 72:2-73:15.

> **Disputed.**  Hearst has no centralized policy to ensure such a result, but the evidence demonstrates that interns do not displace the work of paid employees.  By way of example only, *see, e.g.,* Findikyan Decl. Ex. 13 (Berard Decl.) ¶ 8 (interns shadow her, she is not dependent on interns); Ex. 17 (Burfield Decl.) ¶ 11 (spends more than 10% of his time supervising interns), ¶ 15 (interns a net time loss); Ex. 37 (Diegel Decl.) ¶ 3 (role is 100% mentor), ¶ 4 (interns not capable of doing work of Popular Mechanics writers), ¶ 6 (not dependent on interns); Ex. 179 (Diegel Tr.) 10:18-11:5, 25:4-17, 32:16-24 (interns are a lot of work, time spent with interns); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 59 (Hilmantel Decl.) ¶¶ 9, 13 (more efficient without

interns); Ex. 67 (Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶¶ 5-6, 7 (Good Housekeeping Research Institute lab not dependent on interns, more efficient without interns); *see also* Findikyan Decl. Ex. 16 (Buchalter Decl.) ¶ 10 (must juggle many tasks for multiple supervisors as employee whereas while interns only assisted with a few projects at a time, usually with generous and malleable deadlines); Ex. 147 (Chelak Tr.) 20:6-16 (compared to internship, in current position "responsible for learning a lot of things on my own, and responsible for a lot of activities on my own, entirely"); Ex. 30 (Critides Decl.) ¶ 10 (assignments as an intern were "minimal when compared to the department's overall productivity and workload"); Ex. 42 (Faucett Decl.) ¶ 12; Ex. 151 (Faucett Tr.) 97:9-18 (received a lot of guidance from her supervisors as an intern, which you don't receive as an assistant); Ex. 47 (Friedlander Decl.) ¶ 8; Ex. 45 (Feuer Decl.) ¶ 9 (intern given "easier things to handle that were not particularly time sensitive"); Ex. 52 (Groher Decl.) ¶ 9 (assistant job entails "far more responsibility and accountability" and entails work that is necessary for office function, does not include working on projects solely for personal benefit); Ex. 153 (Groher Tr.) 61:5-6 (as an intern, "I was never responsible directly for things that I did"); Ex. 59 (Hilmantel Decl.) ¶ 9; Ex. 60 (Holiver Decl.) ¶ 10; Ex. 61 (Hunt Decl.) ¶ 7; Ex. 61 (Johns Decl.) ¶ 13 (if employee does not do her work, things necessary for functioning of office would not get done, which is not true for intern projects); Ex. 99 (Reyes Decl.) ¶ 7; Ex. 132 (Sullivan Decl.) ¶ 8; Ex. 140 (Yale Decl.) ¶ 13.

Moreover, many interns spend as little as one to three days/week at their internships. *See* Findikyan Decl. Ex. 8 (Barker Decl.) ¶¶ 2-3, 8; Ex. 68 (Kohen Decl.) ¶¶ 2, 5; Ex. 96 (Pozsonyi Decl.) ¶¶ 3, 4), Ex. 8 (Barker Decl.) ¶¶ 2, 7-8; Ex. 24 (Chelak Decl.) ¶ 6; Ex. 38 (Dotson Decl.) ¶¶ 3-4; Ex. 85 (Neckles Decl.) ¶¶ 2, 4; Ex. 86 (Neilon Decl.) ¶ 4; Ex. 98 (Ramirez Decl.) ¶¶ 3, 4; Ex. 119 (Saltzman Decl.) ¶ 5; Ex. 128 (Snowden Decl.) ¶ 4; Ex. 140 (Yale Decl.) ¶ 5. While many internships last one academic semester, others were for shorter periods of time. *See* Findikyan Decl. Ex. 92 (Park Decl.) ¶ 3 (2.5 weeks); Ex. 61 (Hunt Decl.) ¶¶ 3-4 (3 weeks); Ex. 89 (Niemiec Decl.) ¶¶ 3-4 (4 to 5 weeks); Ex. 13 (Berard Decl.) ¶ 3 (six weeks); Ex. 14 (Brodley Decl.) ¶ 3 (6 weeks).

36.     Hearst has not taken any steps to ensure that it is not benefitting from interns'

work.  Ex. 31 (Roberts Tr. I) 72:9-12.

**Undisputed.**  Most interns, however, gain more from their internships than do the individual departments and magazines that host the internships.  By way of example only, *see, e.g.*, Findikyan Decl. Ex. 13 (Berard Decl.) ¶ 8 (interns shadow her, she is not dependent on interns); Ex. 17 (Burfield Decl.) ¶ 11 (spends more than 10% of his time supervising interns) ¶ 15 (interns a net time loss); Ex. 37 (Diegel Decl.) ¶ 3 (role is 100% mentor), ¶ 4 (interns not capable of doing work of Popular Mechanics writers), ¶ 6 (not dependent on interns); Ex. 39 (Dunn Decl.) ¶ 10 (about 20% of time spent supervising interns); Ex. 42 (Faucett Decl.) ¶¶ 6, 7, 9 (describing Frances Bailey's supervision and mentoring); Ex. 59 (Hilmantel Decl.) ¶ 13 (more efficient without interns); Ex. 67

(Klotzman Decl.) ¶ 7 (generally spent 45 minutes a day supervising interns); Ex. 105 (Ritterbeck Decl.) ¶ 9 (hours spent on interns); Ex. 114 (Rothman Decl.) ¶¶ 5-6, 7 (Good Housekeeping Research Institute lab not dependent on interns, more efficient without interns); Exs. 1, 4, 9-12, 15, 19, 21, 23, 25, 33, 34-35, 49-51, 56, 66, 75, 81, 91, 94, 102, 107, 112, 115, 116, 122-23, 130-31, 133, 137. *See also* Pls. Ex. 15 (Helmus Tr.) 80:10-81:7; Ex. 31 (Roberts Tr. I) 74:22-75:7; 93:7-17; 101:15-102:2; Pls. Ex. 32 (Roberts Tr. II) 9:16-22, 64:2-7; Findikyan Decl. Ex. 129 (Slate Decl.); Findikyan Decl. Ex. 229 (WHD opinion letter).

Moreover, many interns spend as little as one to three days/week at their internships. *See* Findikyan Decl. Ex. 8 (Barker Decl.) ¶¶ 2-3, 8; Ex. 68 (Kohen Decl.) ¶¶ 2, 5; Ex. 96 (Pozsonyi Decl.) ¶¶ 3, 4), Ex. 8 (Barker Decl.) ¶¶ 2, 7-8; Ex. 24 (Chelak Decl.) ¶ 6; Ex. 38 (Dotson Decl.) ¶¶ 3-4; Ex. 85 (Neckles Decl.) ¶¶ 2, 4; Ex. 86 (Neilon Decl.) ¶ 4; Ex. 98 (Ramirez Decl.) ¶¶ 3, 4; Ex. 119 (Saltzman Decl.) ¶ 5; Ex. 128 (Snowden Decl.) ¶ 4; Ex. 140 (Yale Decl.) ¶ 5. While many internships last one academic semester, others were for shorter periods of time. *See* Findikyan Decl. 92 (Park Decl.) ¶ 3 (2.5 weeks); Ex. 61 (Hunt Decl.) ¶¶ 3-4 (3 weeks); Ex. 89 (Niemiec Decl.) ¶¶ 3-4 (4 to 5 weeks); Ex. 13 (Berard Decl.) ¶ 3 (six weeks); Ex. 14 (Brodley Decl.) ¶ 3 (6 weeks).

      37.     Hearst has not taken any steps and has no policy to ensure that interns receive

meaningful work during their internships. Ex. 31 (Roberts Tr. I) 75:9-16.

**Undisputed.** Although the phrase "meaningful work" is vague and ambiguous, individual magazines and supervisors at Hearst do ensure that interns receive real training, including the opportunity to gain experience with projects that interns will find meaningful, during their internships. By way of example only, *see* Findikyan Decl. Ex. 22 (Cavallaro Decl.) ¶ 8; Ex. 24 (Chelak Decl.) ¶ 8; Ex. 147 (Chelak Tr.) 81:17-82:8; Ex. 29 (Corbett Decl.) ¶ 5; Ex. 30 (Critides Decl.) ¶ 9; Ex. 31 (Cubria Decl.) ¶ 8; Ex. 37 (Diegel Decl.) ¶ 4; Ex. 42 (Faucett Decl.) ¶ 9; Ex. 43 (Fazio Decl.) ¶ 9; Ex. 45 (Feuer Decl.) ¶ 10; Ex. 47 (Friedlander Decl.) ¶ 5; Ex. 52 (Groher Decl.) ¶ 8; Ex. 54 (Hard Decl.) ¶6; Ex. 59 (Hilmantel Decl.) ¶¶ 6, 10; Ex. 155 (Hilmantel Tr.) 39:2-42:1; Ex. 62 (Hutzler Decl.) ¶ 6; Ex. 63 (Johns Decl.) ¶ 8; Ex. 67 (Klotzman Decl.) ¶ 8; Ex. 79 (Mevorach Decl.) ¶ 10; Ex. 85 (Neckles Decl.) ¶ 6; Ex. 88 (Nhan Decl.) ¶ 8; Ex. 90 (Novello Decl.) ¶ 7; Ex. 93 (Perle Decl.) ¶ 5; Ex. 95 (Piwko Decl.) ¶ 7; Ex. 97 (Pratt Decl.) ¶ 8; Ex. 102 (Riess Decl.) ¶ 15; Ex. 104 (Riordan Decl.) ¶ 7; Ex. 111 (Roselli Decl.) ¶ 6; Ex. 98 (Ramirez Decl.) ¶ 5; Ex. 113 (Ross Decl.) ¶ 5; Ex. 117 (Rud Decl.) ¶ 6; Ex. 119 (Saltzman Decl.) ¶ 7; Ex. 125 (Shapiro Decl.) ¶ 10; Ex. 126 (Simmons Decl.) ¶¶ 8-9; Ex. 169 (Simmons Tr.) 73:11-74:7; Ex. 140 (Yale Decl.) ¶¶ 9-10. In addition, in order to receive academic credit, interns often must provide a record of their experience to their academic institution, and in many instances, describe what about those experiences was meaningful, useful or important to the intern and their education. By way of example only, *see* Findikyan Decl. Ex. 7 (Bailey Decl.) ¶ 3; Ex. 13 (Berard Decl.) ¶ 3; Ex. 29 (Corbett Decl.) ¶ 3; Ex. 39 (Dunn Decl.) ¶ 4; Ex. 48 (Gonzalez Decl.) ¶ 4; Ex. 52 (Groher Decl. ) ¶ 4 (describing school journal and paper requirements for internship); Ex. 53

(Hackel Decl.) ¶ 3 (same); Ex. 60 (Holiver Decl.) ¶ 4, Ex. 156 (Holiver Tr.) 98:12-103:18 & Ex. 180-182 (Holiver Exs. 4-6) at KH 00001-15; Ex. 140 (Yale Decl.) ¶ 4 (describing credit requirements), ¶¶ 9-10 (describing projects worked on as intern) & Ex. 220 (Yale School Papers) at MY 00001-16.

38.     Hearst has no policy limiting the amount of administrative work that interns can perform during their internships. Ex. 31 (Roberts Tr. I) 75:17-24.

**Undisputed.**

39.     Hearst has no policy limiting the amount of manual labor that interns can perform during their internships.  Ex. 31 (Roberts Tr. I) 75:25-76:3.

**Undisputed**, although the cited testimony does not support the statement; Roberts was not asked about "manual labor," and the phrase is vague and ambiguous.

40.     Hearst does have policies in place to ensure compliance with minimum wage and overtime laws with respect to its employees at the magazines and in corporate departments. Ex. 31 (Roberts Tr. I) 85:5-9.

**Undisputed.**

41.     Hearst's Human Resources Department plays a role in ensuring that the magazines and departments are in compliance with wage and hour laws. Ex. 31 (Roberts Tr. I) 86:12-16.

**Undisputed.**

42.     Hearst does not delegate wage and hour compliance with respect to its employees to the magazines and departments because they are busy producing the company's product. Ex. 31 (Roberts Tr. I) 85:17-86:16.

**Disputed.**  The cited testimony does not support the statement made.  Roberts testified that she did not know when the decision was made not to delegate wage and hour compliance to employees and could only guess at the reasons.

43.     After this lawsuit was filed, Sherri Roberts, Defendant's Senior Vice President of Human Resources, received an anonymous complaint from an individual who claimed to be a Hearst intern. Ex. 32 (Roberts Tr. II) 83:8-24; Ex. 79 (Email, dated Feb. 8, 2012).

**Undisputed.**

44.     The complaint purported to be from a Hearst intern who said he or she was "writing [ ] to file a complaint against Hearst for [its] intern policy." The complainant stated that he or she was "working as a modern slave," worked 12 hours a day on average, and that Hearst "replaces the most menial jobs with a hoard of free labor from eager college students excited to learn about the industry." The complainant said that he or she felt "abused" and attached a copy of the U.S. Department of Labor's six-factor internship test, which the complainant claimed "Hearst is currently violating." The complainant "urge[d]" Hearst to investigate the complaint, including how late interns were working. Ex. 79 (Email, dated Feb. 8, 2012).

**Undisputed.**

45.     The information in the complaint raised concerns for Roberts. Ex. 32 (Roberts Tr. II) 86:7-10.

**Undisputed.**

46.     As the Senior Vice President of Human Resources, Roberts' duties include helping to investigate and resolve issues concerning Hearst employees. Ex. 31 (Roberts Tr. I) 8:14-18.

**Undisputed.**

47.     Roberts told the complainant that Hearst was "investigating" the complaint, but did not undertake an investigation of the claims in the complaint. Ex. 32 (Roberts Tr. II) 84:4-9; 89:23-90:12; Ex. 79 (Email dated February 22, 2012).

> **Disputed.** Roberts did tell the complainant that Hearst was investigating the complaint, but she also testified that she referred the matter to counsel, and caused additional investigation to be conducted. Pls. Ex. 32 (Roberts Tr. II) 88:15-20.

48.     After the lawsuit was filed and receiving the complaint, Roberts did not do anything to determine whether interns at Hearst were performing menial work at the magazines. Ex. 32 (Roberts Tr. II) 89:23:90:7.

> **Disputed.** After this lawsuit was filed and after receiving the referenced complaint, Roberts sought the advice of counsel and does not know whether counsel conducted an investigation. Pls. Ex. 32 (Roberts Tr. II) 83:25-84:3, 84:14-24, 85:7-10.

49.     Roberts forwarded the complaint to Hearst's legal department. Ex. 32 (Roberts Tr. II) 84:25-85:3.

> **Undisputed.**

50.     Roberts did not follow up on whether anything was done to investigate the complaint. Ex. 32 (Roberts Tr. II) 84:14-19; 85:7-10.

> **Disputed.** Roberts testified as to additional investigation that she caused to be conducted. Pls. Ex. 32 (Roberts Tr. II) 88:15-20.

51.     The only investigation that Roberts was aware of was an attempt by Hearst's Information Technology department to uncover the source of the complainant's email to try to identify him or her. Ex. 32 (Roberts Tr. II) 88:15-89:4.

> **Disputed**. Roberts also testified that the purpose of that investigation was not just to identify the complainant, but to try to contact the complainant. She also testified to having referred the matter to legal counsel. Pls. Ex. 32 (Roberts Tr. II) 88:15-20.

52.     Hearst withdrew its good faith affirmative defense. *See* ECF No. 80.

**Undisputed** as to the bare fact alleged, but **disputed** as to the inference that the withdrawal indicated any acknowledgement of a lack of good faith.  Hearst withdrew the defense after the Court ordered Hearst to produce privileged communications, even though Hearst had indicated that its good faith defense did not depend on such communications.

53.     Hearst has used internships to find people who have an interest in its business and who want to work for the company after they graduate, and to assess their skills and "fit" with the company. Ex. 76 (December 2005 Memo).

**Disputed**.  The cited memo does not support the statement made.  Rather, it indicates that in December 2005, the suggestion was made that magazines "should use internships" to find people who have an interest in its business and who want to work for the company after they graduate, and to assess their skills and "fit" with the company.

54.     It is Hearst's practice to ask intern supervisors to evaluate interns' performance on Internship Performance Review forms after they have completed their internship. Ex. 32 (Roberts Tr. II) 67:2-10; 67:22-68:25; 70:4-8; Ex. 256 (Email, dated Aug. 3, 2011) at D0014358.

**Undisputed**.

55.     Hearst uses Internship Performance Reviews to evaluate interns who apply for entry-level positions at the company. Ex. 32 (Roberts Tr. II) 70:21-71:7; 75:2-11.

**Disputed**.  The cited testimony does not support the statement.  Roberts testified that the referenced forms can be a "factor to be considered" or "one element to be considered" when former interns apply for entry-level positions.

56.     Hearst uses the same Internship Performance Review forms for interns at all of its magazines and corporate departments. Ex. 32 (Roberts Tr. II) 76:19-77:2.

**Disputed**.  The cited testimony does not support the statement.  Roberts testified that the referenced forms are provided to supervisors at all Hearst Magazines titles and Hearst Magazine departments.  Pls. Ex. 32 (Roberts Tr. II) 76:19-77:2.

57.     Internship Performance Reviews are completed by Hearst employees who either supervise interns or have knowledge of what interns do during their internships. Ex. 32 (Roberts Tr. II) 69:11-17.

> **Disputed**.  The cited testimony does not support the statement.  Roberts testified that to the extent the referenced forms are completed, they are completed by people who supervised an intern or who had knowledge of what interns do during their internships. Pls. Ex. 32 (Roberts Tr. II) 69:11-17.

58.     Hearst has hired interns to be entry-level employees and freelancers. Ex. 101 (Anderson Decl.) ¶¶ 2-3; Ex. 104 (Berard Decl.) ¶¶ 2-3; Ex. 106 (Buchalter Decl.) ¶¶ 2-3; Ex. 109 (Chelak Decl.) ¶¶ 2-3; Ex. 112 (Critides Decl.) ¶¶ 2-3; Ex. 114 (Dunn Decl.) ¶¶ 2-3; Ex. 115 (Elser Decl.) ¶¶ 2-3; Ex. 119 (Groher Decl.) ¶¶ 2-3; Ex. 121 (Henderson Decl.) ¶¶ 2-3; Ex.  126 (Kommer Decl.) ¶¶ 2-3; Ex. 130 (McCoy Decl.) ¶¶ 2-3; Ex. 134 (Neilon Decl.) ¶¶ 2-3; Ex. 137 (Park Decl.) ¶¶ 2-3; Ex. 138 (Perle Decl.) ¶¶ 2-3; Ex. 141 (Reyes Decl.) ¶¶ 2-3; Ex. 143 (Riordan Decl.) ¶¶ 2-3; Ex. 144 (Ritterbeck Decl.) ¶¶ 2-3; Ex. 148 (Ross Decl.) ¶ 2; Ex. 149 (Rud Decl.) ¶¶ 2-3; Ex. 152 (Shapiro Decl.) ¶¶ 2-3; Ex. 155 (Sullivan Decl.) ¶¶ 2-3; Ex. 157 (Tomlinson Decl.) ¶¶ 2-3; Ex. 160 (Yale Decl.) ¶¶ 2-3; Ex. 32 (Roberts Tr. II) 140:10-23.

> **Undisputed.**

59.     The fact that someone has interned at Hearst will carry a lot of weight in determining whether to hire them as an entry-level employee or freelancer. Ex. 32 (Roberts Tr. II) 162:10-16.

> **Disputed.**  The cited testimony does not support the statement made.  Roberts testified that previous internships or other experience would have a lot of weight in considering someone who had just graduated from college and has no prior work experience for an entry-level job.  Pls. Ex. 32 (Roberts Tr. II) 162:10-24.

-18-

60.     Hearst does not share Internship Performance Reviews with the interns who are evaluated. Ex. 32 (Roberts Tr. II) 74:16-25.

**Undisputed.**

61.     Hearst believes that the comments that intern supervisors include in Internship Performance Reviews are "helpful when contemplating future hires." Ex. 256 (Email, dated Aug. 3, 2011) at D0014358.

**Undisputed**.

62.     Hearst evaluates interns using a 1 through 5 rating system based on the following criteria: (1) Intern follows instructions and performs assigned tasks with minimal supervision; (2) Accurately and thoroughly completes assignments. Work reflects neatness, attention to detail, and conformity to organizational standards; (3) Interacts effectively with employees and other interns. Interacts and communicates thoughts effectively; (4) Organizes and prioritizes assignments given. Able to complete multiple projects simultaneously; (5) Proactive, asks for more work when there is downtime. Wants to get involved; (6) Embodies professionalism through punctuality, maturity, and confidence; (7) Exhibits willingness to learn.  Receptive to feedback/constructive criticism. Asks questions if unsure. Ex. 256 (Email, dated Aug. 3, 2011) at D0014359.

> **Disputed**.  The cited exhibit does not support the statement in question.  Intern supervisors at magazines have been asked to fill out the form (D0014359) in the referenced document, which includes the cited categories, from time to time.  Pls. Ex. 32 (Roberts Tr. II)  67:2-10; 67:22-68:25; 70:4-8; Ex. 256 (Email, dated Aug. 3, 2011).  Plaintiffs have provided no evidence that this form was used during the entirety of the class period, or for every intern.

63.     The Internship Performance Review form asks intern supervisors how interns "rank against other interns" they have had in the past year. Ex. 256 (Email, dated Aug. 3, 2011) at D0014359.

**Undisputed**.

64.     The Internship Performance Review form asks intern supervisors whether the intern would "strongly be considered a viable candidate if an opening were to become available[.]" Ex. 256 (Email, dated Aug. 3, 2011) at D0014359.

**Undisputed**.

65.     The criteria in the Internship Performance Review form are the only criteria on which Hearst evaluates interns' performance. Ex. 32 (Roberts Tr. II) 77:3-6.

**Disputed**.  Hearst does not evaluate interns' performance.  To the extent that supervisors at the magazines evaluate an intern's performance, the referenced form (and related criteria) is the only form provided to the Human Resources department; supervisors may also complete evaluations of interns pursuant to criteria determined by the academic institution from which the intern is receiving credit.  *See, e.g.*, Findikyan Decl. Ex. 18 (Cacich Decl.) ¶ 3; Ex. 29 (Corbett Decl.) ¶ 3; Ex. 36 (DeWitt Decl.) ¶ 3; Ex. 179 (Diegel Tr.) 37:18-38:10; Ex. 150 (Dunn Tr.) 65:18-66:2; 82:11-83:8; Ex. 152 (Fazio Tr.) 56:5-19; Ex. 151 (Faucett Tr.) 75:2-14; Ex. 48 (Gonzalez Decl.) ¶ 4; Ex. 59 (Hilmantel Decl.) ¶ 3; Ex. 156 (Holiver Tr.) 104:11-15; Ex. 157 (Johns Tr.) 88:11-16, 104:6-22; Ex. 65 (Kahn Decl.) ¶ 4; Ex. 70 (Kristensen Decl.) ¶ 3; Ex. 158 (Leszuk Tr.) 183:4-19; Ex. 72 (Lokuta Decl.) ¶ 3; Ex. 79 (Mevorach Decl.) ¶ 4; Ex. 85 (Neckles Decl.) ¶ 3; Ex. 86 (Neilon Decl.) ¶ 3; Ex. 87 (Nelson Decl.) ¶ 3; Ex. 89 (Niemiec Decl.) ¶ 3; Ex. 90 (Novello Decl.) ¶ 4; Ex. 97 (Pratt Decl.) ¶ 4; Ex. 105 (Ritterbeck Decl.) ¶ 9; Ex. 164 (Ritterbeck Tr.) 140:6-18; Ex. 110 (Roelant Decl.) ¶ 4; Ex. 111 (Roselli Decl.) ¶ 3; Ex. 167 (Rothman Tr.) 74:24-75:9; Ex. 168 (Rud Tr.) 59:8-11; Ex. 123 (Senaydin Decl.) ¶ 3; Ex. 171 (Spencer Tr.) 63:6-16; Ex. 177 (Wright Tr.) 48:14-19.  Supervisors also provide interns with feedback on a variety of criteria that could be viewed as evaluating interns' performance. *See, e.g.*, Findikyan Decl. Ex. 15 (Broekema Decl.) ¶¶  8, 12-14, 19; Ex. 6 (Andrews Decl.) ¶ 6; Ex. 21 (Caldwell Decl.) ¶ 6; Ex. 44 (Feil Decl.). ¶ 8; Ex. 65 (Kahn Decl.)¶ 7; Ex. 124 (Senaydin Decl.) ¶¶ 5, 6.

66.     Hearst's Human Resources Department asks Hearst magazines and departments that have interns to provide it with "school credit letters," which state the intern's name and

whether they are eligible to receive credit for their internship. Ex. 15 (Helmus Tr.) 80:10-81:7;

Ex. 32 (Roberts Tr. II) 64:2-7; Ex. 74 (Hiring Criteria Email).

>   **Undisputed.**

67.    Hearst views school credit letters as "a critical element to staying on the right side

of the labor law." Ex. 74 (Hiring Criteria Email); Ex. 75 (Internship Guideline 2007); Ex. 31

(Roberts Tr. I) 76:9-16 (Hearst insures its internship programs are lawful by "collect[ing] letters

of credit that the interns give to their magazines . . .").

>   **Undisputed.**

68.    Hearst believes that school credit is its "way to make sure that the interns

receive something of value" for their internships.  Ex. 31 (Roberts Tr. I) 74:22-75:7; 93:7-17;

101:15-102:2; Ex. 74 (Hiring Criteria Email) (school credit provides something of "monetary

value"); Ex. 75 (Internship Guideline 2007) (school credit provides something of "tangible

value").

>   **Undisputed.**  For completeness, Hearst believes that its magazines and departments
>   (and the supervisors of interns in those magazines and departments) ensure that interns
>   have a valuable experience in many other ways as well.  *See generally* Findikyan
>   Decl. Exs. 1, 4, 9-12, 15, 19, 21, 23, 25, 33, 34-35, 49-51, 56, 66, 75, 81, 91, 94, 102,
>   107, 112, 115, 116, 122-23, 130-31, 133, 137.

69.    Hearst determined that as long as an intern is in college and can provide a letter

stating that they are eligible to earn school credit for their internship, it does not need to pay

them. Ex. 32 (Roberts Tr. II) 8:10-22; 102:9-15.

>   **Undisputed.**

70.    The only criteria on which Hearst relies to not pay interns are whether the intern

is in college and is eligible to receive academic credit. Ex. 32 (Roberts Tr. II) 8:16-21; 11:8-17.

>   **Undisputed.**

71.     Hearst does not know who at the company made the determination or when it was

made. Ex. 32 (Roberts Tr. II) 8:23-9:22.

**Hearst does not dispute** that it does not know who at the company made the
determination that the receipt of school credit was necessary in order for an intern not
to be paid, or when that determination was made.

72.     According to Hearst's Fed. R. Civ. P. 30(b)(6) corporate representative,

information surrounding the determination was "lost in the midst of time." Ex. 32 (Roberts Tr.

II) 11:24-12:2.

Subject to reference to Roberts' errata sheet for the relevant quote, Hearst does not
dispute that Roberts testified that the details of the determination referred to in Pls.
SOF ¶ 69 was "kind of lost in the mist of time." Pls. Ex. 32 (Roberts Tr. II) 11:24-12:2
& Findikyan Decl. Ex. 166 (Roberts Errata).

73.     Hearst's credit policy has been in place at least since 2006. Ex. 32 (Roberts Tr.

II) 9:16-22.

**Undisputed.**

74.     According to Hearst's Fed. R. Civ. P. 30(b)(6) corporate representative,

Sherri Roberts, the Senior Vice President of Human Resources, Hearst's credit policy is

"an imprecise, imperfect system" because "things slip through the sieve[.]" Ex. 32

(Roberts Tr. II) 105:2-13; 108:11-12; 115:16-23.  The policy is not observed "a hundred

percent of the time." Ex. 31 (Roberts Tr. I) 113:12-20.

**Undisputed.**

75.     Hearst does not evaluate the reasons why schools award academic credit for

internships at the company. Ex. 32 (Roberts Tr. II) 16:19-17:5.

**Undisputed.**

-22-

76.     As long as a school awards credit, it does not matter to Hearst what the basis for the school's decision to award credit is. Ex. 32 (Roberts Tr. II) 17:16-20.

**Undisputed.**

77.     If a school awarded credit for internships that benefitted Hearst, it would not matter to Hearst's decision that it is not required to pay the interns. Ex. 32 (Roberts Tr. II) 18:7-16.

> **Disputed**.  The statement in ¶ 77 presents a hypothetical which cannot be properly disputed or affirmed.  Hearst acknowledges that Roberts testified that reasons for awarding credit that Hearst is not in a position to know about cannot matter to Hearst. Pls. Ex. 32 (Roberts Tr. II) 18:7-16.

78.     Interns can meet Hearst's credit policy even if the credit that they are eligible for does not count towards their degree. Ex. 32 (Roberts Tr. II) 125:19-126:19; Ex. 83 (K. Morse school credit letter).

**Undisputed**.

79.     Hearst does not verify whether interns are actually awarded credit for their internships at the company. Ex. 32 (Roberts Tr. II) 35:13-23.

**Undisputed.**

80.     Hearst does not have a practice of following up with schools to verify the information in the school credit letters. Ex. 32 (Roberts Tr. II) 119:19-120:6.

**Undisputed**.

81.     Megan Condon, who submitted a school credit letter that did not state that she was entitled to receive credit, interned at Hearst. Ex. 80 (M. Condon school credit letter); Ex. 269 (Email, dated Jan. 12, 2012); Ex. 270 (Email, dated Feb. 14, 2012); Ex. 271 (Spring 2012 Intern List) at D0173576.

> **Undisputed.**  Hearst adds for completeness that the referenced school credit letter did state that the New York Center for Art & Media Studies is aware of and in support of Condon's participating in an unpaid internship at Good Housekeeping, and that the school "expects her to spend significant time spent in an internship related to her field."  The school further wrote that it was "in support of this educational opportunity and values it as a significant part of Megan's course work.  Moreover, practical training supplements the other academic requirements," and would be noted on Condon's school records.

82.     Camilla Burchfield, who submitted a school credit letter stating that she would receive a "transcript notation" but that did not state that she was entitled to receive credit, interned at Hearst.  Ex. 81 (C. Burchfield school credit letter); Ex. 272 (Summer 2011 Intern List) at D0177080.

> **Undisputed.**  Hearst adds for completeness that the referenced school credit letter did state that Middlebury College "truly values real-world experiences and encourages its students to participate in internships that will enrich their experience in a career they wish to explore or pursue."  The school credit letter further states that Middlebury offers a "Transcript Notation', *i.e.* the internship is recognized as a significant experience on the student's official transcript."

83.     Katherine Hughes, who submitted a school credit letter stating that she would receive zero credits for the course that accompanied her internship and that she "will not receive any credit toward her graduation requirements" for her internship, interned at Hearst. Ex. 82 (K. Hughes school credit letter); Ex. 272 (Summer 2011 Intern List) at D0177065.

> **Undisputed.**  Hearst adds for completeness that the referenced school credit letter did state that Hughes is eligible to enroll in an internship Seminar Course that "is designed to complement a supervised work experience related to students' field of study."  The seminar was designed to "help students understand the relationship of their internship experience to major and/or intended career path, recognize and develop professional work skills, and explore career options."  The referenced credit letter also stated that "[i]n order to receive a grade, a student must complete at least 75 hours at the internship throughout the semester" and submit certain materials including an Learning Contract, employer evaluation, reflection essay, and student evaluation.

84.     Hearst does not require interns to obtain school credit letters from their own school if it will not award credit for their internship. In such circumstances, Hearst will accept a school credit letter from another school. Ex. 15 (Helmus Tr.) 86:15-88:22; Ex. 32 (Roberts Tr. II) 35:24-36:9.

> **Disputed.**  The statement is vague and ambiguous in the use of the terms "require," "will not award credit" and "their own school," and the cited testimony does not support the statement made.  Roberts testified that where an intern's college does not provide academic credit for an internship, it would be permissible for a student to receive credit from a different college.  Helmus testified that students are sometimes able to enroll in a college that does award credit.

85.     Hearst's Finance Department is responsible for all financial reporting, budgeting, and forecasting for Hearst's magazines and for providing financial input into all decisions. Ex. 6 (Chirichella Tr.) 8:19-25.

> **Disputed.**   Hearst Magazines' Finance Department is responsible for all financial reporting, budgeting, and forecasting for Hearst's magazines**.**  Findikyan Decl. Ex. 148 (Chirichella Tr.) 6:19 (Chirichella is CFO of Hearst Magazines); Pls. Ex. 6 (Chirichella Tr.) 8:19-25.   Additional references to "Finance Department" in Plaintiffs' 56.1 Statement will be read to refer to Hearst Magazines' Finance Department.  In addition, the phrase "all decisions" is vague and ambiguous.  Chirichella's testimony makes clear that the Finance Department provides guidelines and initial guidance to magazines with respect to budgeting issues.  Pls. Ex. 6 (Chirichella Tr.) 54:2-55:6, 55:22-56:2, 58:23-59:11.

86.     Each magazine has a budget that includes amounts allocated to payroll costs, including salaries, overtime, taxes, benefits, and bonuses, and expenses, such as rent, contingency workers, including freelance workers, travel and entertainment, office supplies, and courier costs. Ex. 6 (Chirichella Tr.) 47:21-24; 48:5-21; 50:22-51:7; Ex. 59 (Magazine Budgets).

> **Undisputed.**

87.     Any wages paid to interns would generally come out of a magazine's budget for expenses. Ex. 6 (Chirichella Tr.) 66:9-67:12.

**Undisputed.**

88.     On an annual basis, each magazine prepares an initial budget that includes allocations for payroll costs and expenses with guidance and input from Finance Department, Circulation Department, and Production Department. Ex. 6 (Chirichella Tr.) 52:9-53:25.

**Undisputed.**

89.     The Finance Department provides guidelines to the magazines to assist them in putting together their budgets. Ex. 6 (Chirichella Tr.) 58:23-59:3.

**Undisputed.**

90.     The magazines' process of preparing an initial budget mostly involves following the guidelines provided by the Finance Department and looking at the financial forecast prepared by the Finance Department. Ex. 6 (Chirichella Tr.) 57:24-58:5.

> **Disputed.**  Chirichella's referenced and related testimony is that the magazines look at their own forecasts in preparing an initial budget, and that each magazine pulls together the initial budget with input from the publisher, the editor, and the rest of the magazine staff.  Findikyan Decl. Ex. 148 (Chirichella Tr.) 57:10-17.

91.     The guidelines that the Finance Department provides to the magazines discuss how much they should budget for salary increases and that expenses should be flat to the prior year.  Ex. 6 (Chirichella Tr.) 54:2-55:6; 55:22-56:2; 58:23-59:18; Ex. 273 (Email, dated Aug. 16, 2012).

> **Disputed.**  Chirichella's referenced testimony is that the Finance Department provides magazines with guidelines and initial guidance, including how much to budget for salary increases and that expenses should generally be flat to the prior year.

-26-

92.     The Finance Department tells the magazines that headcount should be flat to the prior year. Ex. 6 (Chirichella Tr.) 61:15-16.

> **Disputed.**  Chirichella's referenced testimony was giving an example, and stated that the Finance Department may tell magazines that they should budget flat head count, but they can come and ask for more.

93.     The Finance Department generally provides the same guidelines to the magazines "across the board."  Ex. 6 (Chirichella Tr.) 59:23-24.

> **Disputed.**  The statement is vague and ambiguous to the extent "guidelines" is meant to apply to any specific guidelines, rather than "guidelines" in general.  Chirichella's referenced testimony was not referring to any particular guidelines, rather that whatever guidelines are provided to magazines in a particular year, those guidelines are "kind of across the board."

94.     A magazine must have "very good reasons" for any expense increases. Ex. 6 (Chirichella Tr.) 57:8-9; 71:10-12.

> **Undisputed.**  Chirichella's referenced testimony, however, also states that if a magazine has a compelling argument, they have "a very good chance of getting it approved."

95.     After drafting an initial budget, the magazines submit them to the Finance Department. Ex. 6 (Chirichella Tr.) 69:3-5.

> **Undisputed.**

96.     The Finance Department then meets with each magazine to go through the budget in detail. Ex. 6 (Chirichella Tr.) 69:6-12.

> **Undisputed.**

97.     When the Finance Department believes that the magazines have asked for things in their budgets that do not make sense, a larger meeting is held that includes Hearst's senior management. Ex. 6 (Chirichella Tr.) 69:6-12.

> **Disputed**.  Chirichella's testimony at Pls. Ex. 6 (Chirichella Tr.) 70:7-20 (the correct citation) indicates that the Finance Department has a larger meeting with senior management at which any things that, *inter alia*, "do not make sense" can be raised.

-27-

98.     The magazines must present their requests for additional headcount or spending at the larger meeting. Their requests will either be approved or not approved. Ex. 6 (Chirichella Tr.) 70:7-20; 71:2-4.

**Undisputed.**

99.     Requests by the magazines to hire additional staff require approval at the corporate level. Ex. 6 (Chirichella Tr.) 79:14-80:2.

**Undisputed.**

100.    In response to the decrease in advertising revenue caused by the recession, in 2009, Hearst worked to reduce costs, including by reducing headcount and expenses at the magazines. Ex. 6 (Chirichella Tr.) 30:15-22; 32:5-13; 33:22-34:5; 36:4-8.

**Undisputed as to Hearst Magazines.**

101.    As part of these cost-cutting measures, the Finance Department gave every magazine a target for reductions based on their expense base and then asked them to come up with a plan and execute on it. Ex. 6 (Chirichella Tr.) 33:24-34:5.

**Undisputed.**

102.    The magazines reduced their headcount by letting people go, consolidating positions, not filling open positions, and reducing the size of the magazine, which meant that fewer people would be required to produce content. Ex. 6 (Chirichella Tr.) 35:2-36:3.

> **Disputed**.  Although the referenced testimony does indicate that magazines reduced their headcount by letting people go, consolidating positions, and not filling open positions, Chirichella did not testify that the magazine reduced headcount by "reducing the size of the magazine."  Rather, she testified that in addition to reducing headcount, magazines reduced other expenses, such as edit paging and "MIC" (or "manuscripts, illustrations, and covers") expenses.

103.   The magazines also reduced their spending on expenses as part of their cost-cutting measures. Ex. 6 (Chirichella Tr.) 36:11-21.

**Undisputed.**

104.   In an email dated December 4, 2008, Andrea Rosengarten, the Executive Managing Editor of Harper's Bazaar, instructed staff members that "[t]here needs to be a 20% reduction in the use of messengers. Vendors need to send and pick up product.  In the event this is not possible (a rare occurrence), please use your interns to do Manhattan runs (using the subway). If you don't have an intern please check with Lisa who will look into finding you one for this purpose." Ex. 61 (Email, dated Dec. 4, 2008) at D0005583.

> **Undisputed.**  Plaintiffs have offered no evidence, however, as to whether Rosengarten's instructions were followed, or as to whether Harper's Bazaar had an actual reduction in the use of messengers.

105.   In the same email, Ms. Rosengarten stated, with respect to overtime, "Five hour per week maximum will be enforced.  If work cannot get done within these limits, please use your overtime ineligible staff to achieve these functions." Ex. 61 (Email, dated Dec. 4, 2008) at D0005583.

> **Undisputed.**  Plaintiffs have offered no evidence, however, as to whether any overtime limits were actually enforced.

**REDACTED**

-29-

107.    **REDACTED** ███████████████████████

██████████████████████████████████████████

████████████████████████████

> **Disputed.**  The cited document does not support the statement made.  *See also* Findikyan Decl. Ex. 27 (Chirichella Decl.) ¶¶ 5-9.

108.    The cost-cutting measures that the magazines took helped to offset the

revenue shortfall that the magazines experienced. Ex. 6 (Chirichella Tr.) 39:23-40:3.

> **Undisputed**.

109.    Even after the economy improved in 2010, Hearst has continued to try to

adhere to the cost-saving measures that it took, including by trying to reduce costs every year.

Ex. 6 (Chirichella Tr.) 40:5-41:2.

> **Disputed.**  The statement is vague and ambiguous and misstates the cited testimony.
> Chirichella testified that the magazines have tried to hold costs down or reduce their
> costs each year through productive improvements, and that some magazines have
> actually increased headcount since 2010.  Pls. Ex. 6 (Chirichella Tr.) 41:3-8.

110.    In an email dated July 21, 2011, Leslie Smith, the Managing Editor of Marie

Claire, told Sherri Roberts, Hearst's Executive Vice President of Human Resources, that

Marie Claire "use[s] interns to pick up and deliver merch to reduce our messenger costs." Ex.

60 (Email, dated July 21, 2011) at D0012247; Ex. 32 (Roberts Tr. II) 36:19-21.

> **Undisputed.**

111.    After reviewing the email, Roberts did not have any response to Smith's statement that interns were used to reduce messenger costs and did not take any action except to pass on the information to the Finance Department. Ex. 32 (Roberts Tr. II) 38:8-16; 39:25-13.

> **Disputed.** The statement mischaracterizes the cited testimony. Roberts did not testify that she passed information concerning Smith's statements about interns being used "to reduce messenger costs" to the Finance Department. Rather, she testified that she passed on information concerning the magazine's space requirements to the Finance Department.

112.    Some magazines have retained the same level of staffing that they had during the recession in order to meet their margins. Ex. 6 (Chirichella Tr.) 41:3-18.

> **Disputed**. The statement mischaracterizes the cited testimony, and reference to the "same level of staffing" is vague and ambiguous. Chirichella testified that some magazines have actually increased head count since 2010, and some have not increased head count. Pls. Ex. 6 (Chirichella Tr.) 41:3-18.

113.    There have been occasions where Hearst magazines have had more interns than full-time staff. For the summer of 2011, Marie Claire hired 57 interns for a staff of between 45 to 55 people. Ex. 32 (Roberts Tr. II) 41:7-13; Ex. 60 (Email, dated July 21, 2011) at D0012247.

> **Disputed**. The statement is misleading and cited testimony and document do not support the statement made, and plaintiffs have offered no evidence as to the actual number of staff at Marie Claire magazines in the summer of 2011. The cited testimony and document refer only to Marie Claire magazine, and make clear that the number of interns would not exceed the number of full-time staff on a Full Time Equivalent basis. Instead, many of the interns were at the magazine only part-time or did not overlap with each other. *See* Pls. Ex. 32 (Roberts Tr. II) 41:7-13; Pls. Ex. 60 (Email, dated July 21, 2011) at D0012247; *see also, e.g.,* Findikyan Decl. Ex. 9 (Baugh Decl.) ¶¶ 2-3 (4-5 interns for staff of 23); Ex. 21 (Carbone Decl.) ¶¶ 5, 13 (1-2 interns, if any, at a time for staff of approximately 22); Ex. 25 (Cheney Decl.) ¶¶ 4, 10 (number of staff and interns); Ex. 56 (Healy Decl.) ¶ 5 (number of interns, if any); Ex. 50 (Greene Decl.) ¶ 8 (number of interns); Ex. 122 (Schmidt Decl.) ¶ 4 (number of interns).

██████ **REDACTED** ████████████████████████

████████████████████████████████████████████████

████████████████████████████████

██████████

██████ **REDACTED** ████████████████████

████████████████████████████████████████

████████

██████ **REDACTED** ████████████████████

██████████████████████████████████████

██████████

██████████

117.    Wang applied for an internship in the Accessories Department of Harper's Bazaar

("Bazaar") by responding to a posting on the website, Ed2010.com. Ex. 50 (Wang Tr.) 135:4-24;

Ex. 56 (Broekema Decl.) ¶ 7.

**Undisputed**.

118.    The posting stated that the Bazaar Accessories Department was looking for

highly-motivated, hard-working, and detail-oriented interns to work with the Accessories

editors. The posting sought candidates who demonstrated a "high level of efficiency, the ability

to follow instructions and multitask, and a strong willingness to learn," and who could work at

least three days a week and would receive school credit. Ex. 57 (Accessories Internship

Posting).

**Undisputed**.

119.    Sam Broekema, who was then the Senior Accessories Editor at Bazaar, reviewed the posting before asking an intern, Taylor McNeil, to post it online.  Ex. 3 (Broekema Tr.) 7:21-23; 79:12-23.

**Undisputed**.

120.    Broekema was told by another Bazaar editor to ask McNeil for a copy of the posting to use to hire interns. Ex. 3 (Broekema Tr.) 80:11-81:3.

**Undisputed**.

121.    Wang submitted a cover letter and resume to Broekema in response to the posting. Ex. 50 (Wang Tr.) 136:12-13.

**Undisputed**.

122.    Broekema interviewed and supervised Wang. Ex. 50 (Wang Tr.) 57:21-25; 84:2-10.

**Undisputed**.

123.    Broekema typically supervises between 4 to 8 interns. Ex. 3 (Broekema Tr.) 40:25-41:5.

**Undisputed**.

124.    Broekema believes that interns in the Accessories Department have responsibilities that are vital to keeping operations running smoothly. Ex. 3 (Broekema Tr.) 56:8-12.

**Hearst does not dispute Broekema's inadmissible personal opinions.**

125.    During the interview, Wang and Broekema discussed "why [Wang] wanted to work in fashion, and [they] talked about designers.  [Broekema] said that he likes to get an idea of an intern's aesthetic sense when he meets them." Ex. 50 (Wang Tr.) 139:9-20.

**Undisputed**.

126.    Broekema believes that it is beneficial to the Accessories Department for interns to have previous accessories experience at another magazine or at a public relations firm because the more knowledge they have, the better job they can do. Ex. 3 (Broekema Tr.) 76:13-22.

**Hearst does not dispute Broekema's inadmissible personal opinions.**  For completeness, Hearst adds that Broekema also believes that interns should be interested in learning and in the work done by an accessories department. Pls. Ex. 3 (Broekema Tr.) 76:13-22.

127.    When interns come in with previous experience, this assures Broekema that they will bring a new perspective that will help improve Bazaar's processes. Ex. 3 (Broekema Tr.) 94:4-10.

**Hearst does not dispute Broekema's inadmissible personal opinions.**

128.    This is because every magazine is organized differently and so an intern who has had an experience at another magazine will know how that magazine is organized and can compare it to Bazaar and be helpful in finding different ways of solving problems. Ex. 3 (Broekema Tr.) 94:11-95:2.

**Hearst does not dispute Broekema's inadmissible personal opinions.**

129.    Broekema is looking for interns who are willing to work hard. Ex. 3 (Broekema Tr.) 77:3-5.

**Undisputed**.

130.    Broekema is looking for interns who are willing to roll up their sleeves and get down to work. Ex. 3 (Broekema Tr.) 6-13.

**Undisputed**.  Hearst notes that ¶ 130 does not include a complete citation for this statement.

-34-

131.    Broekema is upfront with interns that some of the work that they will be doing is not glamorous. Ex. 3 (Broekema Tr.) 17-23.

**Undisputed**.  Hearst notes that ¶ 131 does not include a complete citation for this statement.

132.    Broekema tells interns that much of their work will be about "getting things from point A to point B" as quickly as possible. Ex. 3 (Broekema Tr.) 78:7-13.

**Undisputed**.

133.    Broekema frequently asks interns whom he has interviewed to come in for a follow-up interview with another editor so that he can get a second opinion on whether the intern is a good fit. Ex. 56 (Broekema Decl.) ¶ 5; Ex. 3 (Broekema Tr.) 74:6-13.

**Undisputed**.

134.    During Wang's interview, Broekema told Wang about a more senior "Head Accessories Intern" role that would require her to work five days per week. Ex. 50 (Wang Tr.) 140:2-13.

**Disputed**.  The cited testimony does not support the statement made, which includes the vague and ambiguous terms "require" and "work."

135.    The Accessories Department typically designates an intern to serve as Head Intern when there is a good candidate and when the department is very busy. Ex. 3 (Broekema Tr.) 41:9-19.

**Undisputed during Broekema's tenure as Senior Accessories Editor**.  Plaintiffs have offered no evidence on this point for periods outside of Broekema's tenure

136.    The Accessories Department is typically busiest in October and March. Ex. 3 (Broekema Tr.) 43:25-44:16.

**Undisputed during Broekema's tenure as Senior Accessories Editor**.  Plaintiffs have offered no evidence on this point for periods outside of Broekema's tenure.

137.   The Accessories Department typically has more interns during the periods when there is more work to do. Ex. 3 (Broekema Tr.) 45:2-5.

**Undisputed**.

138.   Being Head Intern provides an opportunity for an intern to "step up to the plate." Ex. 3 (Broekema Tr.) 41:9-19.

**Hearst does not dispute Broekma's inadmissible personal opinion**, **but the statement is vague and ambiguous and therefore Hearst disputes the statement as expressed generally.** Plaintiffs have offered no evidence on this point outside of Broekema's view.

139.   A good candidate for Head Intern is someone who is mature, well-spoken, calm under pressure, capable of taking on responsibility, and able to work more days than regular interns so that they are always available to address any issues that arise. Ex. 3 (Broekema Tr.) 41:20-42:10,

**Hearst does not dispute Broekma's inadmissible personal opinion**, **but the statement is vague and ambiguous and therefore Hearst disputes the statement as expressed generally.** Plaintiffs have offered no evidence on this point outside of Broekema's view.

140.   When there is a Head Intern, Broekema is able to delegate some of the work that he typically does to the Head Intern so that he can focus on different work responsibilities. Ex. 3 (Broekema Tr.) 43:13-24.

**Undisputed**.

141.   Broekema interacts more with Head Interns than regular interns because the Head Intern serves as a conduit of information from Broekema to other interns. Ex. 3 (Broekema Tr.) 83:15-20.

**Undisputed**.

-36-

142.   Broekema can go to the Head Intern first for everything. Ex. 3 (Broekema Tr.) 84:6-7.

**Undisputed**.

143.   Head Interns have Hearst email accounts to which Broekema sends instructions. Ex. 3 (Broekema Tr.) 83:18-84:2.

**Undisputed**.

144.   Head Interns interact directly with public relations representatives and are able to develop their own relationships with them. Ex. 3 (Broekema Tr.) 84:3-6.

**Undisputed**.

145.   Head Interns play a role in interviewing prospective interns for the Accessories Department by doing an initial screening interview to assess a prospect's seriousness and experience. Ex. 3 (Broekema Tr.) 49:4-19.

**Undisputed during Broekema's tenure as Senior Accessories Editor**.  Plaintiffs have offered no evidence on this point for periods outside of Broekema's tenure.

146.   If a Head Intern determines that the prospective intern does not have the seriousness or experience level to be an intern, he or she advises Broekema of their assessment. Ex. 3 (Broekema Tr.) 50:7-11.

**Undisputed**.

147.   Broekema does not do a follow-up interview with a prospective intern whom the Head Intern determines does not have the seriousness or experience level to be an intern. Ex. 3 (Broekema Tr.) 50:7-13.

**Undisputed**.

148.    Head Interns also assist in coordinating the days and hours that interns can work.

Ex. 3 (Broekema Tr.) 49:13-19.

**Hearst does not dispute that during Broekema's tenure as Senior Accessories Editor, Head Interns assisted in coordinating intern schedules.**

149.    Head Interns sometimes make the formal internship offer to prospective interns.

Ex. 3 (Broekema Tr.) 50:14-21.

**Undisputed during Broekema's tenure as Senior Accessories Editor.** Plaintiffs have offered no evidence on this point for periods outside of Broekema's tenure.

150.    During her internship, Wang was asked to obtain school credit letters from the

interns whom she supervised and provide them to Hearst's Human Resources Department. Ex. 50

(Wang Tr.) 79:7-80:14.

**Undisputed**.

151.    Wang provided a school credit letter for her own internship to the previous Head

Intern. Ex. 50 (Wang Tr.) 157:25-158:20.

**Undisputed**.

152.    Wang was not ultimately awarded academic credit for her internship. Ex. 50

(Wang Tr.) 152:24-157:24

**Undisputed**.

153.    Broekema offered Wang the Head Intern role because of her availability to work

more and her seniority in school and because she is calm and well spoken.  Ex. 3 (Broekema Tr.)

82:19-83:5.

**Undisputed**.

154.    Wang's calm demeanor was significant to Broekema because it indicated that she would be calm under stress and levelheaded, which is very important. Ex. 3 (Broekema Tr.) 83:4-9.

**Hearst does not dispute Broekema's inadmissible personal opinion**.

155.    During the period when Wang interned at Bazaar, there were no fulltime Hearst employees in the Accessories Department who held the entry-level Assistant position. Ex. 3 (Broekema Tr.) 18:11-21.

>   **Undisputed**.  For completeness, Hearst adds that during the period when Wang interned at Bazaar, there was at least one full time freelance accessories assistant.  Pls. Ex. 3 (Broekema Tr.) 19:4-16, 22:23-25.

156.    From time to time, Bazaar hires paid "freelance" Assistants to work in the Accessories Department whose duties include coordinating incoming and outgoing sample accessories, supervising interns, making requests for samples, and doing expense reports, among other things.  Ex. 3 (Broekema Tr.) 19:4-20:21.

>   **Undisputed**.  Hearst adds for completeness that among the other things that freelance assistants do are schedule appointments, make requests for fashion shows, book hotels and business trips, approve items shot in Studio D for front of book placement, coordinate samples at Studio D, and speak directly with publicists.  Pls. Ex. 3 (Broekema Tr.) 19:4-20:21.

157.    During periods when there are no freelance Assistants, the work that they perform is performed by Broekema and unpaid interns. Ex. 3 (Broekema Tr.) 23:5-17; 85:22-86:8.

>   **Undisputed**.  For completeness, Hearst adds that Broekema testified that to the extent unpaid interns help him during these periods, they do so under his "close supervision" and that he is "ultimately responsible."  Pls. Ex. 3 (Broekema Tr.) 23:5-17, 85:22-86:8.

158.    Between semesters, when students are on break, the Accessories Department typically does not have any interns. Ex. 3 (Broekema Tr.) 107:14-19.

**Undisputed**.

159.   When the Accessories Department does not have interns, Broekema or

another editor has to do their work or Broekema hires a freelance Assistant to do it. Ex. 3

(Broekema Tr.) 107:14-23.

**Undisputed**.

160.   When Broekema has to do the work that interns typically do, his hours are

"much longer." Ex. 3 (Broekema Tr.) 108:25-109:9.

**Undisputed**.

161.   Broekema does not hire a freelance Assistant during periods when there is a Head

Intern. Ex. 3 (Broekema Tr.) 86:11-24.

> **Disputed**.  The statement is not supported by the cited testimony.  Broekema testified
> only that there has never been a time when an intern and a freelance Assistant "played the
> coordinator role" at the same time.  Pls. Ex. 3 (Broekema Tr.) 86:11-24.

162.   It cuts down on error for one person – either a freelance Assistant or a Head

Intern– to coordinate the pick-up and delivery of accessory samples at any given time. Ex. 3

(Broekema Tr.) 86:11-24.

> **Disputed**.  The statement mischaracterizes the cited testimony.  Broekema testified only
> that it cuts down on error if one person – which person could be Broekema – to coordinate
> the pick-up and delivery of samples.  Pls. Ex. 3 (Broekema Tr.) 86:11-24.

163.   Interns in the Accessories Department check in samples and prepare them to be

returned to publicists, maintain the Accessories Closet, do photo research, make requests for

samples, do expense reports, generate ideas for accessories to be used in Bazaar, go on errands to

return or pick up samples, assist at photo shoots, make copies, and make story boards. Ex. 3

(Broekema Tr.) 23:18-24; 24:15-25; 25:9-11; 26:24-27:10; 31:11-32:6; 36:7-18; Ex. 55 (Harper's

Bazaar Fashion Editorial Internship Guidelines).

**Disputed**.  The statement mischaracterizes the cited testimony to the extent that it suggests that all interns do all the listed tasks.  Broekema's cited testimony makes clear that not all interns do all of the listed tasks.  By way of example, Broekema testified that interns in the Harper's Bazaar's Accessories Department only "rarely" make requests for samples or generate ideas for accessories to be used in Bazaar, because doing so "requires a depth of knowledge that an intern does not typically have."  Pls. Ex. 3 (Broekema Tr.) 26:24-27:7.  Hearst further disputes that Pls. Ex. 55 has any bearing on activities of interns in Harper's Bazaar Accessories Department.  Plaintiffs have not provided any evidence that the cited "Editorial Internship Guidelines" apply to interns in Harper's Bazaar's Accessories Department.  Indeed, Broekema testified that he had never seen Pls. Ex. 55 and that Nicole Fritton (referenced in Ex. 55) does not oversee interns in the accessories department.  Pls. Ex. 3 (Broekema Tr.) 65:25-67:5.  Broekema further testified that he is not familiar with any written manuals or guidelines that are given to interns in the Accessories Department.  Pls. Ex. 3 (Broekema Tr.) 67:23-68:3.

164.   During her internship, Wang's duties included, but were not limited to, serving as a contact between editors and public relations representatives, doing online research, cataloguing samples, maintaining the Accessories Closet, and doing story boards.  Ex. 3 (Broekema Tr.) 105:3-106:11; Ex. 58 (Internship Agreement).

**Undisputed.**

165.    Wang also supervised between six and eight other interns who performed tasks in the Accessories Closet. Ex. 50 (Wang Tr.) 172:12-16.

**Hearst does not dispute** that Wang supervised other interns by serving as conduit of information to them, and helping to coordinate pick ups and returns of merchandise by other interns.  Pls. Ex. 3 (Broekema Tr.) 83:18-20, 85:7-17.

166.   Checking in samples involves receiving the sample from Hearst's messenger center or the messenger himself, opening the bag, unwrapping the sample, taking a photograph of it, making a list of everything in the bag, cross-referencing the list against the invoice sent with the bag, and placing the sample with other samples that have been received. Ex. 3 (Broekema Tr.) 27:11-22.

**Undisputed**.

-41-

167.    Between 5 and 100 samples are delivered to the Accessories Department on a

daily basis. Ex. 3 (Broekema Tr.) 32:7-13.

> **Undisputed**, although Broekema also testified that the number of samples delivered
> daily "varies widely." Pls. Ex. 3 (Broekema Tr.) 32:7-10 & Findikyan Ex. 145
> (Broekema Errata).

168.    For instance, on one particular day, the Accessories Department received at least

30 samples. Ex. 3 (Broekema Tr.) 33:12:16.

> **Undisputed**.

169.    Samples are photographed in photo shoots that are used for Bazaar articles. Ex. 3

(Broekema Tr.) 32:15-22.

> **Disputed**.  Broekema did not testify that all samples are photographed, or that all
> photographed samples are used for Bazaar articles.  Pls. Ex. 3 (Broekema Tr.) 32:15-22.

170.    Bazaar follows a set procedure for checking in samples in order to prevent

against loss. Ex. 3 (Broekema Tr.) 29:9-14; Ex. 77 (Fashion Closet Policy).

> **Undisputed as the statement relates to the Accessories Department**, but Hearst
> disputes that Pls. Ex. 77 has any bearing on activities in Harper's Bazaar's Accessories
> Department, and Plaintiffs have offered no evidence on this point.

171.    If samples are lost, public relations firms might not agree to loan them out

or might charge Bazaar for the lost items. Ex. 3 (Broekema Tr.) 29:21-30:9.

> **Undisputed as it relates to the Accessories Department.**

172.    Interns are taught how to check in samples by Broekema, a freelance Assistant,

or a Head Intern. Ex. 3 (Broekema Tr.) 28:4-7.

> **Undisputed**.

173.    Returning samples involves locating the paperwork that was filed for the

incoming sample, dating and initialing the paperwork, packing up the sample in a bag,

labeling the bag, and having the messenger sign for the bag so that Bazaar will know who picked it up. Ex. 3 (Broekema Tr.) 30:25-31:10.

> The statement is **undisputed as it relates to Broekema's tenure as Senior Accessories Editor**. Plaintiffs have offered no evidence for periods outside of Broekema's tenure.

174.    Maintaining the Accessories Closet involves making sure that shoes are kept in pairs and grouped with similar shoes, bags are separated so that they do not damage each other, scarves are folded with other scarves, hats are kept with other hats, belts are on the belt rack, jewelry is arranged in trays by designer, and that accessories are color-coded so that they can be found more easily or separated according to the article they are being used for. Ex. 3 (Broekema Tr.) 33:25-34:24.

> The statement is **undisputed as it relates to Broekema's tenure as Senior Accessories Editor**. Plaintiffs have offered no evidence for periods outside of Broekema's tenure.

175.    Interns spend a lot of their day maintaining the Accessories Closet. Ex. 3 (Broekema Tr.) 88:8-14.

> The statement is **undisputed as it relates to Broekema's tenure as Senior Accessories Editor**. Plaintiffs have offered no evidence for periods outside of Broekema's tenure.

176.    Maintaining the Accessories Closet in an organized manner helps Bazaar to safeguard against loss or damage. Ex. 3 (Broekema Tr.) 34:23-24.

> The statement is **undisputed as it relates to Broekema's tenure as Senior Accessories Editor**. Plaintiffs have offered no evidence for periods outside of Broekema's tenure.

177.    Broekema believes that interns' responsibilities to keep the Accessories Closet organized and to keep meticulous records of incoming and outgoing samples are vital to operations running smoothly in the Accessories Department. Ex. 3 (Broekema Tr.) 56:8-19.

> **Hearst does not dispute Broekema's inadmissible personal opinions**.

-43-

178.    The Accessories Closet is housed in the same location as the Fashion Closet that contains clothing samples.  Ex. 3 (Broekema Tr.) 34:25-35:4.

**Undisputed**.

179.    The Fashion Closet is approximately 20 feet by 15 feet. Ex. 3 (Broekema Tr.) 35:15-19.

**Undisputed**.

180.    Doing photo research involves going into Bazaar's archives and going through past issues to pull images that interns think might be inspirational for a current story. Ex. 3 (Broekema Tr.) 36:11-18.

**Undisputed as it relates to Harper's Bazaar's Accessories Department.**

181.    Interns assist at photo shoots by bringing "styling notes" – images of how the accessory should be photographed – to the photographer and retrieving samples from the photographer that have already been shot or that are needed back urgently. Ex. 3 (Broekema Tr.) 37:3-24.

**Undisputed as it relates to Harper's Bazaar's Accessories Department.**

182.    Making requests for samples involves emailing a public relations representative with images of the accessories that Bazaar is requesting. Ex. 3 (Broekema Tr.) 25:2-8.

**Undisputed**.

183.    Doing expense reports entails collecting receipts from Broekema, including for work-related travel, scanning the receipts, and inputting them into the computer system so that they can be submitted to Bazaar for its records. Ex. 3 (Broekema Tr.) 25:9-26:6.

**Undisputed as it relates to Broekema.**

184.    Wang did Broekema's expenses every month when she was an intern. Ex. 56 (Broekema Decl.) ¶ 8.

**Undisputed.**

185.    It was helpful for Wang to do Broekema's expense reports because it is time-consuming and it was time that Broekema could devote to other tasks that he had to perform. Ex. 3 (Broekema Tr.) 84:8-20.

**Undisputed.**

186.    Interns are sent to return samples instead of messengers when the public relations firm that loaned out the sample needs it back urgently and cannot send someone themselves, and when it is important for Bazaar that they have the sample back faster than a messenger could bring it. Ex. 3 (Broekema Tr.) 31:14-20.

**Undisputed.**

187.    Interns are sent to pick up samples instead of messengers when Bazaar needs an item quickly and the public relations firm is unable to send it. Ex. 3 (Broekema Tr.) 31:21-32:6.

**Undisputed.**

188.    Bazaar also uses interns instead of messengers for pick-ups and deliveries in order to reduce costs. Ex. 61 (Email, dated Dec. 4, 2008) at D0005583.

**Disputed**.  The statement is not supported by the cited document.

189.    Head Interns do not typically make pick-ups or returns because they are required to be physically present in the office in order to coordinate the pick-ups and returns. Ex. 3 (Broekema Tr.) 85:3-17.

**Disputed.**  The statement that Head Interns are "required" to be physically present in the office is not supported by the referenced testimony. Hearst does not dispute that Head Interns do not typically make pick-ups or returns.

190.    Coordinating the delivery and pick-up of samples is an important part of what

Head Interns do. Ex. 3 (Broekema Tr.) 87:21-88:2.

**The statement is undisputed as it relates to Broekema's tenure as Senior Accessories Editor.**  Plaintiffs have offered no evidence for periods outside of Broekema's tenure.

191.    During Wang's internship, she served as the point of contact for obtaining

samples to be used in Bazaar's photo shoots and coordinating their return.  Ex. 50 (Wang

Tr.) 171:18-172:11.

**Disputed**. The cited testimony does not support the broad statement made.  The cited testimony indicates that during her internship, Wang served as a point of contact for obtaining samples of accessories at Harper's Bazaar and coordinating their return, and that Broekema was another point of contact for doing so.

192.    Making story boards involves cutting out images that Broekema had provided

and putting them onto a board for Broekema to use at presentations with Bazaar editors. Ex. 3

(Broekema Tr.) 57:12-58:8.

**Undisputed**, although the cited testimony states that story boards are "typically" used at presentations with Bazaar editors.

193.    Broekema typically starts work between 8:30 and 9:30 a.m. and leaves between 7

and 10 p.m. or later. Ex. 3 (Broekema Tr.) 37:25-38:11.

**Undisputed.**

194.    His workdays are almost always busy. Ex. 3 (Broekema Tr.) 38:13-15.

**Undisputed.**

195.    The other editors with whom Broekema works in the Accessories Department

also generally have busy workdays. Ex. 3 (Broekema Tr.) 38:16-19.

-46-

**Undisputed.**

196.    Interns in the Accessories Department are expected to arrive at the office between 9 and 9:30 a.m. and typically leave between 6 and 8 p.m. Ex. 3 (Broekema Tr.) 58:9-17.

> **Hearst does not dispute** that on days on which interns were in Harper's Bazaar's Accessories Department during Broekema's tenure, which is the only magazine department and time period that Hearst understands the cited testimony and this statement to address, Broekema expected interns to arrive between 9 and 9:30 a.m. and typically stay until between 6 and 8:00 p.m.  Hearst adds for completeness, however, that most interns were not at Harper's Bazaar five days/week. *See, e.g.*, Pls. Ex 57; Pls. Ex. 50 (Wang Tr.) 140:2-24.

197.    Interns sometimes work later than 8 p.m. if a larger than normal volume of samples arrive and the department needs to prepare for a priority photo shoot or multiple photo shoots. Ex. 3 (Broekema Tr.) 58:18-59:3.

> **Undisputed** as to interns in Harper's Bazaar's Accessories Department during Broekema's tenure, which is the only magazine department and time period that Hearst understands the cited testimony and this statement to address.

198.    Wang interned five days a week, typically from 9 a.m. to 8 p.m. Ex. 50 (Wang Tr.) 166:22-167:5.

**Undisputed.**

199.    Wang sometimes stayed later than 8 p.m., until after 10 p.m. Ex. 50 (Wang Tr.) 257:4-6.

**Undisputed.**

200.    Interns are expected to let someone in the Accessories Department know when they leave the office. Ex. 3 (Broekema Tr.) 59:9-12.

**Undisputed.**

201.    Interns are expected to ask for additional work when they do not have any

assignments to do. Ex. 3 (Broekema Tr.) 59:13-16.

**Undisputed** as to interns in Harper's Bazaar's Accessories Department during
Broekema's tenure, which is the only magazine department and time period that
Hearst understands the cited testimony and this statement to address.

202.    On her first day, Wang was trained by another intern who showed her how to

perform her duties. Ex. 50 (Wang Tr.) 160:4-21.

**Undisputed**

203.    The departing Head Intern, Abigail Hirsch, provided Wang with a "pass-over

note" from which Wang learned how to perform her duties. Ex. 50 (Wang Tr.) 173:13-23.

**Undisputed**

204.    Other than the initial training that Wang received and instructions from Hirsch,

Wang did not receive any formal or informal training during her internship. Ex. 50 (Wang Tr.)

249:22-250:2.

**Disputed**.  Wang received training from Broekema and others at Harper's Bazaar.  *See*
Findikyan Decl. Ex. 15 (Broekema Decl.) ¶¶ 10-14 and paragraphs D225 and D230-D234
in Defendant's Counter-Statement of Material Facts below.

205.    Wang learned how to perform her duties "on the job." Ex. 50 (Wang Tr.) 173:24-

174:4.

**Undisputed.**

206.    Wang's interactions with Bazaar editors consisted primarily of email correspondence in which she provided them with status reports about samples that they had requested. Ex 50 (Wang Tr.) 248:24-249:14.

**Disputed**.  Wang also had face-to-face contact with Broekema.  Findikyan Decl. Ex. 15 (Broekema Decl.) ¶ 14.

207.    Wang had expected to work more closely with her supervisors during her internship.  Instead, they just expected assignments to get done. Ex. 50 (Wang Tr.) 248:17-23.

**Hearst does not dispute Wang's expectations**.  Hearst disputes the suggestion that Wang's supervisor, Broekema, did not work closely with Wang or that he "just expected assignments to get done."  Findikyan Decl. Ex. 15 (Broekema Decl.) ¶¶ 10-14.

208.    Wang believed that if she worked hard, her internship would lead to a paid position and a positive job reference. Ex. 50 (Wang. Tr.) 111:9-22.

**Hearst does not dispute Wang's subjective beliefs**, but her cited testimony makes clear that she hope was that she would increase her chances to obtain a paid position "in the industry."

209.    In late November 2011, Broekema told Wang she was "not doing a good job." Ex. 50 (Wang Tr.) 134:7-14.

**Undisputed.**

210.    Broekema felt that Wang was not clear or accurate in giving directions to other interns. Ex. 56 (Broekema Decl.) ¶ 12; Ex. 3 (Broekema Tr.) 88:15-89:3.

**Undisputed.**

211.    Broekema felt that Wang was not doing a good job coordinating the pick-up and return of samples. For example, Wang sent interns to the wrong address. Ex. 3 (Broekema Tr.) 89:4-17.

**Undisputed.**

212.    Broekema felt that the mistakes that Wang made risked preventing photo shoots from happening on time or at all. Ex. 3 (Broekema Tr.) 90:19-24.

> **Undisputed**, although the cited testimony makes clear that Broekema's concern was also that Wang's mistakes were wasting other interns' time or created "a horrible day for another intern."

213.    Beginning in or around November 2011, Wang spent less time supervising other interns and more time working on tasks, including going on runs to pick up and return accessories and other assignments in the Accessories Closet. Ex. 50 (Wang Tr.) 134:15-135:3; 175:16-176:8.

> **Undisputed.**

214.    A freelance Assistant took over Wang's role supervising interns after she was demoted from a Head Intern to a regular intern. Ex. 50 (Wang Tr.) 176:9-14.

> **Undisputed.**

215.    Spencer applied for a position as a "Bookings" intern at Cosmopolitan by submitting a cover letter and her resume. Ex. 43 (Spencer Tr.) 19:9-15; 88:11-13; Ex. 89 (Email, dated Apr. 13, 2010).

> **Undisputed.**

216.    Spencer was interviewed by Sandra Wilson, the Bookings Director at Cosmopolitan. Ex. 43 (Spencer Tr.) 93:17-23.

> **Undisputed.**

217.    During the interview, Wilson told Spencer that her internship would involve being Wilson's assistant, participating in casting, corresponding with agents, organizing Polaroids and casting forms, and keeping Wilson organized. Ex. 43 (Spencer Tr.) 94:7-14.

>   **Disputed.** The statement mischaracterizes the cited testimony. Spencer did not testify that Wilson told her the internship would involve being Wilson's assistant; that is Spencer's description of the role.

218. During the interview Wilson and Spencer discussed that one of the goals for the internship would be for Spencer to work as hard as she could and stand out as an intern so that she "could possibly come back and work for Cosmo." Ex. 43 (Spencer Tr.) 94:15-17.

>   **Disputed.** The statement mischaracterizes the cited testimony. Spencer testified that "[t]he expectation was to work as hard as you can and stand out, so you could possibly come back and work for Cosmo." She did not testify that this was part of her conversation with Wilson.

219.    During the interview, Wilson asked Spencer whether she had experience with organizing because organizing and administrative tasks would be an important part of her role. Ex. 43 (Spencer Tr.) 99:15-24; 100:5-17.

>   **Undisputed.**

220.    Wilson and Spencer also discussed Spencer's past experience styling models. Ex. 43 (Spencer Tr.) 99:24-100:4.

>   **Undisputed.**

221.    Wilson's assistant Lauren Finney ("Finney") offered Spencer the internship, and Spencer accepted it. Ex. 43 (Spencer Tr.) 101:4-16.

>   **Undisputed.**

222.    Spencer's duties included organizing files, holding casting calls for models, assisting at photo shoots, running errands, mailing "tear sheets," or magazine pages where

models appear, to models' agents, updating contact lists, and assisting in the fashion closet. Ex.

43 (Spencer Tr.) 30:12-24; 108:11-23; 125:13-126:22; 140:16-141:15.

>   **Undisputed**.

>   223.   For model casting calls, Spencer's duties included inviting models to

Cosmopolitan's office, collecting information about their height and weight, taking Polaroid

photos of them, and filing the photos. Ex. 43 (Spencer Tr.) 30:12-24.

>   **Undisputed**.

>   224.   Spencer selected the models who were invited to attend casting calls based on the

"look" that Cosmopolitan wanted. Ex. 43 (Spencer Tr.) 31:7-13.

>   **Undisputed.**  For completeness, Hearst adds that Spencer testified that she "was not the
>   sole person to make [the] decision" of which models to invite.  Pls. Ex. 43 (Spencer Tr.)
>   32:25-33:5.

>   225.   Occasionally, Finney assisted Spencer to select the models, but often Spencer

made the decision on her own. Ex. 43 (Spencer Tr.) 34:5-35:13.

>   **Hearst does not dispute** that after Wilson trained Spencer to select models to be invited
>   to castings, Spencer had the chance to do so on her own.  Pls. Ex. 43 (Spencer Tr.)
>   126:23-128:4.  On other occasions Finney made the decision on which models to invite to
>   castings.  Pls. Ex. 43 (Spencer Tr.) 34:23-35:2.

>   226.   Initially, Wilson and Spencer held casting calls together, but Spencer later held

them on her own. Ex. 43 (Spencer Tr.) 156:9-19.

>   **Undisputed.**

>   227.   After the casting call, Spencer gave the Polaroids to Wilson to select the models

that would ultimately appear in the story. Ex. 43 (Spencer Tr.) 33:14-34:4; 127:14-128:4.

>   **Disputed**.  The statement is not supported by the cited testimony.  Spencer testified
>   that she saw Wilson "take Polaroids and, you know, use those for future
>   reference."  Pls. Ex. 43 (Spencer Tr.) 127:17-128:4.  Plaintiffs have offered no

evidence that the models from casting calls held by Spencer "ultimately appear[ed]" in any story.

228.  Spencer attended two photo shoots during her internship. Ex. 43 (Spencer Tr.) 128:5-8. On one occasion, Wilson asked Spencer to act as a messenger and bring a document to the photo shoot. Ex. 43 (Spencer Tr.) 128:14-24.  On the other occasion, Spencer unpacked trunks, hung clothes on racks, organized and steamed the clothes, and helped the models get dressed. Ex. 43 (Spencer Tr.) 129:4-17.

**Undisputed.**

229.    Spencer checked in with Wilson and Finney once or twice a day. Ex. 43 (Spencer Tr.) 189:23-190:4. Spencer typically received her assignments verbally or by email. Ex. 43 (Spencer Tr.) 191:3-6.

**Undisputed.**

230.    Cosmopolitan previously employed a bookings assistant to perform the tasks that Spencer performed during her internship. Ex. 43 (Spencer Tr.) 152:6-15.

**Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c) and the statement mischaracterizes the cited testimony.

231.    Spencer interned four days per week from 9 a.m. to 5 or 5:30 p.m. Ex. 43 (Spencer Tr.) 97:23-25.

**Undisputed.**

232.    The only training that Spencer received during her internship other than on-the-job training consisted of four, one-hour sessions of "Cosmo U."  Ex. 43 (Spencer Tr.) 161:12-23; 190:10-14. At each session, a Cosmopolitan editor talked about how they got their job. *Id*. 115:11-116:15.

**Disputed.** Hearst agrees that Spencer attended four, one-hour sessions of "Cosmo U." Spencer also received extensive additional training from Wilson and others. *See, e.g.*, Findikyan Decl. Ex. 171 (Spencer Tr.) 165:2-24, 173:19-174:9; Ex. 200 (Spencer Ex. 15) at P 0000709 (learned bookings, models, and magazines); Ex. 201 (Spencer Ex. 16) at P 0000724-27 (describing what learned in internship); Ex. 204 (Spencer Ex. 19).

233.    Spencer received school credit for her internship. Ex. 43 (Spencer Tr.) 104:12-19.

**Undisputed.**

234.    To receive credit, Spencer was required to work 200 hours, submit some initial

paperwork, complete an interim evaluation form and student interim assessment, and complete a

final report and evaluation. Ex. 43 (Spencer Tr.) 120:19-121:3; Ex. 275 (Course Syllabus).

**Undisputed.**

235.    Mancini was interviewed for an internship in Marie Claire's Fashion

Department by Abby Kalicka, a fashion assistant, in December 2008. Ex. 22 (Mancini Tr.)

114:20-115:10.

**Undisputed**.

236.    Mancini submitted a copy of her resume prior to the interview. Ex. 22 (Mancini

Tr.) 115:9-10.

**Undisputed**.

237. During the interview, Kalicka asked Mancini about her favorite designer and her

duties at her current internship. Ex. 22 (Mancini Tr.) 115:13-20. Kalicka explained in general

terms what Mancini's duties as an intern would be. Ex. 22 (Mancini Tr.) 119:8-121:20.

**Disputed.** During Mancini's interview for the internship position at Marie Claire, Kalicka explained what the internship position would entail in significant detail. Findikyan Decl. Ex. 22 (Mancini Tr.) 119:8-121:20.

238.     Mancini and Kalicka also discussed Mancini's schedule and availability to intern. Ex. 22 (Mancini Tr.) 117:15-23.

**Undisputed**.

239.     Kalicka offered Mancini the internship after the interview. Ex. 22 (Mancini Tr.) 121:21-122:5.

**Undisputed**.

240.     Mancini worked alongside between 20 to 30 other fashion interns. Ex. 22 (Mancini Tr.) 144:9-16.

**Undisputed.**

241.     The other fashion interns performed substantially the same tasks that Mancini performed. Ex. 22 (Mancini Tr.) 222:18-223:10.

> **Disputed**.  Plaintiffs have not supported the statement with admissible evidence pursuant to FRCP 56(c), and the cited testimony does not support the statement made.

242.     Mancini's duties as a fashion intern included: receiving clothing ordered for photo shoots by Marie Claire staff, unpacking the items and checking to make sure that everything ordered was received and not broken, photographing the items, filing invoices, and putting the items on garment racks for Marie Claire staff to review. Ex. 22 (Mancini Tr.) 119:18-120:11.

**Undisputed.**

243.     Mancini also returned clothing to designers and sent clothing to other magazines, which entailed locating the clothing, wrapping it, and sending it by messenger or carrying the item personally to the designer or magazine. Ex. 22 (Mancini Tr.) 120:12-121:2.

**Undisputed.**

244.    Fashion interns at Marie Claire are involved in "trafficking samples," which means picking them up, dropping them off, or returning them through a messenger, packing trunks for photo shoots, keeping the fashion closet organized, and helping editors to make look books and research trends and other information. Ex. 45 (Tam Tr.) 18:2-19:19.

**Undisputed.**

245.    Keeping the fashion closet organized makes it easier for the stylists to be able to go through the racks to pick out the clothes they want to use in the magazine. Ex. 45 (Tam Tr.) 22:19-24:1.

**Undisputed.**

246.    Fashion interns at Marie Claire spend from 70 to 80 percent of their time trafficking samples and packing trunks. Ex. 45 (Tam Tr.) 25:14-26:1.

**Undisputed**

247.    Lisa Tam, a fashion assistant at Marie Claire, showed new interns around and showed them their responsibilities. Ex. 45 (Tam Tr.) 31:18-32.

**Disputed**.  The statement mischaracterizes the cited testimony.  Tam did not testify that she showed all new interns at Marie Claire (or even in the Fashion Department) the tasks they were to perform.

248.    Tam usually had one intern stay on to be the "go-to" person that new interns could go to for questions. Ex. 45 (Tam Tr.) 31:19-22.

**Disputed**.  The statement mischaracterizes the cited testimony.  Tam testified that she had one intern "stay[] a little longer" than other interns.

249.    Editors at Marie Claire are "constantly asking for interns to help because they are so busy." Ex. 45 (Tam Tr.) 34:13-18.

**Undisputed as it relates to Tam's tenure as Fashion Assistant at Marie Claire**.
Plaintiffs have offered no evidence for periods outside of Tam's tenure.

250.    Editors request interns to help them with making "inspiration boards," which means finding images online that fit the idea for a particular story and printing the "looks" requested by a stylist and cutting them out and pinning them to a board, and with administrative tasks, like filing paperwork. Ex. 45 (Tam Tr.) 24:2-12; 34:24-35:8.

**Undisputed as it relates to Tam's tenure as Fashion Assistant at Marie Claire**. Plaintiffs have offered no evidence for periods outside of Tam's tenure.

251.    A handbook used for fashion interns at Marie Claire identifies the following duties that fashion interns are expected to perform: cleaning the fashion closet, arranging the racks and labeling them for the specific story that they relate to, checking in incoming samples, and returning samples to public relations companies and showrooms. Ex. 93 (Marie Claire Fashion Intern Handbook).

**Disputed** to the extent the referenced document and statement are intended to apply to all fashion interns at Marie Claire at all times or were actually "used" by all interns, as Plaintiffs have offered no evidence to support those statements. Hearst also disputes the statement in ¶ 251 to the extent it states that all fashion interns were expected to perform all the tasks listed. Ms. Tam specifically testified that not all fashion interns were asked or expect to perform all the tasks listed, and that the document cited has changed over time. Hearst does not dispute that the referenced exhibit identifies the listed "duties," but the statement is vague and ambiguous in use of the phrase "used for fashion interns at Marie Claire." Tam testified that although the document in question provided guidelines for some of the things interns helped her with during her tenure (but also included things interns did not do during her tenure), it had been altered since she had been at Marie Claire. Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25. Plaintiffs have offered no evidence that the referenced exhibit was a "handbook" used for all fashion interns at Marie Claire.

252.    Checking in samples involves logging them on a log-in sheet, checking the invoice to make sure it is consistent with what was received, labeling the samples, photographing the samples, placing them on the appropriate rack, and filing the invoice that came with the sample. Ex. 93 (Marie Claire Fashion Intern Handbook).

**Disputed.** Hearst does not dispute that the referenced exhibit describes the process in ¶ 252, but there is no evidence as to if, when, or where the process was used. Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25.

253.   Returning samples involves marking an "X" on the invoice that came with the

samples, packing the samples up the same way that they were delivered, and arranging for

pickup by a messenger service or UPS. Ex. 93 (Marie Claire Fashion Intern Handbook).

**Disputed.** Hearst does not dispute that the referenced exhibit describes the process in ¶ 253, but there is no evidence as to if, when, or where the process was used. Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25.

254.   Fashion interns at Marie Claire replenish supplies, run errands, file invoices,

answer phones, and check email. Ex. 93 (Marie Claire Fashion Intern Handbook).

**Disputed** to the extent the referenced document and statement are intended to apply to all fashion interns at Marie Claire at all times or were actually "used" by all interns, as Plaintiffs have offered no evidence to support those statements. Hearst also disputes the statement in ¶ 254 to the extent it states that all fashion interns were expected to perform all the tasks listed. Ms. Tam specifically testified that not all fashion interns were asked or expect to perform all the tasks listed, and that the document cited has changed over time. Hearst does not dispute that the referenced exhibit identifies the listed "duties," but the statement is vague and ambiguous in use of the phrase "used for fashion interns at Marie Claire." Tam testified that although the document in question provided guidelines for some of the things interns helped her with during her tenure (but also included things interns did not do during her tenure), it had been altered since she had been at Marie Claire. Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25. Plaintiffs have offered no evidence that the referenced exhibit was a "handbook" used for all fashion interns at Marie Claire.

255.   Fashion interns at Marie Claire make storyboards and assist at photo shoots. Ex.

93 (Marie Claire Fashion Intern Handbook).

**Disputed** to the extent the referenced document and statement are intended to apply to all fashion interns at Marie Claire at all times or were actually "used" by all interns, as Plaintiffs have offered no evidence to support those statements. Hearst also disputes the statement in ¶ 255 to the extent it states that all fashion interns were expected to perform all the tasks listed. Ms. Tam specifically testified that not all fashion interns were asked or expect to perform all the tasks listed, and that the document cited has changed over time. Hearst does not dispute that the referenced

exhibit identifies the listed "duties," but the statement is vague and ambiguous in use of the phrase "used for fashion interns at Marie Claire." Tam testified that although the document in question provided guidelines for some of the things interns helped her with during her tenure (but also included things interns did not do during her tenure), it had been altered since she had been at Marie Claire. Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25. Plaintiffs have offered no evidence that the referenced exhibit was a "handbook" used for all fashion interns at Marie Claire.

256.   Making storyboards involves printing photos selected by an editor, cutting them out, and pinning them onto a board. Ex. 93 (Marie Claire Fashion Intern Handbook).

**Disputed.** Hearst does not dispute that the referenced exhibit describes the process in ¶ 256, but there is no evidence as to if, when, or where the process was used. Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25.

257.   When Marie Claire fashion interns assist at photo shoots, their "basic duties are to pack, unpack, steam clothes, help models with their looks, and assist the editor with anything they need." Ex. 93 (Marie Claire Fashion Intern Handbook).

**Disputed** to the extent the referenced document and statement are intended to apply to all fashion interns at Marie Claire at all times or were actually "used" by all interns, as plaintiffs have offered no evidence to support those statements. Hearst also disputes the statement in ¶ 257 to the extent it states that all fashion interns were expected to perform all the tasks listed. Ms. Tam specifically testified that not all fashion interns were asked or expect to perform all the tasks listed, and that the document cited has changed over time. Hearst does not dispute that the referenced exhibit identifies the listed "duties," but the statement is vague and ambiguous in use of the phrase "used for fashion interns at Marie Claire." Tam testified that although the document in question provided guidelines for some of the things interns helped her with during her tenure (but also included things interns did not do during her tenure), it had been altered since she had been at Marie Claire. Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25. Plaintiffs have offered no evidence that the referenced exhibit was a "handbook" used for all fashion interns at Marie Claire.

258.   Marie Claire informs interns that attending a photo shoot is "an extreme privilege," and tells them that their "sole purpose there is to work." Ex. 93 (Marie Claire Fashion Intern Handbook).

> **Disputed.**  Hearst does not dispute that the cited document contains the quoted language, but Plaintiffs have not provided admissible evidence that the cited document was ever used by Marie Claire interns.  Findikyan Decl. Ex. 172 (Tam Tr.) 58:9-62:25.

259.   Mancini did not receive any training during her internship other than how to perform the day to day tasks she was assigned. Ex. 128 (Mancini Decl.) ¶ 7.

> **Disputed**.  Mancini received informal training and advice from Kalicka and others at Marie Claire.  Mancini observed multiple run-throughs in the Marie Claire fashion closet, where she was able to see the Fashion Director look through pieces of clothing and hear discussion between the Fashion Director, editors and assistants about what items should be shot for potential inclusion in the magazine.  Findikyan Decl. Ex. 159 (Mancini Tr.) 184:21-186:23.  Mancini also learned how the fashion department at a major magazine works and gained knowledge about fashion and designers (Ex. 159 (Mancini Tr.) 187:13-17; 206:9-13).  *See also* Findikyan Decl. Ex. 131 (Smith Decl.) ¶ 13 and paragraphs D 42 and D46-D54 in Defendant's Counter-Statement of Material Facts below.  Mancini also received training in how to perform the day to day tasks she was assigned.

260.   Kalicka did not closely supervise Mancini, but instead checked in on her during the day to make sure that she had completed her assigned tasks correctly. Ex. 22 (Mancini Tr.) 156:9-157:2.

> **Disputed**.  Kalicka supervised Mancini during the course of her internship by giving her "pretty regular" feedback on her performance (Findikyan Decl. Ex. 159 (Mancini Tr.) 155:19-156:8), giving Mancini career advice and speaking with Mancini about her experiences (Ex. 159 (Mancini Tr.) 160:4-23), asking Mancini if she was interested in other departments besides fashion (Ex. 159 (Mancini Tr.) 167:12-18), introducing Mancini to a copy editor at Marie Claire to help her potentially get a job (Ex. 159 (Mancini Tr.) 167:22-168:9), and wanting Mancini to learn what interested her (Ex. 159 (Mancini Tr.) 174:12-14).  *See* paragraphs D41-D43, D48-D51, D53-D54 in Defendant's Counter-Statement of Material Facts below.  Hearst does not dispute that Kalicka checked in on Mancini during the day to make sure that she had completed her assigned tasks correctly.

261.    On one occasion, Tam, a fashion assistant, reprimanded Mancini and other interns for "doing a poor job" of keeping the fashion closet organized and running on time. Ex. 22 (Mancini Tr.) 164:20-165:9.

**Undisputed.**

262.    Marie Claire uses interns to pick up and deliver items to cut down on its messenger costs. Ex. 22 (Mancini Tr.) 56:12-57:24; Ex. 60 (Email, dated July 21, 2011) (Marie Claire uses "interns to pick up and deliver merch to reduce [its] messenger costs").

**Disputed.**  Plaintiffs have not supported the statement with admissible evidence pursuant to FRCP 56(c).

263.    Hearst pays its messengers on a per-trip basis. Ex. 45 (Tam Tr.) 40:10-12.

**Disputed.**  The cited testimony does not support the broad statement made, and therefore Plaintiffs have not supported the statement with admissible evidence pursuant to FRCP 56(c).

264. During Mancini's initial interview, Kalicka told Mancini that Marie Claire would "look the other way" with respect to the fact that Mancini was no longer in school and could not receive school credit for her internship. Ex. 22 (Mancini Tr.) 116:23-117:14.

**Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c), and the cited testimony conflicts with Mancini's prior declaration in this case.  *See* Findikyan Decl. Ex. 74 (Mancini Decl.) ¶¶ 5-6 (describing Mancini's interview and purported discussion of credit); *see also* Pls. SOF ¶ 67, *supra* (referring to Hearst policy with respect to receipt of school credit).

265.    During Mancini's internship, Kalicka, Tam, and other fashion assistants held a meeting with the fashion interns about receipt of school credit. Ex. 22 (Mancini Tr.) 129:25-130:13.

**Undisputed.**

266.   During the meeting, the assistants announced that Hearst was trying to "crack down on the policy of having it be necessary that you have school credit as an intern." Ex. 22 (Mancini Tr.) 130:6-13.

**Undisputed.**

267. The interns who were not receiving school credit were instructed to obtain school credit or some documentation saying that they were receiving school credit, or they would be let go. Ex. 22 (Mancini Tr.) 130:11-18.

**Undisputed.**

268.   No one at Marie Claire ever followed up with Mancini about whether she was eligible to receive credit. Ex. 22 (Mancini Tr.) 130:24-131:4.

**Undisputed**.

269.   Mancini did not receive academic credit for her internship. Ex. 22 (Mancini Tr.) 128:17-19.

**Undisputed**.

270.   Mancini interned three to four days a week. Ex. 22 (Mancini Tr.) 144:23-145:3-7.

**Undisputed**.  Hearst adds for completeness that Mancini was given options of how much and when she wanted to work.  Findikyan Decl. Ex. 159 (Mancini Tr.) 144:17-22.

271.   She typically arrived between 8:30 and 9 a.m. Ex. 22 (Mancini Tr.) 148:22-24.

**Undisputed**.

272.    Mancini typically left Marie Claire around 8:30 or 9 p.m., but sometimes stayed as late as 11:30 p.m. or midnight. Ex. 22 (Mancini Tr.) 148:11-21; 149:18-25. One day a week, Mancini left at around 4 p.m. because she had a paid job as a waitress. Ex. 22 (Mancini Tr.) 150:16-21.

> **Disputed**.  The cited testimony and statement conflicts with Mancini's prior declaration, which states that "I usually arrived at work at 9:30 a.m. and usually left between 6:00 p.m. and 8:00 p.m.  Other interns in the fashion department were required to work as late at [sic] 11:00 p.m. . . ."  Findikyan Decl. Ex. 74 (Mancini Decl.) ¶ 14.

273.    Mancini believed that her internship would lead to a paid position at Hearst. Ex. 22 (Mancini Tr.) 128:8-16; 134:11-14; 225:5-15.

> **Disputed**.  The cited testimony does not support the statement made.

274.    During meetings that Mancini and other interns attended, fashion assistants told them that "if you work hard enough, if you stay there long enough, if people like you, if you do what you're told, then it will result in a paid position within the fashion industry." Ex. 22 (Mancini Tr.) 162:11-163:25.

> **Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c).

275.    Skorka was interviewed for an internship by Krista Demaio, Redbook's Beauty Editor. Ex. 42 (Skorka Tr.) 82:22-83:17. Skorka submitted a resume and cover letter in advance of the interview. Ex. 42 (Skorka Tr.) 80:12-81:4.

> **Undisputed**.

276.    During the interview, Demaio and Skorka discussed Skorka's interest in beauty, her duties as an intern, and the skills and experience that Redbook was looking for in an intern. Ex. 42 (Skorka Tr.) 83:10-84:23.

> **Undisputed.**

277. Demaio offered Skorka the internship, and Skorka accepted. Ex. 42 (Skorka Tr.) 86:14-24.

**Undisputed**.

278. Skorka reported to Demaio and Cheryl Kramer Kaye, Redbook's Beauty Director. Ex. 42 (Skorka Tr.) 49:7-8; 83:18-19; 100:9-11.

**Undisputed**.

279. The supervision Skorka received at Redbook is similar to the supervision that she receives currently in her paid, entry-level position as a Marketing Coordinator at Intercos. For example, in both positions, her supervisor initially taught her how to do her tasks, and then Skorka performed them on her own. In both positions, Skorka's supervisor provided her with periodic feedback. Ex. 42 (Skorka Tr.) 32:12-17; 100:12-101:2; 101:6-17; 208:7-9; 208:16-209:5.

> **Disputed.** Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c). Moreover, Skorka received extensive supervision during her Redbook internship. Findikyan Decl. Ex. 170 (Skorka Tr.) 49:7-9, 82:19-23, 83:16-19, 100:9-101:17, 110:14-16, 111:16-112:14, 115:3-9, 117:14-23, 119:4-17, 122:8-21, 125:20-126:6, 129:11-14, 174:20-175:15, 191:18-20 and paragraphs D105 to D120 in Defendant's Counter-Statement of Material Facts below; *see also* Findikyan Decl. Ex. 73 (Lovaglio Decl.) ¶¶ 6-9 (describing supervision in Redbook beauty department).

280. Skorka's responsibilities as a beauty intern involved managing the beauty closet, which entailed rotating products and replacing old beauty products with new ones and organizing and keeping the products neat so that editors could find them easily. Ex. 42 (Skorka Tr.) 204:23-205:15; Ex. 235 (Redbook Beauty Internship).

**Undisputed**.

281.     Skorka's duties also included assisting with photo shoots, coming up with beauty story ideas, writing posts for the website, attending beauty product launches and reporting back to Redbook's editors about the products, and contacting public relations firms about products to include in the magazine. Ex. 42 (Skorka Tr.) 108:14-109:5; 123:21-124:23; Ex. 154 (Skorka Decl.) ¶ 7; Ex. 235 (Redbook Beauty Internship).

**Undisputed**.

282.     Skorka also selected beauty products for potential inclusion in Redbook and participated in "desksides" where public relations personnel discussed beauty products. Ex. 42 (Skorka Tr.) 118:11-119:17; 122:8-123:10.

**Undisputed**, although the term "selected" is vague and ambiguous.

283.     Skorka sometimes assisted Redbook's fashion editor with tasks when she "really needed help." Ex. 42 (Skorka Tr.) 156:9-157:7.  For example, Skorka packed up clothing and accessories, laid out items so that Christina could determine whether they would be appropriate for a story, reviewed "look books," accepted fashion show invitations, and contacted public relations personnel. Ex. 42 (Skorka Tr.) 156:2-8.

**Disputed**.  Hearst does not dispute that Skorka may have had the opportunity to assist Redbook's fashion editor with the tasks described.

284.     Skorka also helped Redbook's health editor sort through health books to determine whether they were relevant to the stories that the editor was writing. Ex. 42 (Skorka Tr.) 157:17-158:6.

**Undisputed.**

285.    Kaye told Skorka she was doing the work that a paid beauty assistant would do. Ex. 42 (Skorka Tr.) 209:6-17.

**Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c).

286.    Paid beauty assistants organize the beauty closet, research and request products, and maintain brand credit and contact lists. Ex. 30 (Ritterbeck Tr.) 26:12-19; 27:9-12; 44:17-45:5; Ex. 71 (Ritterbeck Resume); Ex. 36 (Rud Tr.) 82:12-23; 84:13-23; 109:3-8; Ex. 191 (Town & Country Editorial Assistant/Beauty & Health) -- D0016935-36.

**Undisputed.**

287.    Skorka's supervisors wanted her to stay on as a paid consultant after her internship ended, doing the same tasks that she had done as an intern. Ex. 42 (Skorka Tr.) 158:17-163:25.

**Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c).

288.    Skorka's supervisors asked Redbook's finance department whether Skorka could be employed as a consultant, but were told that the magazine did not have the budget to employ her. Ex. 42 (Skorka Tr.) 162:13-163:20.

**Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c).

289.    Skorka ultimately took a paid internship at Estee Lauder instead of staying on at Redbook. Ex. 42 (Skorka Tr.) 30:4-31:14; 163:21-25.

**Undisputed**.

290.    Skorka interned at Redbook three days a week, from approximately 10 a.m. to 6 or 7 p.m. Ex. 42 (Skorka Tr.) 97:20-98:2; 99:5-7.

**Undisputed**.

291.    After her internship at Redbook ended, Skorka spent a day working at O, The Oprah Magazine, as an unpaid intern. Ex. 42 (Skorka Tr.) 71:6-23.

> **Disputed.**  The cited testimony does not support the statement made.  In fact, Skorka's testimony contradicts the statement.  Pls. Ex. 42 (Skorka Tr.) 72:3-7 (did not work or intern at O Magazine).

292.    At O, Skorka spoke to public relations companies, helped organize the beauty closet, and attended a meeting to discuss skincare products. Ex. 42 (Skorka Tr.) 71:18-23.

> **Disputed**.  The cited testimony does not support the statement made.

293.    Skorka was being considered for an internship at O. Ex. 42 (Skorka Tr.) 71:24-72:2.

> **Undisputed.**

294.    Skorka believed that she would earn [a] job reference through her internship. She also believed that if she performed her duties well, she would be considered for a paid position at Redbook. Ex. 154 (Skorka Decl.) ¶¶ 12-13; Ex. 42 (Skorka Tr.) 200:23-201:5.

> **Undisputed**.  Hearst has no basis to dispute Skorka's personal beliefs.  Hearst adds for completeness that Skorka's internship supervisors told her that she shouldn't "hesitate to ask" for a job reference and Skorka has always tried to include DeMaio and Kramer as references when applying for jobs.  Findikyan Decl. Ex. 227 (Skorka Ex. 8) at P 0000462; Ex. 170 (Skorka Tr.) at 203:17-19.

295.    Skorka received school credit for her internship. Ex. 42 (Skorka Tr.) 92:11-13.

> **Undisputed**.  Hearst adds for completeness that the three credits received by Skorka for her Redbook internship brought her "closer to graduation."  Pls. Ex. 42 (Skorka Tr.) 93:4-10.

296.    To receive credit, Skorka took an online internship class. Ex. 42 (Skorka Tr.)

88:10-12.  The course required her to work a certain number of hours at her internship and

submit a paper every two weeks about her experiences. Ex. 42 (Skorka Tr.) 89:4-12; 91:13.

**Undisputed**.  *See also* paragraphs D94 to D96 in Defendant's Counter-Statement of
Material Facts below.

297.    Skorka did not receive any training at Redbook other than how to perform her

day-to-day tasks. Ex. 154 (Skorka Decl.) ¶ 6.

**Disputed.**  *See, e.g.*, Pls. Ex. 42 (Skorka Tr.) 100:18-101:17; Findikyan Decl. Ex.
170 (Skorka Tr.) 49:7-9, 82:19-23, 83:16-19, 99:18-100:2, 110:14-16, 111:16-
112:14, 115:3-9, 117:14-20, 119:4-17, 122:8-21, 125:20-126:6, 129:11-14, 174:20-
175:15, 191:18-20 and paragraphs D107 to D 122 in Defendant's Counter-Statement
of Material Facts below.

298.    Wagster was interviewed for an internship at Esquire by Worth Turner, the

assistant to the Director of Marketing, and Meg Chaffee, the assistant to the Publisher.  Ex. 49

(Wagster Tr.) 11:15-23; 58:9-15; 74:8-13.

**Undisputed.**

299.    During the interview, Wagster discussed his past experiences doing administrative

and clerical work. Ex. 49 (Wagster Tr.) 85:23-86:12. Turner and Chaffee told Wagster that the

internship involved administrative tasks and assisting with events. Ex. 49 (Wagster Tr.) 85:10-

20.

**Undisputed.**

300.    Turner told Wagster that Esquire was very busy and needed help, and asked

whether Wagster could begin interning the next day. Ex. 49 (Wagster Tr.) 76:20-77:5. Wagster

agreed. Ex. 49 (Wagster Tr.) 77:3-5.

**Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to
FRCP 56(c).

301. Turner told Wagster that he needed to provide documentation stating that he was eligible for academic credit for his internship.  Ex. 49 (Wagster Tr.) 77:6-19. Wagster provided the requested documentation. Ex. 49 (Wagster Tr.) 77:20-21.

**Undisputed**.

302.    After Wagster completed the internship, his university declined to award him credit because the work he performed was not applicable to his major or any other skill set for future career advancement. Ex. 49 (Wagster Tr.) 79:18-22; 129:13-18.

> **Disputed.**  Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c), and have offered no evidence of the reasons why Wagster's university declined to award him credit.

303.    Wagster primarily reported to Turner, although he also performed tasks for other assistants. Ex. 49 (Wagster Tr.) 11:15-17; 108:22-109:9.

**Undisputed**.

304.    Wagster was not closely supervised. Ex. 49 (Wagster Tr.) ¶¶ 15-16.

> **Disputed.**  The cited testimony does not support the broad statement made.  *See* Pls. Ex. 49 (Wagster Tr.) 108:22-24 (Turner supervised with respect to guest lists), 101:11-12 (if did something wrong, told how to fix it), 109:11-110:17 (showing he understood the nature and purpose of the Soho House event); *see also* Findikyan Decl. Ex. 94 (Perri Decl.) ¶¶ 7-11 (describing Esquire ad & marketing intern supervision); Ex. 140 (Yale Decl.) ¶¶ 6-9 (describing Esquire ad sales intern supervision).

305.    As an intern in the Publishing department at Esquire, Wagster ran errands, updated guest lists for events held at Esquire's Soho event space, helped prepare for events, and worked at the doors at the events. Ex. 49 (Wagster Tr.) 103:4-9.

**Undisputed**.

306.    Wagster spent the majority of his time compiling guest lists for events. Ex. 49 (Wagster Tr.) 107:3-10. Compiling guest lists involved entering guests' names into a spreadsheet, confirming that the guests were properly invited, and relaying any guest requests to Esquire staff. Ex. 49 (Wagster Tr.) 107:11-108:6.

**Undisputed**.

307.    Wagster helped to prepare for events by setting up heat lamps, arranging glasses, cleaning, and fetching promotional materials from Esquire's offices. Ex. 49 (Wagster Tr.) 103:11-19.

**Undisputed**.

308.    During events, Wagster checked guests in and sometimes took them upstairs where the event was taking place, or worked the elevator to transport guests up and down. Ex. 49 (Wagster Tr.) 103:20-104:5.

**Undisputed**.

309.    Wagster's duties also included delivering copies of Esquire to other Hearst magazines in the Hearst Tower. Ex. 49 (Wagster Tr.) 66:18-24. He also delivered hard copies of proposed layouts to advertisers and to Esquire events. Ex. 49 (Wagster Tr.) 104:15-105:10.

**Undisputed.**

310.    Wagster's duties included preparing expense reports for Esquire staff. Ex. 49 (Wagster Tr.) 106:11-15.

**Undisputed.**

311.    Wagster attended weekly marketing meetings where he took minutes for Esquire executives. Ex. 49 (Wagster Tr.) 144:5-22.

**Disputed**.  The cited testimony does not support the statement that Wagster "took minutes for Esquire executives."  Hearst does not dispute that Wagster attended weekly marketing meetings and was encouraged to take notes.

312.    Some of the same duties Wagster performed are performed by paid employees at Esquire. *See* Ex. 243 (Esquire Marketing Integration Associate); Ex. 244 (Esquire Marketing Assistant).

**Undisputed.**

313.    Other [than] on-the-job training on his first day at Esquire, in which he was taught how to use the fax machine, answer phones, update the office Rolodex, and perform other administrative tasks, Wagster did not receive any formal or informal training as part of his internship. Ex. 158 (Wagster Decl.) ¶¶ 7-8.

**Disputed**.  Wagster received informal training and advice from Worth Turner, Stephen Jacoby and others at Esquire.  *See* Pls. Ex. 49 (Wagster Tr.) 109:11-110:17 (demonstrating knowledge of nature and purpose of Soho House event), 101:11-12 (if did something wrong, told how to fix it), 143:9-16 (was able to observe events and see how they were run) and paragraphs D204-D209 and D214-215 in Defendant's Counter-Statement of Material Facts below.  Wagster also received training in performing administrative tasks.

314.    Wagster interned three days a week, generally from 9 a.m. to 6 p.m. Ex. 49 (Wagster Tr.) 83:24-84:6. He stayed later on the nights when he was required to attend marketing events. Ex. 49 (Wagster Tr.) 44:14-45:24.

**Disputed.**  Hearst does not dispute that Wagster's internship was only three days a week, but does dispute that he interned on all of those days.  *See, e.g.*, Findikyan Decl. Ex. 208 (Wagster Ex. 7) (emails re: missing days).  Hearst disputes that Wagster was "required to attend" marketing events.  *See* Findikyan Decl. Ex. 213 (Wagster Ex. 12); Ex. 174 (Wagster Tr.) 128:5-129:7 (understood event was optional).

315.    Based on a conversation with Turner, in which Turner told him that having an internship at Esquire would make it easier to get a job at Hearst, Wagster believed that his internship would lead to potential opportunities for paid employment at Hearst. Ex. 49 (Wagster Tr.) 49:6-50:3.

> **Disputed.**  While Hearst has no basis on which to dispute Wagster's inadmissible subjective beliefs, Plaintiffs did not support the statement with admissible evidence pursuant to FRCP 56(c).

316.    Leszuk was interviewed by Zarah Burstein, a sales assistant, Christina Elliot, an advertising assistant, and Amy Katz, a sales associate and media sales executive at Marie Claire. Ex. 21 (Leszuk Tr.) 133:7-9; 308:2-14. Leszuk met with each for approximately 20 minutes. *Id.* 133:11-18.

> **Undisputed**.

317.    During her interviews, Leszuk discussed her background, experience, interests, her goals for the internship, and what her duties would be.  Ex. 21 (Leszuk Tr.) 133:19-24; 135:25-136:6.

> **Undisputed**.

318.    Elliot told Leszuk that, during her internship, she would attend a series of lectures run by different members of the advertising department, covering topics including presentation skills and "media math." Ex. 21 (Leszuk Tr.) 141:22-142:14.

> **Undisputed**.

319.    Other than a brief, approximately 20-minute session about "media math," these lectures never occurred. Ex. 21 (Leszuk Tr.) 226:21-227:7.

> **Disputed**.  The statement in ¶ 319 conflicts with Leszuk's prior contemporaneous statements in an email to Amy Helmus.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 228:18-231:21, 288:12-289:8 & Ex. 228 (Leszuk Ex. 14) at P1833.

320.    Leszuk initially reported to Elliot. Ex. 21 (Leszuk Tr.) 90:8-9. After Elliot left

Hearst, Paige Dubeshter and Rula Sawaf, who were both assistants, primarily assigned Leszuk

tasks. Ex. 21 (Leszuk Tr.) 90:18-23; 239:10-16.

**Undisputed**.  Hearst notes that ¶ 320 does not include a complete citation for this
statement.

321.    Leszuk generally interacted with her supervisors twice a day. Ex. 21 (Leszuk

Tr.) 312:7-25.

**Undisputed**.

322.    Leszuk spent the majority of her time during her internship creating "edit credit"

spreadsheets.  Ex. 21 (Leszuk Tr.) 65:20-66:9; 234:17-235:10.

**Undisputed**.

323.    Doing edit credits involved a line-by-line review of Marie Claire and its

competitors' magazines.  Each time a particular brand was mentioned, Lezuk entered the page,

article, and other information into a spreadsheet.  Ex. 21 (Leszuk Tr.) 65:22-66:4; Ex. 67 (Email,

dated Jan. 28, 2010).

**Hearst does not dispute that Leszuk performed the task described.**

324.    Marie Claire used the information in the edit credits to pitch clients and to

demonstrate to advertisers that the magazine had featured their brand.  Ex. 21 (Leszuk Tr.)

234:24-235:10; 312:3-7.

**Undisputed as to the edit credits done by Leszuk, which are the only edit credits
Hearst understands the statement to refer to**.  The statement is otherwise vague and
ambiguous and Plaintiffs have not supported the statement with admissible evidence
pursuant to FRCP 56(c).

325.    Paid sales assistants at Hearst also compile edit credits. Ex. 2 (Berard Tr.) 58:12-59:7; Ex. 4 (Buchalter Tr.) 41:22-42:4; 78:2-9; Ex. 29 (Riordan Tr.) 48:20-23; 111:4-10; Ex. 41 (Simmons Tr.) 50:8-14; Ex. 180 (Oprah Magazine Sales Assistant); Ex. 189 (Seventeen Sales Assistant); Ex. 190 (Woman's Day Sales Assistant); Ex. 181 (Food Network Sales Assistant); Ex. 185 (Cosmo Sales Assistant); Ex. 186 (Country Living Sales Assistant); Ex. 187 (ELLE Décor Sales Assistant); Ex. 188 (Bazaar Sales Assistant).

**Hearst does not dispute that certain paid sales assistants at certain magazines perform the task described** (Pls. Ex. 2 (Berard Tr.) 58:12-59:7; Ex. 4 (Buchalter Tr.) 41:22-42:4; Ex. 29 (Riordan Tr.) 48:20-23; 111:4-10).  However, the remainder of the exhibits cited in ¶ 325 do not support the statement in question.

326. Leszuk also created "edit credit books" containing pages of Marie Claire in which certain brands were featured. Ex. 21 (Leszuk Tr.) 197:5-13; 309:13-310:7.  Edit credit books are used by Marie Claire sales representatives during their meetings with clients. Ex. 21 (Leszuk Tr.) 310:8-15.

**Undisputed**.

327.    Paid sales assistants at Hearst also compile edit credit books. Ex. 4 (Buchalter Tr.) 41:22-42:4; 78:2-9; Ex. 29 (Riordan Tr.) 142:10-23.

**Disputed**.  Hearst does not dispute that certain paid sales assistants at certain magazines are responsible for the task described, but Plaintiffs have not supported their broad statement with admissible evidence (or any evidence as to magazines other than Esquire or Marie Claire).

328.     Marie Claire's sales representatives present their clients with edit credit books to help build the client's relationship with Marie Claire, demonstrate the editorial support Marie Claire has given their brand, and to help ensure that the client advertises with Marie Claire. Ex. 29 (Riordan Tr.) 83:8-84:8.

**Disputed**.  Hearst does not dispute that sales representatives at Marie Claire may use edit credit books in the way described, but the cited testimony does not support the broad statement made.

329.     During her internship, Leszuk assisted the Marketing Department at a model casting call by bringing the models from the waiting area into the casting room. Ex. 21 (Leszuk Tr.) 207:21-208:22. She also assisted with a marketing event held at a store called Mango by maintaining a waiting list for customers waiting to get makeovers. Ex. 21 (Leszuk Tr.) 246:3-14.

**Undisputed**.

330.     Leszuk interned four days a week, from approximately 9 a.m. until approximately 6 p.m. Ex. 21 (Leszuk Tr.) 198:5-8.

**Undisputed**.

331.     On one occasion, when she was required to attend an event at a store in Soho, she interned until 9 p.m. Ex. 21 (Leszuk Tr.) 81:7-18.

**Undisputed**.

332.     Leszuk received school credit for her internship. Ex. 21 (Leszuk Tr.) 155:24-156:2.

**Undisputed**.

333.     To receive credit, Leszuk was required to work for a certain number of hours, keep a weekly journal, and attend a weekly seminar on Fridays.  Ex. 21 (Leszuk Tr.) 178:8-21; 183:24-184:17.

> **Undisputed**.  For completeness, in order to receive credit from her college, Leszuk was required to intern a minimum of 28 hours per week, at least 7 hours per day Mondays through Thursdays, keep a weekly journal and attend a weekly seminar on Fridays.  *See* Findikyan Decl. Ex. 184 (Leszuk Ex. 11); Pls. Ex. 21 (Leszuk Tr.) 158:17-23.

334.     During her internship, a professor at Lezsuk's school performed a site visit at Marie Claire. Ex. 21 (Leszuk Tr.) 162:17-23; 163:3-164:10.

**Undisputed**.

335.     Leszuk had previously told her professor that she had not received the classes that had been discussed in her interview and that she was unsatisfied with the work she was doing. Ex. 21 (Leszuk Tr.) 184:20-185:12.

**Undisputed**.

336.     Leszuk's professor was concerned that she was supervised by entry-level employees. Ex. 21 (Leszuk Tr.) 169:12-170:20.

> **Disputed**.  Plaintiffs have not supported the statement with admissible evidence pursuant to FRCP 56(c).

337.     Leszuk believed her internship would lead to a paid position at Hearst. Ex. 21 (Leszuk Tr.) 136:13-19; 289:9-17.

**Hearst has not basis to dispute Leszuk's beliefs and hopes.**

338.     Rappaport was interviewed for her internship as a fashion intern at Seventeen by an assistant, Ryan Jin. Ex. 27 (Rappaport Tr.) 100:25-101:9.

**Undisputed.**

339.    During the interview, Jin asked Rappaport questions about her resume and Seventeen, and told her about the hours that she could expect to work. Ex. 27 (Rappaport Tr.) 102:22-103:13.

**Undisputed**.

340.    Jin told Rappaport that the internship would involve putting outfits together and organizing in the fashion closet. Ex. 27 (Rappaport Tr.) 104:13-22.

**Undisputed**.

341.    Jin told Rappaport that because interns fell within Seventeen's target market, they could have input and help improve the magazine. Ex. 27 (Rappaport Tr.) 104:23-105:4.

**Undisputed**.

342.    Rappaport and Jin also discussed her start date, and with whom she would be working. Ex. 27 (Rappaport Tr.) 106:6-22.

**Undisputed**.

343.    Rappaport reported to Jin and Andrew Mukamal, another assistant. Ex. 27 (Rappaport Tr.) 51:14-52:4; 65:9-12; 122:25-123:3.

**Undisputed.**

344.    Rappaport spoke to Jin and Mukamal about once a day. Ex. 27 (Rappaport Tr.) 65:17-19.

**Undisputed.**

345.    Rappaport received assignments via email that went to a single email account shared by all of the fashion closet interns. Ex. 27 (Rappaport Tr.) 65:20-66:7.

**Disputed**.  Hearst does not dispute that one of the ways Rappaport received assignments was via email to a single intern account.  Hearst does dispute that this was the only way she received assignments and the cited testimony does not support

-77-

the statement.  *See* Pls. SOF ¶ 344 and Findikyan Decl. Exs. 191-194 (Rappaport Exs.10-13) (describing internship experience).

346.    Mukamal and Jin told Rappaport and the other interns that they should talk to each other if they had questions before asking them.  Ex. 27 (Rappaport Tr.) 123:18-124:7.

**Undisputed**.

347.    On her first day at Seventeen, Mukamal introduced Rappaport to the other fashion interns, who showed her how to perform her tasks. Ex. 27 (Rappaport Tr.) 115:21-116:12.

**Undisputed**.

348.    As an intern in the fashion closet, Rappaport's duties included organizing clothes, hanging them on racks, packing them for fashion shoots or to be returned to public relations firms, picking up and returning clothing to public relations firms and designers, organizing jewelry, sending packages, copying, faxing, and responding to emails from designers about the return of samples. Ex. 27 (Rappaport Tr.) 82:14-83:22.

**Undisputed.**

349.    Paid, entry-level fashion assistants at Hearst are also tasked with organizing the fashion closet. Ex. 15 (Helmus Tr.) 37:10-38:5.

**Undisputed.**

350.    On one or two occasions, Rappaport attended a photo shoot. Ex. 27 (Rappaport Tr.) 126:14-20.  At the shoot, she unpacked clothes and shoes for the stylist and model, set up jewelry, unpacked equipment, purchased flowers, and packed up when the shoot was over. Ex. 27 (Rappaport Tr.) 127:12-128:8.

**Undisputed.**

351.    Rappaport interned four days a week, from about 9:20 a.m. to between 6:30 and 7:30 p.m. Ex. 27 (Rappaport Tr.) 47:6-8; 103:17-104:2.

> **Undisputed**.  Hearst does not dispute that Rappaport's internship was ultimately four days a weeks, nor does it dispute the general hours of her internship. *But see* Findikyan Ex. 191 (Rappaport Ex. 10).  Hearst adds that Rappaport also took a vacation in the middle of her internship.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 117:13-22.

352.    Rappaport received school credit for her internship. Ex. 27 (Rappaport Tr.) 45:12-46:8.

> **Undisputed**.

353.    To receive school credit, Rappaport registered for a one-credit class, wrote weekly journal entries, and submitted a final paper. Ex. 27 (Rappaport Tr.) 55:25-57:5.

> **Undisputed.**  Hearst adds for completeness Rappaport understood that to receive school credit, she could not be paid for her time in the internship and that her college required her to spend 120 hours in the internship.  Findikyan Decl. Ex. 190 (Rappaport Ex. 9) at P 1973.

354.    Wheels applied for an internship at Cosmopolitan by sending a letter and her resume to Caryn Kanare, a business coordinator. Ex. 51 (Wheels Tr.) 79:2-80:16; 94:5-6.

> **Undisputed**.

355.    Wheels had two phone interviews before she was hired. Ex. 51 (Wheels Tr.) 90:19-91:5. The first interview was with Esther Crain, a deputy articles editor. Ex. 51 (Wheels Tr.) 91:6-19. Crain asked Wheels to complete an "edit test," during which Wheels was asked to draft a "mock up" of an article and submit it for review.  Ex. 51 (Wheels Tr.) 91:24-92:4.

> **Undisputed**.

356.    After Wheels completed the edit test, she had a second interview with Kanare. Ex. 51 (Wheels Tr.) 94:4-6.  During the interview, Wheels and Kanare discussed Wheels' start date and a potential end date. Ex. 51 (Wheels Tr.) 95:14-96:14.

**Undisputed**.

357.    Wheels did not report to a particular supervisor, but instead performed tasks for a number of different Cosmopolitan employees. The supervision Wheels received generally consisted of Cosmopolitan employees asking her to do projects and Wheels turning in what was asked.  Ex. 51 (Wheels Tr.) 53:3-57:11; 186:15-22; 192:15-193:3.

> **Disputed**.  The cited testimony does not support the statements made.  Hearst does not dispute that Wheels received assignments and supervision from a number of different Cosmopolitan employees.  Hearst does dispute that the statement or implication that the only supervision Wheels received was employees asking Wheels to do projects. Moreover, Wheels did have a primary "point person" during her internship, and described the level of interaction with her supervisors as "great" when evaluating her internship.  Findikyan Decl. Ex. 214 (Wheels Ex. 10).

358.    As an editorial intern at Cosmopolitan, Wheels responded to emails from readers, did research for articles, surveyed people on the street for articles, transcribed interviews, compiled statistics on magazine sales, located articles in Cosmopolitan's archives, wrote content for the magazine, and fact-checked articles.  Ex. 51 (Wheels Tr.) 136:16-138:6; 139:19-143:7.

**Undisputed**.

359.    After an editorial assistant, Gabrielle Frank, resigned, Wheels took over some of her responsibilities, including interviewing bachelors from each state and writing short biographies about eleven of them for the magazine. Ex. 51 (Wheels Tr.) 137:8-15; 138:18-139:19; 145:9-146:19.

> **Disputed**.  Plaintiffs have not supported the statement with admissible evidence pursuant to FRCP 56(c).  Hearst does not dispute that Wheels may have interviewed and written short biographies about bachelors, but Plaintiffs have offered no admissible evidence as to Frank's "responsibilities" or who, if anyone, "took over" those responsibilities.

360.    Paid editorial assistants also do research for articles, write magazine content, transcribe interviews, interview bachelors, and write profiles about them. Ex. 17 (Hilmantel Tr.) 6:22-8:12; 22:19-22; Ex. 34 (Ross Tr.) 32:3-9; Ex. 47 (Thompson Tr.) 9:2-10:22; Ex. 260 (Marie Claire Editorial Assistant); Ex. 261 (Marie Claire Editorial Assistant); Ex. 191 (Town & Country Editorial Assistant); Ex. 262 (House Beautiful Editorial Assistant); Ex. 263 (Esquire Editorial Assistant); Ex. 264 (Good Housekeeping Editorial Assistant); Ex. 265 (Good Housekeeping Editorial Assistant); Ex. 266 (Cosmopolitan Editorial Assistant); Ex. 267 (Cosmopolitan Editorial Assistant); Ex. 268 (Woman's Lifestyle Editorial Assistant).

> **Disputed**.  Hearst does not dispute that some paid editorial assistants can be responsible for some of the tasks described, but the testimony and documents cited do not support the statement in ¶ 360 to the extent it purports to suggest that all paid editorial assistants are responsible for all of the tasks described.

361.    Wheels's college, Reed College, refused to award credit for her internship, so she purchased credit from Portland Community College. Ex. 51 (Wheels Tr.) 104:12-105:22.

> **Disputed**.  Plaintiffs have not supported the statement with admissible evidence pursuant to FRCP 56(c).

362.    The career services department at Reed College told Wheels that it would not award her academic credit because it is "a way that businesses get around paying their interns" and can be "exploitative."  Ex. 51 (Wheels Tr.) 106:4-9.

**Disputed**.  Plaintiffs have not supported the statement with admissible evidence pursuant to FRCP 56(c).

363.    During her internship, Wheels attended four, one-hour sessions of "Cosmo U." Ex. 51 (Wheels Tr.) 78:7-11; 205:6-12. At the sessions, employees discussed the various departments of Cosmopolitan and their career paths. Ex. 51 (Wheels Tr.) 205:20-206:24.

**Undisputed**.  For completeness, among the topics discussed at Cosmo U are Cosmopolitan's various departments and their functions and the career paths of editors and executives.  *See also* Findikyan Decl. Ex. 214 (Wheels Ex. 10) at P 2075-76 (giving Cosmo U the highest ranking on a survey of her internship, and describing Cosmo U as "super informative" and "interesting" and noting that she was "blown away" by learning about the marketing side of the business).

364.    Wheels felt that she "could have used a lot more . . . basic training." Ex. 51 (Wheels Tr.) 192:25-193:6; 216:21-24.

Hearst has no basis to dispute Wheels' "feelings."  *See also* Findikyan Decl. Ex. 214 (Wheels Ex. 10) (survey completed by Wheels describing her internship experience). Other editorial interns at Cosmopolitan during the same time period believe that they received extensive training and mentoring.  *See* Findikyan Decl. Ex. 7 (Bailey Decl.) ¶¶ 3-9 (describing Cosmopolitan internship in summer of 2011).

365.    Wheels worked at Cosmopolitan four days a week. Ex. 51 (Wheels Tr.) 130:22-131:13. She typically arrived around 9:15 a.m. and left at around 6 p.m. Ex. 51 (Wheels Tr.) 127:8-12.

**Undisputed**.

366.    Wheels hoped that her internship would lead to a paid position at Cosmopolitan.

Ex. 51 (Wheels Tr.) 81:7-82:8.

**Hearst has no basis to dispute Wheels's "hopes,"** but in any event the statement
mischaracterizes the cited testimony.  *See* Pls. Ex. 51 (Wheels Tr.) 81:7-82:8.


## DEFENDANT'S COUNTER-STATEMENT OF
## ADDITIONAL MATERIAL FACTS


**The Opt-In Plaintiffs**

   **Opt-In Plaintiff Caitlin Leszuk**

D1.    Leszuk understood prior to the start of her internship that it was an unpaid

position.  *See* Findikyan Decl. Ex. 158 (Leszuk Tr.) 130:5-13.

D2.    Leszuk understood prior to the start of her internship that it was not a guarantee

of a job.  *See* Findikyan Decl. Ex. 158 (Leszuk Tr.) 136:13-19.

D3.    Leszuk thought the Marie Claire internship would help her get her "life on

track and in order."  She wanted to get into advertising and thought the internship "would be the

first step on a good track."  Findikyan Decl. Ex. 158 (Leszuk Tr.) 151:2-11, 152:19-153:6.

Leszuk was also satisfying a graduation requirement from LIM College.  Findikyan Decl. Ex.

158 (Leszuk Tr.) 156:3-8.

D4.    As part of the graduation requirements for her Visual Merchandising degree at

LIM College, Leszuk was required to complete a five-month internship for a minimum of 28

hours per week, at least 7 hours per day, Monday through Thursday, during the final semester of

her senior year.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 134:10-17, 156:3-8, 158:17-159:3; Ex. 184 (Leszuk Ex. 11) at D0001796, D0001751.

D5.     In order to complete her internship requirement, Leszuk enrolled in LIM College's "Senior Co-op Program" that was "designed to help launch us into the workplace and get us to be ready to be on our own in the industry that we so choose."  Findikyan Decl. Ex. 158 (Leszuk Tr.) 158:10-14.

D6.     According to LIM College, the goals of the Senior Co-op Program included providing students with "hands on" or "practical 'on the job'" experience, giving students an "opportunity to evaluate, appraise and relate actual job experience to course work learned in the classroom," and "where the skills of the student warrant, independent performance of professional duties."  Findikyan Decl. Ex. 158 (Leszuk Tr.) 160:2-9, 175:23-178:7; Ex. 184 (Leszuk Ex. 11) at D0001796, D0001751.

D7.     Leszuk understood that prior to approving a student's internship, LIM College evaluated the proposed internship company to decide whether or not an internship at that company "was going to have an educational value." Findikyan Decl. Ex. 158 (Leszuk Tr.) 156:9-24.

D8.     LIM College approved Marie Claire as the internship company for Leszuk's internship.  Findikyan Decl. Ex. 158 (Leszuk Ex. 11).

D9.     Near the beginning of her internship, Leszuk provided LIM College with a description of her expected "Internship Responsibilities and Duties."  Findikyan Decl. Ex. 158 (Leszuk Tr.) 157:23-158:9, 175:7-22; Ex. 184 (Leszuk Ex. 11) at D0001751.  She informed LIM College that during her internship she would be "learning Advertisement Sales, helping to

-84-

organize and retrieve items, inputting edit credits, mailing files."  Findikyan Decl. Ex. 158

(Leszuk Tr. 172:5-173:16); Ex. 184 (Leszuk Ex. 11) at D0001751.

D10.     Leszuk wanted to do work that was productive during her internship.

Findikyan Decl. Ex. 158 (Leszuk Tr.) 160:23-25.

D11.     During her internship, Leszuk learned portions of the way the advertisement

sales business is run, helped to organize and retrieve certain items, inputted edit credits and

mailed files.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 173:22-174:3, 174:14-175:6, 287:17-20.  She

also gained some understanding of advertisement sales and marketing for publications during her

internship.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 287:17-20.

D12.     Leszuk's supervisors taught her what edit credits and edit credit books are, how

to create them, and why they are necessary.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 204:13-

205:15, 206:2-24, 234:16-236:9.

D13.     Each week of her internship, Leszuk attended sales meetings with the whole

advertising and marketing department.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 258:4-21.  Leszuk

found those meetings "interesting" and they taught her "how a magazine and advertising

department get together and discuss each month's magazine and . . . how quick an operation like

print happens."  Findikyan Decl. Ex. 158 (Leszuk Tr.) 258:22-259:19.

D14.     During her internship, Leszuk had multiple conversations with her supervisors

and other Marie Claire employees about their career paths and her career aspirations. Findikyan

Decl. Ex. 158 (Leszuk Tr.)  213:24-216:12, 217:9-218:23.  She believes that she could have

asked any Marie Claire employee about their career paths and for career advice.  Findikyan Decl.

Ex. 158 (Leszuk Tr.) 221:7-25.

D15.    Leszuk enjoyed her internship most when she assisted the marketing department with events, but she did not ask to be involved in any additional events.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 245:14-21, 247:18-22.

D16.    Leszuk wanted to work closer with sales representatives during her internship, but she does not recall making any request to do so.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 266:17-25.

D17.    After performing a site visit at Marie Claire during her internship, Leszuk's professor at LIM College determined that the internship was worthy of credit.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 171:4-172:4.

D18.    Leszuk received six credits from LIM College upon satisfactory completion of her internship.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 159:17-25.

D19.    Leszuk received exposure to other in-magazine departments to enhance her overall learning experience.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 146:4-10.

D20.    Rula Sawaf and Paige Dubeshter, two of Leszuk's supervisors at Marie Claire, gave her a negative performance review at the end of her internship.  Findikyan Decl. Ex. 185 (Leszuk Ex. 24).  They stated that "[e]very project we gave her had numerous careless mistakes and they recur[red] even after pointing them out," "[s]he was not very professional – arriving late, spending much of her time off-task on Facebook, shopping online, and on her cell phone," and "[s]he seemed very uninterested in the tasks at hand." Findikyan Decl. Ex. 185 (Leszuk Ex. 24) at D0007547.

D21.    Leszuk admitted that Marie Claire employees could have a different opinion than she on whether her contributions were useful.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 293:6-17.

D22.    Through the training and supervision provided, Leszuk was able to network and gain invaluable career advice from mentors.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 213:24-216:12, 217:9-218:23, 221:7-25.

D23.    One of Leszuk's supervisors at Marie Claire, Howard Costa, has served as a reference for her.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 278:6-19.

D24.    Leszuk has included her Marie Claire internship on her resume.  Findikyan Decl. Ex. 183 (Leszuk Ex. 1).  She believes that an internship is a valuable thing to have on a resume, that Marie Claire is a well-known name and that this carries some weight when she is applying for jobs.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 154:22-155:3, 277:9-11.

D25.    Other Marie Claire advertising sales and marketing interns who did some of the same tasks as Leszuk viewed their internships as highly valuable educational experiences and credit their experiences with helping them to find jobs after graduation.  *See, e.g.*, Findikyan Decl. Ex. 104 (Riordan Decl.) ¶¶ 5-8; Ex. 125 (Shapiro Decl.) ¶¶ 8-11.

D26.    As entry-level employees, assistants in Marie Claire's advertising sales department have a greater level of multi-tasking, accountability, and responsibility than interns do.  Findikyan Decl. Ex. 104 (Riordan Decl.) ¶ 9.

D27.    During her internship, Leszuk sent an email to Amy Helmus in Hearst's Human Resources department attaching a cover letter and resume.  The cover letter stated that Leszuk was "attending weekly classes covering topics such as precall planning, presentations, MediaMath, ABC statements, positioning and service reports" during her Marie Claire internship.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 228:18-231:21; Ex. 228 (Leszuk Ex. 14).  The cover letter also stated that Leszuk was participating in pitches to clients during her internship.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 288:12-289:3; Ex. 228 (Leszuk Ex. 14).

-87-

D28.     Other than her attendance at one MediaMath session, Leszuk testified that the statements she made to Helmus were false.  Findikyan Decl. Ex. 158 (Leszuk Tr.) 228:18-229:4, 288:12-289:3.

D29.     Supervising the sales interns at Marie Claire takes significant time for Marie Claire employees and occasionally takes them away from other job responsibilities.  Findikyan Decl. Ex. 102 (Riess Decl.) ¶ 7.

D30.     Through their internships at Marie Claire, sales interns receive a valuable education about being in a business environment and how the magazine business operates. Findikyan Decl. Ex. 102 (Riess Decl.) ¶ 8.

D31.     Marie Claire marketing interns receive training in skills they would need in an entry-level position in marketing at a magazine and learn essential terminology for a position in sales and marketing at a magazine.  Findikyan Decl. Ex. 102 (Riess Decl.) ¶ 9.

D32.     Interns can learn how to evaluate advertising rates through "MediaMath" sessions.  Findikyan Decl. Ex. 102 (Riess Decl.) ¶ 10.

D33.     Interns at Marie Claire also learn about the business through tasks they are assigned, such as helping to gather "edit credits."  Findikyan Decl. Ex. 102 (Riess Decl.) ¶ 11.

D34.     "Edit Credits" involve reviewing the magazine to determine when a company, the company's product or anything else the company may care about is mentioned in the magazine.  Findikyan Decl. Ex. 102 (Riess Decl.) ¶ 11.

D35.     Marie Claire teaches this skill to its interns because preparing edit credits is a skill that an entry-level sales and marketing assistant should have.  Findikyan Decl. Ex. 102 (Riess Decl.) ¶ 11.

**Opt-In Plaintiff Elizabeth Mancini**

D36.   Mancini understood prior to the start of her internship that it was an unpaid position.  *See* Findikyan Decl. Ex. 74 (Mancini Decl.) ¶ 21; Ex. 159 (Mancini Tr.) 114:20-116:5.

D37.   Mancini understood prior to the start of her internship that it was not a guarantee of a job.  *See* Findikyan Decl. Ex. 159 (Mancini Tr.) 113:9-11, 114:12-19, 114:20-116:5.

D38.   Mancini hoped the internship would help her achieve her primary aim of securing a job at Marie Claire.  *See* Findikyan Decl. Ex. 74 (Mancini Decl.) ¶¶ 19, 21; Ex. 159 (Mancini Tr.) 113:12-114:19; 118:14-25.

D39.   Fashion assistant Abby Kalicka extended an offer to Mancini to intern in the fashion department at Marie Claire magazine.  Findikyan Decl. Ex. 159 (Mancini Tr.) 121:21-122:5.  When Kalicka offered the position to Mancini, she also gave her the names of a few previous interns so Mancini was able to learn as much as she could about the internship before deciding whether to accept the offer.  Findikyan Decl. Ex. 159 (Mancini Tr.) 122:6-24.

D40.   Before accepting the internship position at Marie Claire, Mancini decided that participating in the internship was in her best interest.  Findikyan Decl. Ex. 159 (Mancini Tr.) 113:17-114:15, 118:14-25.

D41.   During her internship, Mancini was supervised by Kalicka.  Findikyan Decl. Ex. 159 (Mancini Tr. 63:15-18).  Kalicka oversaw the luxury brands market.  Findikyan Decl. Ex. 159 (Mancini Tr. 184:3-14).

D42.   Mancini had a "one-on-one" relationship with Kalicka, who wanted the internship to be a valuable experience for Mancini, and wanted Mancini to learn what interested her.  Findikyan Decl. Ex. 159 (Mancini Tr.) 174:9-14, 184:3-9.

-89-

D43.    Kalicka supervised only one other intern during Mancini's internship. Findikyan Decl. Ex. 159 (Mancini Tr.) 137:16-18, 152:17-153:8, 183:17-184:2.

D44.    Lisa Tam, another fashion assistant in Marie Claire's fashion department, oversaw the larger fashion market, which involved less expensive brands than the luxury brand market.  Findikyan Decl. Ex. 159 (Mancini Tr.) 184:3-14.

D45.    During her internship, Mancini thought that the internship was "sort of amazing" and she was "sooo loving Marie Claire."  Findikyan Decl. Ex. 159 (Mancini Tr.) 191:18-192:7, 192:20-193:5.

D46.    Mancini observed multiple run-throughs in the Marie Claire fashion closet, where she was able to see the Fashion Director, Nina Garcia, look through pieces of clothing and hear discussion between Garcia, editors, and assistants about what items should be shot for potential inclusion in the magazine.  Findikyan Decl. Ex. 159 (Mancini Tr.) 184:21-186:23.

D47.    Mancini learned how the fashion department at a major magazine works and gained knowledge about fashion and designers.  Findikyan Decl. Ex. 159 (Mancini Tr.) 187:13-17, 206:9-13.

D48.    Kalicka gave Mancini "pretty regular" feedback on her performance during the internship.  Findikyan Decl. Ex. 159 (Mancini Tr.) 155:19-156:8.

D49.    Kalicka spoke with Mancini about her own career experiences and gave Mancini career advice.   Findikyan Decl. Ex. 159 (Mancini Tr.) 160:4-23.

D50.    Mancini thought Kalicka was an "amazing and inspirational" woman. Findikyan Decl. Ex. 159 (Mancini Tr.) 221:10-12.

D51.    Kalicka asked Mancini if she was interested in other departments besides fashion.  Findikyan Decl. Ex. 159 (Mancini Tr.) 167:12-18.  Mancini believed that Kalicka asked her these questions in Mancini's best interest.  Findikyan Decl. Ex. 159 (Mancini Tr.) 167:12-18.

D52.    Mancini received exposure to other in-magazine departments to enhance her overall learning experience.  Findikyan Decl. Ex. 159 (Mancini Tr.) 167:12-168:9.

D53.    Through the training and supervision provided, Mancini was able to network and gain invaluable career advice from mentors.  Findikyan Decl. Ex. 159 (Mancini Tr.) 167:12-168:9, 200:10-21, 201:4-14 & Ex. 188 (Mancini Ex. 16).

D54.    Kalicka introduced Mancini to a copy editor at Marie Claire to help her get a job that was going to be opening for a copy assistant.  Findikyan Decl. Ex. 159 (Mancini Tr.) 167:22-168:9.

D55.    Mancini left her internship when it was time to pursue a full-time position.  Findikyan Decl. Ex. 159 (Mancini Tr.) 138:9-13.

D56.    Mancini has included her Marie Claire internship on her resume.  Findikyan Decl. Ex. 226 (Mancini Ex. 1).  She believes that the internship was helpful to her obtaining a job as a copy editor/staff writer at Stylecaster immediately following her internship.  Findikyan Decl. Ex. 159 (Mancini Tr.) 205:7-206:5; Ex. 226 (Mancini Ex. 1).

D57.    After Mancini left her internship, Kalicka served as a reference for her in connection with her Stylecaster job application.  Findikyan Decl. Ex. 159 (Mancini Tr.) 200:10-21; Ex. 188 (Mancini Ex. 16).  Mancini believes that Kalicka gave her a good reference, and this helped her get the position at Stylecaster.  Findikyan Decl. Ex. 159 (Mancini Tr.) 200:22-201:3.

D58.    Mancini believes that the knowledge she picked up from her Marie Claire internship regarding fashion and designers helped her fashion writing in her subsequent position at Stylecaster.  Findikyan Decl. Ex. 159 (Mancini Tr.) 206:9-13.

D59.    Mancini believes that she could have contacted Kalicka to ask her to be a reference for other job opportunities subsequent to her internship, but she did not do so. Findikyan Decl. Ex. 159 (Mancini Tr.) 201:4-14.

D60.    Mancini believes that her Marie Claire internship contributed to her magazine skills and experience.  Findikyan Decl. Ex. 159 (Mancini Tr.) 198:20-24.

D61.    Kalicka never represented to Mancini that her internship would lead to a paid position at Hearst.  Findikyan Decl. Ex. 159 (Mancini Tr.) 59:23-60:22, 113:9-11.

D62.    In her sworn declaration dated May 2, 2012, Mancini testified that "[n]o-one at Hearst ever told me that I was required to obtain school credit."  Findikyan Decl. Ex. 74 (Mancini Decl.) ¶ 6.  She also testified that "[a]fter Hearst hired me, an assistant named Lisa Tam asked me if I needed her to call my school to discuss school credit for the internship.  I told her that I had already graduated from college, and she did not pursue the subject further."  Findikyan Decl. Ex. 74 (Mancini Decl.) ¶ 6.

D63.    Contrary to Mancini's sworn declaration, Mancini later testified that she knew from her initial interview that she was in violation of Hearst policy by undertaking her internship without receiving academic credit.  Findikyan Decl. Ex. 159 (Mancini Tr.) 132:16-133:4.  She also later testified that she attended a meeting with Tam, Kalicka and other fashion interns in February 2009, three months into her internship, in which the necessity of interns receiving academic credit was discussed.  Findikyan Decl. Ex. 159 (Mancini Tr.) 129:25-130:19.

D64.    In February 2009, Mancini wrote to Steve Boerner, a Media Advisor at St. John Fisher College, asking him to write a letter saying she would receive school credit for her internship, even though she understood that she could not actually receive credit.  Findikyan Decl. Ex. 186 (Mancini Ex. 7) at P0000002.  Boerner refused to provide Mancini with the letter she requested.  Findikyan Decl. Ex. 186 (Mancini Ex. 7) at P0000001.

D65.    Mancini had previously graduated from St. John Fisher College in 2008. Findikyan Decl. Ex. 159 (Mancini Tr.) 18:22-19:2.

D66.    The purpose of Marie Claire's internship program is to give interns the opportunity to learn the magazine business through first-hand experience.  Findikyan Decl. Ex. 131 (Smith Decl.) ¶ 6.

D67.    Interns in the fashion department at Marie Claire are able to observe the fashion magazine process from behind the scenes.  Findikyan Decl. Ex. 131 (Smith Decl.) ¶ 13.

D68.    They are able to learn where the clothes come from and how editors choose the clothes for the magazine.  Findikyan Decl. Ex. 131 (Smith Decl.) ¶ 13.


**Opt-In Plaintiff Alexandra Rappaport**

D69.    Rappaport understood prior to the start of her internship that it was an unpaid position.  *See* Findikyan Decl. Ex. 161 (Rappaport Tr.) 99:2-13.

D70.    Rappaport understood prior to the start of her internship that it was not a guarantee of a job.   *See* Findikyan Decl. Ex. 161 (Rappaport Tr.) 107:3-6.

D71.    Rappaport "chose Seventeen for a reason, to get a real-life experience." Findikyan Decl. Ex. 161 (Rappaport Tr.) 178:10-180:5.

D72.    Rappaport received credit from Lafayette College for her internship in Seventeen magazine's fashion closet.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 45:12-46:8; Ex. 194 (Rappaport Ex. 9).

D73.    In order to receive academic credit, Lafayette College required that Rappaport not be paid for the internship and intern for 120 hours.  Findikyan Decl. Ex. 190 (Rappaport Ex. 9); Ex. 161 (Rappaport Tr.) 113:18-114:3, 115:11-14.

D74.    Rappaport attended at least one photo shoot during her internship, which helped her learn that more work went into a photo shoot than she had previously thought.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 122:22-126:20, 133:5-14.

D75.    Rappaport gained a better understanding of how Seventeen searches for and prices clothing that is included in the magazine, the amount of clothing there is to choose from to create one spread, and the number of times members of the fashion department run through outfits and change outfits before they have the final product.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 134:2-10, 136:18-137:5, 164:22-165:6; Ex. 193 (Rappaport Ex. 12).

D76.    Rappaport learned about which designers are expensive, which are inexpensive, and which public relations company represents each designer, knowledge that she believes is vital to a career in fashion.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 148:12-149:11; Ex. 191 (Rappaport Ex. 10) at P0001987.

D77.    Rappaport believes she took away "many good life skills" from her internship, including better organizational skills and greater proficiency in Excel.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 173:13-21, 188:14-24; Exs. 193 & 194 (Rappaport Exs. 12 & 13).  She has used these skills since her internship.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 173:22-174:5.

D78.    Rappaport believes that the purpose of internships is to test out your strengths and your interests in specific careers and to get a taste of the work and what the environment is like.  Findikyan Decl. Ex. 161 (Rappaport Tr.)  172:13-20.

D79.    Rappaport's internship helped her realize that she did not want to pursue a career in a fashion magazine or in the magazine business, something she considers a "valuable lesson."  Findikyan Decl. Ex. 161 (Rappaport Tr.) 135:8-12, 168:24-169:15.

D80.    Rappaport believes that if she did decide to pursue a fashion career in a magazine, the experience she gained during her internship and having the Seventeen internship on her resume would help her get a job.  Findikyan Decl. Ex. 161 (Rappaport Tr.) 192:24-193:13.

D81.    Rappaport has included her Seventeen internship on her resume.  Findikyan Decl. Ex. 189 (Rappaport Ex. 1); Ex. 161 (Rappaport Tr.) 195:11-22.

D82.    Other students who undertook fashion internships at Seventeen magazine credit their experiences with helping them land future jobs, and with providing the kind of firsthand, real-world experience that cannot be provided in college.  Findikyan Decl. Ex. 32 (Degnan Decl.) ¶¶ 6, 9.

D83.    Rappaport considers herself "110 percent lucky to get" her Seventeen internship "opportunity," and she "chose Seventeen for a reason, to get a real-life experience."  Findikyan Decl. Ex. 161 (Rappaport Tr.) 178:9-180:5.

D84.    Seventeen's goal is for its interns to be provided with collaborative hands-on training and guidance during 100% of their interning hours by spending time with assistants and editors.  Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 13.

D85.    The purpose of Seventeen's internship program is to train interns to perform the tasks they would perform if they were to secure an entry-level job at a magazine after college. Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 13.

D86.    During a Seventeen internship, an intern receives training and educational experiences both by virtue of the tasks that he/she performs and the firsthand observation of how a magazine is produced.    Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 22.

D87.    Interns also learn how to interact with colleagues in a professional environment.    Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 22.

D88.    Interns have the chance to network with Seventeen's editors.    Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 22.

D89.    The opportunity to network is important for interns who are considering pursuing a career in the magazine industry because they may be able to rely on editors to provide employment recommendations in a competitive industry.    Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 22.

D90.    An internship at a magazine like Seventeen can offer a big boost to someone attempting to secure an entry-level job in the magazine world.    Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 23.

D91.    Fashion internships can be beneficial to interns in helping them realize they do not want to work in the fashion department of a magazine.  Findikyan Decl. Ex. 1 (Abbey Decl.) ¶ 24.

**Opt-In Plaintiff Stephanie Skorka**

D92.    Skorka understood prior to the start of her internship that it was an unpaid

position.  *See* Findikyan Decl. Ex. 127 (Skorka Decl.) ¶ 12; Ex. 170 (Skorka Tr.) 81:18-20.

D93.    Skorka understood prior to the start of her internship that it was not a guarantee

of a job.  *See* Findikyan Decl. Ex. 170 (Skorka Tr.) 86:5-7.

D94.    Skorka interned at Redbook because she had always wanted to intern in the

beauty department of a magazine.  Findikyan Decl. Ex. 170 (Skorka Tr.) 82:12-13, 87:4-9.  She

also undertook the internship to satisfy a college graduation requirement.  *See* Findikyan Decl.

Ex. 170 (Skorka Tr.) 88:15-20.

D95.    Skorka' s internship in Redbook's beauty department satisfied a graduation

requirement for her cosmetic and fragrance marketing major at New York's Fashion Institute of

Technology ("FIT").  Findikyan Decl. Ex. 170 (Skorka Tr.) 17:2-8; 88:15-20.

D96.    Skorka received academic credit for her Redbook internship.  Findikyan Decl.

Ex. 170 (Skorka Tr.) 88:10-14.

D97.    Skorka received an "A" for her Redbook internship.  Findikyan Decl. Ex. 170

(Skorka Tr.)  92:17-93:6.

D98.    Skorka's internship advisor at FIT was Melanie Rush.  Findikyan Decl. Ex. 170

(Skorka Tr.) 52:7-18; 53:8-25; Ex. 118 (Rush Decl.).

D99.    Rush suggested to Skorka that interning in the beauty department at Redbook

would be a good idea for Skorka and that she would "learn a lot."  Findikyan Decl. Ex. 170

(Skorka Tr.) 133:14-22.

D100.  Internships for "experiential learning" are "an integral part of the educational

experience for a FIT student," and the "skills and knowledge that FIT students gain through

internships at magazines are an extension of and significant enhancement to their academic preparation."  Findikyan Decl. Ex. 118 (Rush Decl.) ¶¶ 4-5.

D101.  FIT considers that the internship experiences of its students "help them identify suitable career paths."  Findikyan Decl. Ex. 118 (Rush Decl.) ¶ 3.

D102.  FIT students who participate in internships get the opportunity to network and interact with "highly-skilled and experienced" people. Findikyan Decl. Ex. 118 (Rush Decl.) ¶ 7.

D103.  FIT students who participate in internships learn "what to expect in a professional work environment" and "the reality of what an entry level job entails," helping them "feel prepared and confident when they graduate" and giving them "realistic expectations about what awaits them in a workplace so that they can hit the ground running in the industry of their choice."  Findikyan Decl. Ex. 118 (Rush Decl.) ¶ 10.

D104.  Skorka describes her experience as an intern in Redbook's beauty department as "great," "magnificent" and "incredible."  Findikyan Decl. Ex. 170 (Skorka Tr.) 136:18-20, 176:13-23, 195:22-25.

D105.  Skorka was closely supervised during her internship by Krista DeMaio, Redbook's Beauty Editor, and Cheryl Kramer Kaye, Redbook's Beauty Director.  Findikyan Decl. Ex. 170 (Skorka Tr.) 49:7-9, 82:19-23, 83:16-19, 100:18-101:12, 100:9-11, 101:11-17, 111:16-112:10, 119:4-17, 122:8-21, 125:20-126:6, 175:6-12.

D106.  Other Redbook beauty interns also received close supervision during their internships.  Findikyan Decl. Ex. 73 (Lovaglio Decl.) ¶¶ 6-9.

D107.  Skorka sat in on pitch meetings at which the Editor-in-Chief was present "[a]ll the time" during her internship, and learned how to pitch a story idea from sitting in on those meetings and watching DeMaio and Kaye.  Findikyan Decl. Ex. 170 (Skorka Tr.) 110:14-16,

111:16-19, 117:14-20.  Learning how to pitch a story for possible use in a magazine was a "major" learning experience for Skorka.  Findikyan Decl. Ex. 170 (Skorka Tr.) 174:20-175:5, 191:21-23.

D108.  During her internship, Skorka attended meetings where Redbook staff would tell the Editor-in-Chief the status of their articles, which was a useful learning experience for Skorka.  Findikyan Decl. Ex. 170 (Skorka Tr.) 117:14-23; 118:4-6.

D109.  Skorka sat in on deskside appointments with DeMaio "every couple of weeks," which she found to be a learning experience.  Findikyan Decl. Ex. 170 (Skorka Tr.) 122:8-21.

D110.  Skorka attended three product launches at which she learned the process companies undertake to get a product considered for possible inclusion in a magazine, gained information about product companies and sat down with presidents of those companies.  Findikyan Decl. Ex. 170 (Skorka Tr.) 123:21-124:14, 127:21-23, 128:15-20, 192:8-12.

D111.  Skorka attended and observed photo shoots during her internship, which she enjoyed and were a good learning experience for her.  Findikyan Decl. Ex. 170 (Skorka Tr.) 119:18-121:2.

D112.  DeMaio provided Skorka with instruction on how to do the tasks she was assigned, which Skorka was generally learning for the first time.  Findikyan Decl. Ex. 170 (Skorka Tr.) 100:18-101:2.

D113.  Skorka received guidance from DeMaio on how products are chosen for inclusion in a magazine, which was a "major" learning experience for her.  Findikyan Decl. Ex. 170 (Skorka Tr.) 119:4-17, 174:20-175:15, 191:18-20.

D114.  DeMaio provided Skorka with feedback on her writing and worked with Skorka on edits she made to her writing, explaining why she was making the edits.  Findikyan

-99-

Decl. Ex. 170 (Skorka Tr.) 101:11-17, 111:23-112:10, 125:20-126:6.  Skorka was kept involved in the editing process as a learning experience for her; the editing was also helpful to train her to be a better writer and to allow her to learn the type of writing used in magazines.  Findikyan Decl. Ex. 170 (Skorka Tr.) 112:12-14, 115:3-9.

D115.  DeMaio provided Skorka with feedback on deskside summaries and product launch summaries that Skorka wrote.  Findikyan Decl. Ex. 170 (Skorka Tr.) 125:20-126:6.

D116.  Skorka believes that DeMaio gave her the supervision she needed during her internship.  Findikyan Decl. Ex. 170 (Skorka Tr.) 129:11-14.

D117.  Skorka believes it was valuable to see her supervisors at work during her internship.  Findikyan Decl. Ex. 170 (Skorka Tr.) 136:6-8.

D118.  Through the training and supervision provided, Skorka was able to network and gain invaluable career advice from mentors.  Findikyan Decl. Ex. 170 (Skorka Tr.) 103:16-104:19, 105:3-14, 197:10-18, 135:21-25.

D119.  DeMaio spoke with Skorka about her own career path, which Skorka found "helpful."  Findikyan Decl. Ex. 170 (Skorka Tr.) 105:3-14.

D120.  DeMaio and Kaye gave Skorka career advice, and Skorka continues to keep in touch with them to network.  Findikyan Decl. Ex. 170 (Skorka Tr.) 103:16-104:19, 197:10-18.

D121.  During her internship, Skorka learned about the editorial industry, the editorial process at magazines, how employees of different sections of the editorial department work together, how the beauty department at a magazine works, and the effort and teamwork necessary to put out a magazine.  Findikyan Decl. Ex. 170 (Skorka Tr.) 129:15-18, 188:12-15, 189:2-7, 190:3-6, 194:9-17, 196:5-8, 196:16-18.

D122.   Skorka learned about the ingredients that were in new products at product launches and at deskside appointments.  Findikyan Decl. Ex. 170 (Skorka Tr.) 125:9-19.  This was beneficial to Skorka because it complemented her school studies and enabled her to see what she was learning in school in action in the real world.  Findikyan Decl. Ex. 170 (Skorka Tr.) 125:9-19.

D123.   Skorka believes that the knowledge she gained during her Redbook internship would be helpful in working in a magazine beauty department. Findikyan Decl. Ex. 170 (Skorka Tr.) 174:15-19.

D124.   Skorka believes that her Redbook internship experience, including the clips and bylines she received in her internship and the experience she gained making story pitches, is useful for writing beauty stories for a magazine.  Findikyan Decl. Ex. 170 (Skorka Tr.) 185:10-15, 186:9-15.

D125.   Skorka believes that the contacts she made at Redbook are useful to help her obtain a job writing beauty stories for a magazine.  Findikyan Decl. Ex. 170 (Skorka Tr.) 186:5-8.

D126.   The skills and knowledge that Skorka gained through her Redbook internship were an extension of and significant enhancement to her academic preparation.  Findikyan Decl. Ex. 170 (Skorka Tr.) 135:11-20; Ex. 117 (Rush Decl.) ¶¶ 4-5.

D127.   Skorka's Redbook internship helped her identify a suitable career path. Findikyan Decl. Ex. 170 (Skorka Tr.) 135:4-6; Ex. 118 (Rush Decl.) ¶ 3.

D128.   Skorka's Redbook internship gave her the opportunity to network and interact with highly skilled and experienced people.  Findikyan Decl. Ex. 170 (Skorka Tr.) 135:21-25; Ex. 118 (Rush Decl.) ¶ 7.

D129.  During her Redbook internship, Skorka gained knowledge regarding what to expect in a magazine work environment and learned the reality of what an entry-level job entails in a beauty department.  Findikyan Decl. Ex. 170 (Skorka Tr.) 136:24-137:8; Ex. 118 (Rush Decl.) ¶ 10.

D130.  Skorka believes that internships are helpful in making students feel prepared and confident when they graduate, and in giving students realistic expectations of what awaits them in a workplace.  Findikyan Decl. Ex. 170 (Skorka Tr.) 137:13-21; Ex. 118 (Rush Decl.) ¶ 10.

D131.  Skorka "always" includes her Redbook internship on her resume.  Findikyan Decl. Ex. 170 (Skorka Tr.) 203:8-9; Ex. 197 (Skorka Ex. 7).

D132.  When Skorka applies for editorial positions, she mentions Redbook in her cover letter.  Findikyan Decl. Ex. 170 (Skorka Tr.) 203:13-16.

D133.  Skorka's Redbook internship helped her get a job at a major cosmetics company.  Findikyan Decl. Ex. 170 (Skorka Tr.) 136:21-23.

D134.  Skorka has used DeMaio as a reference in connection with several job applications.  Findikyan Decl. Ex. 170 (Skorka Tr.) 180:13-24.

D135.  Skorka has used Kaye as a reference in connection with at least one job application.  Findikyan Decl. Ex. 170 (Skorka Tr.) 181:15-182:13.

D136.  On July 24, 2012, Skorka became a class representative in this action.  Findikyan Decl. Ex. 225 (Second Amended Class Action Compl.); Ex. 170 (Skorka Tr.) 43:25-44:11, 45:5-46:9.

D137.  Skorka became a class representative due to a "miscommunication" with counsel.  Findikyan Decl. Ex. 225 (Second Amended Class Action Compl.); Ex. 170 (Skorka Tr.) 43:25-44:11, 45:5-46:9.

D138.  Skorka withdrew as a class representative in this action on November 13, 2012.  Pls.' Third Am. Class Action Compl., ECF No. 72.

D139.  The Second Amended Class Action Complaint in this action stated that "Skorka worked alongside other individuals whom Defendant also classified as interns" and that "Skorka worked alongside other individuals whom Defendant also required to purchase college credit from an accredited college or university."  Findikyan Decl. Ex. 225 (Second Amended Class Action Compl.) ¶¶ 86, 88.

D140.  Skorka did not work alongside other interns.  Findikyan Decl. Ex. 170 (Skorka Tr.) 96:12-17.

D141.  In her sworn declaration dated April 25, 2012, Skorka testified that "based on my good performance, another Hearst magazine, O Magazine, asked [her] to intern for them" and that she "performed similar duties at O Magazine that [she] had performed at Redbook." Findikyan Decl. Ex. 127 (Skorka Decl.) ¶ 8.

D142.  Contrary to Skorka's sworn declaration, Skorka later testified that she never interned or worked for O Magazine, nor was Skorka offered an internship position at O.  Findikyan Decl. Ex. 170 (Skorka Tr.) 72:2-7, 151:13-152:7.

D143.  Redbook's goal is for its interns to be training and learning during 100% of their interning hours.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ 12.

D144.  Redbook endeavors to train interns to perform the tasks they would perform if they were to get an entry-level job after college, and designs its internships with a focus on their professional growth.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ 12.

D145.  Redbook hopes that through this model its interns become prepared for magazine jobs later in life and understand the realities of those jobs.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ 12.

D146.  Beauty department interns learn about sources from which editors call in products.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ 13.

D147.  Interns also learn about the products editors select and they become part of the selection process.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ `13.

D148.  By doing so, interns in the Redbook beauty department learn why editors choose certain products and manufacturers over others, what they like and do not like, which products to feature in the magazine, and why those products are featured.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ 13; *see also* Ex. 73 (Lovaglio Decl.) ¶¶ 6-10.

D149.  Interns in Redbook's beauty department pick up on publishing lingo (such as what "spreads" and "well stories" are) by being present and listening to communication exchanges between employees.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ 17.

D150.  During a Redbook internship, interns learn not only practical skills but also what it means to function in a professional environment, including how employees dress and behave, when they come to and leave the office, how they interact with one another, what their work ethic is like and how they manage deadlines.  Findikyan Decl. Ex. 25 (Cheney Decl.) ¶ 21.

**Opt-In Plaintiff Erin Spencer**

D151.  Spencer understood prior to the start of her internship that it was an unpaid

position.  *See* Findikyan Decl. Ex. 171 (Spencer Tr.) 91:8-10.

D152.  Spencer understood prior to the start of her internship that it was not a

guarantee of a job.  *See* Findikyan Decl. Ex. 171 (Spencer Tr.) 171:5-15.

D153.  Spencer was "elated to grab" any editorial or bookings experience in the

fashion industry.  Findikyan Decl. Ex. 171 (Spencer Tr.) 89:4-24.  She also undertook the

Cosmopolitan internship to fulfill a college graduation requirement.  Findikyan Decl. Ex. 171

(Spencer Tr.) 106:20-24.

D154.  As part of the graduation requirements for Erin Spencer's Fashion

Merchandising major at Howard University, Spencer was required to complete an internship of at

least 200 hours.  Findikyan Decl. Ex. 171 (Spencer Tr.) 106:20-24, 120:19-25, 188:18-21.

D155.  To do so, she enrolled in a "Fieldwork" course that "provides supervised work

experience in an approved work setting."  Findikyan Decl. Ex. 203 (Spencer Ex. 18) at

P0000734; Ex. 204 (Spencer Ex. 19) at P000770.  Howard University described the course as a

"supervised opportuni[ty] to allow [students]

- To have a supervised working experience . . . .
- To apply the theories, principles, and learning experiences given during your
  undergraduate education in a non-academic setting;
- To have the opportunity to network with professionals in the field;
- To develop a better understanding of the operation of a business;
- To identify the areas of strength as well as areas of needed improvement in your
  academic qualifications, professional demeanor, and effectiveness in a professional
  employment setting; and
- To provide a structured experience that will hopefully aid in career direction and
  entry into the profession."  Findikyan Decl. Ex. 203 (Spencer Ex. 18) at P000734.

D156.  Spencer provided Howard University a description of her expected "duties and activities" during her internship.  She informed Howard University that during her internship she would, *inter alia*, "assist with model castings," "assemble and file model profile packets," "correspond between agencies and bookings director," "file invoices, call sheets and model releases," "maintain/organize features tear sheets," "update data on agency list," and "update model profiles."  Findikyan Decl. Ex. 204 (Spencer Ex. 19) at P000770.

D157.  Spencer received six credits for her summer 2010 internship in Cosmopolitan's bookings department.  Findikyan Decl. Ex. 171 (Spencer Tr.) 104:12-19 & Ex. 199 (Spencer Ex. 8).

D158.  As part of her credit requirements, Spencer was also required to complete a final paper about her internship experience.  Findikyan Decl. Ex. 171 (Spencer Tr.) 152:16-23; Ex. 201 (Spencer Ex. 16); Ex. 203 (Spencer Ex. 18) at P0000738.

D159.  As part of her credit requirements, Spencer also conducted an interview with Lauren Finney, a fashion assistant at Cosmopolitan.  Findikyan Decl. Ex. 171 (Spencer Tr.) 170:6-18; Ex. 201 (Spencer Ex. 16) at P0000730-32; Ex. 203 (Spencer Ex. 18) at P0000741-44. In the interview, Spencer learned that as Sandra Wilson's assistant, Finney "is required to be available at all times via phone, text or e-mail" and "does not have the freedom to decide when the work is accomplished."  Findikyan Decl. Ex. 202 (Spencer Ex. 17) at P0000730.

D160.  Spencer chose her schedule at Cosmopolitan.  Findikyan Decl. Ex. 198 (Spencer Ex. 6) at P000609.

D161.  Spencer trained closely with her supervisor, Senior Bookings Editor Sandra Wilson.  Spencer viewed Wilson as a mentor who provided career and industry advice.

Findikyan Decl. Ex. 171 (Spencer Tr.) 126:23-128:4, 131:15-20, 134:3-135:14, 142:20-144:6, 164:3-19, 175:23-176:5; Ex. 200 (Spencer Ex. 15) at P0000709.

D162.  As a bookings intern, Spencer was encouraged to dictate how her day went and what she accomplished.  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000724.

D163.  Spencer described her experience at Cosmopolitan as "very positive" and she "loved" her time there.  Findikyan Decl. Ex. 171 (Spencer Tr.) 150:8-9, 186:19-21.

D164.  As part of her internship, Spencer attended four sessions of "Cosmo U," which she described as "[t]he most valuable experience I had . . . . because I took away a lot of good advice on moving forward after I leave my internship."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P 0000725, 726.

D165.  Spencer was able to attend two photo shoots as part of her internship experience, one more than is typically allotted to interns, and her supervisor put Spencer "in the position to go to photo shoots and meet more editors."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000726.

D166.  Spencer's internship was related to academic classes she had taken at Howard University.  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000726.

D167.  Spencer described the "academic portion" of her internship as "thorough." Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000726-27.

D168.  Through her internship, Spencer "was introduced to a lot of magazine terminology and 'how-tos' about breaking into the industry."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000726.

D169.  Spencer's internship at Cosmopolitan "generously contributed" to her "overall career development."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000727.

D170.  During her internship, Spencer learned a lot about bookings, models, and magazines in general.  Findikyan Decl. Ex. 200 (Spencer Ex. 15) at P0000709

D171.  Spencer also had the chance to spend some time in Cosmopolitan's fashion closet, where she was able to "further understand the process of how a garment goes from a runway to a magazine page."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000724; Findikyan Decl. Ex. 171 (Spencer Tr.) 141:13-19.

D172.  Spencer "learned that publishing a magazine every month is a team-oriented process" and that "[n]o one really makes decisions on their own without someone else's vote." Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000725; Findikyan Decl. Ex. 171 (Spencer Tr.) 165:2-24.

D173.  Spencer also was able to see "not only the behind-the scenes work of a fashion editor on photo shoots but also all of the daily preparation that leads up to the shoot."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000727.  She also learned that it takes "good judgment to edit everything down to what is actually used in the magazine."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000727.

D174.  Spencer's internship allowed her to have "a close-up on what being a fashion editor is like."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000727.

D175.  Spencer was also able to develop her own relationships with modeling agents. Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000725.

D176.  Over the course of her internship, Spencer's communication skills improved. Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000725; Findikyan Decl. Ex. 171 (Spencer Tr.) 165:2-24.

D177.  Based on what she learned from her supervisor, Spencer achieved one of the stated objectives of her internship:  to hold her own casting and to "determine whether a model is best for fashion or feature spreads."  Findikyan Decl. Ex. 171 (Spencer Tr.) 173:19-174:9 & Findikyan Decl. Ex. 204 (Spencer Ex. 19).

D178.  Through the training and supervision provided, Spencer was able to network and gain invaluable career advice from mentors.  Findikyan Decl. Ex. 171 (Spencer Tr.) 154:2-7, 165:11-18, 174:24-176:5  & Ex. 200 (Spencer Ex. 15) at P000709.

D179.  Spencer received exposure to other in-magazine departments to enhance her overall learning experience.  Findikyan Decl. Ex. 171 (Spencer Tr.) 162:15-163:5 & Ex. 201 (Spencer Ex. 16) at P000724.

D180.  The knowledge about and skills Spencer developed with respect to model bookings could not be learned in a college class.  Findikyan Decl. Ex. 171 (Spencer Tr.) 168:11-12; Ex. 201 (Spencer Ex. 16) at P0000729.

D181.  Spencer found that overall, her Cosmopolitan internship "was an experience full of opportunities to observe, improve, learn and participate."  Findikyan Decl. Ex. 201 (Spencer Ex. 16) at P0000728.

D182.  Spencer's supervisor at Cosmopolitan, Sandra Wilson, has served as a reference for Spencer.  Findikyan Decl. Ex. 171 (Spencer Tr.) 165:11-18, 182:12-16.

D183.  Lauren Finney has also provided Spencer with a reference.  Findikyan Decl. Ex. 207 (Spencer Ex. 31).

D184.  Spencer has included her Cosmopolitan internship on her resume.  Findikyan Decl. Ex. 171 (Spencer Tr.) 177:19-22, 178:3-16; Ex. 205 (Spencer Ex. 22) at P0001027**.**  She has also noted her internship experience when applying for jobs at publications such as

*Architectural Digest* and *Michigan Avenue*.  Findikyan Decl. Ex. 205 (Spencer Ex. 22) at P0001026-27; Ex. 206 (Spencer Ex. 25) at P0001484-85.

D185.  Cosmopolitan limits the number of interns each department can select in order to provide each intern with a meaningful experience.  Findikyan Decl. Ex.  50 (Greene Decl.) ¶ 8.

D186.  Each intern is assigned to an employee "point person" who is to support the intern throughout their internship.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 9.

D187.  The experience provided to Cosmopolitan interns is often at the cost of significant time expended by the magazine's staff.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18.

D188.  Interns are able to watch, learn and absorb the inner workings of one of the world's most iconic and widely read magazines.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18.

D189.  Interns are able to gain insight into how Cosmopolitan staff come up with ideas and how they execute them from start to end.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18.

D190.  Interns are counseled on professionalism, the significance of confidentiality, how to work with others, and how to conduct themselves in a work environment.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18.

D191.  Interns also receive the benefit of networking.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 19.


**Opt-In Plaintiff Matthew Wagster**

D192.  Wagster understood prior to the start of his internship that it was an unpaid position.  *See* Pls. Ex. 158 (Wagster Decl.) ¶ 18; Ex. 174 (Wagster Tr.) 74:14-16, 86:16-88:2.

D193.  Wagster understood prior to the start of his internship that it was not a guarantee of a job, and he knew prior to starting his internship the types of tasks it would entail. *See* Findikyan Decl. Ex. 174 (Wagster Tr.) 74:14-16, 86:16-88:2.

D194.  Wagster wanted to intern at Esquire because he has a passion for fashion. Findikyan Decl. Ex. 174 (Wagster Tr.) 71:2-83:15.

D195.  Matthew Wagster obtained his internship through family connections to Esquire's then-Associate Publisher, Stephen Jacoby.  Findikyan Decl. Ex. 174 (Wagster Tr.) 11:18-20, 67:23-25, 75:3-9.

D196.  In obtaining his Esquire internship, Wagster represented that he would get academic credit for the experience, but never did.  Findikyan Decl. Ex. 174 (Wagster Tr.) 77:6-21.

D197.  Wagster testified that Jacoby misrepresented that the internship would lead to opportunities for employment at Hearst.  Findikyan Decl. Ex. 174 (Wagster Tr.) 51:2-52:17, 53:17-19, 54:8-18.

D198.  After his internship, Wagster never sought a job with Esquire or Hearst. Findikyan Decl. Ex. 174 (Wagster Tr.) 55:9-12, 55:13-21.

D199.  Other sales and marketing interns met Jacoby during their internships and spoke with him about career and networking advice.  At least one unpaid Esquire intern took Jacoby up on his offer of help post-internship and reached out to Jacoby after she graduated from college to inquire about job openings or career advice.  That intern obtained a job at Esquire as an Advertising Sales Assistant.  Findikyan Decl. Ex. 178 (Yale Tr.) 12:24-13:12, 13:24-14:10, 40:18-21.

D200.  As an Assistant, that intern's responsibilities are different than those she had as an intern.  Findikyan Decl. Ex. 140 (Yale Decl.) ¶¶ 12-13.

D201.  Wagster was closely supervised during his internship.  *See* Findikyan Decl. Ex. 174 (Wagster Tr.) 108:22-24, 101:11-12, 108:12-109-10; *see also* Ex. 94 (Perri Decl.) ¶¶ 7-11 (describing Esquire ad & marketing intern supervision); Ex. 140 (Yale Decl.) ¶¶ 6-9 (describing Esquire ad sales intern supervision).

D202.  Wagster testified that his internship was "worthless" and claimed to have learned nothing from the experience.  Findikyan Decl. Ex. 174 (Wagster Tr.) 113:7-11, 145:23-146:2.

D203.  Wagster claimed to have learned nothing from having the opportunity to sit in on regular team marketing meetings, despite the fact that, according to Wagster, he was required to take notes during those meetings.  Findikyan Decl. Ex. 174 (Wagster Tr.) 144:17-145:4.

D204.  By sitting in on Esquire marketing meetings, Wagster had the opportunity to learn about the process of putting the magazine together, and what new sales, marketing, and advertising initiatives and programs were on the horizon and how the next issue was coming together.  Findikyan Decl. Ex. 94 (Perri Decl.) ¶ 10

D205.  Interns at Esquire marketing meetings are able to soak up the wealth of knowledge that passes between the sales and marketing team and management.  Findikyan Decl. Ex. 94 (Perri Decl.) ¶ 10.

D206.  Esquire provides interns the opportunity to learn about the entire sales and marketing process.  Findikyan Decl. Ex. 94 (Perri Decl.) ¶ 11.

D207.  Esquire provides interns the opportunity to gain perspective on all aspects of publishing a magazine and the publishing business.  Findikyan Decl. Ex. 94 (Perri Decl.) ¶ 13.

D208.  Esquire provides interns the opportunity to learn what tasks and aspects of the

business they enjoy or do not enjoy (and which they might excel in) before committing to a

career in the industry.  Findikyan Decl. Ex. 94 (Perri Decl.) ¶ 13.

D209.  Esquire provides interns the opportunity to gain experience functioning in a

real-world professional setting and to learn how to conduct oneself in a professional workplace,

and how the company and its people work to successfully generate a high quality product.

Findikyan Decl. Ex. 94 (Perri Decl.) ¶ 13.

D210.  Other Esquire sales and marketing interns who did some of the same tasks as

Wagster viewed their experiences as highly valuable and credit those experiences with helping

them to find jobs after graduation.  *See, e.g.*, Findikyan Decl. Ex. 140 (Yale Decl.) ¶¶ 6-7, 12-13.

D211.  Wagster had described his internship as providing him the "opportunity to gain

skills in sales," multitask, self-direct, and teaching him how to "work in a corporate

environment" in a team setting.  Findikyan Decl. Ex. 210 (Wagster Ex. 15); Ex. 174 (Wagster

Tr.) 146:19-155:18.

D212.  Wagster estimates that he spent 50% of his time at Esquire trying to solicit

tasks because he did not have anything to do.  Findikyan Decl. Ex. 174 (Wagster Tr.) 126:22-

127:24.

D213.  As entry-level employees, assistants in Esquire's publishing group have more

accountability and responsibility than interns do, and are essential to the functioning of Esquire's

offices; interns are not.  Findikyan Decl. Ex. 140 (Yale Decl.) ¶ 13.

D214.  Wagster described his internship as including only administrative tasks, such as

maintaining RSVP lists, serving as an intra-office messenger, and checking guests in to Esquire-

sponsored events, and said he did not receive any constructive feedback.  Findikyan Decl. Ex. 174 (Wagster Tr.) 107:3-10, 103:4-24, 101:6-17.

D215.  Other Esquire sales and marketing interns described extensive supervision and feedback, and viewed assisting with administrative tasks as providing them with a substantial benefit.  *See, e.g.*, Findikyan Decl. Ex. 140 (Yale Decl.) ¶¶ 6-7, 12-13.

D216.  Going into his internship, Wagster believed that if he were to receive academic credit, the credit would be sufficient compensation for his internship.  Findikyan Decl. Ex. 174 (Wagster Tr.) 112:15-25.

D217.  Wagster chose to leave his internship early.  Findikiyan Decl. Ex. 174 (Wagster Tr.) 161:25-162:23.

D218.  Wagster has included his Esquire internship on his resume.  Findikyan Decl. Ex. 174 (Wagster Tr.) 61:17-62:19, 145:23-146:11; Ex. 215 (Wagster Ex. 15).


**Opt-In Plaintiff Diana Wang**

D219.  Wang understood prior to the start of her internship that it was an unpaid position.  *See* Pls. Ex. 159 (Wang Decl.) ¶ 24; Findikyan Decl. Ex. 175 (Wang Tr.) 137:3-5.

D220.  Wang understood prior to the start of her internship that it was not a guarantee of a job.  *See* Findikyan Decl. Ex. 175 (Wang Tr.) 200:11-18.

D221.  After graduating from college, Wang aspired to be a fashion stylist but had no experience in the fashion industry.  Findikyan Decl. Ex. 175 (Wang Tr.) 35:7-11, 38:22-39:3.

D222.  Wang "had always dreamed of working [at Harper's Bazaar]" and thought it would be a "dream fulfilled to support the accessories department at Harper's Bazaar as an intern."  Findikyan Decl. Ex. 175 (Wang Tr.) 40:23-41:7, 135:25-136:8, 137:19-138:5.  She

knew what the position would entail and "just really wanted to be there."  Findikyan Decl. Ex. 175 (Wang Tr.) 147:25-148:10, 151:4-18.

D223.  After having the Head Accessories Intern position explained to her during her interview with Sam Broekema, Wang determined that she wanted to intern full-time in this position.  Findikyan Decl. Ex. 175 (Wang Tr.) 139:12-140:25, 147:23-148:10, 151:4-18.

D224.  Wang knew that there was a policy that she must receive academic credit to intern at Harper's Bazaar and submitted a credit letter to Hearst Magazines Human Resources stating that she would receive credit, even though she did not.  Findikyan Decl. Ex. 175 (Wang Tr.) 157:25-160:3.

D225.  Because of her role as Head Intern, Wang was given unusual individual coaching and counseling.  Findikyan Decl. Ex. 15 (Broekema Decl.) ¶ 8

D226.  Wang's internship experience would have been different with a different supervisor.  Findikyan Decl. Ex. 175 (Wang Tr.) 236:22-25.

D227.  Wang believes her internship would have been more valuable to her if she had done "more substantive work" or received more mentoring and supervision.  Findikyan Decl. Ex. 175 (Wang Tr.) 237:6-15, 237:6-22.

D228.  On January 5, 2012, Wang wrote an email to Amy Helmus of Hearst Magazines Human Resources stating that her internship "provided [her] unrivaled skills for working in fashion."  Findikyan Decl. Ex. 57 (Helmus Decl.) Ex. A.  Wang's email also said that it "was the most valuable work experience [she has] had to date."  Findikyan Decl. Ex. 57 (Helmus Decl.) Ex. A.

D229.  In another email that Wang sent to Bazaar fashion editor Ana Maria Pimental (Broekema's direct supervisor) the day before, Wang wrote that her internship "was the most

-115-

unique and valuable professional experience [she] could have asked for."  Findikyan Decl. Ex. 106 (Roberts Decl.) Ex. A.

D230.  Wang learned things in her internship that she couldn't learn in a classroom setting.  Findikyan Decl. Ex. 175 (Wang Tr.) 20:12-17, 189:7-12, 201:10-15, 260:6-10; Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 7 (big difference between studying couture in the classroom and taking responsibility for its handling and care in the real world).  Among other things, she learned how a fashion closet works, the role each person fulfills at a magazine and that  she may not be interested in pursuing fashion as a career.  Findikyan Decl. Ex. 175 (Wang Tr.) 201:10-15, 189:7-12, 190:10-17, 260:6-10.

D231.  Wang was able to interact directly with public relations representatives and was able to develop her own relationships with them.  Pls. SOF ¶ 144, *supra* (citing Pls. Ex. 3 (Broekema Tr.) 84:3-6).

D232.  The knowledge Wang gained about how a fashion closet works would be valuable knowledge at any magazine.  Findikyan Decl. Ex. 175 (Wang Tr.) 190:10-17.

D233.  During her internship, Wang had the opportunity to learn about publicists and designers in the world of high-fashion and to make valuable contacts with those representatives. Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶¶ 7, 17.  She also had the opportunity to learn about the publishing industry and how a magazine functions, and more specifically, about the attention to detail and administration necessary to deal with high volumes of valuable merchandise, including the paths that merchandise takes from origin through the magazine editorial process.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶16.  She also had the opportunity to learn about working collaboratively.  Findikyan Decl. Ex. 15 (Broekema Decl.) ¶ 12.

D234.  Wang also attended photo shoots, including a shoot with a prominent Harper's Bazaar stylist, where she had the opportunity to observe how stylists and everyone on a photo set work together and how stylists determine what items should be featured.  Findikyan Decl. Ex. 175 (Wang Tr.) 92-93, 95:24-97:25; Ex. 112 (Rosengarten Decl.) ¶ 17; Ex. 15 (Broekema Decl.) ¶15.

D235.  Wang has used her Harper's Bazaar supervisor, Sam Broekema, as a reference, and Broekema provided her with contacts for at least one job opening.  Findikyan Decl. Ex. 175 (Wang Tr.) 130:10-13, 131:9-19, 195:13-196:19.

D236.  Wang has included her Harper's Bazaar internship on her resume.  Findikyan Decl. Ex. 175 (Wang Tr.) 232:11-233:4, 58:23-59:5; Ex. 212 (Wang Ex. 20); Ex. 211 (Wang Ex. 19).

D237.  An internship in the Harper's Bazaar Accessories department is an opportunity for those interested in high fashion to have first-hand experience with high fashion accessories. Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 6.

D238.  Harper's Bazaar seeks to have some learning or training component for every task assigned to an intern.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 16.

D239.  For example, although the Accessories intern's task of inventorying might seem like a basic administrative function, it is important for learning the critical nature of tracking items that come in to the magazine.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 16.

D240.  Interns in the Accessories department learn how meticulous editors need to be in understanding what every product looks like and where it goes once it enters the magazine's doors.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 16.

D241.  Through their role in the process, interns learn important lessons about the administrative workings of dealing with such merchandise, the path products take throughout the magazine, and the insurance component that is a constant element to working with clothing and accessories of such high value in a fashion magazine.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 16.

D242.  Accessories interns can also absorb a great deal by attending magazine photo shoots and observing how stylists work with the talent and make decisions about what the talent should wear and what items should be featured in the magazine.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 17.

D243.  Harper's Bazaar tried to provide interns with a real-world experience that gives them first-hand knowledge of how the magazine runs.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 19.

D244.  This experience makes interns better qualified to enter the fashion publishing industry.  Findikyan Decl. Ex. 112 (Rosengarten Decl.) ¶ 19.

### Opt-In Plaintiff Sarah Wheels

D245.  Wheels understood prior to the start of her internship that it was an unpaid position.  *See* Findikyan Decl. Ex. 176 (Wheels Tr.) 90:8-10.

D246.  Wheels understood prior to the start of her internship that it was not a guarantee of a job.  *See* Findikyan Decl. Ex. 176 (Wheels Tr.) 95:11-13.

D247.  Wheels wanted to pursue an internship at Cosmopolitan because she was interested in the Cosmopolitan editorial department and aspired to work at Cosmopolitan after the internship.  Findikyan Decl. Ex. 176 (Wheels Tr.) 80:17-82:8.

D248.   Wheels received credit from Portland Community College for her internship in the editorial department of Cosmopolitan magazine in the summer of 2011. Findikyan Decl. Ex. 213 (Wheels Ex. 7).

D249.   Wheels learned how the editorial side of a magazine works, as well as about acceptable reporting sources, and she increased her knowledge of the magazine industry more generally.  Findikyan Decl. Ex. 176 (Wheels Tr.) 171:8-10, 168:7-9, 215: 20-22, 219:23-25, 213:14-25, 206:6-24 (Cosmo U).

D250.   Wheels was given the opportunity to conduct "man on the street" interviews and interviews with bachelors to work on her interviewing skills.  Findikyan Decl. Ex. 176 (Wheels Tr.) 271:16-19.

D251.   Wheels had the opportunity to research and write short blurbs, including about her "man on the street" interviews.  Findikyan Decl. Ex. 176 (Wheels Tr.) 271:17-19.

D252.   Wheels acknowledged that just because she did not feel that she benefitted from the internship "doesn't mean that other interns aren't benefiting in some other ways." Findikyan Decl. Ex. 176 (Wheels Tr.) 138:18-139:19; 145:9-146:24; 236:22-238:24; 236:22-24.

D253.   Other editorial interns at Cosmopolitan who interned at the same time as Wheels said they received extensive training and mentoring.  *See* Findikyan Decl. Ex. 7 (Bailey Decl.) ¶¶ 3-9 (describing Cosmopolitan internship in summer of 2011).  So did interns who spent time doing some of the same things that Wheels did in earlier summers.  *See* Findikyan Decl. Ex. 59 (Hilmantel Decl.) ¶¶ 5-7 (describing Cosmoplitan internship as better than any class and describing what she learned from, inter alia, conducting "man on the street" interviews).

D254.   Wheels believes part of the reason she felt she did not personally benefit from her internship is that she needed more supervision and training than she claims to have received. Findikyan Decl. Ex. 176 (Wheels Tr.) 188:9-11, 192:23-24, 216:17-24, 223:12-14.

D255.   Other editorial interns who interned with Wheels said they received substantial supervision and feedback.  Findikyan Decl. Ex. 7 (Bailey Decl.) ¶¶ 3-9 (describing Cosmopolitan internship in summer of 2011).

D256.   Wheels's internship included formal educational programs in the form of "Cosmo U" sessions.  Findikyan Decl. Ex. 214 (Wheels Ex. 10); Ex. 176 (Wheels Tr.) 205:6-12.

D257.   The Cosmo U sessions included presentations on career paths and on the business of various departments on the editorial and publishing sides of Cosmopolitan magazine. Findikyan Decl. Ex. 214 (Wheels Ex. 10); *see also* Ex. 50 (Greene Decl.) ¶ 10.

D258.   In her evaluation of her Cosmopolitan internship, Wheels gave the Cosmo U program the highest rating, a "5", meaning she found it "super informative."  Findikyan Decl. Ex. 214 (Wheels Ex. 10).

D259.   Wheels gave her internship experience many of the highest possible ratings, indicating that it "exceeded expectations," that she "learned a whole lot," and that she had "great interactions with supervisors."  Findikyan Decl. Ex. 214 (Wheels Ex. 10).

D260.   Wheels's internship included substantial downtime and "a lot of slow days." Findikyan Decl. Ex. 176 (Wheels Tr.) 184:20-22, 184:25-185:4, 201:11-14.

D261.   Wheels believes she would have benefitted from "more work."  Findikyan Decl. Ex. 176 (Wheels Tr.) 187:11-15; Ex. 214 (Wheels Ex. 10).

D262.   Wheels believed that the magazine could have used fewer interns.  Findikyan Decl. Ex. 176 (Wheels Tr.) 185:22-25.

D263.  Cosmopolitan "didn't usually have interns do" the type of work that assistants do."  Findikyan Decl. Ex. 176 (Wheels Tr.) 146:14-24.

D264.  Wheels's experience at Cosmopolitan was different than that of other editorial interns at the magazine.  Findikyan Decl. Ex. 176 (Wheels Tr.) 153:16-18.

D265.  Wheels never asked her supervisor at Cosmopolitan for a reference or career advice.  Findikyan Decl. Ex. 176 (Wheels Tr.) 194:22-195:22.  Although Wheels testified this was because she was told it was against Cosmopolitan policy to provide references, other Cosmopolitan interns, including opt-in Erin Spencer, did receive references from their supervisors.  Findikyan Decl. Ex. 171 (Spencer Tr.) 165:11-1, 182:12-183:5; Ex. 201 (Spencer Ex. 16); Ex. 207 (Spencer Ex. 31).

D266.  Wheels has included her Cosmopolitan internship on her resume, including when she applied for jobs in the publishing industry.  Findikyan Decl. Ex. 176 (Wheels Tr.) 233:25-234:25, 250:8-12 (used in Harpers Collins applications), 250:23-251:25; Ex. 215 (Wheels Ex. 15).

D267.  Cosmopolitan limits the number of interns each department can select in order to provide each intern with a meaningful experience.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 8.

D268.  Each intern is assigned to an employee "point person" who is to support the intern throughout their internship.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 9.

D269.  The experience provided to Cosmopolitan interns is often at the cost of significant time expended by the magazine's staff.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18.

D270.  Interns are able to watch, learn and absorb the inner workings of one of the world's most iconic and widely read magazines.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18; *see also* Ex. 7 (Bailey Decl.) ¶¶ 3-9 (describing Cosmopolitan internship in summer of 2011);

Findikyan Decl. Ex. 59 (Hilmantel Decl.) ¶¶ 5-7 (describing Cosmopolitan internship as better than any class and describing what she learned from, inter alia, conducting "man on the street" interviews).

D271.  Interns are able to gain insight into how Cosmopolitan staff come up with ideas and how they execute them from start to end.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18.

D272.  Interns are counseled on professionalism, the significance of confidentiality, how to work with others, and how to conduct themselves in a work environment.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 18.

D273.  Interns also get the benefit of networking.  Findikyan Decl. Ex. 50 (Greene Decl.) ¶ 19.

**Hearst Magazine's 2008 Employee Numbers**

D274.  **REDACTED** ███████████████████████████████████████████████████████████████████████████████████████████

D275.  **REDACTED** ███████████████████████████████████████████████████████████████████████████████████████

D276.  **REDACTED** ███████████████████████████████████████████████████████████████████████████████████████████

**REDACTED**

D278.  **REDACTED**

.

D279.  **REDACTED**


Respectfully submitted,

Dated: March 18, 2013                **HEARST CORPORATION**

                                    ___/s/ Jonathan R. Donnellan_____

Of Counsel:                         Eve B. Burton
Proskauer Rose LLP                  Jonathan R. Donnellan
Mark W. Batten                      Kristina E. Findikyan
                                    Courtenay B. O'Connor
                                    Andrea R. Butler
                                    Kristen Hauser Glass
                                    Christine Bateup

                                    *Attorneys for Defendant Hearst Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused a true and correct copy of the foregoing to be served on all counsel of record, this 18th day of March, 2013, by operation of the Court's CM/ECF electronic filing system.

Kristina E. Findikyan
_____
Kristina E. Findikyan