UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
XUEDAN WANG, on behalf of herself and all : 
others similarly situated, :
 :
               Plaintiff, :
 :   **12 CV 793 (HB)**
  - against - :
 :   <u>**OPINION & ORDER**</u>
THE HEARST CORPORATION, :
 :
               Defendant. :
------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      Before the Court are Plaintiffs' motions for partial summary judgment under Fed. R. Civ. P. 56(a) and class certification pursuant to Fed. R. Civ. P. 23(a) and b(3).  Plaintiffs previously interned at various magazines owned by Defendant Hearst Corporation ("Defendant") without pay.  Plaintiffs allege that Defendant violated the minimum wage requirements, overtime provisions, and recordkeeping requirements in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law ("NYLL") Art. 19 §§ 650 *et seq.*, and seek the certification of the following class for their claims under the NYLL: "All persons who have worked as unpaid interns at Hearst Magazines in New York between February 1, 2006 and the date of final judgment in this matter."  For the reasons set forth below, Plaintiffs' motions for partial summary judgment and class certification are DENIED.

**Background[1]**

      Hearst is one of the world's largest publishers of monthly magazines with 20 U.S. magazine titles and several corporate departments. Pls.' 56.1 ¶¶ 1, 5, 6.  Hearst is also an "employer" under the FLSA and NYLL and in addition, has had more than 3,000 interns over the past six years. Pls.' 56.1 ¶¶ 3, 17.  The background is applicable to both motions, summary judgment and class certification.

      Since 2008, Hearst worked to reduce costs by decreasing its headcount and expenses at the magazines as a response to the recession, and internal emails within Harper's Bazaar and Marie Claire instructed the staff to use interns rather than paid messengers to save costs. Pls.'

---

[1] Facts laid out in this section are not disputed between the parties, unless noted otherwise.

56.1 ¶¶ 100, 104, 110.  Discovery revealed that in 2008, 229 full-time employees were eliminated: 109 left due to the closure of three magazines; another 88 positions that were eliminated were middle to senior level employees; and 32 positions were entry-level. Def.'s 56.1 ¶¶ D274-8.

Hearst's Human Resources Department is charged with making sure that the company's magazines and departments are in compliance with wage and hour laws, and a part of its mission was to instruct all concerned to have the interns provide "school credit letters."  Pls.' 56.1 ¶¶ 41, 66.  The primary criteria relied upon by Hearst in concluding not to pay the interns was that for the most part, they were in college and eligible to receive academic credit. Pls.' 56.1 ¶ 70.  This policy has been in place at least since 2006. Pls.' 56.1 ¶ 73.  For the most part, all magazines followed this policy.  To provide some flavor, I describe below what some interns did during their internship.

Named Plaintiff Xuedan Wang worked as an intern five days a week, sometimes from 9 a.m. to 8 p.m., at the accessories department of Harper's Bazaar Magazine from August 2011 to December 2011. Pls.' 56.1 ¶¶ 7, 117, 198.  Wang's duties included serving as a contact between editors and public relations representatives, doing online research, cataloguing samples, maintaining the accessories closet, and doing story boards. Pls.' 56.1 ¶ 164.

Named Plaintiff Erin Spencer and Opt-in Plaintiff Sarah Wheels were interns at Cosmopolitan Magazine, the former from June 1, 2010 to August 15, 2010, and the latter from May 20, 2011 to August 10, 2011. Pls.' 56.1 ¶¶ 8, 14.  Spencer, as a bookings intern, worked four days per week from 9 a.m. to 5 or 5:30 p.m., and her duties included organizing files, holding casting calls, assisting at photo shoots, running errands, mailing magazine pages where models appear to models' agents, updating contact lists, and assisting in the fashion closet. Pls.' 56.1 ¶¶ 216, 222, 223, 231.  Wheels, as an editorial intern, worked four days a week from 9:15 a.m. to 6 p.m., and her duties included responding to emails from readers, researching for articles, surveying people on the street, transcribing interviews, compiling sales statistics, locating articles in the magazine's archive, writing content, and fact-checking articles. Pls.' 56.1 ¶¶ 365, 358.

Opt-in Plaintiffs Elizabeth Mancini and Caitlin Leszuk were interns at Marie Claire Magazine, the former from January 2009 through June 2009 and the latter from January 11, 2010 to May 15, 2010. Pls.' 56.1 ¶¶ 9, 12; Def.'s 56.1 ¶¶ 9, 12.  As a fashion intern, Mancini worked

three to four days a week and arrived between 8:30 and 9 a.m. and left some time after 6 p.m., and her duties included receiving clothing ordered from photo shoots, unpacking the items and checking to make sure that everything ordered was received and not broken, photographing the items, filing invoices, and putting the items on garment racks. Pls.' 56.1 ¶¶ 242, 270, 272. Leszuk, as a sales intern, worked four days a week, from 9 a.m. to 6 p.m., and she spent the majority of her time creating "edit credit" spreadsheets, which involved a line-by-line review of Marie Claire and its competitors' magazines. Pls.' 56.1 ¶¶ 316, 323, 330.

Opt-in Plaintiff Matthew Wagster was an intern at Esquire from July 2009 to December 2009, where he worked three days a week from 9 a.m. to 6 p.m. Pls.' 56.1 ¶¶ 10, 314.  As an intern in the publishing department, he ran errands, updated guest lists for events, helped prepare for events, and worked at the doors at the events. Pls.' 56.1 ¶ 305.

Opt-in Plaintiff Stephanie Skorka was an intern at Redbook from September 2009 to December 2009. Pls.' 56.1 ¶ 11.  As a beauty intern, Skorka worked three days a week from 10 a.m. to 6 or 7 p.m., and her duties included managing the beauty closet, assisting with photo shoots, coming up with beauty story ideas, writing posts for the website, attending beauty product launches, contacting public relation firms, and selecting beauty products for potential inclusion in the magazine. Pls.' 56.1 ¶¶ 280-282, 290.

Opt-in Plaintiff Alexandra Rappaport was an intern at Seventeen from May 23, 2011 to July 26, 2011. Pls.' 56.1 ¶ 13.  As an intern in the fashion closet, Rappaport worked four days a week, from 9:20 a.m. to between 6:30 and 7:30 p.m., and her duties included organizing clothes, hanging them on racks, packing them, picking up and returning clothing, organizing jewelry, sending packages, copying, faxing, and responding to emails from designers. Pls.' 56.1 ¶¶ 348, 351.

Some interns, e.g. Spencer and Wheels, attended four, one-hour sessions of "Cosmo-U" during which the editors at Cosmopolitan talked about their careers. Pls.' 56.1 ¶¶ 232, 363. Leszuk received at least one MediaMath class. Def.'s 56.1 ¶ D27.  More importantly, all Plaintiffs understood prior to their internship that the position was unpaid, Def.'s 56.1 ¶¶ D1, D36, D92, D151, D192, D219, D245, and Hearst made it clear that there was little likelihood, and certainly no guarantee, of a job at the end of their internship, Def.'s 56.1 ¶¶ D2, D37, D93, D152, D193, D220, D246.  The parties do not dispute that some of the duties performed by Plaintiffs were performed by paid employees. *See* Pls.' 56.1 ¶¶ 157, 286, 312, 327, 349.

3

However, the parties dispute the amount of supervision provided, Def.'s 56.1 ¶¶ D12-14, D48, D85, D105, D114-116, D161, D201, D225, D254-256, as well as the benefits received and the advantages that Hearst derived, Def.'s 56.1 ¶¶ D20-25, D29, D53-59, D75-77, D121-2, D170-3, D187, D202-204, D228-230, D249-251, D260.

## Discussion

### A. Motion for Partial Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine issue of material fact, and all reasonable inferences must be drawn in the non-movant's favor. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). A material fact is one that "might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation and quotation omitted).

#### 1. Applicable Legal Standard

Plaintiffs move for partial summary judgment contending that they were "employees" under the FLSA and NYLL.[2] The FLSA[3] defines "employee" as "any individual employed by an employer" and the term "employ" is defined broadly to include "to suffer or permit to work." 29 U.S.C. § 203(e)(1), (g); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003). Although the term "intern" is neither defined nor provided as an exception in the FLSA, the parties do not dispute, and the Court agrees, that for this lawsuit, the Supreme Court in *Walling v. Portland Terminal Co.* 330 U.S. 148 (1947) provides, for the most part, the governing case law. In *Walling*, the Supreme Court found that trainees who worked for seven or eight days for the defendant railroad without pay during "a course of practical training" were not "employees" under the FLSA based on "the unchallenged findings [] that the railroads receive no 'immediate advantage' from any work done by the trainees." 330 U.S. at 153. The Court reasoned that "[t]he definition 'suffer or permit to work' was obviously not intended to stamp all persons as

---

[2] Although Plaintiffs also moved for partial summary judgment with respect to Defendant's willfulness and Plaintiffs' entitlement to liquidated damages, the Court denied that portion of the motion from the bench after the oral argument on April 16, 2013. *See* ECF No. 143.

[3] The courts in this circuit have held that the NYLL "embodies the same standard for employment as the FLSA." *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012). The parties' briefs accordingly focused on the FLSA, Pls.' Supp. 24; Def.'s Opp. 26, and the analysis below is based on the FLSA but is applicable to the NYLL.

employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152.

The Department of Labor ("DOL") published a fact sheet in April 2010, which puts some meat on the *Walling* bones. U.S. Dep't of Labor, "Fact Sheet # 71: Internship Programs Under The Fair Labor Standards Act," available at http://www.dol.gov/whd/regs/compliance/whdfs71.pdf  ("DOL Fact Sheet #71"). In order to overcome the employment label, the internship, according to the DOL, must meet all of the following six factors:

> (1) The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;
>
> (2) The internship experience is for the benefit of the intern;
>
> (3) The intern does not displace regular employees, but works under close supervision of existing staff;
>
> (4) The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;
>
> (5) The intern is not necessarily entitled to a job at the conclusion of the internship; and
>
> (6) The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

While the weight to be given to these factors is far from crystal clear, the Fact Sheet adds to the confusion with the introductory language: "whether an internship or training program meets this exclusion depends upon all of the facts and circumstances of each such program." *Id*.

Not surprisingly, the parties disagree as to the appropriate test for defining an "employee" under *Walling*.  Plaintiffs urge the Court to adopt a standard of "immediate advantage," contending that the outcome in *Walling* "would have been different if the railroads had obtained an immediate advantage from the trainees . . . . When an employer obtains a direct or immediate benefit from work, if has 'suffered or permitted' work and must compensate for it." Pls.' Supp. 26.  In the alternative, they argue that Hearst "must meet all of the factors" in the Department of Labor's ("DOL") six-factor test and that it has failed to do so. Pls.' Supp. 29.  On the other hand, Hearst urges the Court to adopt a "balancing of the benefits test" which looks to the totality of circumstances to evaluate the "economic reality" of the relationship. Def.'s Opp. 28.  As for the DOL's six-factor test, Hearst contends that no judicial deference is required and is critical of Plaintiffs' effort to apply it as "a rigid checklist." *Id*. at 31.

I agree with Hearst that the Supreme Court in *Walling* looked to the totality of circumstances of the training program to determine whether the plaintiffs were "employees" under the FLSA.  Although the Supreme Court held in *Walling* that the men in that case were not employees because the defendant railroads received "no immediate advantage" from the trainees, 330 U.S. at 153, it does not logically follow that the reverse is true, i.e. that the presence of an "immediate advantage" alone creates an employment relationship under the FLSA.  Moreover, Plaintiffs' reading of *Walling* as establishing the test for an employer-employee relationship solely based on "direct or immediate benefit" is misplaced.  There is no one-dimensional test; rather, the prevailing view is the totality of circumstances test. *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985).  To make the cheese more binding, the Second Circuit in a decision only last year echoed that view when it wrote, "whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity," and specifically noted that a key consideration in the analysis depended on "who is the primary recipient of benefits from the relationship . . . ." *Velez v. Sanchez*, 693 F.3d 308, 326, 330 (2d Cir. 2012).

All that said, I am also of the mind that the six factors in Fact Sheet #71 ought not be disregarded; rather, it suggests a framework for an analysis of the employee-employer relationship.  After all, they emanate from the agency that administers the laws under which Plaintiffs brought this lawsuit.  This position finds support in *United States v. Mead Corp.*, where we read "[A]n agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information and given the value of uniformity in its administrative and judicial understandings of what a national law requires." 533 U.S. 218, 234 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  The cases in this district that have considered the six-factor test conclude that the Fact Sheet is "a reasonable application of the FLSA and . . . entitled to deference by this court." *Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 531 (S.D.N.Y. 1998) (Sotomayor, J.); *see also Brown v. New York City Dep't of Educ.,* No. 12 Civ. 35, 2012 WL 6186496, at *8 (S.D.N.Y. Dec. 12, 2012) (referring to DOL Fact Sheet #71, along with agency regulation, to distinguish between services provided to for-profit private sector employers and public agencies).[4]

---

[4] Although Defendants rely on a Sixth Circuit case that denied any deference on the ground that the test was too rigid, the same case still noted that "the six factors may be helpful in guiding that inquiry." *Solis v. Laurelbrook*

### 2. Dispute Regarding Material Facts

Plaintiffs seek partial summary judgment based on the "immediate advantage" standard, while Hearst bases its argument on the totality of circumstances standard. This alone creates a genuine issue of fact sufficient to deny summary judgment. Further, to the extent that Plaintiffs seek partial summary judgment based on the DOL six-factor test, that branch of the motion too must be denied. A genuine dispute and material issues of fact exists, at least with respect to the first, second, third, and fourth factors. This is not a winner-take-all test, and Hearst has shown with respect to each Plaintiff that there was *some* educational training, *some* benefit to individual interns, *some* supervision, and *some* impediment to Hearst's regular operations, etc., which, if viewed in the light most favorable to the non-moving party, as it must be, supports the view that a jury could return a verdict in Hearst's favor.

### B. Motion for Class Certification

Plaintiffs also move the Court to certify the following class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) for the claims under the NYLL: "All persons who have worked as unpaid interns at Hearst Magazines in New York between February 1, 2006 and the date of final judgment in this matter." Pls.' Supp. 40. "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citation omitted). Under the threshold requirements of Rule 23(a), the party seeking class certification must show that: (1) the class is sufficiently numerous; (2) there are questions of law or fact common to the class; (3) the class representative has claims and defenses that are typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Rule 23(b)(3) requires the court to examine whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior" to individual litigation. Fed. R. Civ. P. 23(b)(3). Here, the parties do not dispute, and I agree, that Plaintiffs meet three out of four requirements under Rule 23(a): numerosity, typicality, and adequacy. However, the parties disagree about whether commonality and predominance requirements are satisfied.

---

*Sanitarium & Sch., Inc.*, 642 F.3d 518, 525 (6th Cir. 2011); *see also Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1027 (10th Cir. 1993) ("We are satisfied that the six criteria are relevant but not conclusive . . . ."). There is also contrary persuasive authority at the circuit level; the Eleventh Circuit affords deference to the six-factor test. *Kaplan v. Code Blue Billing & Coding, Inc.*, No. 12-12011, 2013 WL 238120, at *2 (11th Cir. Jan. 22, 2013).

1. **Rule 23(a): Numerosity, Typicality, and Adequacy**

Numerosity is satisfied under the 40-member presumption adopted by the courts of this Circuit, *see Shahriar v. Smith & Wollensky Rest. Group, Inc*., 659 F.3d 234, 252 (2d Cir. 2011), as there are more than 3,000 members of the proposed class, Bien Decl. ¶ 13.  Typicality is also satisfied, since Plaintiffs, like the class they seek to represent, worked for Hearst as unpaid interns, and all of them are suing under the same legal theory that they were "employees" under the NYLL. *See Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993) ("Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.").  The adequacy requirement too is satisfied given the quality of the representation by Plaintiffs' counsel and Plaintiffs' participation in this action without any known conflicts. *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (defining the adequacy requirement as "inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation") .

2. **Rule 23(a): Commonality**

Fed. R. Civ. P 23(a)(2) is satisfied when "there are questions of law or fact common to the class."  The Supreme Court has recently held that the party seeking class certification must raise more than a litany of common questions; rather, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Plaintiffs point out that Hearst has a "centralized policy" of classifying all interns as unpaid, non-employees and propose five common questions "that will generate a common answer:" (1) whether Hearst derived an immediate advantage from the interns' work; (2) whether paid workers were displaced; (3) whether an educational experience was provided; (4) whether the members derived benefit; and (5) whether the economic reality of the relationship was one of employment. Pls.' Reply 16; Pls.' Supp. 42-45.  According to Plaintiffs, the common proof would consist of testimony by select interns and supervisors, Hearst's job postings and evaluation forms, and intern manuals and guidelines from individual magazines. Pls.' Supp. 43.

Hearst responds that the right legal standard involves an examination of individual factors that generate no common class-wide answers, and as in *Dukes*, "'significant proof' of a general policy that resulted in a class-wide violation" is absent. Def.'s 35. The cornerstone of Hearst's argument is that its 20 magazines have "no uniform policies or practices among magazines prescribing what interns must do." *Id*.

Here, while a close question, the commonality requirement is not satisfied because Plaintiffs cannot show anything more than a uniform policy of unpaid internship. In *Dukes*, the Supreme Court noted that the plaintiff failed to provide evidence of a "general policy of discrimination" that would constitute "significant proof" abridging the gap between an individual and a class claim. 131 S. Ct. at 2554. The evidence of a corporate-wide policy of classifying the proposed class members as unpaid interns is insufficient, as that policy alone cannot answer the liability question, which turns on what the interns did and what benefits they received during their internship. Although Plaintiffs have raised many common questions, under *Dukes*, this Court must "consider dissimilarities . . . in order to determine (as Rule 23(a)(2) requires) whether there is even a single common question." 131 S. Ct. at 2556 (alterations and internal quotation marks omitted). The duties performed by Lead and Opt-In Plaintiffs—to say nothing of the variation within each magazine and corporate department—clearly suggest that internships varied greatly from magazine to magazine. As it is Plaintiffs' burden to demonstrate by preponderance of evidence that this litigation will "generate common *answers* apt to drive the resolution," 131 S. Ct. at 2551, the Court is required to appraise such dissimilarities in its commonality analysis. Plaintiffs' vague advice that the Court consider instead "the nature of the work that interns performed," Oral Arg. Tr. 11:8-13:1, eschews, rather than addresses, the glaring problem here, that the Court cannot resort to any common proof to determine the very "nature" of the interns' work.

Certainly, even after *Dukes*, courts of this district have routinely found commonality in analogous misclassification cases under the NYLL. *See Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 616 (S.D.N.Y. 2012) ("The weight of authority rejects the argument that *Dukes* bars certification in wage and hour cases.") (citing cases). However, those cases are very different. *Compare Meyer v. U.S. Tennis Ass'n*, No. 11 Civ. 6268, 2013 WL 1777556, at *6 (S.D.N.Y. Apr. 25, 2013) (finding commonality because the proposed class members "carry out their duties for the [defendant] pursuant to a uniform policy, uniform training, uniform job

9

description, and uniform procedures"), *and Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2013 WL 1137024, at *6 (S.D.N.Y. Mar. 20, 2013) (finding commonality not just based on "the uniform classification of [the plaintiffs as Assistant Store Managers ("ASM")]," but also "the uniform description of ASMs' duties"), *with White v. W. Beef Properties, Inc.*, No. 07 Civ. 2345, 2011 WL 6140512, at *5 (E.D.N.Y. Dec. 9, 2011) (denying commonality based on uniform classification alone based because the "evidence span[ned] nine different departments—Meat, Produce, Frozen, Fish, Grocery, Bakery, Deli, Dairy and Receiving—each of which has a distinct set of concerns and job duties"). The plaintiffs in *Meyer* and *Jacob* were able to show a company-wide policy regarding employee *duties* in addition to a company-wide policy regarding a certain employee classification, whereas here, as in *White*, there is nothing more than a corporate-wide policy of classifying the proposed class members as unpaid interns based on academic credit letters. To mix a metaphor, while half a loaf is better than none, Plaintiffs' argument here just doesn't cut the mustard.

   3. **Rule 23(b)(3): Predominance and Superiority**

Having failed to show sufficient evidence to support commonality, Plaintiffs have an even higher hurdle in their effort to meet the predominance and superiority requirements of Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," and the courts are instructed to "take a close look at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation and internal quotation marks omitted). The Second Circuit instructs that requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). In an analogous misclassification case, the Second Circuit held that while the defendant's "blanket [overtime] exemption policy" regarding the proposed class members is "in a general way relevant to the inquiry here, the existence of a blanket exemption policy, standing alone, is not itself determinative of the main concern in the predominance inquiry: the balance between individual and common issues." *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010). The Second Circuit reasoned that "[i]n possible contrast to a uniform corporate policy detailing employees' job duties, the fact of common exemption does not establish whether all plaintiffs were actually entitled to overtime

pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions." *Id.*

As explained above, Plaintiffs fail to satisfy the predominance requirement because the record shows that there is no uniform policy among the magazines with respect to the contents of the internship, including interns' duties, their training, and supervision, such that the analysis of four out of six DOL factors would have to be individualized. Plaintiffs argue that the Court should overlook such deficiency in the record because the Court can make a determination at the general level as to the nature of the interns' duties, as well as the benefits, training, and supervision that they received, and suggest that the Court do so based on the testimony of select interns and supervisors, various job postings and evaluation forms, and intern manuals and guidelines of individual magazines. Pls.' Reply 17-20. Unfortunately, this is precisely the reason which, when examined closely, directly undermines the predominance prerequisites. For instance, there is a myriad of internship postings, manuals, and guidelines that set out different duties and training for each magazine; indeed, this is so even for the specific department *within* a single magazine. *See, e.g.*, Bien Decl. Ex. 167 (Cosmopolitan Fashion Intern Guide); Ex. 177 (Elle Accessories Intern Survival Guide); Ex. 169 (Esquire Fashion Closet Guide); Ex. 55 (Harper's Bazaar Fashion Editorial Internship Guidelines); Ex. 205 (Harper's Bazaar Intern Guide); Ex. 93 (Marie Claire Fashion Intern Handbook); Ex. 201 (Redbook Magazine Fashion Closet Intern Guide); Ex. 196 (Town & Country Intern Guide); Ex. 72 (Seventeen Beauty Intern Guide); Ex. 219 (Cosmopolitan Beauty Internship); Ex. 219 (Good Housekeeping Beauty Internship); Ex. 222 (Harper's Bazaar Beauty Internship); Ex. 216 (Town & Country Beauty Internship); Ex. 63 (Seventeen Editorial Intern Manual); Ex. 198 (Esquire Interns: A Guidebook); Ex. 95 (Marie Claire Features Intern Handbook); Ex. 202 (Redbook Features Intern Handbook); Ex. 209 (Cosmopolitan Editorial Internship); Ex 230 (Country Living Editorial Internship); Ex. 231 (Elle Features Internship); Ex. 224 (Harper's Bazaar Features Internship); Ex. 234 (Marie Claire Editorial Internship); Ex. 240 (Woman's Day Editorial Internship); Ex. 94 (Bazaar Photo & Bookings Internship); Ex. 204 (Marie Claire Photo Intern Guide); Ex. 200 (Seventeen Photo Intern Manual); Ex. 257 (Cosmopolitan Bookings Intern); Ex. 258 (Seventeen Magazine Bookings Internship); Ex. 212 (Esquire Art Internship); Ex. 91 (Esquire Sales and Marketing Internship); Ex. 178 (Marie Claire Marketing Internship Overview and

Responsibilities); Ex. 247 (Hearst Communications Internship); Ex. 248 (Hearst Marketing Internship).

To make liability determinations, the Court would have to evaluate all of such individualized evidence, in addition to individualized testimony about the level of supervision and respective benefits, against the six factors suggested by the DOL.  Because the content of the internships, which is the core of the dispute, cannot be evaluated based on common proof, individual issues clearly overwhelm the common ones here.  This case is therefore different from the post-*Dukes* misclassification cases. *See Meyer*, 2013 WL 1777556, at *11-12 (finding predominance because the class members' "primary duties" are governed by "Official's Code of Conduct" and their experience varied "at the margins"); *Jacob*, 2013 WL 1137024, at *12-15 (finding predominance "given [the defendant's] uniform [] job description and consistent approach to training"). *See also White*, 2011 WL 6140512, at *5 (denying class certification because there is no "standardized company-wide description of responsibilities").

I further note that the above analysis on predominance does not even take into consideration any problems related to damages calculation. *See Comcast Corp.*, 133 S. Ct. at 1433 (holding that the Circuit Court erred in its predominance analysis by failing to consider whether "questions of individual damage calculations will inevitably overwhelm questions common to the class").  Although Plaintiffs argue that *Comcast* is limited to anti-trust cases, the majority opinion explicitly rejected that very proposition. *Id.* at 1433 ("This case [] turns on the straightforward application of class-certification principles . . . .").  Indeed, although one could certainly quibble with the significance of a grant, vacate, and remand ("GVR") order from the Supreme Court, one must pause at least for a moment when one sees that the Supreme Court, "in light of *Comcast*," has issued an order vacating and remanding a Seventh Circuit's decision affirming the district court's certification in an overtime misclassification case. *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013).

The superiority analysis involves a consideration of four nonexclusive factors: (1) the interest of the class members in controlling the litigation of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).  While there is undeniable efficiency that stems from consolidating and concentrating the litigation of

12

similar claims, the individualized nature of proofs in this case signals that case management would be difficult, if not near impossible, and separate actions may be more appropriate. Furthermore, given that the predominance requirement cannot be satisfied, Rule 23(b)(3) remains an insurmountable barrier to Plaintiffs.

## Conclusion

I have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, Plaintiffs' motion for summary judgment regarding their status as "employees" under the FLSA and NYLL is DENIED. Plaintiffs' motion for class certification under the NYLL claims is also DENIED. The trial, which is scheduled to commence on May 28, 2013, is adjourned sine die. The Clerk of the Court is instructed to close the two motions (ECF No. 105 & 106) and remove them from my docket.

**SO ORDERED**
May 8, 2013
New York, New York

Hon. Harold Baer, Jr.
U.S.D.J.