UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
XUEDAN WANG on behalf of herself and all
others similarly situated, MATTHEW JORDAN
WAGSTER, ERIN E. SPENCER,
ALEXANDRA RAPPAPORT, SARAH
WHEELS, and CAITLIN LESZUK,

                      12-CV-0793 (JPO)

                               Plaintiffs,      OPINION AND ORDER

               -v-

THE HEARST CORPORATION,

                               Defendant.
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Plaintiffs in this action are unpaid interns who worked at various magazines owned by Defendant the Hearst Corporation ("Hearst"). They allege that Hearst failed to compensate them for their work in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and New York Labor Law ("NYLL"), Art. 19 § 650 *et seq*. Hearst moves for summary judgment on whether Plaintiffs were "employees," and thus entitled to compensation, under the FLSA and NYLL. For the reasons that follow, the motion for summary judgment is granted.

**I.    Background**

      This case was filed on February 1, 2012, and was originally assigned to Judge Harold Baer. (Dkt. No. 1.) On July 12, 2012, Judge Baer granted Plaintiffs' motion for conditional certification of an FLSA collective action. (Dkt. No. 34; *see also* Dkt. No. 53 (denying reconsideration).) Plaintiffs thereafter moved to certify a class of unpaid interns under the NYLL and separately moved for partial summary judgment on the question whether unpaid interns are "employees" under FLSA and NYLL. (*See* Dkt. No. 107.) Judge Baer denied both

motions on May 8, 2013. (Dkt. No. 149) The court then certified the May 8 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (Dkt. No. 160), and the Second Circuit granted the petition to appeal from an interlocutory order of the district court (Dkt. No. 170).

The Second Circuit heard the appeal in tandem with *Glatt v. Fox Searchlight Pictures, Inc.*, a case involving parallel issues. (*Id.*) On October 29, 2015, the Circuit issued a summary order in this action (Dkt. No. 172), and issued a full opinion in *Glatt*. *See Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2015). The *Glatt* opinion clarified the Second Circuit's test for when an individual is an "employee" under FLSA and NYLL. *Id.* at 535-37. With respect to this action, the court vacated Judge Baer's order denying summary judgment and remanded for further proceedings consistent with the standard laid out in *Glatt*. (Dkt. No. 172 at 4.) The Second Circuit affirmed the portion of Judge Baer's order that denied Plaintiffs' motion for class certification.

The case was remanded to this Court in October 2015. (Dkt. Nos. 172-73.) On January 29, 2016, Hearst moved for summary judgment on the ground that the six remaining Plaintiffs—Caitlin Leszuk, Alexandra Rappaport, Erin Spencer, Matthew Wagster, Xuedan ("Diana") Wang, and Sarah Wheels—were not "employees" for purposes of the FLSA and NYLL under the *Glatt* test. (Dkt. No. 181.)

Each of these six Plaintiffs worked as an unpaid intern at a Hearst publication. Caitlin Leszuk interned at *Marie Claire* between January and May 2010, during her senior year at LIM College in New York City. (Dkt. No. 187 ¶¶ 5, 6.) She worked in the magazine's advertising department four days a week, except for days during her spring break and her school's career day, when she did not work. (*Id.* ¶¶ 19-20.) Leszuk received six academic credits for her internship, which satisfied the graduation requirements for her Visual Merchandising degree.

(*Id.* ¶¶ 10-12, 18.)  Her duties at *Marie Claire* included entering "edit credits" into an Excel spreadsheet and creating "edit credit books," which the sales department uses as part of its business.  (*Id.* ¶¶ 21-23.)

During her internship, Leszuk was required to keep a weekly journal of her experiences for an LIM class on business management, and one of her professors conducted a "site visit" to the *Marie Claire* offices.  (*Id.* ¶¶ 16-17.)  Leszuk also attended a twenty-minute "Media Math" session led by her internship supervisor, interacted with her supervisors roughly twice a day, and conversed with *Marie Claire* employees about career paths "if they had time."  (*Id.* ¶¶ 25, 29, 248.)  Since leaving *Marie Claire*, Leszuk has listed her internship on her resume, which she believes "carries some weight when she is applying for jobs," and has used one of her *Marie Claire* supervisors as a job reference.  (*Id.* ¶¶ 31-32.)  Leszuk contends that she performed rote duties—largely Excel data entry—during much of her internship, that she learned the skills required to intern within the first few days of her internship, and that she was not provided with "training opportunities that would have allowed her to learn more generally about the sales process" at a fashion magazine.  (*Id.* ¶¶ 21-24.)

Alexandra Rappaport was an intern at *Seventeen* magazine from May to July 2011, between her sophomore and junior years at Lafayette College.  (*Id.* ¶¶ 34-35.)  She worked in the magazine's fashion department four days a week and received academic credit equivalent to one college class for her internship.  (*Id.* ¶¶ 35, 44.)  Like Leszuk, Rappaport was required by her school to complete journal entries related to her internship; she also wrote an academic paper on her experience.  (*Id.* ¶ 47.)  At *Seventeen*, Rappaport organized and created inventories of clothing, went on "'runs' to retrieve and return [clothing] samples," "assisted stylists," and "created weekly fashion invoice spreadsheets."  (*Id.* ¶¶ 49-50.)  Rappaport concedes that she

learned about clothing pricing and the work of a fashion magazine during her internship, but contends that Hearst failed to provide her with opportunities "to interact with employees, shadow them, or work closely with them on creating the magazine." (*Id.* ¶¶ 53-54.)

Erin Spencer worked as an intern in the bookings department at *Cosmopolitan* magazine from June to August 2010, between her junior and senior years at Howard University. (*Id.* ¶¶ 63-64.) She worked four days a week, and her internship qualified for academic credit and satisfied graduation requirements for her Fashion Merchandising major. (*Id.* ¶¶ 64, 68-70.) Spencer submitted multiple evaluations and a final paper about her internship to Howard University. (*Id.* ¶ 74.) At *Cosmopolitan*, she learned how to book models for casting calls, held her own model casting, learned about photo shoots, and conducted a range of administrative tasks, including delivering and unpacking items. (*Id.* ¶¶ 82-89.) She also attended four hour-long sessions of "Cosmo U," a program in which the magazine's senior editors spoke about their career paths. (*Id.* ¶ 90-91.) Spencer contends that, while she learned about the magazine's operations from her internship, she conducted the bulk of her work alone, without any "supervision or guidance from Hearst employees." (*Id.* ¶ 94.) She has since used two *Cosmopolitan* supervisors as references and has listed the internship on her resume when applying for jobs at other magazines. (*Id.* ¶¶ 107-109.)

Matthew Wagster worked as an intern in the marketing department of *Esquire* magazine from July to December 2009. (*Id.* ¶ 111.) He was enrolled at the University of Colorado in "the fall of 2009," but "has not taken a full-time courseload at the university since the spring of 2008." (*Id.* ¶ 110.) Wagster "generally" worked at *Esquire* three days a week, and before starting, provided the magazine with documents stating that he would receive academic credit for his internship. (*Id.* ¶¶ 111, 117-18). At *Esquire*, Wagster created guest lists for events, compiled

4

"VIP guest requests," attended and took notes in staff meetings, prepared expense reports, and delivered copies of the magazine to other publications.  (*Id.* ¶¶ 121-24.)  He includes his internship on his resume, believes that he could ask his *Esquire* supervisors for job references, and discussed his internship while interviewing for a job he later obtained.  (*Id.* ¶¶ 128-30.)  Wagster contends, however, that he "perform[ed] the work of an entry-level marketing assistant" and received too little work and insufficient mentoring.  (*Id.* ¶¶ 126, 134.)  His school ultimately declined to award him credit for his *Esquire* internship because his internship duties were not applicable to his political science major.  (*Id.* ¶ 117-18.)

Diana Wang interned in the accessories department at *Harper's Bazaar* magazine from August to December 2011, five days a week.  (*Id.* ¶ 137.)  She graduated from Ohio State University in March 2010 and, when she began her internship, had been accepted into a graduate program in fashion marketing at Parsons School for Design.  (*Id.* ¶ 136.)  Wang chose to defer her graduate studies in order to be the "Head Accessories Intern" at *Harper's Bazaar*, which she was told would require a five-day-a-week commitment.  (*Id.* ¶ 140-41.)  Before she began her internship, she sought academic credit from Ohio State (*id.* ¶ 148), and provided Hearst with a letter stating that the university had approved her internship for two academic credits (*id.* ¶ 150).

At *Harper's Bazaar*, Wang "catalogued and tracked accessories samples" and "maintain[ed] the accessories closet."  (*Id.* ¶¶ 142, 155.)  She also attended a photo shoot, created storyboards, prepared expense reports, and served as "a point of contact between *Harper's Bazaar* editors and public relations representatives for the logistics" of transporting accessories samples.  (*Id.* ¶¶ 153, 157, 159.)  Wang contends that, for the bulk of her internship, she "learned by doing th[is] entry-level assistant work herself without close supervision, mentoring, or training from Hearst employees."  (*Id.* ¶ 160.)  She also asserts that she was "treated like a

regular employee" and was "reprimand[ed] and demot[ed]" by her supervisor after making mistakes.  (*Id.* ¶ 162.)  Since completing her internship, Wang has used her *Harper's Bazaar* supervisor as a job reference, and that supervisor has "provided her with contacts for at least one job opening."  (*Id.* ¶ 164.)  Ultimately, Wang did not receive credit for her internship from Ohio State.  (*Id.* ¶ 151.)

Sarah Wheels interned in the editorial department at *Cosmopolitan* magazine from May to August 2011, four days a week, in the summer between her sophomore and junior years at Reed College ("Reed").  (*Id.* ¶¶ 173-74.)  She received credit from Portland Community College ("PCC") for her internship.  (*Id.* ¶ 182.)  Wheels sought out credit from PCC because Reed would not provide academic credit for her internship.  (*Id.*)  Her PCC credits did not count toward her Reed graduation requirements.  (*Id.*)

During her internship, Wheels used LexisNexis to fact-check articles, conducted interviews and surveys, compiled data, wrote blurbs and blog posts, and transcribed interviews.  (*Id.* ¶¶ 186-97.)  Like Spencer, she also attended four one-hour "Cosmo U" sessions, and has listed the internship on her resume in job applications.  (*Id.* ¶¶ 199, 206.)  Wheels believes that she learned "a bit" about the editorial side of magazine production during her internship, but like the other Plaintiffs, contends that she did "entry-level assistant" work with inadequate supervision.  (*Id.* ¶¶ 207-08.)

Each of these six Plaintiffs understood at the start of their internships that their positions were unpaid and would not culminate in a guaranteed offer of paid employment.  (*Id.* ¶ 7, 37, 66-67, 112-13, 143-44, 175-76; *see also* Dkt. No. 186 ("Plaintiffs do not claim that they expected to be paid or that they were guaranteed jobs at Hearst.").)  The parties also agree that, as a matter of policy, Hearst typically required a "school credit letter" for participation in any of its magazine's

6

internship programs.  (*Id.* ¶ 231-32.)  Finally, Plaintiffs contend, and Hearst appears to concede, that internship supervisors at its magazines did not verify whether interns were ultimately awarded academic credits by their schools.  (*Id.* ¶ 238.)

## II.     Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In assessing a motion for summary judgment, the court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).  "It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"  *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (citation omitted).

### A.     The Primary Beneficiary Test

The sole question at this juncture is whether Plaintiffs were employees under the FLSA and NYLL.  Subject to exceptions not pertinent here, both the FLSA and NYLL require "employers to pay employees a specified minimum wage."  *Mark v. Gawker Media LLC*, No. 13-CV-4347, 2016 WL 1271064, at *7 (S.D.N.Y. Mar. 29, 2016) (citing 29 U.S.C. §§ 206-07 and NYLL § 652).  This minimum wage requirement, which cannot be waived, applies only to

"employees."[1] *Id.* (citation omitted). To determine whether an intern is an employee under the FLSA and NYLL, and thus entitled to compensation, courts in this Circuit must apply the "primary beneficiary test" adopted in *Glatt*. *Id.* (citing *Glatt*, 811 F.3d at 536); *see also Lucia Vlad-Berindan v. NYC Metropolitan Authority*, No. 14-CV-10304, 2016 WL 1317700, at *5 (S.D.N.Y. Apr. 1, 2016).

Under that test, "an employment relationship is not created when the tangible and intangible benefits provided to the intern are greater than the intern's contribution to the employer's operation." *Glatt*, 811 F.3d at 536. This test focuses analysis of internships on (1) "what the intern receives in exchange for his work," (2) the "economic reality" between the intern and the employer, and (3) whether the intern entered the internship "with the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment." *Lucia Vlad-Berindan*, 2016 WL 1317700, at *7 (quoting *Glatt*, 811 F.3d at 536). The Second Circuit has "articulated a set of non-exhaustive factors" to guide this inquiry. *Glatt*, 811 F.3d at 536. Those factors include:

(1) The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

(2) The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

(3) The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

(4) The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

---

[1] Both the Second Circuit and district courts applying the *Glatt* test have construed the definition of "employee" under NYLL to be "the same in substance as the definition under FLSA." *Mark*, 2016 WL 1271064, at *7 (quoting *Glatt*, 811 F.3d at 534). This Court does so as well.

 (5) The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

 (6) The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

 (7) The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Glatt*, 811 F.3d at 536-37. No single factor is dispositive in the *Glatt* analysis, *id.* at 537, and courts assess internships in light of the totality of the circumstances, *Mark*, 2016 WL 1271064, at *8. Ultimately, while "the existence and degree of each factor is a question of fact . . . whether workers are employees or interns is a question of law." *Id.* (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988) (alteration omitted)). Plaintiffs bear the burden of demonstrating that they are FLSA-protected "employees." *Id.* (citation omitted).

 **B.** **Application of the *Glatt* Factors**

In this case, the parties agree on a number of facts relevant to the primary beneficiary analysis. The Court considers the *Glatt* factors in turn.

 **1.** **Understanding Concerning Compensation and Paid Employment**

As an initial matter, the parties agree that each Plaintiff entered his or her internship understanding that the position was unpaid and did not guarantee an offer of paid employment. Plaintiffs concede that these facts support the conclusion that they were interns rather than employees. (*See* Dkt. No. 186 at 14.) There is thus no genuine dispute of material fact as to the first and seventh *Glatt* factors, which favor Hearst.

 **2.** **Training Similar to an Educational Environment**

The second *Glatt* factor concerns whether an intern received the equivalent of "hands-on" or "clinical" training during her internship. *Glatt*, 811 F.3d at 537. As courts in this District

have noted, this factor is not meant to prompt an inquiry into whether an intern's training resembled classes and coursework in an educational institution. *See, e.g.*, *Mark*, 2016 WL 1271064, at *10 (rejecting this "narrow" view of the second *Glatt* factor). Instead, the question is whether and to what extent the plaintiff received "educational and vocational benefits" through "hands-on" job experience. *Id.*

It is undisputed that each of the Plaintiffs learned practical skills from his or her internship. Leszuk learned "how to create edit credits and edit credit books," and through these tasks, "learned portions of the way the advertisement sales business is run." (Dkt. No. 187 ¶¶ 21, 23.) She also attended a short class on how to price magazine ad space and had conversations with *Marie Claire* employees about their careers. (*Id.* ¶ 25, 29.) At *Seventeen*, Rappaport gained exposure to a new field and learned about clothing pricing and representation of designers by public relations firms. (*Id.* ¶¶ 53-54.) Spencer was taught to book models and held a model casting of her own; she also learned about photo shoots and attended four hours of "Cosmo U" sessions on careers in the fashion industry. (*Id.* ¶¶ 82-91.) Wagster organized professional events, sat in on marketing meetings, and drafted expense reports. (*Id.* ¶¶ 120-125.) Wang learned to create storyboards, managed fashion accessories, prepared expense reports, and observed a photo shoot. (*Id.* ¶¶ 142-162.) Wheels conducted interviews and surveys, used LexisNexis to hone her fact-checking skills, attended sessions of "Cosmo U," and had the opportunity to write "blurbs and . . . blog posts." (*Id.* ¶¶ 182-206.) Each of these facts is undisputed. The parties agree, in other words, that all of the Plaintiffs learned at least some tangible skills in their internships, put those skills to use, and gained the intangible value of exposure to the practical realities of jobs in their respective fields.

Plaintiffs contend that they could have received more and better supervision during their internships. With slight variations, they all argue that they mastered the skills required for their positions before their internships concluded, and that the internships ought to have been more substantive. Even assuming this is true, each Plaintiff concedes that he or she engaged in the practical work of magazine production and learned about an industry in the process. While the rote nature of some of the tasks involved in these internships diminishes the import of this factor, the parties concur that each internship provided hands-on training. The second *Glatt* factor therefore weighs slightly in favor of Hearst with respect to all six Plaintiffs.

### 3. Connection to the Intern's Formal Education Program

The third *Glatt* factor—"the extent to which the internship is tied to the intern's formal education program"—also favors Hearst, though to differing degrees for each Plaintiff. *Glatt*, 811 F.3d at 537. With respect to Leszuk, Rappaport, and Spencer, the parties agree that these interns received academic credit from their educational institutions and that Leszuk and Spencer used those credits to satisfy the graduation requirements for their majors. (Dkt. No. 187 ¶¶ 10-12, 18, 34-35, 44, 64, 68-70.) Both Leszuk and Rappaport were required to keep journals about their internships; Leszuk's professor conducted a site visit at *Marie Claire*; and Rappaport and Spencer wrote academic papers on their experiences. (*Id.* ¶¶ 16-17, 47, 74.) While these Plaintiffs contend that their positions involved repetitive and unchallenging tasks, each had an internship that was closely tied to her educational program. The third *Glatt* factor thus weighs strongly in Hearst's favor for these three Plaintiffs.

The same conclusion applies to Wheels, though with less force. Wheels received academic credit for her internship, but obtained it from PCC rather than Reed, where she was enrolled. (*Id.* ¶ 182.) While this fact attenuates the relationship between Wheels' internship and

her educational program at Reed, there is no dispute that she chose to obtain credit from PCC, described the "learning objectives" of her internship to PCC, and communicated with a PCC representative at least once after her internship began. (*Id.* ¶¶ 183-85.) The fact that Wheels received academic credit from a community college rather than Reed does not mean that the internship was not tied to her educational program—after all, Wheels received credit from an academic institution in recognition of the work she did during her internship. The third factor thus weighs slightly, but not heavily, in favor of Hearst with respect to Wheels.

Wagster and Wang present a closer question, but again, this factor supports the conclusion that they were interns rather than employees. Neither Wang nor Wagster ultimately received academic credit from their educational institutions. (*Id.* ¶¶ 117-18, 151.) Both Plaintiffs, however, pitched their internships to their academic institutions, obtained approval for the internships, and provided documents to Hearst indicating that their academic institutions had approved the internships for credit. (*Id.* ¶¶ 111, 117-18, 150.) Plaintiffs argue that these facts are insufficient to tilt the third factor in Hearst's favor because the magazines did not confirm that the interns actually received academic credit after their internships concluded. This argument misconstrues the third *Glatt* factor. The fact that Wang and Wagster did not receive credit reduces the weight of the third factor in analysis of their status under the FLSA and NYLL, but it does not render this factor neutral or irrelevant. While these Plaintiffs did not obtain credit in the end, Hearst required proof of academic credit, and they both provided such proof to their internship coordinators. In this respect, their internships were tied to their educational program. The third *Glatt* factor thus weighs slightly in favor of Hearst with respect to their claims. *See Lucia Vlad-Berindan*, 2016 WL 1317700, at *8 (discussing the relevance of academic credit in the *Glatt* analysis).

### 4.     Accommodation of the Intern's Academic Commitments

The fourth *Glatt* factor examines the relationship between the internship and the academic calendar.  This factor weighs in Hearst's favor for all Plaintiffs except Wang and Wagster, for whom it is neutral.  Three Plaintiffs—Spencer, Rappaport, Wheels—interned during their summer breaks from college. (Dkt. No. 187 ¶¶ 34-35, 63-64, 173-74.)  One Plaintiff, Leszuk, interned during the spring semester of her senior year, but did not work on Fridays, when she had class, and received time off during her spring break and her school's career day.  (*Id.* ¶¶ 19-20.)  It is beyond genuine dispute that these four Plaintiffs' internships accommodated their academic schedules.

The two remaining Plaintiffs, Wang and Wagster, interned during periods when they were not in school.  Wagster worked as an intern at *Esquire* from July to December 2009, when he was not taking academic courses. (Dkt. No. 186 at 24.)  Wang interned between her graduation from Ohio State and her matriculation at the Parsons School of Design.  (*Id.* at 3, 23-24)  Plaintiffs argue that the fourth factor favors Wang because she postponed graduate school to take a position as "Head Accessories Intern."  (*Id.* at 23-34.)  But there is no dispute that Wang chose to defer her studies and was not required to do so by *Harper's Bazaar*.  (*Id.*)  The fourth factor is thus neutral with respect to Wang and Wagster because, by choice, neither had an academic schedule to accommodate.

### 5.     Limitation to the Period of Beneficial Learning

The fifth *Glatt* factor compares the duration of an internship to its beneficial value to the intern.  In assessing this factor, courts "must 'keep in mind that designing an internship is not an exact science.'"  *Mark*, 2016 WL 1271064, at *10 (quoting *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1213 (11th Cir. 2015) (adopting the *Glatt* test)).  "[T]o provide significant

weight in favor of the plaintiff, the length of the internship must be 'grossly excessive in comparison to the period of beneficial learning.'" *Id.* (quoting *Schumann*, 803 F.3d at 1214).

Here, three of the internships—those held by Spencer, Rappaport, and Wheels—lasted for the duration of a summer break from school, and one—Leszuk's—extended for a single academic semester.  As noted above, during these internships, each Plaintiff obtained practical skills and, crucially, gained exposure to the workings of an industry in which she was interested.  In light of the brief duration of these internships, no reasonable jury could conclude that Spencer, Rappaport, Wheels, and Leszuk worked well beyond the period of beneficial learning.

Analysis of the remaining Plaintiffs' internships yields the same conclusion.  While Wang and Wagster each interned for slightly longer than a summer break—in Wang's case, from August to December 2011; in Wagster's, from July to December 2009—neither internship lasted more than a few months.  (Dkt. No. 187 ¶¶ 111, 137.)  While these Plaintiffs, like the others, argue that the "beneficial learning" in their internships was minimal and quickly obtained, they do not dispute that their internships were only slightly longer than an academic semester, nor do they contest that they gained some hands-on experience and exposure to an industry of interest to them.  Given these undisputed facts, no reasonable juror could conclude that the length of these two Plaintiffs' internships was "grossly excessive" in comparison to the tangible and intangible benefits they gained.  *Schumann*, 803 F.3d at 1214.  The Court therefore concludes that there is no genuine dispute of material fact as to *Glatt* factor five, which favors Hearst.

### 6. The Extent to Which the Intern's Work Complements, Rather than Displaces, the Work of Paid Employees While Providing Educational Benefits

The sixth *Glatt* factors addresses the extent to which the plaintiff's labor complemented, rather than displaced, the work of paid employees.  This factor is concerned with whether the

intern's work was "educational rather than mere scut work that the paid employees would rather avoid." *Mark*, 2016 WL 1271064, at *11. To qualify as complementary work, an intern's labor need not be useless to an employer, and indeed, can provide considerable benefits to the employer's business. *Id.* Similarly, "there is no reason why 'complementary' work cannot . . . be work that paid employees would need to do . . . in an intern's absence." *Id.* But the sixth factor favors the plaintiff where an internship exists to pass drudge work on to unpaid laborers. Ultimately, "[t]he FLSA does not permit employers to simply replace employees with student workers and call them 'interns' to avoid paying minimum wage." *Id.*

Drawing all inferences in Plaintiffs' favor, there are features of each Plaintiff's internship that qualify as "scut work." *Id.* Leszuk entered large amounts of data into Excel spreadsheets; Rappaport delivered and retrieved clothing samples; Spencer delivered and unpacked items; Wagster deliveries copies of *Esquire* magazine; Wang folded clothing and transported samples; and Wheels compiled survey data. A reasonable jury could conclude that these tasks had little educational value and displaced the work of paid delivery and data-entry personnel. With respect to Wang and Leszuk, moreover, there is undisputed evidence that editorial staff at *Harper's Bazaar* and *Marie Claire* instructed employees to use interns rather than messengers to transport merchandise and thus to reduce overhead costs. (Dkt. No. 187 ¶¶ 219, 220.) This evidence supports the conclusion that Wang and Leszuk, to some extent, displaced the work of paid employees.

At the same time, there is also undisputed evidence that each intern did "complementary" work. Two Plaintiffs—Wagster and Wheels—testified that they needed more work, which cuts against the argument that their labor displaced drudge work that paid employees would rather avoid. (*Id.* ¶¶ 126, 204.) Rappaport assisted stylists in the *Seventeen* fashion department and

thus observed their work; Spencer had the opportunity to hold her own model casting; Wheels wrote blog posts and conducted interviews; Wang attended a photo shoot and created storyboards; and Leszuk compiled edit credit books that taught her about the sales process. Each of the Plaintiffs did at least some work that complemented the work of paid employees and imparted practical skills training, which benefited them.

Taking these undisputed facts together, and viewing them in the light most favorable to Plaintiffs, the Court concludes that a reasonable juror could find that Plaintiffs did at least some labor that displaced the work of paid employees. The sixth factor weighs slightly in each Plaintiff's favor.

### C. Totality of the Circumstances

In light of the foregoing analysis, the question is whether, given the totality of the circumstances, Plaintiffs were employees as a matter of law. The Court concludes, based on the undisputed evidence, that they were not. Most of the *Glatt* factors—specifically, the first, second, third, fifth, and seventh factors—weigh in Hearst's favor for all of the Plaintiffs. One factor—accommodation of the academic schedule—supports Hearst's argument for all Plaintiffs except Wang and Wagster, for whom it is neutral. Only the sixth *Glatt* factor favors Plaintiffs, and it does so slightly given the practical skills and experience each Plaintiff gained in his or her position. Overall, the balance of the *Glatt* factors tips decidedly toward Hearst and thus toward the conclusion that the Plaintiffs were properly classified as interns.

Ultimately, even when all inferences are construed in Plaintiffs' favor, there is no genuine dispute of material fact as to whether the Plaintiffs were employees. These interns worked at Hearst magazines for academic credit, around academic schedules if they had them, with the understanding that they would be unpaid and were not guaranteed an offer of paid

employment at the end of the internships.  They learned practical skills and gained the benefit of job references, hands-on training, and exposure to the inner workings of industries in which they had each expressed an interest.  While their internships involved varying amounts of rote work and could have been more ideally structured to maximize their educational potential, each Plaintiff benefited in tangible and intangible ways from his or her internship, and some continue to do so today as they seek jobs in fashion and publishing.  Given the totality of the undisputed evidence, no reasonable juror could conclude that the Plaintiffs were employees under governing law.  The Court therefore concludes that, under the FLSA and NYLL, Plaintiffs were interns rather than employees as a matter of law.

### III. Conclusion

For the foregoing reasons, Hearst's motion for summary judgment is GRANTED.  The Clerk of Court is directed to close the motion at docket number 180 and to close this case.

SO ORDERED.

Dated: August 24, 2016
       New York, New York

_____
J. PAUL OETKEN
United States District Judge